# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH N. GIELATTA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 05-567-GMS |
| | ) |
| ANDREA L. ROCANELLI, individually and | ) |
| in her Official capacity as Chief Counsel of the | ) |
| Office of Disciplinary Counsel for the Supreme | ) |
| Court of Delaware;  THE STATE OF | ) |
| DELAWARE, and THE OFFICE OF | ) |
| DISCIPLINARY COUNSEL FOR THE | ) |
| SUPREME COURT OF DELAWARE, | ) |
| | ) |
| Defendants. | ) |

## APPENDIX TO DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION TO DISMISS

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

Richard W. Hubbard  (I.D. #2442)
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8308

Attorney for the Defendants

Date: January 13, 2006

## TABLE OF CONTENTS

**Tab**

*Gielata v. Lugg,* C.A. No. 05-4099 (E.D.Pa. August 2, 2005) (order)   A

*Delaware Lawyers' Rules of Disciplinary Procedure*, Rule 16   B

*In the Matter of a Member of the Bar:  Joseph N. Gielata*, No. 51, 2004
    (Transcript of pre-hearing conference on August 9, 2005)   C

*Soliman v. Taylor*, 2005 WL 2429886 (D.Del.)   D

*Hamilton v. Messick*, 2005 WL 736684 (D.Del.)   E

*Hamilton v. Civigenics*, 2005 WL 418023 (D.Del.)   F

*Rules of the Supreme Court of the State of Delaware*, Rule 64   G

*Alston v. Hudson, Jones, Jaywork, Williams and Liguori*, 1999 WL 743671 (Del. Super)   H

*Pawlek v. Nix*, 1996 WL 560360 (E.D. Pa.)   I

*Frankel v. The Disciplinary Board. of the Supreme Court of Pennsylvania*,
    2005 WL 2994354 (E.D.Pa.)   J

*Thompson v. Kramer*, 1994 WL 725953 (E.D.Pa.)   K

*Delaware Lawyers' Rules of Disciplinary Procedure*, Rule 10   L

*Pawlek v. Pennsylvania Board of Law Examiners*, 1995 WL 517646 (E.D.Pa.)   M

# TAB A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH GIELATA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SEAN LUGG, | : | |
| THE STATE OF DELAWARE, | : | |
| ANDREA ROCANELLI, and | : | |
| THE OFFICE OF DISCIPLINARY | : | |
| COUNSEL FOR THE SUPREME COURT | : | NO. 05-CV-4099 |
| OF DELAWARE | : | |

## ORDER

AND NOW, this 2nd day of August, 2005, it appearing that:

A.  This court lacks jurisdiction to enjoin a state court criminal prosecution. See Younger v. Harris, 401 U.S. 36 (1971); 28 U.S.C. § 2283.

B.  A prosecutor has absolute immunity from claims under 42 U.S.C. § 1983 for seeking an indictment. See Malley v. Briggs, 475 U.S. 335, 343 (1986). Under state law, the Deputy Attorney General has absolute immunity "from all civil claims or causes of action founded upon an act or omission arising out of the performance of an official duty..." Del. Code Ann. tit. 10, § 4001 (2005).

C.  The State of Delaware is immune from civil suits by its own citizens under the Eleventh Amendment to the Constitution of the United States unless consent to be sued is "unequivocally expressed." Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99 (1984). The State of Delaware has not expressed its consent to be sued under this cause of action.

D.  A federal district court has jurisdiction under 28 U.S.C. § 1343 over claims of federal civil rights violations in a state bar disciplinary hearing because such a hearing is not a "state proceeding" under 28 U.S.C. § 2283. See Taylor v. Kentucky State Bar Ass'n, 424 F.2d 478, 482 (6th Cir. 1970).

E.  It is probable that proper venue for this cause of action lies in the District of Delaware, where it could have been brought. Even if venue lies in the Eastern District of Pennsylvania, most of the parties and witnesses relating to

this action are located in Delaware.  Transfer to the District
of Delaware will therefore serve the convenience of the
parties and witnesses.

It is **ORDERED** that:

1.  Defendants Sean Lugg and The State of Delaware are
**DISMISSED** for lack of jurisdiction.

2.  This action shall be **TRANSFERRED FORTHWITH** to the United
States District Court for the District of Delaware under 28
U.S.C. 1404(a).

Norma L. Shapiro, S.J.

# TAB B

212

disciplinary and
iot be expanded
proceedings for

ns for reinstate-
status shall be

ing discipline or
rden of proof in
inactive status

he discretion of
be held for the
icedural issues,
the hearing, or
r of the Hearing

fficial record of
he respondent's

minal, or other
it in a disciplin-
ippropriate and
ich action.

neglect of the
settlement, nor
r restitution by
icessing of any
er shall not be
ie disposition of

in these Rules,
to observe pre-
tor but does not
n or proceeding.
plinary matters
el, or the Board
y the Court of a
le 64(d) for the
ter. Complaints
the Board. The
rt of a special

sconduct under
ally criminal in
be effective or
Court for good
are commonly

213                 II. PROCEDURE                 Rule 16

## COMMITTEE COMMENT

This Rule is substantially equivalent to the former rule, which outlined various additional procedures, and which referred to the Superior Court Rules of Civil Procedure to cover areas not specifically addressed herein. There have been some minor revisions for the purpose of clarification and consistency. Rule 15(k) is new, and is intended to conform to actual practice as it has evolved in the last two decades.

---

**Intent of rule.** — This rule is intended to provide a procedure for the filing of a Petition to Discipline against a member of the Board on Professional Responsibility based upon an alleged violation of the Delaware Lawyers' Rules of Professional Conduct; it was not intended as a means by which a person could file a complaint in the Supreme Court against members of the Board when he is dissatisfied with the decision of the Disciplinary Counsel or the Preliminary Review Committee or a decision by the Board on the merits when a petition to discipline has been filed. In re Connolly, 510 A.2d 484 (Del. 1986).

**Board on Profession Responsibility entitled to extensively examine witnesses.** — Where an attorney asserted that the Board on Professional Responsibility's extensive questioning of witnesses exceeded the proper scope of permissive questioning and deprived the attorney of the attorney's right to a full adversary hearing, there was no legal support for the attorney's position, as disciplinary proceedings were sui generis, under Del. Law. R. Disc. P. 15(a), and were only governed by the Delaware Superior Court Rules of Civil Procedure to the extent practicable, under Del. Law. R. Disc. P. 15(b); it was the Board's responsibility to test the stipulation of the parties and to satisfy itself that the record supported the stipulation. In re Bailey, 821 A.2d 851 (Del. 2003).

