## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH N. GIELATA,<br><br>          *Plaintiff*,<br><br>      v.<br><br>ANDREA L. ROCANELLI, individually and in her official capacity as Chief Counsel of the Office of Disciplinary Counsel for the Supreme Court of Delaware, THE STATE OF DELAWARE,[1] and THE OFFICE OF DISCIPLINARY COUNSEL FOR THE SUPREME COURT OF DELAWARE,<br><br>          *Defendants*. | Civil Action No. 05-567 GMS<br><br>**AMENDED VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; DAMAGES FOR CIVIL RIGHTS VIOLATIONS, MALICIOUS PROSECUTION, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, and TORTIOUS INTERFERENCE**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph N. Gielata, Esq. ("Plaintiff") as and for his Amended Complaint in the above-captioned action, alleges as follows upon personal knowledge and, where stated, upon information and belief, superceding Plaintiff's initial complaint in its entirety:

## I.    <u>Preliminary Statement</u>

1.    This action arises from the improper and illegal actions and misconduct of defendant Andrea L. Rocanelli ("Rocanelli"), at all relevant times the Chief Counsel of the Office of Disciplinary Counsel for the Supreme Court of Delaware (the "ODC").

2.    By abusing her position at the behest of her former colleagues and to benefit her family and former employer's client, Rocanelli's malicious actions caused the State of Delaware

---

[1] The State of Delaware is named herein subject to and contingent upon the granting of Plaintiff's Motion For Reconsideration Of The August 2, 2005 Order Dismissing Claims Against The State Of Delaware (D.I. 8).

(the "State") to institute a baseless and futile prosecution of Plaintiff, depriving Plaintiff of his federal constitutional rights and harming him, his clients, and his reputation.

3.     Plaintiff, a Delaware attorney, specializes in representing individuals defrauded by public companies.  Plaintiff is involved in litigation against some of the State's most powerful corporations, and thus he has influential enemies in some quarters.  After drawing Rocanelli's ire, Plaintiff became the target of a vendetta and was singled out for prosecution.

4.     The relevant events began in 2004, when Plaintiff filed suit in the Delaware Justice of the Peace Court against PayPal, Inc. ("PayPal") on behalf of a Pennsylvania resident (the "Counterparty") in connection with a contract dispute between PayPal and the Counterparty.

5.     PayPal retained counsel who, after contentious interactions with Plaintiff, appealed to Rocanelli, who was formerly associated with PayPal's counsel.  Rocanelli enjoys a position of unparalleled power over Delaware lawyers.  Despite her obvious conflict of interest, Rocanelli thereafter initiated a bogus probe into Plaintiff's actions, with immediate and catastrophic repercussions for Plaintiff.

6.     After learning that Plaintiff was preparing to campaign against a class action settlement providing a valuable release for PayPal, Rocanelli immediately lobbied the Delaware Department of Justice ("DDJ") to initiate a criminal investigation into the contractual controversy between PayPal and the Counterparty, to see if Plaintiff could somehow be charged.

7.     In so doing, Rocanelli intimidated Plaintiff into silence and squelched his right to solicit and present objections to PayPal's proposed nationwide class action settlement.

8.      Subsequently, the DDJ launched a broad investigation to concoct a criminal prosecution of Plaintiff, despite the absence of any crime or victim.  An indictment of Plaintiff would allow Rocanelli to seek to cripple Plaintiff's law practice by petitioning for an interim suspension of Plaintiff's law license.

9.      Months later, Rocanelli launched a second, unrelated probe of Plaintiff, ***once again at the behest of another former colleague***.  This second probe, as baseless and arbitrary as the first, was initiated just two weeks after Plaintiff filed a shareholder lawsuit involving a corporation where Rocanelli's husband is a senior executive.

10.      Finally, Rocanelli got her wish.  On July 25, 2005, the DDJ sought and obtained an indictment of Plaintiff by shoehorning a contract dispute into a felony theft statute.  On behalf of the ODC, Rocanelli immediately filed a petition to suspend Plaintiff's law license, even though the indictment does not even state a cognizable offense.

11.      In effect, PayPal was seeking to snuff out its legal opponent by wrongfully exploiting the ODC's vast powers.  Regardless of the fact that Plaintiff's actions were at all times legal and appropriate, Rocanelli sought to neutralize his ability to represent aggrieved individuals and to irreparably tarnish, if not end, his legal career through a relentless smear campaign.

12.      The indictment and Rocanelli's vindictive petition came just as Plaintiff was visiting family over 5,000 miles away in a small town in South America.  Rocanelli, who knew that Plaintiff would be outside the country, seized this opportunity to pounce and quickly cripple Plaintiff without any opposition.

13.    Immediately upon learning of these developments, Plaintiff rushed back to the United States.  Upon debarking from a plane in Miami on Saturday, July 30, 2005, Plaintiff was seized by agents with the federal Department of Homeland Security, as a result of the indictment. Plaintiff was detained, searched and questioned, and only after the local police department declined extradition was Plaintiff released.

14.    Plaintiff seeks preliminary and permanent injunctive relief with respect to the above-mentioned State course of conduct (the "Prosecution").  Unless the seemingly never-ending Prosecution is enjoined, Plaintiff will suffer irreparable injury because his ability to practice law continues to be impaired.

15.    Plaintiff also seeks (i) declaratory relief affirming the terms of the PayPal contracts at issue in the Prosecution, (ii) prospective relief enjoining the Prosecution, and (iii) damages for civil rights violations and common law claims in connection with the Prosecution.

## II.    <u>Jurisdiction and Venue</u>

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2202, 42 U.S.C. § 1983 and the All Writs Act, 28 U.S.C. § 1651.

17.    This action is brought under and to remedy violations of the First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments to the Constitution of the United States; and violations of 42 U.S.C. §§ 1981, 1983, 1985 and 1986.

18.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to adjudicate Plaintiff's state law claims because they arise out of the same set of facts and circumstances that give rise to Plaintiff's federal claims asserted herein.

19.    The venue of this action is proper in the District of Delaware pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims occurred in this district and Plaintiff is informed and believes that Rocanelli resides in this district.

## III.    Parties

20.    At all times relevant hereto, Plaintiff resided in the County of New Castle, State of Delaware.  Plaintiff presently resides in the County of Delaware, State of Pennsylvania. Plaintiff, who presently practices law in the State of Delaware, has extensive experience in the prosecution of securities class actions and derivative litigation in state and federal courts.

21.    Defendant Rocanelli is and, at all times relevant hereto, was an individual residing in the State of Delaware.  Insofar as prospective relief is sought herein, this action is brought against Rocanelli in her official capacity as the chief counsel of the ODC.  This action is brought against Rocanelli in solely her personal capacity insofar as monetary damages are sought herein.

22.    Defendant State of Delaware is a state of the United States of America.

23.    Defendant ODC evaluates and investigates alleged lawyer misconduct. The ODC also enforces disciplinary rules and, where appropriate, sues to seek the imposition of sanctions. Plaintiff is informed and believes that the ODC is and, at all times relevant hereto, was funded by annual assessments imposed on Delaware lawyers, not by taxes, and, accordingly, any recovery from this action against the ODC in excess of its current ability to pay would be funded by increased assessments, not by the State treasury.

IV.    **Statement of Facts**

A.    **PayPal: Notorious Corporate Malfeasant**

24.    PayPal is a wholly-owned subsidiary of eBay Inc., an Internet-based marketplace headquartered in San Jose, California.  As of January 26, 2006, eBay enjoyed a market capitalization of over $60 billion.  Also located in San Jose, California, PayPal was founded in 1998 and acquired by eBay Inc. in October, 2002.  Despite its subsidiary status, "PayPal's growth is crucial for eBay…."  Robert D. Hof, "PayPal Spreads Its Wings," *BusinessWeek* (May 23, 2005); *see also* Kevin Kelleher, "eBay Grooms Another Phenom," *TheStreet.com* (Mar. 8, 2005) ("PayPal has the potential to be as big, if not bigger than, eBay").

25.    PayPal offers an electronic payment service that allows a business or private individual to send and receive payments via the Internet.  A PayPal account holder sends money by informing PayPal of the intended recipient's e-mail address and the amount to be sent and by designating a funding source such as a credit card, bank account or separate PayPal account. PayPal accesses the funds and immediately makes them available to the intended recipient.  If an intended recipient does not have a PayPal account, the recipient must open an account to access the payment by following a link that is included in the payment notification e-mail.  PayPal generates revenues from, *inter alia*, transaction fees and the interest it derives from holding funds until they are sent.

26.    All interactions between PayPal and its users are governed by the User Agreement for PayPal Service (the "Agreement").  A true copy of the Agreement, as last modified on July 14, 2005, is annexed hereto as Exhibit "1" and incorporated by this reference.  Eighteen policies are incorporated into the Agreement by reference, including the Money Back Guarantee Policy

(the "MBG Policy"), the Payments (Sending, Receiving, and Withdrawals) Policy (the "PSRW Policy") and the policy for Closing Accounts and Limiting Account Access (the "CALAA Policy"). True copies of the MBG Policy (as last modified on January 14, 2005), the PSRW Policy, and the CALAA Policy are annexed hereto as Exhibits "2," "3" and "4," respectively, and incorporated by this reference.

27.     PayPal users open an account by completing an online application for a personal, premier, or business account. A prospective customer clicks a box at the bottom of the application page that reads, "[you] have read and agree to the User Agreement and [PayPal's] privacy policy." The text of the Agreement is compressed within a small window located at the bottom of the application. The window need not be scrolled through for the application to be processed. The Agreement (and policies incorporated therein) consists of over 40,000 words of provisions and subparagraphs enumerating the parties' respective obligations and duties. The policies incorporated in the Agreement "may be changed from time to time and are effective immediately after [PayPal] post[s] the changes…."

