**Exhibit A**

<u>PRECEDENTIAL</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-4124
_____


DAVID T. SPRINGER, M.D.

v.

RENATA J. HENRY,
individually and in her official capacity as
Director of the Division of Alcoholism, Drug Abuse
and Mental Health of the Department of
Health and Social Services of the State of Delaware;
GREGG C. SYLVESTER, M.D.,
in his official capacity as Secretary of the
Department of Health and Social Services
of the State of Delaware;
DELAWARE DEPARTMENT OF HEALTH & SOCIAL
SERVICES

Renata J. Henry,
<u>Appellant</u>


_____


On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 00-cv-00885)
District Judge: Honorable Gregory M. Sleet
_____


Argued October 26, 2005


Before: SLOVITER, FISHER, and GREENBERG,
<u>Circuit Judges</u>.


(Filed:  January 18, 2006)

―――

Phebe S. Young     (Argued)
Marc P. Niedzielski
Department of Justice
Wilmington, DE 19801

      Attorneys for Appellant

Thomas S. Neuberger    (Argued)
Stephen J. Neuberger
The Neuberger Firm
Wilmington, DE 19801

      Attorneys for Appellee

Andrew L. Schlafly
New York, NY 10175

      Attorney for Amicus-Appellee
      Association of American Physicians and Surgeons, Inc.

OPINION OF THE COURT

―――

SLOVITER, <u>Circuit Judge</u>.

The case before us can be viewed on two levels.  On one level, we have an appeal by an employer from an adverse verdict in favor of an employee (here independent contractor) on his claim of unlawful termination in retaliation for speech protected by the First Amendment.  On the other level, the amicus curiae, the Association of American Physicians and Surgeons, argues that the issue transcends the relationship between the parties and instead impacts thousands of patients damaged as a result of hospital errors, incompetence, wrongdoing, and cover-ups.  On either level, our task is to review the law applied by the District Court on a plenary basis and ascertain whether there is sufficient evidence to support the jury verdict.

**I.**

The Appellant (defendant in the District Court), Renata Henry, has been the Director of the Division of Alcoholism, Drug Abuse, and Mental Health ("Division"), the division of the State of Delaware's Department of Health and Social Services ("DHSS") responsible for the Delaware Psychiatric Center ("DPC" or "Center") since July 1, 1999. Dr. Gregg Sylvester was the Secretary of DHSS from October, 1997 through January, 2001, the time period at issue here.

Plaintiff/Appellee, Dr. David T. Springer, a psychiatrist, was an independent contractor at the DPC from July 1, 1991 until June 30, 2000 pursuant to nine successive one-year contracts. Although each contract specified that Dr. Springer could be terminated without cause upon fifteen days' notice, and none of the contracts guaranteed renewal, at the end of each contract year Dr. Springer received and signed a proposed contract for the following year.

Each of Dr. Springer's yearly contracts since July 1, 1996 specified his duties as "[t]o provide psychiatric services to patients at Delaware Psychiatric Center." App. at 1431. The parties agree that in practice Dr. Springer also served as the director of the DPC psychiatric residency training program from 1993 until 2000, the elected president and the chairperson of its Medical Staff Executive Committee from 1999 to 2000, and a member of its credentials committee from 1993 to 2000.

In a series of five memoranda dated from October 21, 1999, to January 26, 2000, Dr. Springer voiced his critical opinions on matters relating to the policies, procedures and administration of the DPC. These were introduced into evidence at trial as Plaintiff's Exhibits PX-1 through 5. Other physicians, medical residents, and staff members signed onto these memoranda. We summarize them below but because they are central to the issues before us they are included verbatim in the Appendix to this opinion.

PX 1, a memorandum dated October 21, 1999 entitled "Concerns about Delaware Psychiatric Center," contains a long list of inadequacies on patient care and safety issues.

3

App. at 1384. It describes the DPC as failing in the task of treating psychiatric patients with high quality care in a respectful and safe environment. The memorandum charges that there was "gross understaffing of the hospital;" that experienced psychiatrists had left because "they declined to compromise the patient care and safety;" that security was poor; that members of the staff had subjected patients to demeaning comments; that patients had complained of being physically abused; that "the patient units lack[ed] discipline due to lack of training provided to the aides and technicians;" and that "[s]taff [was] afraid to speak out on issues affecting patient care and safety." App. at 1384-86. In the final paragraph, the memorandum states that as "hospital administration has shown lack of concern over this it is time that these issues were put in front of legislature and electorate of Delaware whose family members come here for treatment and whose tax money is put into work." App. at 1387. Although the memorandum was signed by 11 psychiatric residents, Dr Springer conceded that he helped to edit the language of PX 1. The memorandum shows copies going to Governor Carper, the Secretary of Health & Social Services Sylvester, the Hospital Director Simono, the Medical Director Dr. Smayer, the Training Director Dr. Springer, Senators of Delaware, the DHCC, the Department of Public Safety, and the News Journal, and there was testimony that it was handed to Governor Carper during one of his visits to the hospital.

PX 2, a memorandum dated November 23, 1999 (just one month after the earlier memorandum), from Dr. Springer, in his capacity as president of the DPC Medical Staff Executive Committee and co-signed by five other physicians, is captioned "Critical Issues in the Care of the Mentally Ill in Delaware" and is addressed to the DPC Governing Body. App. at 1388. It summarizes the earlier "plea for help" for the beleaguered program previously outlined by the DPC medical residents, and, in Dr. Springer's own words, "was basically a plea to the Governor, the hospital director, Ms. Henry, and other people." App. at 780. It states, inter alia, that "the capacity of DPC to provide [Delaware citizens with severe and/or long term mental illness] with treatment is deteriorating and facing collapse as of July 2000." App. at 1388.

4

The third memorandum, PX 3, is dated December 2, 1999, less than two weeks later, and was written by Dr. Springer on behalf of the DPC Medical Staff Executive Committee. Dr. Springer testified that it was handed to a Medicare reviewer who was on campus "in hopes that the Medicare folks would help us in terms of some of the concerns that we had with patients." App. at 784-85. It was signed by four physicians in addition to Dr. Springer, and, in its own words, sought to bring attention to the unresolved issues at DPC, and "proposed actions that may begin us on the road to protecting and preserving patient care and safety." App. at 1390. The solutions proposed were to "Address Safety Issues as Soon as Possible;" "Fix Understaffing/Personnel Issues as Soon as Possible;" and "Increase Physicians' Authority to Ensure Quality and Safe Patient Care." Id.

PX 4, dated December 16, 1999, two weeks later, was written by Dr. Springer, in his capacity as President of the DPC Medical Staff, and Psychiatric Residency Training Director, and is addressed to the DPC Governing Body Members and consists of a proposed agenda for the December 22, 1999 Governing Body Meeting. That agenda lists some of the areas that the medical staff believed needed to be addressed under the headings "Need for a Psychiatric Residency Program at DPC," "Need to Attract and Retain Dedicated and Qualified Teaching Attendings" and "Contingency Plans." App. at 1392-93. Under the latter heading, the proposal urges that "if a decision is made to close the residency program, the current residents should be given the option of completing their entire training at DPC." App. at 1393.

The fifth memorandum, PX 5, was Dr. Springer's report to the DPC Governing Body, entitled "Medical Staff President Report to the Governing Body Meeting of January 26, 2000." App. at 1394. The evidence reflects that it was not presented until the March 21, 2000 DPC meeting. The Report summarized the issues of concern affecting patient care at DPC that the Medical Staff Executive Committee Officers proposed for discussion by the Governing Body. The Report stated that "[t]he most glaring issue at hand is that the DPC medical staff is now in open disagreement with the hospital administration about how

the patients should be treated." App. at 1400. It notes, inter alia, that "the situation has deteriorated to the point that physicians are essentially being asked to practice medicine at below their own minimum ethical standards on a routine basis" and lists "New Concerns Around Patient Care, Credentialling [sic] and Liability Issues for DPC." Id. It also discusses "New Patient Care Issue," "Ethical Issues," and "Continued Concerns Around Patient Care and Safety." App. at 1400-04. PX 5 additionally contains the two statements that Henry argues are "falsities" that allegedly deprive the communications of their First Amendment protection - one that she describes as alleging Medicare fraud and the other referring to an applicant as "unlicensed." Those statements will be discussed at length hereafter.