## Rule 16. Interim suspension.

(a) *Transmittal of evidence.* Upon receipt of sufficient evidence demonstrating that a lawyer subject to the disciplinary jurisdiction of the Court (i) has been charged with or convicted of a felony, (ii) has been charged with or convicted of other criminal conduct which demonstrates that the lawyer poses a significant threat of substantial harm to the public or to the orderly administration of justice, or (iii) has otherwise engaged in professional misconduct which demonstrates that the lawyer poses a significant threat of substantial harm to the public or to the orderly administration of justice, the ODC shall transmit such evidence to the Court together with a petition and proposed order for the lawyer's immediate interim suspension pending the disposition of disciplinary proceedings as otherwise described in these Rules. The ODC shall also take all appropriate steps to process the matter through the disciplinary system as otherwise described in these Rules. The ODC's filing of a petition for interim suspension, and all subsequent proceedings, shall be confidential unless otherwise ordered by the Court.

(b) *Certificate of conviction conclusive.* A certified copy of a judgment of conviction of an attorney for any crime shall be prima facie evidence of the commission of that crime in any disciplinary proceeding instituted against the attorney based upon the conviction.

(c) *Petition for interim suspension.* The ODC's petition for interim suspension shall set forth a plain and concise statement of the grounds, shall be verified by the member of the ODC signing the petition, or otherwise supported by an affidavit, and shall be filed with the Court and served upon the respondent.

(d) *Hearing before the Court.* The Court shall promptly schedule a hearing on the petition for interim suspension, with notice to the ODC and the respondent. The notice of hearing shall state that the respondent is entitled to

be represented by a lawyer at the respondent's expense, to cross-examine witnesses; and to present evidence. At the request of the respondent, the Clerk of the Court shall compel by subpoena for any such hearing the attendance of witnesses and the production of pertinent records, books, papers, and documents. The ODC may exercise its subpoena powers as otherwise described in these Rules for purposes of the proceedings described in this Rule.

(e) *Standard and burden of proof.* The standard of proof in proceedings under this Rule shall be that the misconduct or charges are supported by clear and convincing evidence. The burden of proof in such proceedings shall be upon the ODC.

(f) *Disposition by the Court.* Following the hearing, the Court may enter an order suspending the respondent from the practice of law on an interim basis pending the disposition of disciplinary proceedings as otherwise described in these Rules, or may enter such orders as it deems necessary to protect the interests of the public and the orderly administration of justice, including but not limited to orders restricting the respondent's right to practice pending the ultimate disposition of disciplinary proceedings.

(g) *Publicity.* If the Court issues an order that suspends or otherwise restricts the respondent's authority to practice law, such order shall be public, and shall be disseminated as otherwise described in these Rules, unless otherwise ordered by the Court. If the Court issues an order which dismisses the petition, such order shall remain confidential unless otherwise ordered by the Court.

(h) *Appointment of receiver.* In the event that the Supreme Court enters an order suspending the respondent from the practice of law on an interim basis, the Supreme Court may direct that proceedings be instituted by the ODC for the appointment of a receiver of the respondent's law practice by the Court of Chancery pursuant to Rule 24.

(i) *Cooperation and compliance by respondent.* Any lawyer suspended under this Rule shall comply with the notice and other requirements for suspensions set forth in these Rules, and with any other conditions set forth in the Court's disposition of the matter. A lawyer not suspended by the Court under this Rule but whose law practice or conduct is restricted by the Court shall take all appropriate steps to comply fully with the Court's orders.

(j) *Reinstatement upon dismissal of charges or reversal of conviction.* If a lawyer suspended on an interim basis under these Rules later demonstrates to the Court that the criminal charges have been dismissed or the underlying conviction has been reversed or vacated, the order for interim suspension may be vacated by the Court upon motion, and the lawyer reinstated to practice. The vacating of the interim suspension shall not automatically terminate any other disciplinary proceedings currently pending involving the lawyer with the ODC, the PRC, or the Board, the disposition of which shall be determined on the basis of the available evidence.

(k) *Duty to report.* Any lawyer subject to the disciplinary jurisdiction of the Court who is charged with or convicted of a felony, whether within or outside of this State, shall within 10 days of such charge or conviction report the matter to the ODC.

cross-examine
lent, the Clerk
attendance of
ers, and docu-
se described in
ule.

n proceedings
ported by clear
s shall be upon

: may enter an
n interim basis
se described in
to protect the
, including but
ce pending the

: or otherwise
shall be public,
Rules, unless
hich dismisses
rise ordered by

'ourt enters an
. interim basis,
by the Board or
by the Court of

spended under
or suspensions
n in the Court's
nder this Rule
shall take all

:onviction. If a
emonstrates to
che underlying
uspension may
:ed to practice.
terminate any
awyer with the
determined on

isdiction of the
thin or outside
ion report the

## COMMITTEE COMMENT

Rule 16 has been substantially revised and clarified, although the procedures described therein are similar to the procedures found in the former rules relating to these procedures. Interim suspension proceedings are generally initiated as a result of evidence of very serious misconduct, which includes being charged with criminal conduct. The types of conduct justifying the utilization of the procedures in this rule are primarily felonious criminal conduct, criminal activity containing an element of moral turpitude, or criminal conduct involving interference with the administration of justice, dishonesty, bribery, extortion, misappropriation, conspiracy, or the like. In addition, the Rule may be utilized for non-criminal conduct that is serious enough to pose a significant threat of substantial harm to the public or to the orderly administration of justice. Rule 16(k) clarifies a lawyer's duty to report charges of felonious criminal activity to the Delaware disciplinary authority.

## Rule 17. Conditional admissions and discipline by consent.

(a) *Conditional admission and proposed sanction.* A lawyer against whom a petition for discipline has been filed may offer to the Board a conditional admission to the petition or to a particular count or counts thereof in exchange for a specific disciplinary sanction, provided that the ODC agrees in writing to the conditional admission and proposed disciplinary sanction.

(b) *Affidavit of consent.* A conditional admission offered to the Board shall be accompanied by the respondent's proposed affidavit setting forth the following:

(1) A description of the specific factual allegations and the particular count or counts of the petition for discipline which are being conditionally admitted, and

(2) A statement that the respondent desires to consent to the imposition of the proposed sanction, that such consent is freely and voluntarily given and is not the subject of coercion or duress, and that the respondent is fully aware of the implications of submitting such consent.

(c) *Consideration by the Board.* Upon the offer to the Board of a conditional admission as described herein, the Board shall hold a hearing on the matter to determine the respondent's reasons for the proffered conditional admission and the agreement by the ODC. If the Board is satisfied that the conditional admission and the proposed sanction are appropriate, the Board shall issue a report with recommendations to the Court as described in Rule 9(d). If the Board is not satisfied with either the conditional admission or the proposed sanction, the Board shall inform the ODC and the respondent of its determination and reasons.

(d) *Rights of respondent.* If the Board rejects a proposed conditional admission, or if after the Board approves a proposed conditional admission, it is rejected by the Court upon review under Rule 9(e), the admissions made in the prior proceedings shall not be used against the respondent in the pending or any subsequently filed proceedings.