28.     PayPal admonishes every user to read the Agreement carefully, informs him or her that the Agreement forms a binding contract, and advises the customer to retain a copy of the Agreement. The Agreement is a "clickwrap contract," formed when the customer signs up for a PayPal account and clicks "Yes" to the question: "Do you agree to the User Agreement and Privacy Policy, and terms incorporated therein?" *See also* Agreement ¶ 14.1 ("You agree that this Agreement constitutes 'a writing signed by You'"). Remarkable for its vast scope and specificity, the Agreement is plainly a contract of adhesion. It is also fully integrated. Agreement ¶ 16 ("This Agreement and the documents it incorporates set forth the entire understanding between us with respect to the subject matter hereof.").

29.     As the Agreement makes clear, and as the very nature of PayPal's business model attests, PayPal maintains absolute control over its users' funds.  No funds are released from PayPal's control without PayPal's authorization.  Accordingly, it is impossible for funds to be "taken" from PayPal.

30.     PayPal has furiously and successfully lobbied to avoid being categorized as a bank or an insurance company for regulatory purposes.  A recent book by a former PayPal insider acknowledged PayPal's "ambiguous regulatory status" and revealed that PayPal's then-Chief Executive Officer had "instructed the legal team to engage regulators to seek a classification before one could be thrust upon us.  He sought to avoid having the company labeled as a commercial bank but also feared that compliance with state-by-state laws governing money transmission companies would prove excessively burdensome."  Eric M. Jackson, *The PayPal Wars: Battles with eBay, the Media, the Mafia, and the Rest of Planet Earth* 168 (World Ahead Publishing, Inc. 2004).

31.     The Agreement sets forth PayPal's ambiguous status: "PayPal acts as a facilitator to help you accept payments from and make payments to third parties.  We act as your agent based upon your direction and your requests to use our Services that require us to perform tasks on your behalf. …You acknowledge that (i) PayPal is not a bank and the Service is a payment processing service rather than a banking service, and (ii) PayPal is not acting as a trustee, fiduciary or escrow with respect to your funds, but is acting only as an agent and custodian."  Agreement ¶ 2.1.  PayPal is not registered to do business as a bank or as an insurance company in Delaware.

32.     PayPal has earned notoriety for its unremitting exploitation of users.  This pattern is so flagrant and widespread that several websites have emerged dedicated to cataloguing and denouncing PayPal's extensive misconduct.    *See, e.g.,* <http://www.paypalwarning.com/>; <http://www.nopaypal.com/>; <http://avoidpaypal.org/>; and <http://www.aboutpaypal.org/>.

33.     A nationwide class action in the Northern District of California, commenced in 2002, alleged that PayPal, *inter alia*, unlawfully freezes its customers' accounts; fails to provide customers with necessary information, such as an address and telephone number, so that customers can easily report erroneous financial transactions; and fails to fully compensate customers damaged by erroneous financial transactions.

34.     Various state regulators have repeatedly sanctioned PayPal's widespread corporate misconduct.  Louisiana's attorney general charged PayPal with conducting an illegal money transfer operation.   In separate prosecutions, New York Attorney General Eliot Spitzer settled charges that PayPal misrepresented to consumers its policy on repayment and that PayPal unlawfully facilitated online gambling.   Minnesota has sanctioned PayPal for unlicensed operations.  PayPal has even settled charges that it violated the Patriot Act.

### B.     PayPal's Money Back Guarantee Scam

35.     On September 18, 2002, PayPal launched what it called the Money Back Guarantee ("MBG") program for buyers using PayPal to purchase goods.  According to PayPal:

> When you make a payment on the PayPal website, you can now buy a Money Back Guarantee to protect your purchase of physical goods on selected transactions. ***If you purchase the Money Back Guarantee, you will have the <u>option</u> to return your merchandise to PayPal in exchange for a reimbursement (not including the Guarantee fee),*** provided that you file a complete reimbursement request within 45 days of payment.

This program will only be offered for tangible goods transactions of less than with pre-qualified sellers. PayPal may take additional criteria into account in deciding whether to offer the Money Back Guarantee on a particular transaction.

You will know if a transaction qualifies when you get to the Confirm Payment Details page. If we are offering the Money Back Guarantee, you will see a check box quoting the price of the Guarantee for that transaction. Just click on the box before you send payment. For more complete information about the Money Back Guarantee and its specific exclusions and fees, please go to the Money Back Guarantee Policy of the User Agreement. [Emphasis added.]

36.     According to PayPal's MBG Policy:

PayPal's Money Back Guarantee program, which applies to selected physical goods transactions for less than $1,000, ensures that if you buy the Guarantee, you will be satisfied with your purchase or have an ***option to resell*** the merchandise to PayPal *for the price you paid for it for the first 30 calendar days following the date of payment or seven days after receipt, whichever is earlier.* [Emphasis added.]

37.     Thus, the MBG is nothing more than a put option contract. Such a contract gives the holder the right (but not the obligation) to sell some underlying item (a "Covered Object") at a specified price within a specific time period. For instance, in the securities market, a put is an option contract that gives the holder the right to sell a certain quantity of shares of a specified security at a specified price within a specific time period.

38.     The MBG Policy provides that a Covered Object is ***any good*** except for the following: "[a] Items that have been damaged by the buyer, [b] Apparel items that have been worn or washed, [c] Media products such as DVDs, CDs, video and audio cassette tapes, video games and other software, etc., [d] Stored value cards (e.g. phone cards, gift cards, etc.) of any kind, [e] Hazardous materials including but not limited to chemicals, explosives, flammables,

poisons, and gases, [f] Firearms, explosives, or ammunition of any sort including but not limited to guns, rifles, and bombs, [g] Illegal/contraband goods, [h] Animals, plants, or any parts thereof, [i] Motorized vehicles of any kind, including but not limited to automobiles, motorcycles, boats, and airplanes, [j] Recalled products, [k] Consumables and perishables, [l] Land, buildings, structures, or real estate properties, lots or improvements, [m] Items weighing more than 70 pounds, [n] Items that, when packed, exceed 130 inches in combined length and girth (the combined length and girth is length plus twice the height plus twice the width), and [o] Virtual or intangible items."  MBG Policy ¶ 1.iii.3.

39.    The MBG Policy is not an insurance contract.  PayPal has not registered with the State's insurance regulator or any other state insurance agency to sell insurance.  Also, nowhere does PayPal refer to the MBG as insurance.  This State defines insurance as "a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, called 'risks,' or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies or to act as surety."  18 *Del. C.* § 102(2).  A put option contract, *i.e.* the contractual right to resell an item to another at a specified price within a specific time period, does ***not*** fall within this definition.  Unlike an insurance contract, where an ***event*** (one of the "certain specified contingencies or perils" set forth in the insurance contract) triggers payment, an option provides a ***right*** which can be exercised ***for any reason***.  For instance, an insurance policy on a home pays the policy holder a certain amount for a ***specified reason*** (say, $100,000 if the home burns to the ground).  By contrast, under a put option contract granting the homeowner the right to sell the house for $100,000 to another person, the homeowner is entitled to sell the house at the specified price ***for whatever reason, or for no reason at all***.

40.     On July 2, 2003, *The Register*, a United Kingdom publication, published an article

entitled "Anyone ever managed to claim on PayPal's Money Back Guarantee?":

> The perfect insurance company would have thousands of customers paying for its services but never claiming. But then that's a fantasy scenario. Or it was anyway before PayPal managed to fit for a second time into a legal grey area with its Money Back Guarantee service.
>
> In March this year, the US Federal Deposit Insurance Corporation decided PayPal was not a bank or savings association since it does not accept deposits as defined by federal law. The decision angered thousands of customers who had seen their money fall into PayPal's coffers without an adequate explanation or appeal process.
>
> Now it seems that the same question will be posed over whether PayPal is an insurance company and so forced to comply with all the laws that are placed upon them. At least one US State is concerned over PayPal's Money Back Guarantee that it introduced in September 2002.
>
> There is good reason to be. Because, while PayPal is charging people on average six per cent of the cost of the transaction for its "guarantee", we find it extremely hard to imagine a scenario in which it would ever be required to pay out. There are plenty of opportunities for a claim to be filed but thanks to an over-complex process and restrictive time element in the "guarantee", it would seem that PayPal has simply built its own press to print its own online money.
>
> If you live in the US and choose to buy a good online using PayPal, you may well be offered the choice of its Money Back Guarantee. This states that for around six per cent the cost of the transaction, you will get your money back through PayPal if you are unhappy with the goods you get or if they don't arrive.
>
> For people nervous of buying online this may seem like a logical step to take. However, a closer inspection of the terms and conditions attached show that the chances of you ever managing to claim back on this service are tiny.
>
> First the restrictions: The good must be under $1,000. Fair enough. It must be a physical good that you have bought and not hired/leased etc. Okay. It can't have been damaged or worn by you. It can't weigh more than 70lbs. It cannot be more than 130 inches

in overall size, which in reality means a rectangle about twice your desk length, so pretty big.

No DVDs, CDs, videos, games, software, value cards, hazardous materials, ammunition, animals, plants, any form of motorised transport or consumables.

Okay, you must make your claim within 30 days of paying for the good or within seven days of receiving it - whichever is earlier. So, if you ordered something and were given a 21-day delivery time, you have nine days from the day they are late to when you have to claim. More likely though you will be given a 28-day delivery time, meaning you have just two days to apply once it has passed their agreed delivery date. If they deliver to you on the 27th day and you aren't happy, you still only have three days to make a claim to PayPal.