On May 12, 2000, less than two months after Dr. Springer's presentation of the fifth memorandum, Henry notified Dr. Springer by letter that his contract at DPC would not be renewed upon its expiration on June 30, 2000, and that the Division would be publishing Requests for Proposals (RFP), to which Dr. Springer was "free to respond." App. at 1405.

Delaware state law had changed in 1996 to require that contracts for professional services exceeding $50,000 per year, such as those under which Dr. Springer worked, be awarded through a process of public bidding. 29 Del. Code Ann. tit. 29, §§ 6913, 6981 (2005). Dr. Sylvester instructed his Division Directors, including Henry, in accordance with these changes. Since May, 1999, the Division has published Requests for Proposals for the provision of psychiatric services to various Division programs, including the DPC. Dr. Springer did not respond to any of those Requests for Proposals.

It is Dr. Springer's position that he was the only physician whose contract was not renewed before or during the year 2000, ostensibly because of the new state requirement. Although Henry relies on this 1996 state law revision as one of the bases for non-renewal of Dr. Springer's contract, she produced no

6

evidence that she had sent any such notice to anyone else.[1]

On October 6, 2000, Dr. Springer initiated the instant action under 42 U.S.C. § 1983, seeking monetary damages and injunctive relief[2] for the non-renewal of his contract, claiming that said non-renewal constituted retaliation for his engagement in speech protected under the First Amendment.  On November 9, 2001, Henry moved for summary judgment.  She argued that Springer's speech was not protected because it addressed his personal concerns, it was disruptive, he would have been terminated because he failed to bid for renewal, he suffered no damages, and that Henry was entitled to qualified immunity.  Dr. Springer moved for partial summary judgment on the ground that his speech was protected by the First Amendment, and argued that Henry was not entitled to qualified immunity because his First Amendment right was clearly established.

In a Memorandum and Order entered March 12, 2002 (the "March Order"), the District Court denied Henry's motion for summary judgment and granted Dr. Springer's motion.  The Court held that (1) Dr. Springer's "speech was protected under the First Amendment" because "[t]he content of Springer's speech clearly addressed a matter of public concern" and (2) Henry "is not entitled to qualified immunity" because "Springer's right to engage in speech was clearly established at the time he was terminated," and there were no facts to show that Springer's comments had any disruptive effect.  App. at 49.  The court stated, in conclusion, "a jury must decide whether his protected speech motivated his termination, whether he would

---

[1] Henry did not seek Dr. Sylvester's approval for her non-renewal action.

[2] Dr. Springer sought a variety of monetary damages and injunctive relief against the defendants.  DHSS was dismissed for all purposes by stipulation on June 19, 2001.  On the same day all claims for monetary damages against the individual defendants in their official capacities were dismissed.  The request for an injunction was moot.  Thus, the only remaining claim is against Henry in her individual capacity.

have been terminated in the absence of the speech, and whether he suffered damages." App. at 16.   The case proceeded to trial.

On April 1, 2004, the jury returned a verdict for Dr. Springer.  In response to special interrogatories, it found the following: (1) Dr. Springer had "proven by a preponderance of the evidence that his protected activity under the First Amendment reflected in Plaintiff's Exhibits 1, 2, 3, 4 and 5 was a substantial or motivating factor in the decision to not renew or offer him a new contract," App. at 18-19; (2) PX 2, 3, 4, and 5 were the instances of protected activity for the decision not to renew Henry's contract; (3) Henry had failed to prove "by a preponderance of the evidence that regardless of plaintiff's exercise of his First Amendment rights, [that she] would . . . not have renewed his contract in July 2000," App. at 19; (4) Dr. Springer suffered actual injury from the non-renewal of his contract; (5) the damages that Dr. Springer had suffered which were proximately caused by the nonrenewal of his contract  were $285,464 to the present and $588,431 into the future, App. 20; and (6) $100,000 in non-economic damages.  In an additional interrogatory, the jury found that  (7) Henry "acted recklessly, intentionally or maliciously with regard to plaintiff," App. at 22, and awarded Dr. Springer $25,000 in punitive damages in connection with the latter finding.

On September 17, 2004, the District Court entered a memorandum opinion and order on the parties' motion for post-trial relief ("September Opinion")  in which it upheld the jury verdict in all respects but struck the $100,000 award of non-economic reputation damages.  Henry filed this timely appeal.

## II.

### A.

The standards by which we review the trial court's rulings are well-settled.  We exercise "plenary review over the District Court's denial of judgment as a matter of law," applying "the same standard as the District Court." Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003).  We also exercise plenary review of a district court's grant of summary judgment.  McGreevy v.

Stroup, 413 F.3d 359, 363 (3d Cir. 2005).  We review the denial of a new trial for abuse of discretion.  Foster v. Nat'l Fuel Gas Co., 316 F.3d 424, 429-30 (3d Cir. 2003).  A new trial should be granted only where the "great weight" of the evidence cuts against the verdict and "where a miscarriage of justice would result if the verdict were to stand."  Sheridan v. E. I. Dupont de Nemours & Co., 100 F.3d 1061, 1076 (3d Cir. 1996) (en banc).

## B.

We have recently reviewed the analysis applicable when a public employee files a claim of retaliation for engaging in protected First Amendment activity.  McGreevy, 413 F.3d at 364.  The plaintiff must first demonstrate that s/he engaged in protected activity, i.e. speech that addresses a matter of public concern.  We then employ the balancing test derived from Pickering v. Bd. of Educ., 391 U.S. 563 (1968), "to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption."  McGreevy, 413 F.3d at 364 (quoting Pickering, 391 U.S. at 568).  Next, the plaintiff must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action.  Thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct.  Id.

Whether an employee's speech is protected under the First Amendment is a question of law.  Azzaro v. County of Allegheny, 110 F.3d 968, 975 (3d Cir. 1997) (en banc); Baldassare v. New Jersey, 250 F.3d 195 (3d Cir. 2001).  The First Amendment's protection of an employee's right to speak on matters of public concern extends to independent contractors. Bd. of Comm'rs, Wabaunsee v. Umbehr, 518 U.S. 668, 686 (1996).[3]  See also O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712, 721 (1996).  Henry has not seriously

---

[3] Accordingly, we refer to Springer as a "public employee" or "employee" interchangeably.

disputed that the contents of Dr. Springer's speech (i.e., a physician's critique of patient safety and unsafe working conditions) constitute matters of public concern.  In several cases cited by the District Court the courts held that statements by health care providers regarding patient care involved matters of public concern.  Scheiner v. New York City Health and Hospitals, 152 F.Supp.2d 487, 495-96 (S.D.N.Y. 2001); Kattar v. Three Rivers Area Hosp. Auth., 52 F.Supp.2d 789, 799 (W.D. Mich. 1999).  We adopt the District Court's determination that Dr. Springer's speech raising concerns on the state of healthcare at the DPC facility addressed matters of public concern.  The distribution of the five communications to persons within the hospital and those responsible for governing the hospital as well as to public officials and the general public through the media was not inappropriate.

Henry's appellate brief lists sixteen issues but essentially they condense to Henry's claim that the District Court erred in holding that Dr. Springer's speech was protected under the First Amendment without analyzing whether the five memoranda contained false statements that are allegedly unprotected[4] and in

---

[4]  Dr. Springer contends that Henry waived her falsity defense by failing to raise it in the pretrial order. He relies on our decision in Ely v. Reading Co., where we adopted the proposition that "[t]he pretrial order is generally binding on the parties . . . [and] cannot be modified without the permission of the court and a showing of manifest injustice." 424 F.2d 758, 763 (3d Cir. 1970) (citing Fed. R. Civ. Pro. 16; 3 Moore's Federal Practice § 16.11). In Ely, we upheld the district court's refusal to permit Ely's expert witness to testify where the expert's name was not listed in the pretrial order but was only included in an unauthorized supplemental pre-trial memorandum. Id. at 763, n. 13. We held that "[t]he decision of whether or not to permit a change [in a pretrial order] is within the discretion of the trial judge" and that "[a]ppellate interference with this discretion should be kept at a minimum." Id. at 763.