(e) *Disbarment by consent.* Where the respondent has admitted engaging in misconduct that is serious enough to warrant disbarment as a final disposition, the respondent and the ODC may submit at any stage of the disciplinary proceedings described in these Rules a written stipulation of disbarment by consent directly to the Court requesting that the Court enter an order of disbarment as soon as possible. Any such stipulation shall contain a detailed description of the misconduct in which the respondent admittedly engaged, an analysis of legal precedent for the imposition of such a sanction, a signed affidavit of consent from the respondent in the form described in subsection (b) of this Rule, and any other supplementary materials which may be appropriate

# TAB C Sealed

# TAB D

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Saad M. SOLIMAN, Plaintiff,
v.
Stanley TAYLOR, Paul Howard, Thomas Carroll,
Lawrence McGuigan, James Lupinetti, David E.
Pierce, Jr., Joseph B. Richardson, Ronald
Hosterman, and State of Delaware Department of
Correction, Defendants.
**No. Civ.A. 04-1378(GMS).**

Sept. 30, 2005.

Herbert G. Feuerhake, Law Office of Herbert G.
Feuerhake, Jeffrey K. Martin, Margolis Edelstein,
Wilmington, DE, for Plaintiff.
Aaron R. Goldstein, Department of Justice,
Wilmington, DE, for Defendants.

MEMORANDUM

**SLEET**, J.

I. INTRODUCTION

**\*1** Saad M. Soliman ("Soliman") is presently
incarcerated at the Delaware Correctional Center
(the "DCC"), which is located in Smyrna,
Delaware. On October 21, 2004, Soliman filed this
civil rights action pursuant to 42 U.S.C. §§ 1983
and 1985. The complaint alleges that Commissioner
of Correction Stanley Taylor ("Taylor"), Bureau
Chief Paul Howard ("Howard"), Warden Thomas
Carroll ("Carroll"), Deputy Warden Lawrence
McGuigan ("McGuigan"), Internal Affairs Director
James Lupinetti ("Lupinetti"), Lieutenant David E.
Pierce, Jr. ("Pierce"), Internal Affairs investigator
Joseph B. Richardson ("Richardson"), drug
counseling Treatment Administrator Ronald
Hosterman ("Hosterman") (collectively, the "
individual defendants"), the State of Delaware

Department of Correction (the "DOC"), and certain
unknown individual employees of the DOC
violated, and conspired to violate, Soliman's
constitutional rights. Soliman is seeking both
compensatory and punitive damages from the
defendants, as well as injunctive relief.

Presently before the court are: (1) the DOC's
Motion to Dismiss/Summary Judgment Pursuant to
Federal Rules of Civil Procedure 12(b)(1), 12(b)(6)
and 56(c) (D.I.23); and (2) the individual state
defendants' Motion to Dismiss/Summary Judgment
Pursuant to Federal Rules of Civil Procedure
12(b)(6) and 56(c) (D.I.25). For the following
reasons, the court will grant the DOC's motion and
deny the individual defendants' motion.

II. BACKGROUND

The following facts are taken from the allegations
set forth in Soliman's amended complaint. (D.I.31.)
FN1 FN2

> FN1. Soliman filed an amended complaint
> (D.I.31), in accordance with the local rules
> for the District of Delaware on February 8,
> 2005. The court will construe the amended
> complaint as a motion seeking leave to
> amend and grant the motion, as it is not
> opposed by any of the defendants. Also
> supporting the court's decision is the fact
> that the defendants' Joint Reply Brief in
> Support of Its Motion to Dismiss/Summary
> Judgment (D.I.34) addresses the amended
> complaint.

> FN2. For purposes of the Motion to
> dismiss only, the defendants have adopted
> the factual allegations set forth in the
> complaint, as well as the affidavits filed in
> support of the motions to dismiss. (D.I. 34,
> at 3.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 2

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

### A. Soliman in Prison Prior to Filing a Petition for Commutation of Sentence

On December 26, 1995, Soliman became an inmate at the DCC, after being arrested and charged with criminal conduct stemming from a robbery. On August 16, 1996, the Delaware Superior Court sentenced Soliman to a fifteen year, Level 5 prison sentence, following his guilty plea to manslaughter, first degree robbery, and possession of a firearm during the commission of a felony. (D.I. 31 ¶¶ 22-23.) In the early stages of his incarceration, Soliman was written up several times for insubordination. (*Id.* ¶ 25.) However, in his later years at the DCC, Soliman developed into a "model inmate," having achieved extraordinary accomplishments and having undergone extensive rehabilitation. (*Id.* ¶ 26.) While incarcerated, Soliman acquired his G.E.D. and earned an Associate Degree in computer science. (*Id.* ¶ 27.) Soliman also was working toward receiving a Bachelor of Science degree in the field of business management technology. (*Id.*)

In addition to his educational achievements, Soliman underwent extensive personal rehabilitation while incarcerated. (*Id.* ¶ 29.) During his nine years of incarceration, Soliman completed nineteen rehabilitation programs, including a character development program, a frustration ventilation program, two alternatives to violence programs, and a pre-release program. (*Id.*) Soliman also was certified as a Laubach tutor, assisting more than twenty-five inmates in receiving their G.E.D. (*Id.* ¶ 30.) Additionally, he served as a peer mediator, a certified AIDS Awareness instructor and a facilitator in the Victim Identification Program. (*Id.* ¶ 30-31.)

**\*2** As a result of his merit as an inmate, his educational accomplishments, and his strides toward self-improvement, personal growth and rehabilitation, Soliman was assigned to an off-site job, where he participated in computer-aided design, working with civilian workers for the Delaware Department of Transportation. (*Id.* ¶ 28, 32.) Soliman was also housed in the lowest possible security level at the DCC and was recommended, by Warden Thomas Carroll, for acceptance into the

Delancey Street Foundation Program, an expedited rehabilitation program in New York for inmates who have done exceptionally well during their time in prison. (*Id.* ¶ 32 .) The Delancey Street Foundation Program would have reduced Soliman's sentence status to "conditional release." (*Id.* ¶ 32.)

Having reached extraordinary educational and rehabilitative goals, and believing that he could be released from prison early, Soliman had his defense attorney prepare and file a Petition for Commutation of Sentence (the "Petition") on or about April 7, 2004. (*Id.* ¶ 34.) Prior to filing the Petition, Soliman was well-respected by fellow inmates and correctional officers. (*Id.* ¶ 36; *see also id.* at Ex A.) According to Soliman, however, filing the Petition sparked a downward spiral of events, beginning with his request for letters of recommendation to attach to the Petition. (*Id.* ¶¶ 37-39.)