Before you make any claim to PayPal though you have to have tried to sort it out the situation with the seller personally or the PayPal "guarantee" is not valid. So - best case scenario - if you are lucky enough to be on a 14-day delivery and you call on the 15th day to complain and they promise it will be within you within three days and it doesn't turn up, you still have 11 days to claim on your PayPal guarantee. Most likely though, you'll be on 21-day and you'll have just three days. Or 28 days, in which case you can forget it.

Equally, if you get your goods and you're not happy with them, if they promise to send a replacement, they'd need to send it within six days and you to immediately go to PayPal if you're not happy.

If you have the good fortune to fit in with any of these scenarios, all you need to do is send the item to PayPal and it will give you a full refund. Of the money you paid the seller anyway. You will not get back the guarantee money back and you will have to pay the cost of sending the good to PayPal.

Presuming of course you have supplied all the paperwork. You will need to have filled in an online form. And then to send a properly completed reimbursement form with the transaction ID and a written explanation of why you are using the guarantee. Plus of course a printout of the website page where you bought it from. And the auction listing and email and invoice to prove how much you had paid. You need to supply tax and shipping terms with this as well.

You better hope you haven't thrown away any of the packaging because that also needs to be sent to PayPal. Plus copies of all correspondence you have had with the company. If you do all this within the allocated time span, PayPal will consider your request. It does reserve the right to decide how much of the fee it will refund though. If it does decide to pay only part of the reimbursement, you have no appeal, its decision is final.

So you buy a jumper for $50 and pay PayPal $3 for its guarantee scheme. It arrives bang-on 21 days later. It's not the size you ordered. You call up the company and tell them. They ask you to send it back and they will send you a new one. You aren't happy with it - oh no, hang on, the guarantee's not valid because it's a different item. Go back. They say they're sorry, they will send you another. You wait for five days. Nothing. You call again. They promise it'll be there on Monday. You've already passed the guarantee's date. But wait - you didn't believe them and you decided immediately to send your jumper to PayPal and get the money back. So you go to the PayPal website and send an online complaint. Then you print off the reimbursement claim form and fill it in. You pack the jumper up, with the original packing. You go to the company's website and go to the right page and print if off. You print off the email they sent you confirming the order. You stick all this in a bag and pay $5 to send it to PayPal.

PayPal gets it just in time and emails you back two weeks later to tell you they aren't paying anything because there's no evidence that you contacted the company in question. They keep the jumper. Okay, so you remembered to write on a piece of paper all the details in your phone conversation - when you made it, who it was to, what was discussed. PayPal tells you that you didn't try hard enough to sort out the problems. It keeps the jumper, no money. Okay, PayPal believes you that they weren't trustworthy and you get the full $50 back. And it only cost you $8 and six hours of chasing to get it.

Of course this scenario is pretty unlikely anyway because PayPal only allows its guarantee to be put on top of goods from certain sellers - namely, those sellers that has been trading through PayPal for at least five months and have a very high record of delivering the right goods on time. Those companies themselves have to opt out of the guarantee system as it is automatically added to those services that PayPal deems safe enough to offer a guarantee service on.

***Now, no insurance company in the world would offer such terms as one court challenge would see them thrown out for being***

*unreasonably restrictive. But is PayPal an insurance company? Does it again exist in legal no man's land?*

Under US law it would have to be shown to be collecting a pool of money with which to pay for the losses of a few. It would also have to go through a third party that makes the guarantee. Neither of these appear to apply to PayPal yet it is clearly offering what people would consider to be an insurance service.

The problem is that PayPal really is its own separate entity. It merely appears to be a bank and an insurer but because it takes and pays out money and offers guarantees on goods purchased. In law, however, thanks to the gap opened up by the Internet, it is currently not either.

*This means that there will continue to be hundreds of angry customers who feel cheated but who have no legal recourse.* Only yesterday a reader complained to us that he had sold two items on eBay through PayPal for £75. He tried to transfer this into his UK bank account. PayPal sent an email a week later saying the transfer had been rejected. The PayPal account now said £61. His bank denied any such rejection of transfer. So PayPal appears to be at fault and charged £14 for the pleasure. If past experience is anything to go by, he won't get it back.

This is just one very small story of hundreds dotted all over the Internet. And these stories will continue until either a) the law changes to pull in PayPal and force it to follow the laws and regulations everyone else is subjected to or b) people learn the fine distinction between PayPal and the institutions they instinctively trust. [Emphasis added.]

41.    As the article above indicates, the MBG Program is essentially a scam. PayPal promises "protection" but then so narrowly draws the parameters of a valid claim as to practically foreclose reimbursement. PayPal rakes in fees by pitching a product of dubious value.

42.    Perhaps the most deceptive feature of the MBG Program is PayPal's willingness to accept fees in connection with items which are completely excluded by the MBG Policy. If PayPal offers and sells a user a resale option on, for instance, a DVD, and the user thereafter

attempts to exercise the paid-for option, PayPal will point to the MBG Policy's list of excluded item categories and reject the reimbursement request. Of course, PayPal keeps its fee regardless. Thus, PayPal ***deliberately ignores*** the nature of the item at the time of offering the resale option. This ***willful blindness*** entitles PayPal to retain its fee even when the underlying item is excluded by the MBG Policy. As a result, PayPal's profit margin on MBG Program fees paid on excluded items is 100%! Users duped into paying MBG Program fees on excluded items, only to find out that the fees were paid for nothing, might well feel cheated, but PayPal's response is clear and unequivocal: *It's all right there in the MBG Policy, which you were supposed to read.*

43.     One user duped in this manner reported that PayPal sent him the following form communication:

> This reimbursement request has been voided by the PayPal Guarantee Department. The following item you purchased is not covered under the Money Back Guarantee: Media: DVDs, CDs, video games, and other software. We can send the item back to you at your request via FedEx. However, you are responsible for any shipping charges.

44.     By ***not*** inquiring into the nature of the item prior to offering the "protection" of the MBG Program, PayPal shields itself from any accusation of fraud. PayPal can simply say: *We had no idea what the item was. All we do is **blindly** offer the MBG Program. It's up to the user to read the MBG Policy and make sure that the item isn't excluded.*

45.     Accordingly, PayPal deliberately ignores the underlying item – except, as explained below, to the extent that PayPal can earn a profit by later avoiding a reimbursement obligation. Put another way, PayPal will offer the MBG Program "protection," for a fee, ***no matter the underlying item*** (for transactions under $1,000). This deliberate ignorance appears to be a fundamental pillar of the MBG Program business model.

### C.  **PayPal's Automated Contracting Algorithm**

46.    It is simply *impossible* to mislead PayPal in connection with the MBG Program. As the MBG Policy implies, PayPal's computerized interface contains a "bot," in this case an automated contracting algorithm (the "Algorithm"), which determines whether a particular funds transfer is eligible for the MBG Program and, if so, what fee to propose to a funds transferor.  No natural person is involved in this split-second, immediate runtime determination.  The essential contours of the Algorithm are set forth in the MBG Policy.  If a funds transferor agrees to pay to PayPal the proposed fee, a contract is created, the full terms of which are set forth in the MBG Policy.

47.    By the very terms of the MBG Policy, the Algorithm considers only the following *unmanipulable* criteria to determine whether, and at what price, to offer to a funds transferor an option to resell an item at a specified price for a specified period:

**a.    Funds recipient requirements:**

"The seller must have qualified for inclusion in the program as a 'trusted' seller.  Among other things, they must have a PayPal account in good standing and have been an account-holder for at least 5 months.  The seller also must not have opted out of the Money Back Guarantee program."  MBG Policy ¶ 1.ii.3.  Each of these requirements is objective and completely *precludes* user manipulation.  A user does not choose to be a "trusted seller"; rather, PayPal determines whether or not to include a particular user in that category, leaving the user only the ability to opt out.

**b.    Funds transferor requirements:**

"The Guarantee will be offered to U.S. buyers only.  Each account may only file a maximum of 3 Guarantee reimbursement requests in a given twelve-month period.  PayPal

reserves the right not to offer the Guarantee to specific buyers if any prior reimbursement requests have been denied."  MBG Policy ¶ 1.ii.4.  Again, each of these requirements is objective and completely *precludes* user manipulation.  Either a user is in the United States, or not.

      **c.**     **Magnitude of payment:**

"The cost of the Money Back Guarantee will be displayed on eligible transactions at the time of payment.  If a transaction is eligible, the Money Back Guarantee must be purchased as part of the original transaction.  This fee will not be refunded under any circumstances, except if the seller initiates a refund of the transaction before the buyer has filed a request for reimbursement under the Money Back Guarantee."  MBG Policy ¶ 1.i.  "If PayPal is offering the Money Back Guarantee on a transaction, the option to purchase the Money Back Guarantee will be displayed during the payment flow."  *Id.* ¶ 1.ii.  PayPal does not disclose the arithmetical formula which determines the fee proposed to a funds transferor.  However, the formula is apparently a function of the magnitude of the payment, *i.e.*, the larger the magnitude of the payment, the larger the proposed fee.  As the magnitude of the payment is an absolute numerical input, entered digitally into PayPal's website interface, it is not susceptible to misrepresentation or manipulation.  Importantly, only PayPal determines the magnitude of the proposed fee in the MBG Program.  PayPal can propose as high, or as low, a fee as it feels is necessary to justify the risk of granting a resale option.  Too high a fee may deter buyers.  Too low a fee may expose PayPal to excessive reimbursements (which is important because PayPal deliberately ignores the nature and value of the underlying item).  Fortunately for PayPal, its virtual monopoly over the market for cyberspace payments allows it to set its MBG Program fees without the influence or burden of competition.