Ely is inapposite to the present facts. Under Ely, we review for a "clear abuse of discretion." However, our decision in Ely did

holding that Henry was not entitled to qualified immunity.  We consider each issue in turn.

### 1. The alleged false statements

Henry's claim asserting that material containing falsities is unprotected under the First Amendment must be considered in the context of now well-established principles.  In Pickering, where the principles relating to a government employee's free speech right were first enumerated, a teacher was dismissed by the Board of Education for writing and publishing in a newspaper a letter criticizing, inter alia, the Board's allocation of school funds between educational and athletic programs.  The Supreme Court unequivocally rejected the view of the Illinois Supreme Court "that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work . . . ."  Pickering, 391 U.S. at 568.  The Court repeated its earlier statement made the preceding year that "[t]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected."  Id. at 568 (quoting Keyishian v. Bd. of Regents, 385 U.S. 589, 605-06 (1967)).

It was in its discussion of the required balancing "between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it

---

not hold that an argument automatically is waived if not extant in the pretrial order. Here the District Court allowed Henry to present testimony at trial as to the truth or falsity of statements in PX 1-5. Dr. Springer does not argue that the District Court abused its discretion in so allowing.  Instead, his argument appears to suggest that even though Henry presented testimony on the falsity issue at trial she has waived her right to raise the issue *on appeal* because it was not present in the pretrial order.  We find no legal support for such a proposition and reject Dr. Springer's contention that Henry waived her falsity argument.

11

performs through its employees," id. at 568, that the Pickering Court made any reference to false statements. The Court reviewed Pickering's speech and determined that some of the statements were erroneous. It did not hold that the speech was therefore unprotected, as Henry would have us do. The Court stated:

> What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

391 U.S. at 572-73 (footnote omitted). It continued:

> The public interest in having free and unhindered debate on matters of public importance - the core value of the Free Speech Clause of the First Amendment - is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him except when such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity.

391 U.S. at 573 (emphasis added) (citations omitted).

Unlike the Pickering Court's acceptance that Pickering's communication included false assertions, we are not prepared to accept without question Henry's assertion that PX 5 contained false statements. They may be more accurately viewed as exaggerations in the context in which they were made.

12

One of the two statements Henry alleges was false, that the hospital hired a physician who was not licensed, was discussed by the District Court in its September Opinion. PX 5 states that "[t]wo Acting Medical Directors were appointed by the administration in one week, including an unlicensed psychiatrist." App. at 1401. Henry objects to the statement that the Administration appointed an "unlicensed psychiatrist." Henry argues that the psychiatrist referred to was actually licensed to practice at DPC. Dr. Springer testified that the basis for his statement was that the psychiatrist in question was "not an independently licensed psychiatrist" or physician but rather had only a DPC institutional license, granted by Henry herself. The District Court's September Opinion states that Henry requested temporary credentialing for a particular physician applicant. Dr. Springer objected, three members of the Credentialing Committee voted to grant the physician partial privilege and two, including Dr. Springer, voted not to do so. Henry refused to sign the physician applicant's credentialing unless he was given full unrestricted privileges. At the conclusion of the discussion of that incident in one half of a page on PX 5, the Report states that "[t]he Medical Staff requests that the Governing Body pass a motion supporting adherence to the Medical Staff Bylaws, especially in regard to matters of credentialling [sic] physicians to the DPC Medical Staff." App. at 1401. Dr. Springer's asserted bases for his statements do not support a contention that they were recklessly made.

The other falsity Henry alleges relates to the section of the same Report headed "Ethical Issues" and alleges that "[i]n order to give the appearance to Medicare reviewers that DPC had adequate staffing," nurses, psychologists, and staff were brought in from elsewhere. The Report denominates this action as unethical, states that it might bring future negative actions against the hospital and requests that the Governing Body pass a motion that DPC must "follow ethical principles in dealing with state, federal or other regulations or other overseeing bodies." App. at 1401. This discussion hardly accuses Henry or DPC with Medicare fraud, as Henry contends.

Even if these statements contain a somewhat one-sided view, their recounting, totaling no more than one page in the 14-

1/2 pages of PX 1 through PX 5, does not support Henry's characterization of the exhibits as containing falsities. They represent a small portion of the evidence presented.

The District Court permitted counsel for Henry to present testimony at trial as to falsity, yet evidence elicited from Henry on direct examination establishes that she believed there to be no untrue allegations in PX 3 or PX 4. The trial transcript demonstrates that the "falsities" counsel for Henry tried to elicit through his client's testimony were merely Henry's disagreements with Dr. Springer as to what policies would best improve the DPC:

> **[Counsel for Henry]:** Okay. Turning to Exhibit 3 – and again, this is one that you have seen quite a bit in the past few days, I think – are there allegations contained in this document which you believe are untrue?
>
> **[Henry]:** No.
>
> **[Counsel for Henry]:** Are there recommendations in this document with which you disagree, that is, that you would believe are not a good idea?
>
> **[Henry]:** Yes.
>                 . . . .
>
> **[Counsel for Henry]:** No. 4, Exhibit 4, are there allegations contained in this that you believe are, let's start with true?
>
> **[Henry]:** Are there allegations that are true? A lot of these are recommendations. Allegations, I don't see allegations that are true.
>
> **[Counsel for Henry]:** Do you see allegations that are false or is it just a matter of recommendations?
>
> **[Henry]:** The majority of these are recommendations.
>
> **[Counsel for Henry]:** Are they recommendations that

14

were consistent with the plan that you had for correcting the problems at the hospital?

**[Henry]:** There is one suggestion that I would not agree with on this, that would not fit in my plans with how I thought the problems needed to be fixed.

**[Counsel for Henry]:** Otherwise, you had no big problem with this?

**[Henry]:** No.

App. at 1180-81.

Such "recommendations," by definition, cannot be false. The testimony before the court was unequivocal: Henry answered "[n]o" to every question about whether she could find false allegations in PX 3 or PX 4. Id.

Henry additionally argues that the District Court did not allow her to present sufficient testimony to support her falsity argument. She adduces a page of bullet-pointed "[s]tatements contained in Plaintiff's Exhibits 1-5 upon which Ms. Henry's full testimony would have been helpful." Appellant's Br. at 18-19. However, every one of these statements is devoid of factual assertions except the last, and this last statement relates to PX 5 discussed above, not PX 3 or 4.

Henry's argument that the District Court failed to fulfill its duty by submitting the five documents to the jury as protected despite Henry's contention that there was undisputed evidence that each contained statements which were untrue or believed to be untrue misses its mark. The issue is not falsity vel non but whether such statements, even if untrue, were knowingly or recklessly made. See Pickering, 391 U.S. at 574 (1968).[5] There

---

[5]Henry failed to argue in her opposition to Dr. Springer's motion for partial summary judgment that any allegedly false statements made by Dr. Springer were made with knowledge or reckless indifference to their falsity. She addressed the issue only

15

was no such evidence. On the contrary, the District Court stated that "[i]t is apparent that [Dr. Springer] was motivated by a desire to improve conditions at the DPC and was frustrated that, in his view, he was encountering resistance." App. at 46-47. Because we reject Henry's argument that the communications were unprotected because of alleged falsities, it is irrelevant whether the District Court submitted two of the memoranda to the jury as protected and decided post-trial that the remaining were protected. After examination of the documents as the Supreme Court did in <u>Pickering</u>, we hold that all five exhibits are protected under the First Amendment.

2.  <u>Reiteration of Qualified Immunity Defense</u>

Henry's other argument reiterates her pre-trial argument that she was entitled to qualified immunity, an argument the District Court rejected in its March Order denying Henry's motion for summary judgment on that ground. Henry now argues that in view of the evidence presented at trial, the District Court erred in failing to reconsider its ruling rejecting her claim of entitlement to qualified immunity as a matter of law.