### B. Events Occurring After Soliman Filed the Petition

#### 1. Actions Taken Directly by Hosterman and Indirectly by the Remaining Individual Defendants

After Soliman filed the Petition, Hosterman, a Treatment Administrator who directed counseling services provided to inmates, refused to write an " important" letter of recommendation for the Petition. (*Id.* ¶ 38.) Hosterman also directed the other counselors at the DCC to refuse to write recommendation letters for Soliman. (*Id.* ¶ 39.) Soliman alleges that Hosterman's actions were racially and religiously motivated, as Hosterman is Caucasian and Jewish, while Soliman is Middle Eastern and Muslim. (*Id.*) Soliman also alleges that Hosterman made racially-insensitive remarks, telling other counselors that Soliman would " become an Al Qaeda terrorist" if released from prison. (*Id.*)

Soliman next alleges that, after filing the Petition, Hosterman banned Muslim families from bringing traditional Middle Eastern meals into the DCC during the celebration of Muslim holidays, while at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 3

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

the same time granting the privilege to Jewish families during the celebration of Jewish holidays. That is, prior to filing the Petition, family members of Muslim and Jewish inmates were allowed to bring traditional meals from home to eat with the inmates during holidays. (*Id.* ¶ 40.) However, after filing the Petition, only Jewish family members were permitted to bring outside food into the DCC. (*Id.*) These celebrations were under Hosterman's control. (*Id.* ¶¶ 41-42.)

On or about April 28, 2004, Troy Stevens ("Stevens "), an inmate at the DCC, was charged with possessing cocaine in his cell and, although Soliman had no involvement in the incident, he was directed by correction officers to sign an affidavit making statements against Stevens that he knew were not true. (*Id.* ¶ 43.) Specifically, an Internal Affairs investigator stated to Soliman, "So you scum inmates want to concoct lies about our [correctional officers], huh? Well, let's see if we can't make our own." (*Id.*) Soliman, however, refused to sign the affidavit in spite of the demands that the Internal Affairs investigator made. (*Id.* ¶ 44.) Shortly after this refusal, Soliman's off-site job privileges were revoked at Hosterman's direction. (*Id.* ¶ 45.) According to Soliman, these actions were taken both because of his race and/or religion, and because he had refused to sign the affidavit. (*Id.* ¶ 46.) Not long after the entire incident, Soliman was warned by a correctional officer to "watch his back" because certain DCC employees were "out to get" him because of his race, religion and/or exercise of free speech. (*Id.* ¶ 48.) In addition to Hosterman, Soliman contends that Taylor, Howard, Carroll, McGuigan, Lupinetti, Pierce, Richardson, and the DOC are responsible because they were the moving force behind Hosterman's actions and/or, with deliberate difference, instructed him to perform the actions. (*Id.* ¶ 48.)


### 2. Actions Taken Directly by Richardson and Indirectly by the Remaining Individual Defendants

**\*3** On May 9, 2004, Correctional Officer Keith Lovett ("Lovett") intercepted a package from Bruce Duncan ("Duncan"), an inmate leaving the infirmary. (*Id.* ¶ 49.) According to Lovett and

Richardson, the package was sent by Sandra Patterson ("Patterson"), a registered nurse in the infirmary, and intended for Soliman, although his name did not appear on the package. (*Id.*) Lovett and Richardson assumed that the package contained contraband, based on its contents which, according to them, included a letter addressed to "Papi," photographs of Soliman's tattoos, three scarves, nine four-ounce bottles of "Muslim oil," fifty empty small containers "for repackaging and resale of the Muslim oil," photographs of Patterson's three children, Ambien (a sleeping pill), and Zyrtec (an allergy medication). (*Id.* at 50 (describing the incident report)). According to Soliman, the item to which the report referred to as "Muslim oil" was a bottle of cologne but, because Lovett and Richardson believed that the package was intended for Soliman, a practicing Muslim, the cologne was labeled as "Muslim oil" in the report. (*Id.* ¶ 51.)

On or about May 11, 2004, Richardson interrogated Duncan and Patterson. Duncan admitted ownership of the cologne, empty containers and scarves, and Patterson made admissions with respect to the remaining items in the package, violations for which she was terminated. (*Id.* ¶ 52.) Richardson, however, reported that it was his "belief" that the items were intended for Soliman to use in an attempt to escape. (*Id.*) Based on his belief, which Soliman alleges was rooted in racism and religious stereotypes, Richardson charged Soliman with escape and attempt to escape, possession of dangerous contraband, bartering, creating a health safety or fire hazard, failing to obey an order, and possession of non-dangerous contraband. (*Id.* ¶ 53.) Soliman, however, was never in possession of, nor did he solicit, the package or any of its contents. (*Id.* ¶ 54.)

On or about May 12, 2004, at approximately 9:30 p.m., Soliman was talking on the telephone to a member of his family when six or seven correctional officers approached him, handcuffed him and took him to the prison's visitation room, where Richardson was waiting. (*Id.* ¶ 55.) One of the officers remained in the room with Soliman and Richardson, who handcuffed Soliman's hands behind his back and shackled his legs to the chair in which he was sitting. (*Id.* ¶ 55-56.) Richardson

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

then told Soliman to " 'tell [him] what's going on and nothing bad will happen.' " (*Id.* ¶ 56.) Soliman informed Richardson that he did not know what Richardson was talking about. (*Id.*) Richardson responded by directing racially-insensitive remarks toward Soliman, calling him a "Muslim ringleader," "member of the Al Qaeda," "full blown terrorist," "rag head," "sand nigger," "camel lover" and other slurs. (*Id.* ¶ 57.) Richardson then offered Soliman a cup of coffee, which he refused, irritating Richardson, who then began to fire rapid questions at him regarding whether he had impregnated a correctional officer, whether he was involved with a prison doctor, whether or not he was the ringleader in the Stevens incident, and what his role was in the contraband package incident. (*Id.* ¶ 58.) Soliman responded with either "I don't know" or "no," and asked for an attorney, but Richardson denied the request because there were no charges filed against him at that time. (*Id.*)

*4 After Richardson asked his questions, and in the presence of the correctional officer, he punched Soliman in the right side of his rib cage so hard that it took Soliman's breath away. (*Id.* ¶ 59 .) Richardson, without provocation, repeatedly struck Soliman, who was defenseless, handcuffed and shackled to the chair. (*Id.*) Richardson also threatened to file a long list of charges against Soliman if he did not cooperate. (*Id.* ¶ 60.) Soliman asked Richardson to remove his handcuffs and return him to his cell, telling Richardson that "if [he was] half a man, [he] would not have stolen a cheap shot at a defenseless man." (*Id.*) Richardson then left the room, but re-entered a moment later carrying a large telephone book. (*Id.* ¶ 61.) Soliman told Richardson "if he was trying to scare him, it was not going to work." (*Id.*) As Soliman was speaking, Richardson swung the telephone book and struck him in the back of the head and neck so hard that he was knocked unconscious. (*Id.* ¶ 62.)