48.     Thus, in accordance with the MBG Policy, the Algorithm determines whether a particular funds transfer is eligible for the MBG Program and, if so, what fee to propose to a funds transferor.  ***PayPal does not rely on any other information.***  There are no negotiations or exchanges of qualitative information between PayPal and the funds transferor.  If the Algorithm "decides" to offer the resale option and the funds transferor accepts, PayPal willingly takes its fee in exchange for granting an option to the funds transferor.  PayPal is indifferent to whether the funds transferor is related in any way to the funds recipient—the MBG Policy is entirely silent on this point.  As explained above, PayPal is also indifferent to the qualities of the item being purchased, except to the extent that PayPal can avoid a reimbursement obligation under the MBG Policy.  *See* MBG Policy ¶¶ 1.ii ("[E]ven if offered and purchased, the Guarantee will not cover excluded items as described in Section iii below."), 1.i (the "fee will not be refunded under any circumstances").

> ### D.     The Subject Transactions: PayPal Flagrantly Dishonors Its Contracts

49.     On or about November 16, 2003, Plaintiff purchased Covered Objects from the Counterparty.  Plaintiff used PayPal's electronic payment service to transmit the agreed-upon purchase price, for which PayPal received a fee.  Plaintiff transmitted the purchase price separately for each Covered Object.  Each time, PayPal offered the MBG to Plaintiff for a fee.  Neither the terms of the MBG Policy nor the fees requested by PayPal were negotiable.  Plaintiff agreed each time to pay PayPal the requested fee for the MBG and agreed to be bound by the terms of the MBG Policy.  Each time, PayPal notified Plaintiff that he had "purchased PayPal's Money Back Guarantee coverage… For specific terms and exclusions, view the PayPal User Agreement."  Thus, separate MBG contracts for each Covered Object transaction were created.

50.     Plaintiff received the Covered Objects and, within the time period provided in the MBG Policy, Plaintiff exercised the resale option pursuant to the MBG contracts.

51.     With respect to each resale option exercised, PayPal notified Plaintiff as follows:

> Dear Joe Gielata,
>
> Thank you for contacting PayPal.  Our investigation of the following reimbursement request is now complete.
>
> […]
>
> Because your request was valid, we have reimbursed you for the full amount of your coverage under PayPal's Money Back Guarantee program.
>
> […]
>
> This case is now closed and no further action is required of you at this time.
>
> For more information about the Extended Money Back Guarantee, please see the PayPal User Agreement at:
>
> http://www.paypal.com/us/cgi-bin/webscr?cmd=p/gen/ua/ua-outside
>
> Sincerely,
>
> Erica
>
> PayPal Guarantee Department

52.     Thus, PayPal willingly paid Plaintiff the amount contractually due.

53.     Subsequently, on December 18, 2003, the Counterparty purchased a Covered Object from Plaintiff.  PayPal offered the Counterparty an MBG put option contract on the purchase, which the Counterparty accepted, paying PayPal its requested fee (the "December Contract").  Pursuant to the December Contract, the Counterparty timely exercised the resale option and complied with all terms of the contract.  However, PayPal, without explanation,

reneged on its obligation to pay the Counterparty the amount specifically agreed upon in the December Contract.

54.    PayPal similarly reneged on other MBG put option contracts entered into between PayPal and the Counterparty.

### E.  Battling PayPal: David v. Goliath, Inc.

55.    On or about March 19, 2004, the Counterparty, through the Plaintiff, filed a small claims complaint against PayPal in the State's Justice of the Peace Court, seeking to enforce PayPal's obligation under the December Contract and other relief (the "PayPal Lawsuit").

56.    By letter to Plaintiff dated May 17, 2004, Michelle Squires, a Senior Litigation Paralegal with PayPal, advised that PayPal intended to file a motion to compel arbitration in connection with the PayPal Lawsuit.  The letter failed to mention that the mandatory arbitration provision in PayPal's user agreement had already been struck down by a federal court in California.  *See Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165 (N.D. Cal. 2002).

57.    Despite its threat, PayPal never moved to compel arbitration.  Instead, PayPal retained a prominent Delaware corporate law firm (the "Delaware Firm") to represent it in the PayPal Lawsuit.

58.    After some contentious interactions with the Delaware Firm, Plaintiff voluntarily dismissed the PayPal Lawsuit on June 16, 2004, with the intention of re-filing as a class action on behalf of all persons who had been duped into purchasing MBG option put contracts. Plaintiff advised the Delaware Firm of this possibility on June 21, 2004.

### F.   Class Action Sellout: PayPal Attempts to Evade Massive Liability

59.    On or about July 29, 2004, both the Counterparty and Plaintiff received via email the following "Notice of Pendency of Class Action and Proposed Settlement", dated July 12, 2004:

> IF YOU OPENED A PAYPAL ACCOUNT BETWEEN OCTOBER 1999 AND JANUARY 2004, YOU MAY BE ENTITLED TO A PAYMENT FROM A CLASS ACTION SETTLEMENT.
>
> PLEASE READ THIS NOTICE CAREFULLY.
>
> UNITED STATES DISTRICT COURT
>
> NORTHERN DISTRICT OF CALIFORNIA
>
> SAN JOSE DIVISION
>
> In re PayPal litigation
>
> Case No. CV-02-01227-JF (PVT)
>
> NOTICE OF PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT
>
> […]
>
> 8. WHAT AM I GIVING UP IF I PARTICIPATE IN THE SETTLEMENT?
>
> If you do not exclude yourself from the class and the settlement is granted final approval, the judgment entered upon approval of the settlement will dismiss the lawsuit with prejudice, and will **release any and all claims, demands, rights, liabilities, and causes of action of every nature and description whatsoever, known or unknown, matured or unmatured, at law or in equity, existing under federal or state law, that were or could have been asserted in the Litigation against the Released Persons, including without limitation, claims under the Electronic Fund Transfer Act, California Business and Professions Code §§ 17200 et seq.; the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.; and for PayPal's alleged conversion, breach of the User Agreement or other contract,**

**money had and received, unjust enrichment, and negligence under California law or any other state or federal law arising out of, among other things, PayPal's restriction or limitation of accounts; PayPal's dispute resolution policies, practices and procedures; PayPal's debit of accounts following the receipt of chargebacks, buyer complaints, reports of unauthorized access or in connection with its Seller Protection Policy, Buyer Complaint Process or Buyer Protection Policy; PayPal's alleged conversion of funds; and PayPal's compliance with the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 et seq., or any similar legislation arising under the laws of any state. <u>You will be permanently barred from bringing any such claims that arose prior to February 1, 2004.</u>** With regard to accounts that were limited prior to February 1, 2004, however, you will not be releasing claims to recover any balance that remained in the account 180 days after the account was initially limited.

**In summary, if you do not exclude yourself, you will not be able to sue, continue to sue, or be part of another lawsuit against PayPal relating to the legal issues in this case.** You will be bound by all proceedings, orders, and judgments entered in connection with the settlement, whether favorable or unfavorable, and will be represented by the Representative Plaintiffs and Class Counsel for purposes of the settlement. If you do not exclude yourself from the class, and the settlement is granted final approval, your claims against PayPal and its affiliates will be released as described above. If you are a class member, you may, if you wish, appear in this lawsuit through your own attorney at your own expense. You need not do so to participate in the settlement, however.

[…]

12. CAN I COMMENT ON THE SETTLEMENT?

If you decide to remain in the class, and you wish to comment in support of or in opposition to the settlement or Class Counsel's motion for attorneys' fees and expenses, you may do so by mailing or delivering your written (non-email) comments, such that they are RECEIVED on or before September 3, 2004, as follows: (1) the original must be sent to the Court at the following address:

Clerk of the Court
United States District Court
    for the Northern District of California
280 South First Street
San Jose, California 95113

and (2) copies must be sent to Co Lead Counsel and PayPal's counsel at the addresses listed in Section 9, above.

Your written comments must contain your name and address; be signed by you; and include the reference In re PayPal Litigation, Case No. CV-02-1227-JF (PVT). If you wish to appear and present your comments orally at the hearing, your written comments must contain a notice that you intend to appear and be heard, a statement of the position you intend to present at the hearing, and any supporting arguments.

If you do not comply with the foregoing procedures and deadlines for submitting written comments or appearing at the hearing, you will not be entitled to be heard at the hearing; contest or appeal from approval of the settlement or any award of attorneys' fees or expenses; or contest or appeal from any other orders or judgments of the Court entered in connection with the settlement.

13. HOW CAN I GET MORE INFORMATION ABOUT THE SETTLEMENT?

You can get more information by writing Plaintiffs' Co-Lead Counsel electronically or by first class mail at:

> paypalsettlement@settlement4onlinepayments.com
> Girard Gibbs & De Bartolomeo LLP
> 601 California Street, Suite 1400
> San Francisco, California 94108
> Wolf Popper LLP
> 845 Third Avenue
> New York, NY 10022

This notice is a summary and does not describe all details of the settlement. For full details of the matters discussed in this notice, you may wish to review the Settlement Agreement dated June 11, 2004 and on file with the Court or visit https://www.paypal.com/settlement/. Complete copies of the Settlement Agreement and all other pleadings and papers filed in the lawsuit are also available for inspection and copying during regular business hours, at the Office of the Clerk of the Court, United States District Court for the Northern District of California, 280 South First Street, San Jose, California 95113. [Emphasis added.]