The District Court held that Dr. Springer's right to speak on various problems confronting hospital administration was clearly established. The court also rejected Henry's contention that Springer's right was not clearly established because his contract was not certain to be renewed under the new bidding process.

Promptly after this ruling, Henry filed an interlocutory appeal. This court dismissed the appeal for lack of jurisdiction,

───────────────────

in her discussion of the disruption analysis, stating that allegedly "false statements were crafted to cause disruption." As such, Henry cannot now complain that the District Court failed to consider knowing or reckless falsity in its March Order. <u>Baldassare</u>, 250 F.3d at 198 ("The public employer . . . bears the burden of justifying the discharge, which varies depending upon the nature of the employee's expression.") (citations omitted).

16

holding that "disputes of fact preclude this court from exercising jurisdiction." Springer v. Henry, No. 02-1776 at 3 (3d Cir. Nov. 27, 2002) (citing Johnson v. Jones, 515 U.S. 304 (1995)).[6] We identified only one such dispute of fact in said order: "[T]he parties dispute whether appellee, David T. Springer, was treated differently than other physicians with respect to rebidding for their positions." Id. We deferred our review of qualified immunity pending "appeal at the conclusion of the case," i.e., the instant appeal.[7] Forbes, 313 F.3d at 147-48.

We exercise plenary review of the District Court's determination that Henry was not entitled to qualified immunity.[8] Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001);

_____

[6] This Interlocutory Order was filed some two weeks before our December 11, 2002 decision in Forbes v. Twp. of Lower Merion, 313 F.3d 144, 146 (3d Cir. 2002), in which we "announce[d] a supervisory rule to be followed in all subsequent cases in which a summary judgment motion based on qualified immunity is denied on the ground that material facts are subject to genuine dispute," which supervisory rule now "require[s] the District Courts to specify those material facts that are and are not subject to genuine dispute and explain their materiality."

[7] In Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002), we noted that "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right."

[8] Demonstrating that it did not view our Interlocutory Order as a vacation of its qualified immunity decision at summary judgment, the District Court "construe[d] defendant's [Rule 50] motion as an untimely motion for reconsideration of its previous summary judgment ruling," a procedural disposition under which Henry's motion would be "granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension." App. at 35-36. Noting that

17

see also Forbes, 313 F.3d at 148 ("In assessing a claim of
qualified immunity, we must review the law relevant to the
official's behavior and ask whether the official could have
believed that his or her actions were justified by law.").

Henry relies on the Sixth Circuit's decision in Gossman v.
Allen, 950 F.2d 338 (6th Cir. 1991), where the court held that
the employer was entitled to qualified immunity on a claim that
it violated the employee's rights because a reasonable official
could have believed that Gossman knowingly or recklessly made
false statements, and could be terminated on the basis of those
unprotected statements. Id. at 341-42. Gossman does not
support Henry's claim of qualified immunity because Henry,
unlike the employer in that case, failed to proffer any persuasive
evidence that Springer made false statements or that any of the
statements he made were made with his knowledge or with
recklessness as to their falsity. Therefore, no reasonable official
could have fired Springer on the basis of those statements.

As the Supreme Court has noted, "the court should ask
whether the [official] acted reasonably under settled law in the
circumstances, not whether another reasonable, or more
reasonable, interpretation of the events can be constructed five
years after the fact." Hunter v. Bryant, 502 U.S. 224, 228
(1991). Henry raises the issues of knowledge and recklessness
for the first time in the instant appeal;[9] she never sought to

_____

"[n]o additional evidence was introduced at trial to change the
court's understanding of the issue," the District Court ruled that
"Henry is not entitled to qualified immunity for the reasons stated
in the court's [March Order]." App. at 36 (including in a footnote
the entire text of the March Order's qualified immunity decision).

[9]Henry originally based her motivation for sending Dr.
Springer a non-renewal letter on the public bidding requirements
imposed on her by changes in State law that took effect in 1996.
See Note 3, supra (citing 29 Del. Code Ann. tit. 29, §§ 6913, 6981
(2005)). Indeed, when Henry sought to introduce evidence of
falsity at trial, the District Court commented, "I thought [Henry's

present evidence as to Dr. Springer's mental state with regard to allegedly false statements.

Because Dr. Springer's First Amendment right to speak out was clearly established at the time of his non-renewal, we consider whether, viewing the evidence in the light most favorable to Dr. Springer, it would be clear to a reasonable official in Henry's position that s/he could not properly refuse to renew Dr. Springer's contract because of the new state bidding requirement. See Saucier v. Katz, 533 U.S. 200, 202 (2001); Karnes v. Skrutski, 62 F.3d 485, 494 (3d Cir. 1995). In our Interlocutory Order of November 27, 2002, we stated that whether a reasonable official could have sent the non-renewal notice depends primarily upon whether "appellee, David T. Springer, was treated differently than other physicians with respect to rebidding for their positions." Springer, No. 02-1776 at 3 (Interlocutory Order).

Both at trial and on appeal, Henry has failed to refute evidence tending to show that Dr. Springer was the only independent contractor physician whose contract was non-renewed in 2000 and the only such physician to have ever received a non-renewal letter during his nine years of working at the hospital. Viewing this record in the light most favorable to Dr. Springer, no reasonable official could have sent a non-renewal letter to only one of at least five other independent contractor physicians at the hospital.

Henry nonetheless argues that "[a] reasonable official in [] Henry's position could have believed that requiring [Dr. Springer] to comply with state procurement laws did not violate [Dr. Springer's] rights." Appellant's Br. at 41. We view the question before us somewhat differently. As our order denying the interlocutory appeal suggests, the relevant question is whether a reasonable official in Henry's position could have believed that there was any constitutional basis for requiring only Dr. Springer and no other independent contractor physician

_____

claimed reason for not renewing Dr. Springer's contract] was because he simply didn't apply for a new contract." App. at 1176.

19

to comply with state procurement laws.  Because Henry provided no plausible reason for her targeting of Dr. Springer to the exclusion of other independent contractor physicians, the answer to this question is in the negative.  Henry's rationale that she began to enforce the bidding requirement with Dr. Springer because he was the independent contractor physician who was at DPC the longest is not plausible.  On the facts viewed in the light most favorable to Dr. Springer, see Karnes, 62 F.3d at 494, no reasonable official could have believed that the decision to target solely Dr. Springer could be based on any reason other than retaliation for protected speech.

## C.

Henry challenges the judgment for both economic damages and punitive damages.  The jury awarded Dr. Springer $873,895 for his economic loss notwithstanding Henry's counsel's argument that Dr. Springer did not suffer any economic injury as a result of losing his job.  She argues that there was no assurance that his contract would have been renewed and that he was never promised that it would be.  Her claim is unpersuasive.

Dr. Andrisani, Dr. Springer's expert witness, gave testimony sufficient to serve as the basis for the jury's finding that Dr. Springer's contract would have been renewed absent the non-renewal letter.[10]  The only contradictory evidence was the testimony of Dr. Link, Henry's expert witness.   It was the jury's role to determine which expert was more credible, and the jury reasonably could have adopted the view of Dr. Springer's expert witness.

On a Rule 50 motion for judgment as a matter of law, a

---

[10]  Dr. Paul J. Andrisani analyzed economic data and evaluated courtroom testimony and concluded that Dr. Springer had suffered a total economic loss of $1,281,068 based upon a 60 hour work-week.  The jury limited Andrisani's calculation of loss to $873,895.  There was sufficient expert testimony on loss to support the jury verdict. (App. 39-40.)

district court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000). The District Court correctly observed in its September Opinion that "[w]hether Springer's contract would have been renewed but for his memos was a question of fact properly before the jury." App. at 39.  Drawing all inferences in favor of Dr. Springer, a reasonable juror could infer that he would work many more years at the DPC.  The evidence was sufficient to support the jury's economic damages award.

A jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct. See Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir. 2000); see also, Smith v. Wade, 461 U.S. 30, 54-56 (1983). This standard is disjunctive: "[T]he defendant's conduct must be, at a minimum, reckless or callous.  Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard." Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989). In response to special interrogatories, the jury specifically found $25,000 in punitive damages appropriate because Henry acted "recklessly, intentionally or maliciously with regard to [Dr. Springer]." App. at 22.