When he regained consciousness, Soliman was in a cell with four concrete walls, a plastic/vinyl mat on the floor, a steel toilet, a sink and a big caged fluorescent light. (*Id.* ¶ 64.) He was nearly naked, lying only in his socks, a t-shirt and his boxers,

unaware of how, when, or why his clothing was removed. (*Id.*) The air conditioning was set at 50 degrees, and there were fifteen four inch by four inch vents blowing cold air on him. (*Id.*) According to his watch, it was approximately six hours after Richardson had knocked him unconscious. (*Id.*) He attempted to get up to wash his face and immediately felt excruciating pain in his ribs, neck, head and back, making it "nearly impossible" for him to move. (*Id.* ¶ 66.) He requested, but was denied medical treatment for the injuries that he sustained during the beating. (*Id.* ¶ 69.)

At approximately 5:00 a.m., a correctional officer served him breakfast. After asking the correctional officer where he was and how he go there, he was told that he was in SHU Building 18, C-Tier Lower 3, which he realized was "the hole." (*Id.* ¶ 67.) Prior to the events that took place on May 12, 2004, Soliman was housed in the lowest security status at the DCC, and was permitted to leave the prison for his job assignment. (*Id.* ¶ 68.)

While in "the hole," Soliman requested grievance forms and a pen so that he could file grievances regarding his "beating, his lack of medical care, and his being placed in '[t]he Hole." ' (*Id.* ¶ 70.) He never received the items he requested, however, because Sgt. Thomas and other correctional officers told him that he was not permitted to have the items while he was in "the Hole," and could not file a grievance until he was finished serving his "Hole Time." (*Id.*)

On or about May 14, 2004, Lovett and Richardson issued as Disciplinary Report charging Soliman with escape, attempted escape, possession of dangerous contraband, creating a health, safety or fire hazard, failing to obey an order and possession of non-dangerous contraband. (*Id.* ¶ 72.) The report stated that Soliman intended to use the sleeping pills found in the package to drug the officers at his off-site job, obtain an officer's clothing and escape using an officer's vehicle. (*Id.*; Ex. B.) The report was approved by Pierce, and " Approved as Directed" by Major David Holman. ( *Id.*) According to Soliman, he was removed from his off-site job the first week of May 2004, before the package was confiscated, thereby refuting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

Richardson's charge because he no longer held the position from which he was charged with attempting to escape. (*Id.* ¶ 74.)

*5 In addition, while Soliman was still in "the hole," Richardson instructed other correctional officers to go through Soliman's cell and write him up for technical violations, including a small bowl of pretzels found "not in their original container," and having "too many clean t-shirts" in his cell. (*Id.* ¶ 76.)

Regarding his time in "the hole," Soliman alleges the following: (1) he was allowed to shower and brush his teeth only three times per week; (2) he was so cold that he could barely sleep because the temperature in his cell ranged from 50-60 degrees, with constant cold air being blown into the cell and him being "nearly naked with nothing to keep him warm except his socks, t-shirt and boxers"; (3) he was given very little food on a plastic tray for meals, which was removed in several minutes, despite the fact that he was still eating; and (4) he was denied visitors, phone calls, and basic privileges. (*Id.* ¶¶ 78-80.) Soliman was allowed one visit from his defense attorney, Joseph Hurley, Esq. ("Hurley"), on or about May 19 or May 20, 2004. According to Soliman, Hurley observed that he was covered in bruises. (*Id.* ¶ 81.)

On or about May 28, 2004, Soliman, while still in "the hole" was reclassified to SHU, the maximum security level at the DCC. (*Id.* ¶ 82.)

On June 4, 2004, twenty-two days after he was placed in "the hole," Soliman was given a hearing on the charges that Richardson had filed against him. (*Id.* ¶ 83.) According to Soliman, there is a policy that inmates in "the hole" must have a hearing within fifteen days maximum. (*Id.*) Soliman believes that his hearing was delayed in order to allow his visible bruises to heal. (*Id.*) Officer Larry Savage ("Savage") conducted Soliman's hearing, which Richardson did not attend, and found that Soliman was not guilty of any of the charges that Richardson had filed against him. (*Id.* ¶ 85; *see also id.* at Ex. C.) Following the disciplinary hearing, Savage told Soliman, "on the record," that the charges against him were "beginning to appear

like a personal Crusade," and "he's [Richardson's] after you ... be careful son." (*Id.* ¶ 86.) Soliman asserts that Richardson was "out to get" him because of his race, religion and exercise of free speech. (*Id.* ¶ 87.)

After he was found " 'not guilty' " of all charges, Soliman wrote to the classification personnel, explaining that he was found not guilty and requesting to be returned to the minimum-security status he had earned prior to the May 9, 2004 incident. (*Id.* ¶ 88.) Soliman alleges that he made the request "immediately" because he knew that it was "critically important" to his upcoming hearing on the Petition, scheduled for June 17, 2004. (*Id.*) His request, however, was ignored. (*Id.* ¶ 89.) Soliman contends that the individual defendants were the moving force behind the decision to ignore his request and/or exhibited deliberate indifference by instructing, fostering, encouraging and/or condoning that his request be ignored. (*Id.* ¶ 90.)

*6 Following his hearing, Soliman also sent a letter to Richardson, inquiring when his personal property that was taken from his cell would be returned. (*Id.* ¶ 91.) On June 14, 2004, Richardson visited Soliman, carrying a tape recorder, and opened the conversation by reading Soliman his Miranda rights and asking him if he understood those rights. (*Id.*) Soliman responded in the affirmative and asked Richardson if he was pressing charges against him. (*Id.*) After indicating that he was pressing charges, and in response to a question from Soliman, Richard stated that he would be filing "a number of charges but we won't get into all that now." (*Id.*) Soliman requested an attorney and Richardson turned off the tape recorder and left the room. (*Id.*)

According to Soliman, he had to request a postponement of his June 17, 2004 Petition hearing due to Richardson's efforts to prevent him from being restored to minimum-security status, write-ups for insignificant infractions, and the removal from his off-site job. (*Id.* ¶ 92.)

On or about June 18, 2004, Richardson contacted Soliman's sister by telephone and attempted to extort information from her by threatening to file criminal charges against Soliman if she continued to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 6

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

"insult his intelligence." (*Id.* ¶ 93.) Richardson also made a racially and/or religiously insensitive comment to Soliman's sister, telling her "I know your kind." (*Id* .) Soliman contends that Richardson's comments were based on his animus toward people of Middle Eastern descent and Muslims. (*Id.*)

On September 8, 2003, Ms. Deborah Wilson, a close friend of Soliman and his family, wrote a letter to Warden Carroll asking him to conduct an investigation into Richardson's conduct and Soliman's classification. (*Id.* ¶ 94.) As of the date of the filing of the amended complaint, Carroll had neither responded to the letter nor opened an investigation. (*Id.*)

On or about September 20, 2004, Soliman was moved from SHU to MHU and reclassified from Quality of Life Level II to Quality of Live Level III. (*Id.* ¶ 95.) Soliman's new unit is a combination of SHU and MHU. However, Soliman contends that it is still far from his original minimum-security classification, which he held prior to May 9, 2004. (*Id.*) Soliman believes that he has not been returned to his minimum-security status because Richardson " has kept him in 'pending investigation' status" since May 9, 2004, even though he was found not guilty of all pending charges on June 4, 2004. (*Id.* ¶ 96.)