60.     Troubled by the terms of the proposed settlement, and the unusually broad release proposed therein (potentially covering the claims in the PayPal Lawsuit), Plaintiff began questioning the class counsel.   Plaintiff sent the following email in accordance with the settlement notice:

> Date:    Mon, 2 Aug 2004 19:34:44 -0700 (PDT)
>
> From:   "Joe Gielata" <gielata@yahoo.com>
>
> Subject:        Claims Tally
> To:             paypalsettlement@settlement4onlinepayments.com
>
> Thus far, how many claims have been submitted?
> How many are Statutory Damage claims?
> How many are Short Claim Forms?
> How many are Long Claim Forms?
>
> Thank you.

61.     The next day, on August 3, 2004, Plaintiff sent the following email anonymously:

> To:             paypalsettlement@settlement4onlinepayments.com
> Subject:        claim site questions
> To Whom It May Concern,
>
> 1) Why doesn't the claims site include an exclusion form?
>
> 2) Why doesn't the claims site offer any electronic submission of objection(s)?
>
> 3) Why doesn't the claims site set forth a breakdown of the claims submitted into the 3 categories of claims pursuant to the plan of allocation?
>
> 4) Why doesn't the claims site make available the operative complaint in this case?
>
> 5) Why doesn't the claims site make available the docket or any of the relevant pleadings?
>
> -PayPal Settlement class member

62.    Plaintiff also began to draft a solicitation intended to recruit objectors to the proposed settlement.    A true and correct copy of the never-completed draft of Plaintiff's solicitation to potential objectors to the class settlement is annexed hereto as Exhibit "5" and incorporated by this reference.

63.    Regrettably, as a result of defendants' misconduct, the objector solicitation would never see the light of day.

### G.  The ODC Steps In to Assist PayPal

64.    On or about August 16, 2004, Plaintiff received a letter from defendant Rocanelli, dated August 12, 2004, on behalf of the ODC.  Acting upon a complaint by the Delaware Firm, Rocanelli stated in the letter that the ODC was launching an extensive probe into Plaintiff's conduct.  *Unbeknownst to Plaintiff, Rocanelli was formerly an attorney with the Delaware Firm.*  Rocanelli never disclosed this fact to Plaintiff, nor apparently did she consider whether this relationship might cloud her judgment with respect to civil litigation between parties represented by the Delaware Firm and Plaintiff.  This first bogus probe shocked Plaintiff.

65.    The very next day, Plaintiff met face-to-face with Rocanelli to explain the contractual underpinnings of the PayPal Lawsuit, as well as his concerns about PayPal's proposed class action settlement.  Revealing her unmistakable animus, Rocanelli rejected this explanation out of hand and severely castigated Plaintiff for disrespecting the Delaware Firm. She expressed her belief that Plaintiff was out of line and saw himself as a "cowboy" in fighting against corporate misconduct, a role she considered distasteful and inappropriate.  The thrust of Rocanelli's objection was: "*That's not the way we do things around here in Delaware.*"

66.     After hearing of Plaintiff's objector solicitation draft, Rocanelli refrained from expressing an explicit opinion as to the propriety of challenging PayPal's class action settlement, although her opposition to such a course of action was made clear to Plaintiff.  Indeed, her actions would speak louder than words.  As the meeting ended, Rocanelli coldly advised Plaintiff to retain counsel and inform his then-employer of her probe.  At no time throughout the meeting did Rocanelli suggest that Plaintiff had committed any crime.

67.     That day, Plaintiff advised his then-employer, a law firm, of Rocanelli's inquiry.  Fearing Rocanelli's well-known vindictiveness, the law firm immediately placed Plaintiff on a leave of absence.  On or about this date, Rocanelli, using her influence, contacted the DDJ to recommend that it initiate a criminal inquiry into the circumstances surrounding the PayPal Lawsuit.  Rocanelli did so knowing that any sort of criminal charge would give her extreme leverage to restrict Plaintiff's ability to continue practicing law.

68.     The ***very next day*** after Plaintiff's August 17 meeting with Rocanelli, Plaintiff received an extensive email from the class counsel in PayPal's class action litigation, purporting to answer Plaintiff's questions about the proposed PayPal class action settlement.

69.     Notably, class counsel wrote to Plaintiff at his employer's email address, signifying that class counsel had somehow identified Plaintiff as the author of the anonymous email, set forth above, inquiring about the proposed settlement.  Plainly, class counsel viewed Plaintiff as a threat to neutralize.

70.     Coming just one day after Plaintiff was forced into a leave of absence due to Rocanelli's inquiry, and after Rocanelli's excoriation of Plaintiff, Plaintiff saw the writing on the wall: Rocanelli would not look kindly upon Plaintiff objecting to PayPal's class action

settlement. Plaintiff could not risk potentially catastrophic confrontation with Rocanelli by following through with his planned objection campaign. Thus, PayPal averted a potentially significant obstacle and gained a sweeping release against liability. Rocanelli's swift intervention had saved the day for her former employer's client.

71. Unbowed, Plaintiff moved on. In early 2005, Plaintiff hung out his own shingle as a solo practitioner. Shortly after setting up his law office, Plaintiff distributed the following solicitation regarding potential claims against certain officers of eBay, Inc., PayPal's parent company:

Advertising Material
ATTORNEY INVESTIGATES WHETHER WHITMAN
MUST RETURN OVER $100 MILLION TO EBAY

WILMINGTON, DELAWARE - March 10, 2004

Shareholder attorney Joseph N. Gielata has commenced an investigation into whether eBay's accounting restatement in 2003 obligated eBay's CEO Meg Whitman to return to the company hundreds of millions of dollars in compensation and stock sales.

In its 2002 annual report, released in 2003, eBay quietly restated its pro forma earnings, revising upwards its reported pro forma losses for 2001 and 2000 by 743% and 26%, respectively. The company has never disclosed the reasons for these prior period adjustments. In effect, the restatement revealed that eBay's financial statements for 2001 and 2000 were materially false and/or misleading when issued.

While eBay issued defective financial statements, its market valuation soared and Whitman sold over $100 million in stock.

However, Whitman may be obligated to return this windfall to eBay. Under the Sarbanes-Oxley Act of 2002, the CEO and CFO of a public company must return certain compensation and proceeds from stock sales to the company if it prepares an accounting restatement as a result of misconduct. Under the corporate law of Delaware (where eBay is incorporated), a shareholder may be able to enforce this forfeiture statute on the company's behalf. Also, eBay's directors may be liable if they failed to investigate or pursue such forfeiture.

If you have owned eBay stock continuously since 2002 and would like to learn more about this claim, please contact Joe Gielata at ebay@gielatalaw.com or (302) 798-1096. His office address is 501 Silverside Road, Suite 90, Wilmington, Delaware 19809.

Mr. Gielata is licensed to practice law in Delaware.

Advertising Material

72.     Thus, PayPal's parent company would continue to view Plaintiff as a viable and dangerous adversary, but one who could be eliminated with Rocanelli's assistance.

### H.   Fighting Other Corporate Malfeasance: The JPMorgan Litigation

73.     JPMorgan Chase & Co. ("JPMorgan") is one of the State's largest employers.

74.     On March 17, 2005, Plaintiff commenced a class action against JPMorgan and certain of its present and former directors (the "JPM Litigation"). The operative complaint in the JPM Litigation alleges that JPMorgan shareholders were duped into approving a $57 billion merger with Bank One Corporation in 2004. Unbeknownst to them, JPMorgan's CEO had rejected a $50 billion deal to save his CEO title for 2 years more. JPMorgan shareholders paid for the $7 billion difference without having been told of the better offer. Plaintiff's clients assert claims under Sections 10(b), 14(a) and 20(a) of the Securities and Exchange Act of 1934 [15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)], Rules 10b-5 and 14a-9 promulgated thereunder by the SEC [17 C.F.R. §§ 240.l0b-5 and 240.14a-9], Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 [15 U.S.C. §§ 77k, 77l(a)(2) and 77o], and pendent common law claims for breach of fiduciary duty.

75.     The JPM Litigation seeks in excess of $10 billion in compensatory damages and punitive damages in addition. Plaintiff accepted the engagement on contingency and anticipates receiving a reasonable percentage of any funds recovered.

76.    On March 18, 2005, a rival shareholder lawyer (the "Rival Lawyer") in a state court class action related to the JPM Litigation sent a letter to Vice Chancellor Stephen P. Lamb, of the State's Court of Chancery, objecting to Plaintiff's actions in the JPM Litigation.  A true copy of the letter is annexed hereto as Exhibit "6" and incorporated by this reference.  In a cheap tactical gambit, the Rival Lawyer copied Rocanelli on the letter.

77.    Plaintiff is informed and believes that the Rival Lawyer had previously been an attorney with the Delaware Firm ***and had been a colleague of Rocanelli***.

78.    Plaintiff is informed and believes that the Rival Lawyer and Rocanelli knew each other and had worked together.

79.    The Rival Lawyer was aware of Rocanelli's probe into Plaintiff because Plaintiff had previously worked for the Rival Lawyer.

80.    Plaintiff is informed and believes that  the Rival Lawyer copied Rocanelli on his letter only because he knew that Rocanelli would  seize upon it as an excuse to further harass Plaintiff and interfere with his law practice.

81.    The Rival Lawyer's letter was presented not only to Vice Chancellor Lamb, but also to the federal judge in the JPM Litigation and to the State's Supreme Court.  Each and every time, the letter was ***completely ignored*** in written opinions by the Court of Chancery, the federal court, and the State's Supreme Court, indicating that no court took seriously the Rival Lawyer's insinuations.

82.    On June 21, 2005, the district court appointed Plaintiff lead counsel in the JPM Litigation.  The JPM Litigation continues to be prosecuted.