Although we might not have reached the same verdict as the jury, the record contains sufficient evidence to support the jury's conclusion that Henry singled out Dr. Springer for intentional disparate treatment. As we noted above, Dr. Springer produced unrefuted evidence that he was the only independent contractor physician whose contract was non-renewed in 2000. The District Court ruled that "[a] reasonable jury could have concluded that Henry was motivated by evil intent or reckless indifference." App. at 41.

The jury's finding of reckless or intentional behavior is supported by consideration of the circumstances under which Dr. Springer received Henry's non-renewal notice which informed him his contract would not be renewed and that "the Division will be publishing Requests for Proposals."  App. at 1405. Although an RFP with a submission deadline of 11:00 a.m. on

Wednesday, May 17 ("May 17 RFP") was issued on April 10, 2000, (App. 1472-73), Henry did not send the non-renewal notice to Dr. Springer's home address until Friday, May 12. Henry testified–and the jury was entitled to believe–that he received the notice of non-renewal on the evening of Monday, May 15, less than two days before the proposal deadline.[11]  As the District Court noted, "Henry notified Springer only five days, at best, before the proposal deadline despite the fact that the position had been advertised for over a month." App. at 41.

On May 16, 2000, Dr. Springer tried fruitlessly to obtain an extension that would have allowed him sufficient time to fill out the requisite thirty page application form by the May 17 RFP's proposal deadline, which form Henry had failed to attach to the non-renewal letter.  On the same day, Henry was notified of Dr. Springer's attempt to secure an extension in filling out the application, but there is no evidence that she attempted to assist him despite the fact that the timing of her non-renewal notice was the source of his impediment.  Even Dr. Sylvester testified that Henry followed "unusual" procedures in ending Dr. Springer's employment.[12]   App. at 681.

---

[11]The Request for Proposals provided that "QUESTIONS CONCERNING THIS RFP MUST BE SUBMITTED IN WRITING BEFORE THE DEADLINE OF April 19, 2000 AT 4:30 PM," App. at 1472, some four weeks prior to Dr. Springer's receipt of the non-renewal notice.

[12]In arguing against the punitive damages award, Henry relies in part on Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003), where the court found insufficient evidence on the record for punitive damages. Henry attempts to portray Brennan as a case with far more evidence adverse to the defendant than the present case.  However, in purporting to cite that evidence, Henry instead cites Brennan's own unsubstantiated allegations. In fact, we concluded that there was insufficient evidence for a punitive damages award specifically because there was insufficient evidence for a jury to find that Brennan's unsubstantiated allegations (of harassment and retaliation) were correct.  See Id.  Brennan's version of the facts had no evidentiary support in the record.

The jury finding of callous or malicious behavior also is supported by Henry's attitude toward Dr. Springer and the medical staff in general. Dr. Sylvester testified that Henry viewed her interactions with the medical staff, including Dr. Springer, as "adversarial." App. at 666. Three witnesses–Henry, Dr. Sylvester, and Dr. Springer–testified that Henry was upset and unhappy with Dr. Springer. Dr. Springer testified that during meetings of the DPC Governing Body Henry was "angry and spoke [to him] with a lot of emotion," App. at 780. Based on its observations at trial, the jury could have concluded that Henry acted vindictively.

The evidence supports the jury finding that Henry acted at least recklessly or callously, if not intentionally or maliciously, with respect to Dr. Springer's constitutionally protected rights.[13]

---

Brennan, 350 F.3d at 429. By contrast, in the instant case, there is ample evidentiary support for the jury finding.

[13] We are mindful in our review of whether there was sufficient evidence to support the punitive damages award of the possible conflict of interest the Delaware Department of Justice has in representing Henry regarding this specific issue. A letter from Springer's counsel to the Department of Justice offering to settle the pending matter on appeal references a formal opinion authored by the Delaware Attorney General which explained that state law bars Delaware from paying any portion of a civil judgment against a state official if a jury finds that official is liable for punitive damages. App. at 1954-56. Thus, the practical effect of the punitive damages award in this case would render Henry individually liable for the entire amount. As a result, we note the possible disincentive for the State to represent Henry zealously with respect to the punitive damages award.

In this case, Appellant's voluminous brief devotes two cursory sentences to its analysis that the record is insufficient to support a punitive damages award. See Appellant's Br. at 54. We do not suggest that the State intentionally omitted arguments regarding the punitive damages award; rather, we raise the issue to note our concern over the possibility of a conflict. See, e.g., Del.

The District Court did not err in affirming the jury's punitive damages award.[14]

_____

Rules of Prof'l Conduct R. 1.7. We urge the Delaware Department of Justice to look into this issue in the future. Mindful of the possible conflict in this case, we have examined the sufficiency of the evidence de novo, and we are convinced, based upon our independent review, that there is sufficient evidence to uphold the punitive damages award.

[14] We reject Henry's argument that Dr. Springer's counsel inserted racially inflammatory language during his rebuttal closing argument. Henry failed both to object to the language in question during closing argument and to raise an objection to the allegedly inflammatory statement in her motion for a mistrial. The first time Henry complained of the misconduct was in her motion for a new trial. We therefore apply the plain error standard.

Dr. Springer's counsel stated during rebuttal in his closing argument, that "An octopus, when it's attacked by an enemy, emits a *jet black* inky film throughout the water and in the disarray, confusion, the octopus escapes. In this case, from the very first moment, the defendant has been *emitting black fluid* to cloud the issues in this case." App. at 1369-70 (emphasis added). Thereafter, in discussing damages, counsel referred to Dr. Springer as "a 45-year old - white male professional." App. at 1370. Henry is an African-American female and Dr. Springer is a white male. Race was never raised elsewhere as an issue in the present case.

In his argument to this court Dr. Springer's counsel sought to justify his comments as for identification. We find that unacceptable. We deplore any introduction of race into a case where race is not at issue. Nonetheless, the District Judge, himself an African American, found possible neutral reasons and concluded that "[t]he court is satisfied that the octopus and black ink analogy is common enough and did not likely confuse the issues for the jury." App. at 49.

Inasmuch as the District Court who had an opportunity to view the closing argument in the context of the trial, found the

## IV.

We see no error of law.  Nor can we conclude that the verdict was against the weight of the evidence.  For the foregoing reasons, we will affirm the judgment of the District Court in its entirety.

_____

remarks unobjectionable, combined with Henry's failure contemporaneously to object to the language, we will not hold that the District Court abused its discretion in denying Henry's motion for a new trial.

<u>David T. Springer, M.D. v. Renata J. Henry</u>,  No. 04-4124

APPENDIX
(See attached PDF document)

PX
1

## CONCERNS ABOUT DELAWARE PSYCHIATRIC CENTER
### DATE : 10/21/99

Delaware Psychiatric Center, the only state run hospital for mentally ill, serving all of Delaware, treats the sickest and most vulnerable segments of our society. As most patients are quite ill, may not have involved families, and have no choice of treatment facility, the state hospital has an enormous responsibility to treat these psychiatric patients with high quality care in a respectful and safe environment. Unfortunately, DPC is failing in this task with the prospects for improvement slim.

### PATIENT CARE and SAFETY ISSUES:

1) There is gross understaffing of the hospital. Psychiatrists routinely treat 45 patient each; one psychiatrist is responsible for 85 patients. There is also an inadequate of nurses to safely run the hospital. The hospital treating environment is not conducive to recruiting and retaining qualified personnel.

K3 is the most acute unit in the hospital with a stated capacity of 32 patients. The unit even when it is over-census; at times exceeding 50 patients. This poses a great safety hazard because of overcrowding and understaffing. Patients are unable to be adequately monitored for safety with little or no time for any treatment.

Over the course of last few years, at least 6 Board Certified and dedicated psychiatrists have left K3 as they declined to compromise the patient care and safety. It appears that the main function of the administrative Unit Director is to act as a monitor to keep the patient census down; not to promote quality patient care. When staff members do not agree with demands of the Unit Director, he often becomes hostile and threatening, making for an intolerable working environment. This has been brought to the notice of administration repeatedly with no action taken resulting in an extraordinary deterioration of morale.