In addition to Richardson, Soliman contends that Taylor, Howard, Carroll, McGuigan, Lupinetti, Pierce, Hosterman, and the DOC are responsible because they were the moving force behind Richardson's actions and/or, with deliberate difference, instructed him to perform the actions. (*Id.* ¶¶ 94, 97.) Further, Soliman alleges that the individual defendants are responsible for their inaction-that is, they knew about Richardson's actions and failed to investigate them. (*Id.*) They also failed to restore Soliman to his original minimum-security status, even though he had been found not guilty of all criminal charges lodged against him. (*Id.*) Soliman asserts that these failures demonstrate that the individual defendants condoned and encouraged Richardson's behavior, and their inaction is based upon Soliman's race, religion and/or exercise of free speech. (*Id.*)

### 3. Other Actions Taken by the Individual Defendants

**\*7** According to the amended complaint, in early October 2004, Soliman requested to increase his commissary fund, from his own personal funds, from $15.00 per week to $100.00 per week in order to purchase food and supplies necessary for Ramadan, a month-long period of prayer and Islam's holiest period of the year. (*Id.* ¶ 98.) During Ramadan, Muslims can only eat before dawn and after sundown. (*Id.*) Soliman requested special accommodations for Ramadan, asking that his meals be served before sunrise. The individual defendants denied his request. (*Id.* ¶ 99.) As a result, Soliman had to chose between violating the tenets of his religion or not eating. (*Id.*) Because his requests were denied, and in an attempt to resolve the issue, Soliman's attorney sent a letter repeating these requests to Deputy Attorney General Richard Hubbard on October 13, 2004. (*Id.*) The requests were again denied. (*Id.*) Soliman alleges that the individual defendants were the moving force behind the denial of his religious rights and/or, with deliberate difference, instructed or encouraged individuals to deny his religious rights. (*Id.* ¶ 101.) In the alternative, Soliman claims that the individual defendants knew that he was being denied his religious rights and chose to permit the denial. (*Id.*)

Soliman further alleges that since he filed the Petition, the defendants have engaged in numerous acts of retaliation, racial and religious discrimination against him, as well as administering physical beatings and placing him in isolation. With respect to these claims, Soliman alleges the following: (1) he has been denied food and medical attention, as well as basic civil rights and human dignity; (2) he has lost fifty pounds since May 12, 2004; (3) he has been denied the right to bathe and brush his teeth daily; (4) his personal property was taken from his cell and not returned; (5) he lost his off-site job without explanation or warning; (6) his visitation and telephone privileges were reduced without justification or explanation; and (7) he was forced to spend almost a month in isolation for a crime he did not commit or even attempt to commit, a crime of which he was later found "not guilty." (*Id* . ¶ 102.) Soliman has spent his nine years of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

incarceration studying, reading, rehabilitating himself and preparing himself to "become a valuable member of society upon his release." (*Id.* ¶ 103.) His expected release date has come and gone, and any prospect of an early release seems unattainable, given Richardson's alleged statement that Soliman will "never see the light of day." (*Id.*)

With respect to all of the allegations contained in the amended complaint, Soliman asserts that Taylor, Howard, Carroll, McGuigan, Lupinetti, Pierce, Richardson, Hosterman, and/or DOC "were or are the moving force behind the violations of [his] civil rights and/or fostered, encouraged, and condoned such actions, and/or knew that the violations occurred or were occurring and affirmatively chose to permit the violations to occur. All of th[e][d]efendants participated in and/or had knowledge of the actions taken against Soliman by virtue of their positions work for DOC and/or DCC. " (*Id.* ¶ 104.)

### III. STANDARD OF REVIEW

#### A. Rule 12(b)(1)

**\*8** A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). The present motion makes a facial challenge to the complaint because the defendants' arguments are based solely upon the application of legal principles to the facts as alleged in the complaint. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiffs' favor. *See id.*

#### B. Rule 12(b)(6)

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993).

Thus, in deciding a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. " *Colburn v. Upper Darby Twp.,* 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus, in order to prevail, a moving party must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley,* 355 U.S. at 45-46.

It should be noted that the court is not relying on matters outside the pleadings to decide this motion. Thus, it is not proper to convert the motion from a motion to dismiss into one for summary judgment. *See* Fed.R.Civ.P. 12(b) (If, in a motion to dismiss for failure to state a claim, "matters outside the pleading are presented to *and not excluded by the court,* the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 ....") (emphasis added). Additionally, the court will use the motion to dismiss standard to address Soliman's claims because "it would be inappropriate to convert the [defendants'] motion[s] to dismiss into motion[s] for summary judgment pursuant to Fed.R.Civ.P. 12(b), since there has been no discovery conducted in the present case." *Brug v. The Enstar Group, Inc.,* 755 F.Supp. 1247, 1251 (D.Del.1991); *see Melo v. Hafer,* 912 F.2d 628, 634 (3d Cir.1990); *Ospina v. Dep't of Corr.,* 749 F.Supp. 572, 574 (D.Del.1990). The court, therefore, will review only Soliman's amended complaint in making its ruling.

### IV. DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

### A. Soliman's Claims Against the DOC

*9 The DOC has moved to dismiss Soliman's claims against it, contending that it is not a "person" within the meaning of 42 U.S.C. §§ 1983 and 1985. The DOC further contends that controlling case law supports its position that it is an "arm of the state" or agency of the state. [FN3] Finally, the DOC contends that Soliman has recognized that the DOC is an agency of the state of Delaware, as his complaint specifically states that "[d]efendant, State of Delaware Department of Correction, is a division of the State of Delaware...." (D.I. 24, at 8 n. 3).