## I.   **The Last Straw: The MBNA Litigation**

83.     Rocanelli's bad-faith harassment of Plaintiff escalated dramatically in June 2005. On or about June 6, 2005, partnering with a San Diego law firm, Plaintiff filed a derivative lawsuit against certain directors and executives of MBNA Corporation (the "MBNA Litigation"), one of the State's largest employers.

84.     Unbeknownst to Plaintiff, Rocanelli's husband is an executive of MBNA Corporation.  The foregoing allegation is made upon belief based upon, in part, the following information: (i) MBNA's March 19, 1999 annual report indicating that Thomas D. Veale was a company operating executive, (ii) the absence of any publicly available information indicating that Veale is no longer an MBNA executive, (iii) a December 29, 2003 newspaper article in *The News Journal* reporting Rocanelli's married status, and (iv) Delaware property records indicating that Veale and Rocanelli have purchased and sold homes together, indicating that Veale is Rocanelli's husband.

85.     The filing of the lawsuit involving the MBNA Corporation was the last straw for Rocanelli.  Not only had Plaintiff challenged Rocanelli's former employer (the Delaware Firm) and her former colleagues (including the Rival Lawyer and others); now Plaintiff was challenging **her husband's own employer**.  Her earlier animus towards Plaintiff transformed into a vendetta armed with the vast powers of the State.  By any means necessary, including those available to her under color of State law, Rocanelli would retaliate by attempting to destroy Plaintiff's ability to practice law.

**J.  The ODC Steps In Again, This Time
   to Assist the Rival Lawyer**

86.    By letter dated June 16, 2005, Rocanelli informed Plaintiff that the ODC had initiated a ***second*** probe into Plaintiff's conduct, this time in connection with the JPM Litigation. Curiously, Rocanelli's letter arrived the same day that the defendants in the JPM Litigation filed their motion to dismiss the operative complaint in that action.   Again, Rocanelli's uncanny timing interfered with ongoing civil litigation.

87.    Citing the Rival Lawyer's letter dated ***three months earlier,*** which had been circulated to and ignored by multiple courts, Rocanelli demanded that Plaintiff "provide a written explanation for [his] professional conduct in direct response to the allegations set forth in [the Rival Lawyer's] letter dated March 18, 2005 addressed to the Honorable Stephen P. Lamb, a copy of which is enclosed.  Please include specifically how you fulfilled your obligations pursuant to Rules 1.1, 1.2, 1.6, 1.9, 3.1, 3.3, 4.1 and 8.4 of the Delaware Lawyers' Rules of Professional Conduct."   Other than appending and adopting the Rival Lawyer's insinuations, Rocanelli did not articulate in any way that Plaintiff had committed any particular misconduct.

88.    Thus, Rocanelli had ***once again*** interfered in civil litigation ***on behalf of a former colleague***.  Further, this additional harassment in the form of yet another bogus probe came only two weeks after Plaintiff had filed a lawsuit against her husband's employer.  But Rocanelli's most audacious retaliatory move was yet to come.

89.    On July 15, 2005, Plaintiff responded to Rocanelli's June 16 letter, noting that he would "be out of the country visiting family between July 25 and August 9" and elsewhere placing Rocanelli on specific written notice that, in addition to the JPM Litigation, he was also involved in the MBNA Litigation.

90.     On July 25, having heard nothing from Rocanelli, Plaintiff boarded a plane for Santiago, Chile to visit his grandfather and other family members in the small town of his birth, San Pedro de la Cruz, just outside the city of Concepcion, Chile.

### K.   The Sneak Attack: Defendants Pounce While Plaintiff is Outside the Country

91.     By July 15, 2005, Rocanelli knew that Plaintiff would be "out of the country visiting family between July 25 and August 9," and the other defendants (through their agents) thus had reason to know that Plaintiff would be outside the country during that time period.

92.     Sensing a perfect opportunity to strike, defendants moved in for the kill.

93.     On July 25, 2005, the DDJ sought and obtained on behalf of the State an indictment of Plaintiff and the Counterparty on felony charges of theft and conspiracy to commit theft (the "Indictment").  A true copy of the two-page Indictment is annexed hereto as Exhibit "7" and incorporated by this reference.

94.     The State, through the DDJ and at Rocanelli's urging, essentially sold the grand jury a bill of goods.  Through a haze of vagueness, the Indictment transforms a contractual dispute between an individual and a powerful corporation, as set forth herein, into criminal charges against the individual and his attorney!  By siding with a notorious corporate malfeasant, the defendants have given new meaning to the State's "business-friendly" reputation.

95.     Contrary to Plaintiff's constitutional right under the Sixth Amendment "to be informed of the nature and cause of the accusation" in a criminal prosecution, the Indictment affords no notice of the theft accusation, which purportedly was committed "pursuant to a

common scheme," as no scheme is described. Nor does the conspiracy charge comply with the Sixth Amendment, as it does not allege a specific overt act or any means and method.

96.     The obvious lack of particularity in the Indictment also violated Plaintiff's Fifth Amendment right to be accused by a grand jury for any felony. The Indictment effectively leverages the grand jury's acquiescent endorsement into an unbounded charge, a "blank check," permitting the State to alter or amend its theory without limitation or accountability.

97.     The Indictment is all the more appalling because PayPal has engaged in an unlawful course of conduct with the actual knowledge and approval of the Defendants. Defendants Rocanelli and the ODC have completely abdicated their responsibilities, as actors under color of state law within the meaning of 42 U.S.C. § 1983, to implement their powers solely to promote the public interest. Instead, defendant Rocanelli, through the ODC, has knowingly allowed PayPal's interests and the interests of Rocanelli's family and friends to influence the vast prosecutorial power of the State to further purely private goals. Incredibly, with full knowledge of PayPal's outrageous and illegal conduct with respect to the MBG scam and other corporate misconduct, the defendants have nevertheless initiated retaliatory prosecution against Plaintiff.

98.     Further demonstrating the malice at the heart of the Prosecution, the State sought and obtained an arrest warrant for Plaintiff rather than issuing a criminal summons. Rule 9(a) of the State's Rules of Criminal Procedure provides, in relevant part, that:

> Upon the request of the attorney general certifying that there is a warrant or capias for the defendant outstanding, that there is a risk of flight or of danger to the public, or that there is other good reason that a warrant should issue in lieu of a summons, the court shall issue a warrant for each defendant named in an information or in an indictment.

99.     There was no basis whatsoever to assert that Plaintiff presented a risk of flight or danger to the public, or that there was any other good reason for an arrest warrant.  Nevertheless, consistent with the retaliatory and bad faith nature of the Prosecution, the State exhibited its malice by seeking an arrest warrant, in the knowledge that Plaintiff had yet to re-enter the country and inevitably would be detained upon re-entry.

### L.   Rocanelli's Criminal Act: The ODC Demands Automatic Suspension

100.     At long last, Rocanelli got her wish.  Through the Indictment, Rocanelli's vendetta was almost completely realized.  With the Indictment firmly in hand, the ODC rushed to file a petition for a suspension of Plaintiff's law license pursuant to Rule 16 of the Delaware Lawyers' Rules of Disciplinary Procedure.

101.     By drafting, endorsing and filing a petition for an interim suspension of Plaintiff's license to practice law at the same time that Plaintiff was representing a shareholder in the MBNA Litigation, Rocanelli committed a crime under 29 *Del. C.* § 5805(f)(1) because, upon information and belief, her husband is an employee of MBNA who earns or has earned a salary likely in excess of $5,000.  Pursuant to § 5805(f)(1), "[a]ny person who knowingly or willfully violates any provision of this section shall be guilty of a misdemeanor…."  In particular, Rocanelli violated 29 *Del. C.* § 5805(a)(1), which provides that "[n]o state employee…may participate on behalf of the State in the review or disposition of *any* matter pending before the State in which the state employee…has a personal or private interest…."  (Emphasis added.) "'Matter' means any application, *petition*, request, business dealing or transaction of any sort." 29 *Del. C.* § 5804(7) (emphasis added).  "A personal or private interest in a matter is an interest which tends to impair a person's independence of judgment in the performance of the person's

duties with respect to that matter." *Ibid.* "A person has an interest which tends to impair the person's independence of judgment in the performance of the person's duties with respect to any matter when…[t]he person or *a **close relative** has a **financial interest in a private enterprise*** which enterprise or interest *would be affected by any action* or inaction on a matter to a lesser or greater extent than like enterprises or other interests in the same enterprise." 29 *Del. C.* § 5805(a)(2)(b) (emphasis added). The definition of a "close relative" includes a person's spouse. 29 *Del. C.* § 5804(1). "A person has a 'financial interest' in a private enterprise if…[t]he person is associated with the enterprise and received from the enterprise during the last calendar year or might reasonably be expected to receive from the enterprise during the current or the next calendar year income in excess of $5,000 for services as an employee [or] officer…." 29 *Del. C.* § 5804(5)(b).

102.    According to Rocanelli and the ODC, no evidence is necessary under Rule 16, other than the Indictment itself, to suspend Plaintiff's law license. In their view, that Plaintiff is completely innocent, and presumed as such, is irrelevant. Further, in their view, that the Indictment does not even state a crime is equally immaterial. By force of the Indictment alone, Rocanelli and the ODC implored the Supreme Court to immediately incapacitate Plaintiff and thereby strip his clients of their chosen counsel.

103.    The ODC's petition was initially set for a hearing at 10:00 a.m. on August 1, 2005, when, ***as Rocanelli knew***, Plaintiff would be out the country. Thus, but for the swift intervention of an attorney for Plaintiff in securing a continuance of the hearing until August 11, 2005, Plaintiff's law license would have been suspended on August 1, 2005.