2) The admission area is almost always understaffed. There is rarely ever a nurse present in the admission area. The nurse who is supposed to cover the admission area is rarely available due to widespread understaffing. Patients who are agitated and need to be medicated immediately are not treated in a timely manner.

3) Security officers are rarely present in the admission area. Though they are present on the hospital campus, it may take up to 10 minutes for security to arrive when called in the case of violent patient.

The following are 2 examples of safety concern:

An agitated, intoxicated and psychotic patient barricaded and locked himself in an office of the admission area and attempted to hang himself with a phone cord.

**DEPOSITION EXHIBIT**
#8

001384



A0261

Acutely psychotic and/or severely depressed patients while on arm's length observation are often allowed to go to the restroom unaccompanied by staff.

4) When the unit gets overcrowded, no beds are available for patients, they have to sleep on cots, or on couches in the dayrooms, which compromises the safety of patients and staff. These cots are unsafely stored in the computer room of the unit. A staff member was injured when cots landed on her head.

5) Acutely psychotic patients have been able to escape the unit at will. Patients have been able to walk through doors, climb fence or break window guards to escape.

6) A patient who was on arm's length observation for suicidal intent, at the time went into her room and tied a pillow cover around her neck with an intention to strangle herself. She was found in time before a tragedy happened. The incident was investigated but no action taken.

7) There seems to be too much attention focused on keeping the patient census down. There is often pressure to discharge patients before an adequate and safe treatment plan has been formulated. There is intense pressure to keep the number of suicide watches down.

There are times when a patient voluntarily walks into the admission area with an expectation of seeing a psychiatrist and instead the Unit Director, a social worker, evaluates them. Invariably the patient is asked to leave by the unit director and does not get to see a psychiatrist.

Similarly, when a patient with legal charges is brought into the admissions area the unit director often triages the patient without allowing for a psychiatric evaluation and discharges the patient.

8) There have been a numerous instances when the Unit Director and other staff have subjected the patients in the admission area to demeaning comments. Besides being unethical and disrespectful these comments often result in aggravating a severely mentally ill patients. On numerous instances K3 Unit director has been observed to be demeaning to numerous patients. Patients often become agitated and violent requiring unnecessary medication of the patient. When staff members questioned the Unit Director about the inappropriateness of his comments, the Unit Director has become verbally threatening toward the staff members.

Recently there were 2 cases on the unit when patients had complained of being physically abused by the staff members. Families of the patients were very concerned about the safety of their family members. However, investigations into staff misconduct often do not lead to appropriate disciplinary action.

On one of the units, an HIV pregnant patient had a delivered her baby in the seclusion room of DPC. The patient stated that when she had gone up to the staff and reported that

001385

she was in labor, staff asked her to go to the seclusion room instead of arranging for her to be transferred to hospital. Needless to say, the safety of the newborn was also jeopardized in this case.

9) All the patient units lack discipline due to lack of training provided to the aides and technicians before they start working on the unit. There are numerous instances of staff lying, speaking disrespectfully, and in an intimidating manner to other staff and patients. The hospital administration, by its lack of firm response to this, is implicitly supporting that kind of behavior.

Staff is afraid to speak out on issues affecting patient care and safety. As they are afraid of being punished by the administration. Staff has also expressed fear of speaking out and/or disciplining the staff for fear of getting their tires slashed, having feces smeared on their car or worse. The administration has been made repeatedly aware of this problem, with no action to date.

10) Delaware Psychiatric Residency Training Program, the only training program in the state of Delaware began in the late 1950's and grew rapidly to serve Delaware State.

The primary goal of the Delaware Residency Program in Psychiatry was and is ability to develop a broad range of professional skills for the residents so that they can effectively and competently practice psychiatry in a wide variety of settings. The varied activities of the Delaware Residency Program in Psychiatry may be seen as composed of concentric circles. The first circle consists of service related to community needs; an example is an intimate working relationship with the DPC, community psychiatry, crisis intervention, and numbers of general hospitals, etc. The second circle consists of teaching, training, research, and continuing education in the Delaware State community. The Delaware Psychiatric Center is responsible for teaching in all four years of the postgraduate training in general psychiatry. That training takes place in the everyday world of medical practice through selfless commitment of residents to the patients with a genuine concern for their interests, needs, and safety.

Excellence in psychiatry requires intensive training and experience with a fundamental emphasis on assessment, treatment planning and application of modern therapeutic technology. Individual supervision, educational seminars, rounds, and case conferences are the primary techniques used to convey knowledge, clinical skills, and the professional attitudes appropriate for a clinician. However, during the last few years it became harder and harder to provide excellence in training for residents due to the lack of integrity of staff, increased tenseness among hospital administration and clinical staff, and undermining the physician role in therapeutic process.

Resident doctors are the only physicians providing services to the hospital from 4:30 PM to 8AM on weekdays and all day weekends. During this time frame resident doctors provide not only psychiatric but also all medical care to over 350 patients in addition to admitting patients around the clock. Inability of the hospital administration to retain dedicated teaching psychiatrists has created a void in the training of the residents.

Having a residency program is not only a monetary benefit for the hospital but residency provides educational environment within and outside hospital system. The residency program, fully accredited for over 40 years has produced quality psychiatrists that after graduation have settled in the area to function in the Public Mental Health sector, will likely be closed due to insufficient dedicated teaching psychiatrists that hospital administration has not been able to retain.

As hospital administration has shown lack of concern over this it is time that these issues were put in front of legislature and electorate of Delaware whose family members come here for treatment and whose tax money is put into work.

|  | **NAME** | **SIGNATURE** |
|---|---|---|
| PGY IV: | Dr Fahim Fahim. | |
| | Dr. Panna Jolapara. | |
| PGY III: | Dr. R. Rizvi. | |
| | Dr. R. Srinivasa. | |
| | Dr. Dilip J. Joshi. | |
| | Dr. G. Sahani. | |
| PGY II: | Dr. Shafiqa Azamy. | |
| | Dr. Aleya Karim. | |
| PGY I: | Dr. Art Pogre. | |
| | Dr. Sharad Sawant. | |
| | Dr. A. Yarlagadda | |

CC:    Governor, Mr. Thomas R. Carper.
Secretary of Health & Social Services, Gregg C. Sylvester, MD.
Hospital Director, Mr. Jiro Shimono.
Medical Director, Dr. Phyllis Smoyer.
Training Director, Dr. David Springer.
Senators of State of Delaware.
DHCC.
Dept. of Public Safety, Brian J. Bushneller.
News Journal.

*PX 2*



**DELAWARE HEALTH
AND SOCIAL SERVICES**

DIVISION OF ALCOHOLISM,
DRUG ABUSE AND MENTAL HEALTH

RECEIVED

NOV 2 9 1999

OFFICE OF THE DIRECTOR DELAWARE PSYCHIATRIC CENTE
DADAMH

To:  Delaware Psychiatric Center Governing Body (Renata J. Henry, Chairperson,
     Eugene Wolinsky, Vice-Chairperson, Gregg C. Sylvester, MD, Cabinet Secretary,
     Benjamin Fileti, Isaiah F. Henry, Stephen Moores, M.C., Dorothy Patterson, Gary
     L. Wirt, Ed.D.)

Cc:  Mr. Thomas Carper, Governor
     Mr. Jiro R. Shimono, ACSW, Hospital Director

From: Delaware Psychiatric Center Medical Staff Executive Committee Officers (David
      T. Springer, MD, President, Cheryl Cantrell, MD, Vice-President, Fawzia Hasan,
      MD, Secretary, Ellis Kendle, MD, Medical Staff Activities Director, Syed Munir,
      MD, Member-at-large, Hugo Del Villar, MD, Member at Large)

Date:  November 23, 1999

Re:  Critical Issues in the Care of the Mentally Ill in Delaware

DEPOSITION
EXHIBIT
*Springer #7*
*8-20-01*  *VB*

Delaware Psychiatric Center (DPC), known as Delaware State Hospital for a century prior to
1996, is the only state psychiatric hospital in Delaware and, as such, the only inpatient facility
available to Delaware citizens with severe and/or long term mental illness. The patients'
conditions include schizophrenia, depression, bipolar disorder, severe personality disorders,
substance abuse, dementia, brain injury, mental retardation, and psychiatric complications of
medical illnesses, such as, AIDS. Currently, as the number of people with these problems
increases, the capacity of DPC to provide them with treatment is deteriorating and facing
collapse as of July 2000.