> FN3. *See* D.I. 34, at 4-5 (citing *Allen v. Feldman,* C.A. No. 03-555-JJF, 2004 WL 1254001, at *4 (D.Del. June 2, 2004) (§ 1983 claim against state agency dismissed as frivolous); *Evans v. Ford,* C.A. No. 03-868-KAJ, 2004 WL 2009362, at *4 (D.Del. Aug.25, 2004) (same); *Ospina v. Dep't of Corr.,* 749 F.Supp. 572, 579 (D.Del.1991); *Evans v. Probation & Parole,* C.A. No. 03-869-KAJ, 2004 WL 2009369, at *3 (D.Del. Aug.25, 2004) (finding that a subdivision of the DOC, the Division of Probation and Parole, was an agency of the State of Delaware for section 1983 purposes); *Jackson v. First Corr. Medical Servs.,* C.A. No. 03-1031-SLR, 2004 WL 1730355, at *4 (D.Del. July 27, 2004) (holding that the State of Delaware has not consented to suit or waived its **immunity** under the **Eleventh Amendment**); *Turner v. Corr. Medical Servs.,* C .A. No. 03-048-SLR, 2004 WL 22037712, at *3 (D.Del. Aug.20, 2003) (same); *Jolly v. Snyder,* C.A. No. 00-041-JJF, 2003 WL 1697539, at *6 (D.Del. Mar.22, 2003) (same); *Laboy v. Taylor,* C.A. No. 02-248-JJF, 2003 WL 1698542, at *1-2 (D.Del. Mar. 21, 2003) (same); *Church v. Dep't of Corr.,* C.A. No. 00-085-SLR, 2002 WL 31927434, at *4 (D.Del. Dec.18, 2002) (same); *Atkinson v. Dep't of Corr.,* C.A. No. 99-563-JJF, 2001 WL 3468330, at *3 (D. Del. June 26, 2001)

).

Conversely, Soliman asserts that there are genuine issues of material fact as to whether the DOC is an arm or agency of the state and entitled to **Eleventh Amendment immunity.** (D.I. 32, at 27.) Soliman also points out that no discovery has been taken in this case and, therefore, no factual record exists with regard to this issue. (*Id.*)

In order to state a claim under 42 U.S.C. §§ 1983 and 1985, and recover against the defendants, Soliman must show that he was deprived of a constitutional right by a person acting under the color of state law. *See, e.g., Groman v. Twp. of Manalpan,* 47 F.3d 628, 633 (3d Cir.1995) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). With respect to the DOC, Soliman has failed to make the proper showing.

The DOC is a state agency that exists pursuant to the laws of Delaware. *See* Del.Code Ann. tit. 11 §§ 6501, 6520. A suit against a state agency or state official in his or her official capacity is treated as a suit against the state. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). This is so because neither a state nor its officials acting in their official capacities are "persons" under § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). [FN4] While a state is normally entitled to sovereign **immunity,** Congress may have abrogated the state's **immunity** through a valid exercise of its power, or the state itself may have waived its **immunity.** *See Lavia v. Commonwealth of Pennsylvania,* 224 F.3d 190, 195 (3d Cir.2000).

> FN4. Section 1985, which provides remedies for conspiring to interfere with civil rights, also applies to a "person." 42 U.S.C. § 1985 ("If two or more *persons* in any State or Territory conspire ..."); *see Crawford v. Pennsylvania,* Civil Action No. 1: CV-03-693, 2003 U.S. Dist. LEXIS 16358, at *11 (M.D.Pa. Sept. 12, 2003) (citing *Zombro v. Baltimore Police Dep't,* 868 F.2d 1364, 1371 (4th Cir.1989), *cert.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

> *denied,* 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989). Thus, Soliman's § 1985 claim against the DOC must fail for the same reasons that his § 1983 claims fail.

Neither of the two above-mentioned sovereign **immunity** exceptions are relevant here. First, the state has not waived its **Eleventh Amendment immunity.** A waiver will be found only where it has been stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Space Age Products, Inc. v. Gilliam,* 488 F.Supp. 775, 780 (D.Del.1980) (citing *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Such an express waiver may be made through clear constitutional or statutory language. *See Lavia,* 224 F.3d at 195. Neither the constitution nor any Delaware statute expressly waives Delaware's **Eleventh Amendment** sovereign **immunity.** *See Ospina v. Dep't of Corr.,* 749 F.Supp. 572, 579 (D.Del.1990). [FN5] Therefore, Delaware has not clearly waived its **immunity.**

> FN5. Soliman contends that the Delaware General Assembly has waived state **immunity** by enacting Del.Code Ann. tit. 18, § 6511 (1969). Soliman cites to several Delaware state court cases to support his contention. Soliman's contention, however, is contrary to *Pagano v. Hadley,* 535 F.Supp. 92 (D.Del.1982), where the court held that § 6511 does not evidence "an intention on the part of the Delaware General Assembly, in 1969, that Delaware would henceforth be open to suit in federal courts." 535 F.Supp. at 99. Soliman does not cite any other facts which might be material and raise a genuine issue as to whether Delaware has waived its **immunity**
> .

Finally, Congress has not abrogated the states' **immunity** for claims under Sections 1983 and 1985 . *See Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Since Delaware's

**immunity** has not been waived or abrogated, the court will dismiss Soliman's claims against the DOC on the ground that the DOC is not a "person" within the meaning of sections 1983 and 1985.

### B. Soliman's Claims Against the Individual Defendants

#### 1. Soliman's Section 1983 Civil Rights Claims

**\*10** Through their motion, the individual defendants, other than Hosterman and Richardson, contend that Soliman's claims against them should be dismissed because they are predicated on the theory of *respondeat superior.* That is, the defendants contend that the plaintiff's complaint fails to allege any personal involvement by any of the individual defendants, other than Hosterman and Richardson (D.I. 26, at 4.) The individual defendants further contend that Soliman's amended complaint presents pure legal argument and, therefore, is insufficient to withstand a motion to dismiss. (*See* D.I. 34, at 9.) [FN6]

> FN6. The defendants concede, for purposes of this motion to dismiss, that Soliman's affidavit is sufficient to defeat the motion to dismiss with respect to the claims against Richardson, and is also sufficient to preclude summary judgment with respect to whether Soliman exhausted his administrative remedies.

In response, Soliman asserts that he has sufficiently pled his civil rights allegations. Soliman further asserts that, because no discovery has occurred in the case, it is patently unfair to require him to allege with minute detail every single action that every single defendant took that resulted in his constitutional violations. (D.I. 32, at 14.) According to Soliman, a plaintiff in a civil rights case must plead only the following: (1) when the constitutional violations occurred; (2) where the constitutional violations occurred; and (3) which persons are/were responsible. (*Id.* at 15.) Soliman asserts that his amended complaint specifically

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

alleges that the supervisory defendants instructed the acting defendants (*i.e.* Richardson and Hosterman) to perform the actions and/or fostered, encouraged the actions, and or knew that the actions occurred and affirmatively chose to permit them to occur. Lastly, Soliman contends that his amended complaint specifically alleges that the defendants knew or were aware of the constitutional violations that he suffered.