104.    On August 9, 2005, a panel of the Supreme Court held a pre-hearing conference at which it was determined that Plaintiff would notify his clients and each court before which he appeared of the Indictment and that the ODC's petition for an interim suspension of Plaintiff's law license would be continued indefinitely.    The Supreme Court panel further ordered Rocanelli's recusal from any proceeding involving Plaintiff.

### Count 1
### (FIRST AMENDMENT – 42 U.S.C. § 1983)

105.    Plaintiff repeats and reallege each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

106.    Plaintiff has the right, secured by the First Amendment to the United States Constitution, not to be deprived of his right to free speech and free assembly, especially by governmental actions that are unrelated to any legitimate governmental interest.    The First Amendment also guarantees Plaintiff the right to petition the government for a redress of grievances.

107.    Through the ODC and under color of state law, Rocanelli intimidated Plaintiff into silence on a matter of public concern, namely, the fairness, adequacy, and reasonableness of the nationwide class action settlement proposed by PayPal in 2004.    But for Rocanelli's wrongful acts, Plaintiff would have exercised his First Amendment rights to object to the proposed settlement, to gather other objectors, and to petition the federal court overseeing the class action not to approve the settlement as proposed.

108.    Rocanelli also retaliated against Plaintiff for his expressed desire to exercise his First Amendment rights, as set forth herein, by causing Plaintiff to be subjected to the Prosecution.

109.    The foregoing course of conduct, taken under color of state law by Rocanelli and the ODC, deprived Plaintiff of his privileges, rights and immunities secured by the United States Constitution, including but not limited to those protected under the First Amendment, as applied to state actors by the Due Process Clause of the Fourteenth Amendment.

110.    By reason of the foregoing course of conduct undertaken by Rocanelli and the ODC, Plaintiff is entitled under 42 U.S.C. § 1983, against said defendants, to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory and punitive damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## Count 2
### (FOURTH AMENDMENT – 42 U.S.C. § 1983)

111.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

112.    The aforementioned abuse of the ODC's regulatory and enforcement powers by Rocanelli is so outrageously arbitrary, capricious, and irrational as to constitute a gross abuse of governmental authority which has violated Plaintiff's rights under the Fourth Amendment to the United States Constitution against unreasonable seizure and prosecution absent probable cause.

113.    Through the ODC, Rocanelli caused the baseless and futile Prosecution.  Due to her actions and influence, the Indictment against Plaintiff was sought and obtained, despite the absence of any probable cause that a criminal offense had been committed by Plaintiff.

114.    As a result of the Prosecution, Rocanelli caused Plaintiff to be seized twice: *first*, on or about July 30, 2005, when Plaintiff was detained in Miami; and *second,* on or about August 9, 2005, when Plaintiff was booked, processed, ordered to appear for arraignment, and subsequently bound for trial.  Both seizures were unreasonable in violation of the Fourth Amendment as they were based upon the Indictment which lacked probable cause.

115.    The Fourth Amendment applies to state actors through the Due Process Clause of the Fourteenth Amendment.

116.    Under color of state law, and in reckless or callous disregard of, or indifference to, Plaintiff's rights, Rocanelli and the ODC have deprived Plaintiff of present and future employment and prospective economic advantage and damaged his reputation.

117.    By reason of the foregoing course of conduct, Plaintiff is entitled against Rocanelli and the ODC under 42 U.S.C. § 1983 to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory and punitive damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## Count 3
### (FIFTH AMENDMENT – 42 U.S.C. § 1983)

118.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

119.    The aforementioned abuse of the ODC's regulatory and enforcement powers by Rocanelli is so outrageously arbitrary, capricious, and irrational as to constitute a gross abuse of governmental authority which has violated Plaintiff's rights under the Fifth Amendment to the United States Constitution.

120.    Through the ODC, Rocanelli caused the baseless and futile Prosecution.  Due to her actions and influence, the Indictment against Plaintiff was sought and obtained, despite the absence of any probable cause that a criminal offense had been committed by Plaintiff.

121.    The Indictment deprived Plaintiff of his Fifth Amendment right to be charged with a felony only upon a finding of probable cause.  As the Indictment states no cognizable offense, and intentionally avoids particularity in order to conceal this failure, no probable cause could be found that Plaintiff committed a criminal offense.

122.    By reason of the foregoing course of conduct, Plaintiff is entitled against Rocanelli and the ODC under 42 U.S.C. § 1983 to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory and punitive damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## Count 4
### (SIXTH AMENDMENT – 42 U.S.C. § 1983)

123.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

124.    The aforementioned abuse of the ODC's regulatory and enforcement powers by Rocanelli is so outrageously arbitrary, capricious, and irrational as to constitute a gross abuse of

governmental authority which has violated Plaintiff's right to notice of the nature and cause of the accusation(s) against him under the Sixth Amendment to the United States Constitution.

125.    Through the ODC, Rocanelli caused the baseless and futile Prosecution. Due to her actions and influence, the Indictment against Plaintiff was sought and obtained, despite the absence of any probable cause that a criminal offense had been committed by Plaintiff.

126.    The Indictment deprives Plaintiff of his Sixth Amendment right to be adequately informed of the nature and cause of the accusation(s) against him. The charges in the Indictment are unconstitutionally vague and fail to apprise Plaintiff of what he must meet at trial in the criminal proceeding. Furthermore, the vagueness in the Indictment prevents Plaintiff from establishing the extent to which double jeopardy attaches if the Indictment is dismissed or Plaintiff is acquitted at trial.

127.    By reason of the foregoing course of conduct, Plaintiff is entitled against Rocanelli and the ODC under 42 U.S.C. § 1983 to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory and punitive damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## Count 5
### (FOURTEENTH AMENDMENT – 42 U.S.C. § 1983)

128.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

129.    Plaintiff is entitled to the equal protection of the laws under the Fourteenth Amendment of the United States Constitution, and due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.

130.    Plaintiff, similarly situated to other PayPal users, has been intentionally singled out by the defendants for disparate, unlawful and malicious treatment.

131.    By reason of the foregoing course of conduct undertaken, Plaintiff is entitled against Rocanelli and the ODC to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory and punitive damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## Count 6
### (Equal Rights Under the Law – 42 U.S.C. § 1981)

132.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

133.    Defendants' misconduct violated Plaintiff's rights under 42 U.S.C. § 1981(a) "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

134.    Plaintiff, of Chilean origin and descent, and the Counterparty, of Taiwanese descent, sought to enforce the December Contract against PayPal and brought suit against PayPal in a Delaware court, as they were entitled to do under § 1981.  Defendants frustrated and

impaired these rights by retaliating against Plaintiff and the Counterparty through multiple bogus probes and the Prosecution for no other apparent reason other than their race.

135.   By reason of the foregoing discriminatory course of conduct undertaken, Plaintiff is entitled against all defendants to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory and punitive damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## Count 7
### (Conspiracy to Interfere With Civil Rights - 42 U.S.C. § 1985)

136.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "135" above, as if fully set forth herein.

137.   Beginning in or before August 2004, and continuing up to and including the present, within the District of Delaware, and elsewhere, defendants Rocanelli and the ODC did knowingly conspire with each and others known, including PayPal and the Delaware Firm, and unknown to interfere with Plaintiff's civil rights, as set forth herein, for the purpose of depriving, either directly or indirectly, Plaintiff and others of the equal protection of the laws, and/or of equal privileges and immunities under the laws; and/or for the purpose of preventing or hindering the constituted authorities of the State from giving or securing to all persons within such State the equal protection of the laws.

138.   The conspiracy set forth herein injured Plaintiff in his person and property, and deprived Plaintiff of having and exercising his rights and privileges as a citizen of the United States.

139.    In furtherance of said conspiracy and to effect and accomplish the objects thereof, defendants Rocanelli and the ODC and others known, including PayPal and the Delaware Firm, and unknown committed the following overt acts, among others, within the District of Delaware, and elsewhere: (1) the Delaware Firm contacted Rocanelli in order to harass and neutralize Plaintiff; (2) Rocanelli caused the DDJ to commence a baseless and futile criminal investigation and prosecution against Plaintiff to intimidate Plaintiff into refraining from challenging PayPal's proposed class action settlement; (3) Rocanelli, in violation of 29 *Del. C.* § 5805(f)(1), filed a petition on the ODC's behalf seeking an interim suspension of Plaintiff's law license; and (4) Rocanelli initiated two bogus probes against Plaintiff at the behest of former colleagues.

## **Count 8**
### **(Negligent Failure to Prevent Conspiracy – 42 U.S.C. § 1986)**

140.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "139" above, as if fully set forth herein.

141.    Defendants Rocanelli and the ODC have actual knowledge of a conspiracy to violate Plaintiff's rights as described by 42 U.S.C. § 1985.

142.    Defendants Rocanelli and the ODC knew or had reasons to know about a conspiracy to injure Plaintiff and failed to prevent a conspiracy.

143.    Defendants Rocanelli and the ODC have a duty and the power to prevent or aid in preventing the commission of the conspiracies described by 42 U.S.C. § 1985, and defendants failed to do so.

144.    Plaintiff suffered damages caused by the misconduct of Defendants Rocanelli and the ODC.

145.    Defendants Rocanelli and the ODC are jointly and severally liable to Plaintiff.

**Count 9**
**(Award of Attorneys' Fees, Expert Fees**
**and Costs - 42 U.S.C. § 1988)**

146.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "145" above, as if fully set forth herein.