For several years, we have had difficulty maintaining adequate numbers of psychiatrists at DPC.
We are heavily dependent on the physicians in our 50+ year old psychiatry residency program
(the only one in Delaware) to provide clinical coverage, both psychiatric and medical. However,
residents must be both educated and supervised. Every board certified teaching psychiatrist we
have hired in the last five years has resigned after a relatively short stay, citing hostile and
unsafe working conditions and understaffing. Since the sixth such resignation in October 1999,
it has seemed unlikely that the residency could be continued after the current academic year, in
spite of the fact that no one wants to lose this valuable program. The negative impact of closing
or failing to fill the positions in the residency can hardly be overstated: it would mean the loss of
all night, weekend and holiday coverage, and daytime admission coverage for the hospital.

On October 21, 1999, the DPC residents wrote a letter to Governor Carper, with copies to state
administrators and legislators, that was essentially a plea for help for their beleaguered
program. Their letter received attention in the media and spawned a series of interesting
responses and editorials. The Governing Body of the hospital should take immediate steps to
reverse the current downward spiral, before it is too late. We must hire residents for the
academic year beginning in July 2000 no later than March 2000. We have four months to
reverse the trends of the last five years.

001388

**PAGE TWO**
Nov. 23, 1999 Memo to Governing Body

The Medical Staff requests that the Governing Body schedule a series of emergency meetings with the specific goal of hiring and retaining teaching psychiatrists and maintaining the psychiatry residency program.

S. Munir M.D

001389

A0260

PX 3



**DELAWARE HEALTH
AND SOCIAL SERVICES**

DIVISION OF ALCOHOLISM,
DRUG ABUSE AND MENTAL HEALTH

RECEIVED

DEC 1 7 1999

OFFICE OF THE DIRECTOR
DADAMH



DELAWARE PSYCHIATRIC CENTER



DEPOSITION
EXHIBIT
_September #9_
_8-20-01 V/3_

TO: WHOM IT MAY CONCERN

FROM: Delaware Psychiatric Center Medical Staff Executive Committee Officers

DATE: December 2, 1999

    We have been trying unsuccessfully to communicate issues of patient care and safety to the hospital administration for several years. Unfortunately, often when such issues have been raised they have been objected to because of the "process" of bringing attention to these problems at Delaware Psychiatric Center. The unresolved issues remain.

    Our oaths as physicians require us to strive for the best in patient care. To remain silent when the situation has deteriorated so badly, and as is about to get significantly worse, would be gross negligence and would seriously jeopardize the civil rights of the patients.

    We look forward to working with the administration to aggressively deal with these issues before the lives of our patients and their families are put at serious risk. The chance to have free and open communication with those who can and will implement the required changes in the system in a timely manner is the cornerstone of a solution to these problems. We must roll up our sleeves and pull together to deliver the top quality patient care which we know how to do.

    The following is a list of proposed actions that may begin us on the road to protecting and preserving patient care and safety. We encourage others to come up with other creative solutions to some of the problems plaguing Delaware Psychiatric Center.

1) ADDRESS SAFETY ISSUES AS SOON AS POSSIBLE

    a) The patient census reached 367 this week, which are 67 patients over what we can reasonably care for given current clinical resources.

    b) Stop addressing the census problem by accusing psychiatrists of "keeping too many patients." Address the census problem by increasing the number of beds, and staffing for those beds, in the hospital.

2) FIX UNDERSTAFFING/PERSONNEL ISSUES AS SOON AS POSSIBLE

    a) There should be a permanent waiver to the bid process for contract physicians who apply for positions at DPC.

    b) All barriers to hiring Merit system psychiatrists at competitive rates should be eliminated.

3) INCREASE PHYSICIANS' AUTHORITY TO ENSURE QUALITY AND SAFE PATIENT CARE

    a) Have a chief psychiatrist and charge nurse run each treatment unit.

    b) Appoint, at least, two Board-Certified psychiatrists to the Governing Body. Schedule an additional meeting of the Governing Body as soon as possible to discuss issues of patient care and safety, as well as, to ensure the psychiatric residency's survival.

    c) Give to the Governing Body a complete detailed accounting of expenditures (including each employee or contractor's name, position, and amount paid) to evaluate whether the current

A0265

Page Two
Letter from DPC MSEC Officers
Dec 2 1999

allocation of resources reflects the priority of direct patient care.  There appear to be many employees who are working under clinical sounding job descriptions, but whose jobs do not include direct clinical care.  Monies identified as superfluous should be spent on hiring true clinical staff and creating new patient units.

PX
4



**DELAWARE HEALTH
AND SOCIAL SERVICES**

DIVISION OF ALCOHOLISM,
DRUG ABUSE AND MENTAL HEALTH

RECEIVED

DEC 1 7 1999

OFFICE OF THE DIRECTOR DELAWARE PSYCHIATRIC CENTER
D.P.A.H.I

To: DPC Governing Body Members

From: David T. Springer MD
         President, DPC Medical Staff
         Psychiatric Residency Training Director

DEPOSITION
EXHIBIT

Springer #10
8-20-01 VB

Re:  PROPOSED AGENDA FOR DECEMBER 22, 1999 GOVERNING BODY
MEETING

Date: December 16, 1999

  Thank you for taking the time to meet to discuss critical issues affecting the DPC
Psychiatric Residency Program. Your commitment and interest is greatly appreciated.
The following is an outline of some of the areas that the Medical Staff believes needs to
be addressed to ensure the future of the residency program. In addition, I am enclosing a
memo from the DPC Medical Staff Executive Committee Officers which lists some
proposed actions.

I.  NEED FOR A PSYCHIATRIC RESIDENCY PROGRAM AT DPC

- the severity of psychiatric and medical illnesses of DPC patients require
24 hour coverage by psychiatrists
- replacing resident coverage with attending psychiatric coverage would
likely cost $800,000 more than having a residency program
- even if extra monies were allocated, the likelihood of finding sufficient
numbers of dedicated attending psychiatrists to cover 370 patients,
seclusion orders and acute admissions on nights, weekends, and holidays
would be remote
- the loss of the academic atmosphere provided by the residency would have
a deleterious effect on patient care

II.  NEED TO ATTRACT AND RETAIN DEDICATED AND QUALIFIED
TEACHING ATTENDINGS

- Without sufficient numbers of qualified teaching attendings, the residency
cannot survive
- qualified teaching attendings will only agree to come and stay at DPC if
they feel that they can work in an environment that is safe and where they
have an ability to provide quality care
 having insufficient staffing and overcrowding throughout the hospital is
not conducive to attracting and retaining teaching psychiatrists



001392

A0267

- having an apparent emphasis on keeping the census down at DPC is demoralizing and confusing for psychiatrists and staff
- psychiatrists need to have the authority, not just the responsibility, to treat patients (i.e. psychiatrists should not be accused of keeping patients too long in the hospital, not be pressured to take patients off suicidal watch, not have minimal roles in administrative decisions affecting patient care, not have to fight for adequate funding for medication and doctors, not have roadblocks put in the way of hiring new psychiatrists and not be reproached for questioning the orthodoxy of the non-medical viewpoint)

## III   CONTINGENCY PLANS

- if a decision is made to close the residency program, the current residents should be given the option of completing their entire training at DPC

001393

A0268

,100

PX
5



DEPOSITION
EXHIBIT
*#11*
*4-26-01   V.5*

## MEDICAL STAFF PRESIDENT REPORT TO THE GOVERNING BODY MEETING OF JANUARY 26, 20000

In preparation for the January 29, 2000 Governing Body meeting, the Medical Staff Executive Committee Officers propose that the following be discussed in fulfillment of the Medical Staff's obligation to inform the Governing Body of issues of concern affecting patient care at DPC.