It is well established in the Third Circuit that absent some sort of personal involvement in the allegedly unconstitutional conduct, a § 1983 defendant cannot be held liable under a *respondeat superior* theory. *See Fagan v. City of Vineland,* 22 F.3d 1283, 1291 (3d Cir.1994); *Gay v. Petsock,* 917 F.2d 768 (3d Cir.1990). However, a supervisory public official may be held liable for a subordinate's constitutional tort if he is the "moving force [behind] the constitutional violation" or is "deliberate[ly] indifferen[t] to the plight of the person deprived. *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989) (citing *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Reviewing the allegations of Soliman's amended complaint in the light most favorable to him, and in the context of the applicable law, the court concludes that he sufficiently alleges that the individual defendants were the moving force behind the alleged constitutional violations or deliberately indifferent to his plight. For example, with respect to the alleged First Amendment religious violations, Soliman asserts that the individual defendants "were the moving force behind the actions taken against [him] by [d]efendant Hosterman and/or exhibited deliberate indifference to [his] plight, in that [d]efendants, acting with a culpable state of mind, instructed [d]efendant Hosterman to perform the actions taken against [him] and/or fostered, encouraged and condoned such actions, and/or knew that the actions occurred or were occurring and affirmatively chose to permit the actions to occur." (D.I. 31 ¶ 47.) The amended complaint also alleges that the individual defendants "were ' out to get' Mr. Soliman because of his race and/or religion and/or exercise of free speech." (*Id.* ¶ 48.) Soliman also alleges that the individual defendants were the moving force behind the charges that

Richardson filed against him, as well as the interrogation and beating that Richardson inflicted upon him. (*Id.* ¶ 63.) Finally, the amended complaint alleges that the individual defendants were the moving force behind and/or exhibited deliberate indifference to Soliman's plight for the following actions/inactions: (1) Soliman's classification to an increased level of confinement, which sabotaged his ability to secure a sentence commutation; (2) denying Soliman medical treatment for the injuries he sustained from the alleged beating while in "the hole"; (3) revoking Soliman's off-site work assignment; (4) the conditions imposed upon Soliman while in the hole; (5) ignoring Soliman's request to return to minimum security status; (6) refusing to investigate why the allegedly unconstitutional actions were taken against Soliman; and (7) denying Soliman's religious rights during Ramadan. (*See id.* ¶¶ 65, 69, 77, 84, 87, 90, 94, 101, 104.) Accordingly, the court finds that Soliman has sufficiently alleged supervisory liability to withstand the individual defendants' motion to dismiss with respect to his section 1983 civil rights claims.

### 2. Soliman's Failure to Train and Maintenance of Unconstitutional Custom, Policies, or Practices Claim

**\*11** In addition to his claims based on civil rights violations, Soliman alleges a § 1983 claim based on the individual defendants' failure to properly train and supervise DOC personnel so as to protect inmates' safety and physical well-being, the failure to maintain safe conditions, and the failure to adopt and properly implement practices and policies so as to protect the inmates' safety and physical well-being. Local government bodies and supervising employees can be sued directly under section 1983 "where the alleged unconstitutional action was the result of the execution or implementation of a policy, ordinance, regulation, or custom officially adopted or promulgated by that body's officers." *Jamison v. Wilmington Police Dep't,* No. Civ. 04-033-SLR, 2004 WL 2434298 (D.Del. Oct.12, 2004), at \*2 (citing *Monell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Additionally, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

supervising employee can be sued pursuant to section 1983, in the absence of a policy, for its failure to train its employees and officers. *See Canton v. Harris,* 489 U.S. 378, 387-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see also Nelson v. New Castle County Police Dep't,* 60 F.Supp.2d 308, 313 (D.Del.1999).

In order to successfully prove a failure to train claim, the plaintiff must establish that: (1) the failure to train amounts to deliberate indifference to the rights of persons with whom the municipal employees come into contact; and (2) the training deficiency actually caused the injury. *Nelson,* 60 F.Supp.2d at 313 (citing *Reitz v. County of Bucks,* 125 F.3d 139, 145 (3d Cir.1997). The Third Circuit has recognized, however, that without discovery a plaintiff cannot be expected to know what type of policies or customs are in place, what procedures are used to implement the policies or whether there was a pattern of misconduct sufficient to require that a policy be established. *See Carter v. City of Philadelphia,* 181 F.3d 339, 357 (3d Cir.1999). As such, the court cannot conclude at this time that Soliman's allegations fail to state a claim upon which relief could be granted. Accordingly, Soliman should have the opportunity to pursue discovery with respect to his failure to train claim, and the court will, therefore, deny the individual defendants' motion to dismiss this claim.

### 3. Soliman's Section 1985 Claim

Lastly, Soliman claims that the individual defendants conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985, including: (1) his right to equal protection and treatment; (2) his right to be free from cruel and unusual punishment; (3) his right to own personal property; (4) his right to freedom of religion; and (5) his right to freedom of speech. (D.I. 31 ¶ 124.) Section 1985 prohibits conspiracies motivated by racial or class-based discrimination and provides, in pertinent part:
If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal

privileges and **immunities** under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

**\*12** 42 U.S.C. § 1985(3). In order to state a claim under section 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (citing *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 835, 828-29 (1983); *Griffen v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

In the present case, Soliman's amended complaint alleges a set of facts that, if proven true, could entitle him to relief. That is, Soliman has alleged racial animus by the individual defendants. For example, Soliman contends that the individual defendants fostered, encouraged and condoned the actions taken against him, and/or knew that violations were occurring and affirmatively chose to permit the violations to occur. Soliman further alleges that all of the individual defendants participated in and/or had knowledge of the actions taken against him. Finally, Soliman alleges that the individual defendants conspired to commit the alleged violations and deprive him of his rights, resulting in physical and mental injury. While Soliman's amended complaint does not allege the degree of involvement of each of the individual defendants with any specificity, "conspiracies are by their very nature difficult to discern and prove." *Monahan v. City of Wilmington,* No. Civ. A. 00-505-JJF, 2003 WL 22939386, at \*3 (D.Del. Mar.28, 2003). Thus, at this stage of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 12

Slip Copy, 2005 WL 2429886 (D.Del.)
**(Cite as: Slip Copy)**

proceedings, prior to the beginning of discovery, the court is not inclined to dismiss Soliman's conspiracy claim, and concludes that Soliman has sufficiently alleged a conspiracy claim against the individual defendants. Accordingly, the court will deny the individual defendants' motion to dismiss the conspiracy claim.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. The DOC's Motion to Dismiss/Summary Judgment Pursuant to Rules 12(b)(1), 12(b)(6), and 56(c) (D.I.23) is GRANTED.
2. The plaintiff's claims against the DOC are dismissed with prejudice.
3. The Individual State Defendants Motion to Dismiss/Summary Judgment Pursuant to Rules 12(b)(1), 12(b)(6), and 56(c) (D.I.25) is DENIED.

D.Del.,2005.
Soliman v. Taylor
Slip Copy, 2005 WL 2429886 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:04cv01378 (Docket) (Oct. 21, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.