147.    Plaintiff is entitled to an award of costs, including his reasonable attorney's fees and expert fees.

**Count 10**
**(Deprivation of Federal Statutory Rights - 42 U.S.C. § 1983)**

148.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

149.    The Private Securities Litigation Reform Act of 1995 (the "PSLRA") requires federal courts to appoint a lead plaintiff in federal securities class actions.

150.    The PSLRA provides that the most adequate plaintiffs, those with the largest financial interest in the relief sought by the class, shall be appointed lead plaintiffs. 15 U.S.C. §§ 77z-1(a)(3)(B), 78u-4(a)(3)(B).  The plaintiff selected as most adequate plaintiff is directed to select class counsel subject to the approval of the court. 15 U.S.C. §§ 77z-1(a)(3)(B)(v), 78u-4(a)(3)(B)(v).

151.    Pursuant to the federal statutory provisions identified hereinabove, Plaintiff was appointed lead counsel in the JPM Litigation on June 21, 2005.

152.    The aforesaid course of conduct of the defendants has interfered with, impaired and otherwise deprived Plaintiff of his right to be lead counsel in the JPM Litigation.

153.    By reason of the foregoing course of conduct, Plaintiff is entitled against defendants Rocanelli and the ODC to such relief under 42 U.S.C. § 1983 as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory and punitive damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

### Count 11
**(Damages for Malicious Prosecution)**

154.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

155.    As set forth above, Defendants did without proper lawful authority intentionally and maliciously institute criminal proceedings against Plaintiff through seeking and obtaining the Indictment. The prosecution was initiated to persecute Plaintiff without any requisite legitimate governmental interest and without probable cause that any criminal offense was committed.

156.    The charges in the Indictment are futile and must be dismissed with prejudice; or Plaintiff shall be acquitted of the charges.

157.    Plaintiff was specifically singled out for criminal prosecution for (i) his participation as counsel in litigation against some of the State's largest employers, and (ii)  his crossing of defendant Rocanelli (by litigating against her former employer, her former colleagues, and her husband's employer) and thereby alleges specific violations of his right of redress of grievances as the basis for malicious prosecution.

158.    As a result of the malicious prosecution, Plaintiff has lost prospective economic rights, including substantial claims to fees in connection with pending suits he was or is

prosecuting, such as the MBNA Litigation and the JPM Litigation. Such loss of prospective fees, among other losses sustained, constitutes damages for the malicious prosecution.

## Count 12
### (Damages for Intentional Infliction of Emotional Distress)

159.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

160.    Rocanelli did knowingly cause Plaintiff to be subjected to the Prosecution for purposes intended to disrupt his free speech rights and litigation activities and not to achieve otherwise legitimate governmental ends. The conduct of Rocanelli herein set forth was odious, outrageous, wilful, wanton, reckless, intentional, persistent and continuous.

161.    Instituting multiple bogus probes against Plaintiff and causing Plaintiff to be unreasonably charged, seized and bound for trial is outrageous behavior outside that tolerated by the norms of society, and was the direct cause of extreme emotional distress for Plaintiff from the day such probes were commenced through the present.

162.    These actions were so outrageous in character, and extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

## Count 13
### (Damages for Tortious Interference)

163.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

164.   Defendant Rocanelli's conduct as alleged herein gives rise to common law liability for intentional interference with contractual relations and intentional interference with prospective economic advantage and/or prospective contractual or business relations.

165.   At all relevant times, Plaintiff had valid contractual relationships or legitimate expectations of legally enforceable contractual or economic relationships with third parties.

166.   The foregoing relationships would have provided economic and other benefits to Plaintiff but for Rocanelli's tortious and illegal conduct.

167.   At all relevant times, Rocanelli knew of Plaintiff's valid and legally enforceable contractual and prospective contractual and economic relationships with third parties. Specifically, Rocanelli knew, or had reason to know, that Plaintiff had been engaged by clients to prosecute cases including the MBNA Litigation and the JPM Litigation, among others.

168.   Rocanelli willfully engaged in the foregoing acts and practices with the intent to induce breach or disruption of Plaintiff's existing and prospective contractual and economic relationships with third parties.

169.   Rocanelli's deliberate and primary purpose in engaging in some, if not all, of the foregoing acts and practices was to disrupt Plaintiff's prospective contractual and economic relationships with third parties.

170.   The foregoing acts and practices, and Rocanelli's continuing course of illegal and tortious conduct, were and are wrongful for reasons in addition to their impact on Plaintiff's business and prospects for economic advantage and development.

171.    The foregoing acts and practices, and the continuing course of Rocanelli's illegal and tortious conduct, deliberately and directly resulted in actual breaches or disruptions of Plaintiff's existing and prospective contractual and business relations with third parties.

172.    The foregoing acts and practices, and the continuing course of Rocanelli's illegal and tortious conduct, directly and proximately caused Plaintiff to suffer injury and damages to his business and property, as set forth above.

173.    Rocanelli committed these tortious acts with deliberate and actual malice, ill-will, and specific knowledge that her actions constituted an outrageous, willful and wanton disregard of Plaintiff's legal rights.

## Count 14
### (Declaratory Relief)

174.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

175.    Plaintiff contends that the Defendants have unlawfully interpreted PayPal's MBG Policy agreement as a form of insurance rather than, as it plainly spells out, a put option contract. Plaintiff further contends that the MBG Policy, on its face and as implemented by PayPal, provides PayPal with an improper and unlawful degree of control over honoring or reneging on its contractual commitments under the MBG Policy.    Plaintiff further contends that the Prosecution solely benefits PayPal's purely private interest in honoring as few MBG Policy reimbursement requests as possible to increase its profits.

176.    Plaintiff is informed and believes that the defendants contend that the MBG contracts are insurance contracts and deny that the MBG contracts are put option contracts.

177.    By reason of the foregoing, a serious dispute exists between Plaintiff and the defendants concerning the validity and nature of the MBG Policy such that a judicial determination of the rights, powers, privileges, duties, obligations and liabilities of the parties to contracts governed by the MBG Policy is desirable, necessary and in the public interest.

## Count 15
### (Preliminary and Permanent Injunctive Relief)

178.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "104" above, as if fully set forth herein.

179.    The State has brought the futile Prosecution in bad faith.

180.    The Prosecution represents the culmination of Rocanelli's vendetta and smear campaign directed against Plaintiff.

181.    The Indictment so lacks particularity that it violates the Fifth Amendment by allowing the State, by and through the DDJ, to sidestep the grand jury and manipulate, amend and/or alter its theory of the case without limitation or accountability.

182.    The Indictment so lacks particularity that it violates the Sixth Amendment by failing to inform Plaintiff of the nature and cause of the accusation.

183.    Plaintiff's right to a speedy trial has been violated, as the Indictment was returned in July 2005 and a trial is not scheduled to begin until June 2006.

184.    Plaintiff has been and continues to be irreparably injured as a result of the deprivation of his constitutional rights and therefore is entitled to preliminary and permanent injunctive relief, as set forth in the Prayer for Relief herein.

## JURY TRIAL DEMANDED

185.    Plaintiff hereby demands a trial by jury on all issues triable by jury in this matter.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests a judgment as follows:

A)    Permanently enjoining the defendants from continuing the Prosecution and the related suspension proceeding, and declaring that the Prosecution violates Plaintiff's constitutional rights;

B)    Declaring that the MBG contracts between Plaintiff and PayPal are valid and enforceable, as a matter of law, and that any dispute concerning the MBG contracts is, at most, a civil matter;

C)    Permanently enjoining the defendants from wrongfully impeding or interfering with Plaintiff's right to practice law;

D)    Retaining jurisdiction in this Court to enforce any and all relief granted in favor of Plaintiff;

E)    Awarding compensatory damages in favor of Plaintiff and against the defendants, jointly and severally, in such amount as the Court deems just and proper to compensate Plaintiff for the deprivation of his constitutional rights, deprivation of any legal fees that Plaintiff would have earned but for the malicious Prosecution, his out-of-pocket expenditures, costs, fees and other charges and expenses proximately caused by the defendants'

intentional and wrongful course of conduct which has delayed, obstructed and unreasonably denied Plaintiff the ability to represent his clients;

F)    Awarding to Plaintiff punitive damages sufficient to punish and deter defendants from repeating the foregoing unlawful conduct in the future;

G)    Awarding to Plaintiff his costs in this action, including all reasonable attorneys' fees and expert fees; and

H)    Awarding such other and further relief as to this Court may seem just, equitable and proper.

Dated:    January 30, 2006                    Respectfully submitted,


                                 /s/ *Joseph N. Gielata*
                                 Joseph N. Gielata, Esq., *pro se* (DSBA #4338)
                                 501 Silverside Road, Suite 90
                                 Wilmington, Delaware 19809
                                 (302) 798-1096

## VERIFICATION

Joseph N. Gielata, being duly sworn, deposes and says that he is the plaintiff to this action and that he has written, read and signed the within complaint and that he knows it to be true, except where allegations are stated upon information and belief.

Subscribed and sworn before me this **30ᵗʰ** day of January, 2006

_Mary B. Duvall_
Mary B. Duvall
Notary Public

MARY B. DUVALL
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Mar. 17, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 30, 2006, I electronically filed PLAINTIFF'S AMENDED COMPLAINT with the Clerk of Court using CM/ECF which will send notification of such filing to:

Richard Hubbard, Esq.
Delaware Dept. of Justice
820 N. French St., 6th Floor
Carvel State Building
Wilmington, DE 19801

*Attorney for Defendants*

/s/ *Joseph N. Gielata*
Joseph N. Gielata (DSBA # 4338)
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, Delaware 19809
(302) 798-1096
attorney@gielatalaw.com