The most glaring issue at hand is that the DPC medical staff is now in open disagreement with the hospital administration about how the patients should be treated. We have for years had a situation in which the physicians were legally responsible for making the most important clinical decisions but at the same time were reporting to lay administrators. This created a tense situation in which administrative techniques could be used to pressure physicians into making a particular decision. At present, the situation has deteriorated to the point that physicians are essentially being asked to practice medicine at below their own minimum ethical standards on a routine basis. Therefore, we are morally obligated to fight this practice, including notification of the appropriate regulatory agencies that might have the power to intervene and demand improvements.

## NEW CONCERNS AROUND PATIENT CARE, CREDENTIALLING AND LIABILITY ISSUES FOR DPC

1) New Patient Care Issue

On three separate days, the hospital administration told the psychiatric residents on call to abruptly transfer patients either to another unit within the hospital or to another facility, either on a weekend day or in the middle of the night. Two transfers were of elderly patients at around 8 PM on a Friday night. Residents were given direct orders by non-psychiatric administrators to discharge and transfer the patients without consultation or approval of the unit attending psychiatrist or the backup attending psychiatrist.

Transferring patients at off-hours, without adequate planning and preparation of the patient and their families can be seriously disruptive to the patient's treatment. This includes disrupting the patient's relationship with his psychiatrist and treatment team members, a lack of doctor to doctor transfer of sick patients, disregard for sick patients' need to get reoriented to a new treatment team, and disruption of the discharge planning and family contacts that have occurred to date.

It is of equal concern that residents, with training licenses, were instructed against hospital policy and with possible violation of state regulation, to follow orders of non-psychiatric administrators.



The Medical Staff requests that the Governing Body pass a motion that supports the fact that only an attending psychiatrist may order treatment for a patient at DPC and that non-psychiatric administrators may not order treatment, including the discharge of patients.

2)  Credentialling

There has been a serious shortage of psychiatric staff at DPC for years. Little was done about this until Medicare made an unannounced site visit and discovered the dire staff shortages. The measures taken by the administration, unfortunately, showed little concern for the patients' best interests and were in violation of hospital policies, Medical Staff bylaws and JCAHO regulations.

A 35 per hour a week contract psychiatrist was placed on the admissions unit of DPC with "temporary privileges" in flagrant violation of medical staff bylaws.

There was no meeting of the Credentials Committee or the Medical Staff Executive Committee. The Medical Staff Executive Committee or President of the Medical Staff did not designate anyone to act on their behalf. There was no recommendation of the Credentials Committee or Medical Staff Executive Committee. There was no consideration of the applicant's review of performance and peer recommendation as communicated verbally and by email to Mr. Shimono by Drs. Springer and Cantrell. Two Acting Medical Directors were appointed by the administration in one week, including an unlicensed psychiatrist.

The Medical Staff requests that the Governing Body pass a motion supporting adherence to the Medical Staff Bylaws, especially in regard to matters of credentialling physicians to the DPC Medical Staff.

3)  Ethical Issues

In order to give the appearance to Medicare reviewers that DPC had adequate staffing, nurses were brought in from other state facilities, psychologists and other staff were made to work as psychiatric aids in return for compensation time the following week. Recently, at least two nurses have been reassigned from patient care units back to the administrative building.

The Medical Staff believes that utilizing staff in a manner, in which they might be put in a position to deceive federal regulators about the permanence of their positions, is unethical and may risk future negative actions against the hospital.

The Medical Staff requests that the Governing Body passes a motion that DPC must follow ethical principles in dealing with state, federal or other regulators or other overseeing bodies.

## CONTINUED CONERNS AROUND PATIENT CARE AND SAFETY

The administration's written response to both the resident's and medical staff's concerns attempted to portray that all their concerns were addressed. The residents and medical staff believe that few, if any, concerns were adequately addressed and that serious concerns remain which continue to affect patient care and safety at DPC.

1) Patient Care and Safety Issues:

The Medical Staff have been requesting that a nurse be assigned to the admissions unit for over six years, yet the administration is still only "considering" the assignment. Inadequate security presence in the admissions area has not been addressed. Voluntary "walk-in" patients are routinely turned away by the Unit Director without allowing the patient to be seen by a psychiatrist. Potential patients for admission are accepted by the Unit Director or clerk without a DPC psychiatrist accepting the patient. There remain safety issues for the planned admission area patient unit.

2) Patient Length of Stay:

The Medical Staff oppose the appointment of a consultant to "ensure that patients are receiving the best care possible with the appropriate length of stay." The Medical Staff have not received any notification that their care of individual patients, including the length of time they are treated in the hospital has been inappropriate. It is evident that the purpose of hiring a consultant, at taxpayer's expense, is to try to lower the length of stay. It is the hope that DPC does not go down the failed road of managed care where reduced length of stay becomes more important than quality care for the individual patient.

3) Resignation of teaching psychiatrists in the last five years who have cited hostile unsafe working conditions

The Medical Staff encourages the Governing Body to set up a subcommittee to investigate this matter.

4) Impact of failing to fill positions in residency program

The Medical Staff requests that the Governing Body passes a motion giving explicit support and long-term commitment to the residency program.

5) Personnel Issues

001396

The Medical Staff requests that the Governing Body form a Personnel subcommittee to investigate personnel practices at DPC. It is evident that there is a significant lack of uniformity in the application of disciplinary measures.

In addition, acts of vandalism and threats of vandalism (for example, tires slashed or feces smeared on cars) in retaliation for discipline of staff members has not been adequately addressed.

6) Allocation of Resources

The Medical Staff believes that a gross analysis of administrative costs versus direct service costs would not shed enough light on the actual allocation of resources. Hundreds of thousands of dollars of taxpayer money have been spent on adjunctive activities while the hospital has been understaffed for years. The truth can only been found out in the details. The Medical Staff requests that the entire Governing Body or subcommittee investigate.

The Medical Staff requests the Governing Body investigate the exact costs of paying for uninsured patients at Meadow Wood Hospital and Rockford Hospital and whether that money would be better spent in opening up more patient space at DPC.

7) Request for a series of emergency meetings with the DPC Governing Body

The Medical Staff believes that the Governing Body should meet on, at least, a monthly basis at this time, as addressing the above issues and ones that follow demand a lot of time and attention.

8) Proposals not yet addressed:

a) Need for permanent waiver to bid process for hiring contract psychiatrists.
b) Eliminate all administrative barriers to hiring Merit psychiatrists.
c) Have a chief psychiatrist and charge nurse run each treatment unit.
d) Appoint, at least, two board-certified psychiatrists to the Governing Body.

## ADDITIONAL PROPOSED ITEMS FOR THE AGENDA

1) SHOULD POPULATION-BASED METHODS, SUCH AS, CENSUS OR LENGTH OF STAY BE DETERMINANTS OF QUALITY CARE OR THE INDIVIDUAL TREATMENT OF THE PATIENT?
2) SHOULD THE MENTALLY ILL BE AT GANDER HILL AND WCI OR DPC? (please see enclosed article)
3) WHAT IS DPC'S CONTINGENCY PLAN FOR THE POSSIBILITY THAT MEDICAID MANAGED CARE COMPANIES, WHICH HAVE BEEN GOING BANKRUPT AT AN INCREASING RATE AROUND THE COUNTRY, WILL BE

UNABLE TO CARE FOR DELAWARE'S MEDICAID PSYCHIATRIC
PATIENTS?

4) WOULD THE NEEDS OF THE CHRONICALLY MENTALLY ILL BE BETTER
SERVED BY HAVING A BOARD-CERTIFIED PSYCHIATRIST BE THE
DIRECTOR OF THE HOSPITAL?

5) SHOULD PATIENTS (WITH SIGNIFICANT BRAIN DISEASE) AT DPC BE
TREATED UNDER A MEDICAL MODEL OR A SOCIAL WORK MODEL OF
CARE?