# TAB O

Westlaw.

Not Reported in F.Supp.2d                                                     Page 1

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Kenny R. VALENTIN
v.
PHILADELPHIA GAS WORKS, et al.
**No. Civ.A.03-3833.**

March 29, 2004.

Robert H. Bembry, III, Law Offices of Robert H.
Bembry, III, Robert T. Vance, Jr., Law Offices Of
Robert T. Vance, Jr., Philadelphia, PA, for Plaintiff.
Howard Lebofsky, Philadelphia Gas Works,
Philadelphia, PA, for Defendants.

*MEMORANDUM*

PADOVA, J.
**\*1** Plaintiff has brought this action for racial
discrimination in employment pursuant to 42 U.S.C.
§ 1981 against his former employer, Philadelphia
Gas Works ("PGW"). Before the Court is
Defendant's Motion for Summary Judgment. For the
reasons which follow, Defendant's Motion is
granted.

### I. BACKGROUND

Plaintiff, who is Hispanic, began working for PGW
as a laborer in 1984. (Compl.¶ 8.) He was injured
on November 8, 1999 and worked on light duty jobs
until he was fired on February 4, 2002. (Compl.¶
9.) He claims that he has been subject to disparate
treatment and harassment because of his race since
his injury, culminating in his termination in
February 2002. [FN1] Plaintiff claims that he was
treated differently than similarly situated white
employees as follows: 1) he was harassed in
connection with requests for his medical records
following his placement on light duty; 2) he was

subjected to investigations of his residency; 3) his
claim for workers' compensation benefits was
denied; 4) he was terminated for sick leave fraud; 5)
he was not notified of his termination within 20
working days as required by PGW's collective
bargaining agreement with his union; and 6) he was
refused reinstatement after his termination.

> FN1. Although Plaintiff claims to have
> been subject to racial harassment, he
> asserts only a disparate treatment claim
> against PGW in this lawsuit.

#### A. *Request for Medical Records*

Plaintiff alleges that he was treated differently than
other, white, employees because PGW harassed him
with respect to the provision of updated medical
records supporting his light duty status. PGW has
an Employee Utilization Committee ("EUC") which
reviews the work status of employees who are
absent for more than 30 days, temporarily disabled,
and on long-term light duty. (Lewis Dep. at 29-31;
Stewart Dep. at 33-34.) The EUC is comprised of
PGW's Medical Director, Vice-President of Labor
and Business, Director of Labor, Director of Risk
Management, Director of Safety, and Director of
EEO and Affirmative Action. (Lewis Dep. at 33,
Stewart Dep. at 31 .) PGW's Medical Director
notifies the EUC when a particular employee's
medical records are not current. (*Id.* at 36-39.)
When the Medical Director informs the EUC that
an employee's medical records are not current, the
EUC has the manager or director of the employee's
unit send the employee a letter requesting that he or
she provide the medical department with updated
medical information. (*Id.* at 41.) If the employee
does not provide the requested information, the
EUC may direct his or her department manager to
write a letter to the employee stating that, if he or
she does not provide medical information by a
specific date it will result in termination. (*Id.* at 45.)
PGW does not have a written policy to that effect,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

however, the EUC will threaten termination if the employee had not provided information when previously requested and is not cooperating. (*Id.* at 45, 47.) The manager or director of the unit has input into what the letter requesting medical information says. (*Id.* at 48.) PGW maintains that these letters are sent at the direction of the EUC to " PGW employees regardless of their race, color, national origin, age or sex. As such, these letters are sent to white employees in addition to black employees and Hispanic employees." (Stewart Aff. ¶ 7.) The record before the Court indicates that, over the past three years, the EUC has directed that these letters be sent to twenty-five (25) white employees, thirty-one (31) black employees and seven (7) Hispanic employees. (*Id.* at ¶ 3.)

*2 On September 28, 2001, Robert Barlow, M.D., PGW's Medical Director, sent Plaintiff a letter by certified mail to his address at 4961 Whitaker Avenue in Philadelphia, informing him that PGW had asked his physician to provide updated information with respect to the extent of his injury and asking Plaintiff to provide that information by October 12, 2001. (Pl.'s Ex. 4.) Plaintiff did not receive the letter and his doctor did not provide the requested information. On October 17, 2001, Joseph Sullivan, Plaintiff's supervisor, had a copy of the letter hand delivered to Plaintiff and spoke about it with him on the telephone. (Pl.'s Ex. 5.) Sullivan wrote to Plaintiff on December 14, 2001, asking him to provide the medical information requested in the previous letter, which had not been provided, and notified him that "[f]ailure to provide this information by December 28, 2001 will result in your termination of employment from PGW." (Pl.'s Ex. 6.) On December 18, 2001, Plaintiff resubmitted information to the Medical Department which he had previously provided in May 2001. (Pl.'s Ex. 9.) Sullivan sent Plaintiff another letter on December 18, 2001, asking him to comply with the December 14, 2001 letter requesting updated medical information. (*Id.*) The December 18, 2001 letter repeated the statement that "[f]ailure to provide this information by December 28, 2001 will result in your termination of employment from PGW." (*Id.*) The EUC subsequently extended the deadline for provision of this information until January 7, 2002. (Pl.'s Ex. 10.)

B. *Investigation of Plaintiff's Residency*

Plaintiff maintains that he was discriminated against and harassed by PGW in connection with his residency. PGW has had a policy since 1983 that all union employees hired after that date must reside in the City of Philadelphia. (Sullivan Aff. ¶ 3.) Plaintiff maintains that he has resided continuously in Philadelphia. PGW began an investigation into Plaintiff's residency on October 17, 2001, after he told Sullivan that he had not received the first letter requesting medical documentation, although he still lived at 4961 Whitaker Avenue in Philadelphia. (Pl.'s Ex. 13 at 1.) Sullivan was suspicious that Plaintiff was not being truthful and checked the gas account for that address. (*Id.*) Sullivan discovered that the gas account for 4961 Whitaker Avenue had not been in Plaintiff's name since September 3, 1999. (*Id.*) Albert D'Attilio, Director of Labor Relations, Safety and Security for PGW, then requested a residency investigation of Plaintiff. (*Id.* at 2.) Two resulting investigations did not turn up any evidence that Plaintiff resided outside of Philadelphia. (Pl.'s Exs. 12, 14.)

In late 2001, Jane Lewis, PGW's Director of Risk Management, who was reviewing Plaintiff's pending worker's compensation claim, was told by a PGW employee that Plaintiff had taken a job at Today's Man in Cherry Hill, New Jersey. (Lewis Aff. ¶¶ 3-4.) Lewis instructed outside counsel to subpoena Valentin's employment records from Today's Man. (*Id.* ¶ 4.) In November 2001, in response to the subpoena, she received a copy of Plaintiff's employment application with Today's Man and a copy of the Federal W-4 form that Plaintiff filed with Today's Man. (*Id.* ¶ 5.) These documents both show that Plaintiff's address is in Blackwood, New Jersey. (*Id.*, Exs. 1 & 2.) Lewis provided those documents to Sullivan on January 29, 2002, as well as the results of surveillance performed by Wes Davis Detective Agency on January 25-26, 2002. (Sullivan Aff. ¶ 4, Sullivan Dep. at 110.) The investigator for Wes Davis Detective Agency followed Plaintiff to an apartment on Woodhaven Road in Philadelphia. (Pl.'s Ex. 16.) Sullivan questioned Plaintiff about his residency on January 29, 2002, Plaintiff stated that he did not live in New Jersey. (Sullivan Aff. ¶ 7.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

### C. *Denial of Plaintiff's Worker's Compensation Benefits*

**\*3** Plaintiff claims that after August 13, 2000, when he returned to work from his shoulder injury, PGW refused to pay for his physical therapy or ongoing doctor treatments. Plaintiff also claims that PGW used his failure to continue physical therapy to contest the permanency of his disability. Plaintiff's worker's compensation case was eventually settled and he was paid for some limited periods of benefits. (Lewis Dep. at 42.)

### D. *Plaintiff's Termination for Sick Leave Fraud*

PGW fired Plaintiff for working for another employer on the same day he called in sick to PGW and received sick leave pay from PGW. FN2 (Sullivan Dep. at 20-21.) Lewis discovered the facts which formed the basis of Plaintiff's termination during her review of Today's Man's employment records from Today's Man. PGW's counsel on Plaintiff's workers' compensation case sent those work records to Lewis on January 8, 2002. (Lewis Aff. ¶ 8.) Those records showed the dates and numbers of hours Plaintiff worked at Today's Man. (*Id.,* Ex. 4.) Lewis reviewed the records a few days after receiving them and compared them with Plaintiff's PGW attendance records. (*Id.* ¶ 5.) The Today's Man records showed that Plaintiff worked at Today's Man on three days he was off sick from PGW, September 30, 2000 and May 1 and 2, 2001. (Lewis Dep. at 46-47.) At the time of Plaintiff's termination, PGW did not have a written policy specifically prohibiting employees from working for another employer on a day they are off sick and collecting sick pay from PGW. (Sullivan Dep. at 21, 25.) Lewis believed, however, from her experience in another case, that PGW considered this conduct to be a violation of a work rule. (Lewis Dep. at 46-48.) Lewis sent a memo to Sullivan on January 29, 2002, stating what she had discovered. (Lewis Aff. ¶ 6.)

> FN2. Plaintiff does not claim that the letters sent by Sullivan to Plaintiff demanding updated medical

documentation or the investigations into his residency resulted in his termination from PGW.

Sullivan met with Plaintiff and two union representatives on January 29, 2002 and asked Plaintiff if he could explain why the Today's Man employment records showed that he had been working there while he was off sick from PGW. (Sullivan Aff. ¶ 7.) Plaintiff said that he could not. (*Id.*) Sullivan then suspended Plaintiff with intent to terminate for fraudulently calling out sick at PGW while he was working at Today's Man. (*Id.* ¶ 8.) Sullivan then recommended to D'Attilio that Plaintiff be terminated for sick leave fraud. (*Id.* ¶ 9.)

D'Attilio determined that Plaintiff had violated PGW's "sick leave policy by working at another position on days when he had taken off sick and received sick pay" and decided to terminate him. (D'Attilio Aff. ¶¶ 9-10.) D'Attilio has been employed by PGW since March, 1999 and, during his tenure at PGW, it has been PGW's uniformly enforced "policy to terminate employees who are found working at another job on the same day that they had taken sick leave and collected sick pay." (D'Attilio Aff. ¶¶ 5-6.) He is aware of five other "cases where individuals were found to have violated PGW's work rules by working at another job on the same day that they had taken off sick and collected sick pay. In every case, PGW terminated the employees who violated this work rule." (*Id.* ¶ 11.) In two of these cases the employee was Hispanic (Plaintiff and his brother Edgardo Valentin), in two cases the employees were black and in two cases the employees were white. (*Id.* ¶ 11.)

**\*4** Plaintiff admitted in his deposition that he was working at Today's Man on two of the days he had taken off sick from his job at PGW and collected sick pay. (Valentin Dep. at 328-29.)

### E. *The Twenty Day Rule*

Plaintiff claims that PGW violated its Collective Bargaining Agreement with his union, Local 686,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

by firing him in violation of the 20 day rule. According to the Collective Bargaining Agreement, "[a]ll discipline shall be imposed within twenty (20) working days of the alleged misconduct, or the Company's knowledge thereof." (Pl .'s Ex. 28 at 9.) PGW received the payroll information from Today's Man on January 8, 2002. The 20th working day after January 8, 2002 was February 6, 2002. PGW sent a termination letter to Plaintiff at his 4961 Whitaker Avenue, Philadelphia address on February 4, 2002. (Def.'s Ex. H.) Plaintiff claims that he did not receive that letter, but a copy was hand delivered to him on February 19, 2002 by a union representative. (Pl.'s Mem. at 15.) PGW has disciplined other employees after the twenty day period in two instances, both of the disciplined employees are white men. (D'Attilio Aff. ¶ 13.)

### F. Post Termination Discrimination

Plaintiff alleges that PGW discriminated against him by not rehiring him after he was terminated for sick leave fraud. Plaintiff has submitted evidence that two employees who had been terminated by PGW for sick leave fraud were reinstated following arbitration after Plaintiff filed this lawsuit. (Pl.'s Exs. 27, 28.) One of those individuals, Edgardo Valentin, Plaintiff's brother, is Hispanic. The other individual, Stephanie Burgess, is an African-American female. Edgardo Valentin was rehired after an arbitrator found, on November 5, 2003, that he was on vacation from PGW, and not on sick leave, at the time he was found to have been working at his second job. (Pl.'s Ex. 27 at 14.) The arbitrator in the case of Ms. Stephanie Burgess found, on April 21, 2003, that her conduct, in working a second job outside of her normal PGW working hours, while on sick leave from PGW, was not fundamentally dishonest. (Pl.'s Ex. 26 at 9.) The arbitrator noted that Ms. Burgess had provided PGW with a doctor's note "canvassing her medical history of work induced stress, revealing her treatment regimen, and explaining how she was able to work a second job at Strawbridges while she was out of work from PGW ." (Pl.'s Ex. 26 at 10.)

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

*5 A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by " pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing " sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." *Boykins v. Lucent Technologies, Inc.,* 78 F.Supp.2d 402, 407 (E.D.Pa.2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. *Callahan v. AEV, Inc.,* 182 F.3d 237, 252 n. 11 (3d Cir.1999) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1234 n. 9 (3d Cir.1993)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

### III. DISCUSSION

Plaintiff asserts his claim for discrimination pursuant to 42 U.S .C. § 1981. Section 1981(a) provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (1994). PGW argues that Plaintiff's claims must be dismissed because Plaintiff cannot bring a direct action against a municipality pursuant to Section 1981 and that, if Plaintiff can bring an action against PGW pursuant to Section 1981, there is no evidence to support a cause of action pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). [FN3]

> FN3. Defendant also contends that Plaintiff cannot bring an action for race discrimination pursuant to 42 U.S.C. § 1981 because he is Hispanic. The Court finds that an Hispanic person can bring a cause of action for race discrimination pursuant to Section 1981. *See Rodriguez v. American Parts System,* Civ. A. No. 86-3904, 1986 WL 13034, at *3 (E.D.Pa. Nov.19, 1986) (determining that "an allegation of discrimination based upon Puerto Rican background states a cause of action for racial discrimination under 42 U.S.C. § 1981."); *see also Al-Khazraji v. Saint Francis College,* 784 F.2d 505, 517-18 (3d Cir.1986) (concluding that a person of Arab background could state a claim for racial discrimination under Section 1981).

### A. *Section 1981 Actions Against a Municipal Agency*

PGW "is not, itself, an identifiable entity," PGW is " merely a collective name for the real and personal property used to furnish gas service to customers within the City." *Hendrickson v. Philadelphia Gas Works,* 672 F.Supp. 823, 825 (E.D.Pa.1987) (citing *Dawes v. Philadelphia Gas Commission, et al.,* 421 F.Supp. 806, 811 (E.D.Pa.1976)). PGW's general operations are overseen by the Philadelphia Gas Commission, which "is an operating arm of the City of Philadelphia responsible for the setting of rates and operating regulations by reason of Article III, §§ 3-100 and 3-309 of the City's Home Rule Charter." *Id.* (citing *Dawes,* 421 F.Supp. at 815). The Philadelphia Facilities Management Corporation manages PGW for the "sole and exclusive benefit" of the City pursuant to municipal ordinance. *Id.* (citing *Dawes,* 421 F.Supp. at 815). PGW is, therefore, considered to be a municipal agency " ' synonymous with the City of Philadelphia' for purposes of the civil rights statutes." *Sanders v. Philadelphia Gas Works,* No. Civ. A. 98-6271, 1999 WL 482394, at *1 (E.D.Pa. July 2, 1999) (citing *Hendrickson,* 672 F.Supp. at 825).

**\*6** PGW argues that Plaintiff cannot bring a viable cause of action against it pursuant to Section 1981 because 42 U.S.C. § 1983 is the exclusive remedy for allegations of discrimination against a municipal agency. Defendant relies on *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), in which the Supreme Court held that Section 1983 provides the exclusive federal remedy for violations of Section 1981 by a state actor:

We hold that the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

*Id.* at 735.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

The Court recognizes that "there is disagreement among other circuits, as well as within the Eastern District of Pennsylvania" regarding whether the 1991 amendments to the Civil Rights Act, which added subsection (c) to Section 1981, created an independent cause of action, thereby abrogating the holding in *Jett* that Section 1983 provides the only remedy for violations of Section 1981 by state actors. *Jacobs v. City of Philadelphia,* No. Civ. A. 03-950, 2004 WL 241507, at *4 (E.D. Pa. Jan 29, 2004) (noting that Section 1983 remains the exclusive remedy for violations of Section 1981 by a municipality). Subsection (c) provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). There is nothing in the legislative history of the 1991 amendments which indicate that Congress intended to overrule *Jett* and establish an independent cause of action against state actors pursuant to Section 1981. *See Miles v. City of Philadelphia,* No. Civ. A. 98-5837, 1999 WL 274979, at *5 (E.D.Pa. May 5, 1999) ("The legislative history of the 1991 amendments shows that § 1981(c) was intended only to codify existing case law. There is no indication that Congress intended to nullify *Jett* and to create a new civil cause of action.") (citations omitted). This Court addressed this issue in *Poli v. SEPTA,* No. Civ. A. 96-6766, 1998 WL 405052 (E.D.Pa. July 7, 1998), and found that the 1991 amendments to the Civil Rights Act did not overrule *Jett:*
The Court of Appeals for the Ninth Circuit ("Ninth Circuit") has held that the Civil Rights Act of 1991 creates an implied cause of action against state actors under section 1981, and thus statutorily overrules *Jett'* s holding that section 1983 provides the exclusive federal remedy against municipalities for violation of the civil rights guaranteed by section 1981. *Federation of African American Contractors v. City of Oakland,* 96 F.3d 1204, 1214 (9th Cir.1996). In contrast, the Courts of Appeals for the Fourth and Eleventh Circuits have held that section 1983 continues as the exclusive federal remedy for rights guaranteed in section 1981 by state actors. *Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995); *Johnson v. City of Fort Lauderdale,* 903 F.Supp. 1520 (S.D.Fla.1995), *aff'd* 114 F.3d 1089 (11th Cir.1997).

*7 In keeping with the reasoning of *Dennis* and *Johnson,* the Court finds that the 1991 Amendments do not abrogate the holdings of *Jett,* that section 1983 is the exclusive remedy for section 1981 claims against municipal entities, and that direct claims under section 1981 cannot be brought against municipal entities.

*Id.* at *11-12 (footnotes omitted). Although the United States Court of Appeals for the Third Circuit ("Third Circuit") has not addressed this issue explicitly, it recently reiterated the holding, in *Jett,* that Section 1983 provides the remedy for violations of Section 1981 by a state actor:The Court has ruled "that the express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.... Thus to prevail in his claim for damages [against a state actor], [a claimant] must show that the violation of his right to make contracts protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases."

*Oaks v. City of Philadelphia,* 59 Fed. Appx. 502, 503 (2003) (citing *Jett,* 491 U.S. at 735-36).

Plaintiff suggests that some courts have permitted Section 1981 claims to proceed against municipal actors if the requirements for bringing a Section 1983 action against municipal actors set forth in *Monell* are satisfied. Indeed, *Miles v. City of Philadelphia,* No. Civ. A. 98-5837, 1999 WL 274979 (E.D.Pa. May 5, 1999), found that the 1991 amendments did not overrule the ruling in *Jett* that Section 1983 provides the exclusive remedy for violations of Section 1981 by state actors and, consequently, treated plaintiff's Section 1981 claim as merged into his Section 1983 claim. *Id.* at * 5. That approach was followed in *Jacobs v. City of Philadelphia,* No. Civ. A. 03-950, 2004 WL 241507 (E.D. Pa. Jan 29, 2004), which similarly treated plaintiff's Section 1981 claim as being merged into his Section 1983 claim. *Id.* at *4 ("This Court will follow the approach taken by the Third Circuit in *Oaks* and Judge Waldman in *Miles.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Accordingly, Plaintiff's § 1981 will not be dismissed, but will be treated as merged into his § 1983 claim.").

The Court finds, for the reasons set forth in *Poli, Miles, Jacobs,* and *Oaks,* that Section 1983 remains the exclusive remedy for violations of Section 1981 by a state actor. Plaintiff maintains that the requirements of Section 1983 are satisfied in this case and that he could, if need be, amend his Complaint to restate his claim pursuant to Section 1983, the Court will follow the approach taken in *Miles* and *Jacobs* by treating Plaintiff's claim as if it had been brought pursuant to Section 1983. Consequently, Defendant's Motion is denied with respect to Defendant's argument that Plaintiff cannot bring an action against PGW pursuant to Section 1981. However, Plaintiff's claim cannot survive summary judgment unless he can establish, in accordance with the requirements for a claim brought pursuant to Section 1983, that the race discrimination he complains of "was caused by a custom or policy within the meaning of *Monell."* *Oaks,* 59 Fed.App. at 503.

### B. *Monell*

**\*8** PGW argues that, if Defendant's claim is treated as a Section 1983 claim, it is entitled to summary judgment because Plaintiff cannot establish that he was discriminated against in accordance with any policy, custom or practice of PGW. PGW, as a municipal agency, cannot be held liable under Section 1983 *"solely"* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (emphasis in original). The Supreme Court concluded in *Monell* that:
a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

injury that the government as an entity is responsible under § 1983.

*Id.* at 694. A government's policy is established when "a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). A course of conduct becomes a custom when "though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Id.* (quoting *Monell,* 436 U.S. at 690). It is the plaintiff's burden to show that "a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Id.* A policymaker is an official with "final, unreviewable discretion to make a decision or take an action." *Id* . at 1481 (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 142, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). Even high ranking officials are not policymakers for purposes of Section 1983 if their decisions are constrained by policies put into place by others, or if their decisions are reviewable:When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

*Praprotnik,* 485 U.S. at 127 (emphasis in original); *see also Vassallo v. Timmoney,* No. Civ. A. 00-84, 2001 WL 1243517, at \*8 (E.D.Pa. Oct.1, 2001) (noting that even a high ranking official "is not a final policymaker if his decisions are subject to review and revision.") (citing *Morro v. City of Birmingham,* 117 F.3d 508, 510 (11th Cir.1997), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1299, 140 L.Ed.2d 465 (1998)).

PGW argues that there is no evidence that Sullivan, or any one else employed by PGW, acted pursuant to a policy, custom or practice that was anything other than neutral on its face with respect to PGW's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

treatment of Plaintiff. Plaintiff does not contend that he was discriminated against pursuant to a discriminatory policy or custom of PGW. He argues, however, that "Sullivan, D'Attilio and Lewis, the principal actors involved in Mr. Valentin's termination and employment history at defendant, are all high-ranking policymaking officials of defendant." (Pl's Mem. at 23.) He maintains, therefore, that their actions can be construed as the actions of PGW and as setting official municipal policy pursuant to *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

**\*9** In *Pembaur,* the Supreme Court recognized that a municipality may be liable for a single decision to take unlawful action made by a municipal policymaker under Section 1983 "where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). Plaintiff maintains that Lewis, Sullivan and D'Attilio are policymaking officials of PGW whose actions can subject PGW to municipal liability because they had complete discretion with respect to their conduct toward Plaintiff in connection with the requests made for Plaintiff's medical records, the investigations of Plaintiff's residency, and Plaintiff's termination. Plaintiff does not assert that these individuals have full discretion with respect to PGW's denial of Plaintiff's worker's compensation benefits, PGW's violation of the 20 day rule, or PGW's refusal to reinstate Plaintiff after his termination. Consequently, Defendant's Motion is granted with respect to these allegations of discrimination.

Plaintiff contends that Lewis had full discretion to order a residency investigation of Plaintiff. Plaintiff has submitted evidence that Lewis had discretion to order surveillance in direct relation to workers' compensation claims. (Ferrer dep. at 21-22.) However, Plaintiff has submitted no evidence that Lewis has unfettered authority to order surveillance of PGW employees, that she has any authority to order residency investigations, or that she was

responsible for establishing final policy with respect to residency investigations.

Plaintiff argues that Sullivan had complete discretion with respect to the letters sent to Plaintiff requesting medical documentation, ordering residency investigations of Plaintiff, and terminating Plaintiff. Plaintiff maintains that Sullivan had full discretion to determine the discipline which would be applied if Plaintiff failed to provide the updated medical documentation requested by the EUC. However the record on this Motion shows otherwise. The letters sent by Sullivan concerning the EUC's request that Plaintiff provide updated medical records were not sent by Sullivan in his full discretion, but at the request of the EUC, in accordance with the practice of the EUC of threatening termination if an employee did not comply with a request for records. (Stewart Dep. at 44-49, Stewart Aff. ¶¶ 8-10). M. Ann Stewart, the Chairperson of the EUC, explained the EUC's practice as follows:
8. There are two letters that the EUC requests managers to send to employees who request or are currently working in light duty assignments or are on long-term sick leave-more than thirty (30) days.
9. The first letter is a request to provide updated medical information to PGW with [sic] ten days.
10. The second letter, which is sent if the employee does not respond to the first letter, states that the employee will be terminated if the requested information is not provided in ten days.

**\*10** (Stewart Aff. ¶¶ 8-10.) Plaintiff has submitted no evidence that Sullivan had the complete discretion to order a residency investigation of Plaintiff. The evidence submitted by Plaintiff shows that, in order to obtain a residency investigation of Plaintiff, Sullivan would have to make a request for such an investigation to D'Attilio or John Straub. (Ferrer Dep. at 22-24.) The evidence on the record of this Motion also does not support Plaintiff's claim that Sullivan had complete discretion to order Plaintiff's termination. Plaintiff has submitted no evidence that Sullivan had unfettered discretion to terminate employees. Sullivan testified at his deposition that he did not have the unconstrained discretion to fire Plaintiff. He testified that he participated in the decision, but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 9

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

that the recommendation that Plaintiff be fired came from the risk manager's office at PGW and that the ultimate call belonged to D'Attilio. (Sullivan Dep. at 32.) There is also no evidence that Sullivan is responsible for establishing final policies for PGW with respect to letters requesting medical documentation, employee discipline if the requested documentation is not provided, employee surveillance, or employee termination.

Plaintiff contends that D'Attilio had complete discretion to order residency investigations of Plaintiff. There is evidence on the record that D'Attilio could order a residency investigation of a PGW employee. (Ferrer Dep. at 20.) However, Plaintiff has submitted no evidence that D'Attilio's authority was not subject to review or that his authority was unconstrained by PGW's employment and personnel policies. Plaintiff also contends that D'Attilio had the unfettered discretion to terminate Plaintiff. There is evidence on the record that D'Attilio had authority to terminate PGW employees. (Sullivan Dep. at 32.) However, the evidence also shows that D'Attilio exercised this discretion in accordance with his understanding of the manner in which PGW's sick leave policy had been enforced during his entire tenure at PGW. (D'Attilio Dep. at 56-57.) The record also shows that Sullivan's and D'Attilio's decision making authority with respect to the termination of employees was constrained by PGW's written policies with respect to sick leave (Pl.'s Ex. 21); PGW's written corporate discipline policy (Pl.'s Ex. 24); PGW's written personnel policy (Pl.'s Ex. 25); and the collective bargaining agreement between PGW and Plaintiff's union (Pl.'s Ex. 28.) Moreover, there is no evidence on the record that D'Attilio's authority to terminate PGW employees was not subject to review or that he had final authority to establish final policy with respect to either residency investigations or the termination of employees of PGW.

The Court finds that Plaintiff has failed to meet his burden of setting forth specific facts which would establish that Lewis, Sullivan, or D'Attilio were policymakers with respect to any of the actions they took vis a vis Plaintiff. Consequently, the Court finds that there is no genuine issue of material fact

with respect to Plaintiff's claim to have been subjected to race discrimination in accordance with a policy, custom or practice of PGW. Plaintiff has not, therefore, satisfied the requirements of *Monell* and Defendant's Motion for Summary Judgment is granted. [FN4]

> FN4. Since the Court grants Defendant's Motion for Summary Judgment based upon Plaintiff's failure to establish the existence of a genuine issue of material fact regarding his claim that he was subjected to race discrimination in employment according to a policy, custom or practice of PGW, the Court need not reach Defendant's argument that it is entitled to summary judgment because Plaintiff has not met the requirements for a disparate treatment claim pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### C. *Request to File Amended Complaint*

*11 Plaintiff asked the Court, in his "Sur Reply Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment" for leave to amend the Complaint to assert a new claim for post-termination discrimination. Plaintiff seeks to allege a retaliation claim based on PGW's refusal to rehire him after he was terminated for sick leave fraud. Plaintiff states that he filed a discrimination complaint against Defendant with the Philadelphia Commission on Human Relations ("PCHR") on February 20, 2002 and PGW denied Valentin's grievance of his termination on May 9, 2002. (Pl.'s Sur Reply at 7.) Plaintiff states that other employees, namely Edgardo Valentin and Stephanie Burgess, were rehired after an arbitrator ordered their return to work.

The Federal Rules of Civil Procedure provide that, after a responsive pleading has been filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). Rule 15 further provides that " leave shall be freely given when justice so requires."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Fed.R.Civ.P. 15(a). Decisions on motions to amend are committed to the sound discretion of the district court. *Gay v. Petsock,* 917 F.2d 768, 772 (3d Cir.1990). However, courts liberally allow amendments when "justice so requires," and when the non-moving party is not prejudiced by the allowance of the amendment. *Katzenmoyer v. City of Reading,* 158 F.Supp.2d 491, 497 (E.D.Pa.2001) (citing *Thomas v. State Farm Ins. Co.,* No. Civ. A. 99-268, 1999 WL 1018279, at *3 (E.D.Pa. Nov.5, 1999)). An applicant seeking leave to amend a pleading has the burden of showing that justice requires the amendment. *Id.* The United States Supreme Court has determined that leave to amend should be granted in "the absence of any apparent or declared reason-such as [1] undue delay, [2] bad faith or dilatory motive on the part of the movant, [3] repeated failure to cure deficiencies by amendments previously allowed, [4] undue prejudice to the opposing party by virtue of allowance of the amendment, [5] futility of the amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The Third Circuit has explained "that prejudice to the non-moving party is the touchstone for the denial of the amendment." *Cornell & Co. v. Occupational Safety and Health Rev. Comm'n,* 573 F.2d 820, 823 (3d Cir.1978). Such prejudice exists " if the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation." *Rehabilitation Inst. v. Equitable Life Assur. Soc. of the U.S.,* 131 F.R.D. 99, 102 (W.D.Pa.1990) (citing Wright, et al., 6 Federal Practice and Procedure § 1487 (1990)); *see also Niesse v. Shalala,* 17 F.3d 264, 266 (8th Cir.1994) (refusing to find the district court abused its discretion in denying a request to amend where it "was correct in noting that considerable additional discovery would be required to deal with the question of class certification"); *Berger v. Edgewater Steel Co.,* 911 F.2d 911, 924 (3d Cir.1990) (affirming district court's denial of motion for leave to amend where " allowing the amendment here would inject new issues into the case requiring extensive discovery"); *Cuffy v. Getty Ref. & Mktg. Co.,* 648 F.Supp. 802, 806 (D.Del.1986) (noting that "the general presumption in favor of allowing amendment can be overcome only by the opposing party showing that the amendment will be prejudicial").

**\*12** Plaintiff's request for leave to file an amended complaint asserting a new cause of action under a new legal theory was made on March 24, 2004, after the close of discovery, after Defendant's Motion for Summary Judgment was fully briefed, after the parties submitted their pre-trial memoranda, and a mere twelve days prior to the scheduled trial of this lawsuit on April 5, 2004. Moreover, Plaintiff's new theory is based on facts of which he was aware well before the close of discovery in this case. His grievance was denied nearly two years ago, the arbitrator's decision in Ms. Burgess' case was issued eleven months ago, and the arbitrator's decision in Plaintiff's brother's case was issued more than four months ago. The Court finds that Plaintiff has unduly delayed moving to amend his Complaint and that the amendment, asserting a new claim under a new legal theory less than two weeks prior to the scheduled trial of this action, would be unduly prejudicial to Defendant. Accordingly, Plaintiff's request to file an amended complaint asserting a cause of action for retaliation is denied.

An appropriate order follows.

*ORDER*

AND NOW, this 29th day of March, 2004, in consideration of Defendant's Motion for Summary Judgment (Docket No. 28), the papers filed in support thereof, Plaintiff's response thereto, and the oral argument held on the Motion on March 24, 2004, IT IS HEREBY ORDERED that the Motion GRANTED. It is further ORDERED that JUDGMENT is ENTERED on behalf of Defendant and against Plaintiff. The Clerk of Court shall CLOSE this case for statistical purposes.

E.D.Pa.,2004.
Valentin v. Philadelphia Gas Works
Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                             Page 11

Not Reported in F.Supp.2d, 2004 WL 690805 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents (Back to top)

• 2004 WL 1498001 (Trial Motion, Memorandum
and Affidavit) Defendant's Response to Plaintiff's
Answer to Defendant's Motion for Summary
Judgment (Mar. 18, 2004)
• 2004 WL 1498000 (Trial Motion, Memorandum
and Affidavit) Defendant's Second Supplemental
Memorandum of Law in Support of Motion for
Summary Judgment (Feb. 13, 2004)
• 2004 WL 1497999 (Trial Motion, Memorandum
and Affidavit) Supplemental Memorandum of Law
in Support of Defendant's Motion for Summary
Judgment (Feb. 09, 2004)
• 2004 WL 1497998 (Trial Motion, Memorandum
and      Affidavit)      Defendant's      Supplemental
Memorandum of Law in Support of Motion to
Compel Plaintiff's Deposition and Award Attorney's
Fees and Costs_ for Preparing and Filing the
Motion (Jan. 08, 2004)
• 2003 WL 23640933 (Trial Pleading) Answer and
Affirmative Defenses of Defendants Philadelphia
Gas Works Joe Sullivan (Aug. 22, 2003)
• 2:03cv03833 (Docket) (Jun. 26, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB P

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1

Not Reported in F.Supp.2d, 1999 WL 274979 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Collins MILES
v.
CITY OF PHILADELPHIA, Capt. Thomas Nestel
and Lt. John Lacon
**No. CIV.A. 98-5837.**
**CIVIL ACTION NO. 98-5837.**

May 5, 1999.

*MEMORANDUM*

WALDMAN.

I. *Introduction*

*1 Plaintiff has asserted claims pursuant to 42
U.S.C. §§ 1981 and 1983 as well as the
Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et
seq.,* for racial discrimination in employment and
retaliation for speaking out against wrongdoing in
the Philadelphia Police Department. Presently
before the court is defendants' motion to dismiss
plaintiff's federal claims pursuant to Fed.R.Civ.P.
12(b)(6).

II. *Legal Standard*

Dismissal for failure to state a claim is appropriate
only when it clearly appears that plaintiff can prove
no set of facts in support of the claim which would
entitle him to relief. *See Conley v. Gibson,* 355 U.S.
41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Robb
v. Philadelphia,* 733 F.2d 286, 290 (3d Cir.1984).
Such a motion tests the legal sufficiency of a claim
while accepting the veracity of the claimant's
allegations. *See Markowitz v. Northeast Land Co.,*
906 F.2d 100, 103 (3d Cir.1990); *Sturm v. Clark,*
835 F.2d 1009, 1011 (3d Cir.1987); *Winterberg v.*

*CNA Ins. Co.,* 868 F.Supp. 713, 718 (E.D.Pa.1994),
*aff'd, 72 F.3d 318* (3d Cir.1995). A complaint may
be dismissed when the facts alleged and the
reasonable inferences therefrom are legally
insufficient to support the relief sought. *See
Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.,*
836 F.2d 173, 179 (3d Cir.1988).

III. *Facts*

The facts as alleged by plaintiff are as follow.

Plaintiff is a Philadelphia police officer. He is
black. Prior to 1996, plaintiff consistently received
satisfactory evaluations and was considered by his
peers to be an excellent, reliable police officer. In
January 1996, a white police officer drew his
service revolver and pointed it in a threatening
manner at Officer Angela Brown, a black woman.
Officer Brown reported the incident to supervisory
officers in the 14th District who responded by
publicly insulting her.

Plaintiff and other nonwhite officers in the 14th
District expressed their support for Officer Brown
and requested that the officer who pointed his
weapon at her be disciplined. The nonwhite officers
were advised by unidentified persons "to stay out of
the Angela Brown" incident. The officer who
pointed his weapon at Officer Brown was
suspended for three days and then transferred to
another platoon within the 14th District. Nonwhite
officers who had committed offenses involving the
drawing of their weapons were regularly disciplined
more severely. Such discipline included extensive
investigations, board hearings and suspensions
exceeding three days.

Plaintiff and other nonwhite officers in the 14th
District complained about what they perceived to be
the minimal disciplinary action taken against the
white officer. Plaintiff also spoke out against the
physical assault of a prisoner by an unidentified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 1999 WL 274979 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

sergeant assigned to the 14th District, the "suggested planting of a weapon on a suspect" and the generally "deteriorating and hostile racial atmosphere [and] the increasing retaliatory conduct towards himself and the other minority officers."

*2 Plaintiff expressed his concerns to his supervisors at the 14th District and other unidentified "responsible parties." Captain Nestel and Lieutenant LaCon responded to the nonwhite officers' complaints by taking unspecified actions which the nonwhite officers "believed to be threats to their person and safety." Defendants Nestel and LaCon perceived plaintiff as the principal spokesman for the 14th District's nonwhite officers and began to give him "out of the way assignments."

In March 1997, plaintiff reported his concerns regarding allegedly illegal actions by 14th District officers against him, other nonwhite officers and the public at large to the Department's Internal Affairs Bureau. In April 1997, Officer Brown was detailed out of the 14th District and the white officer who had pointed his service revolver at Officer Brown was transferred back to the platoon to which he had been assigned before his post-misconduct transfer. Plaintiff protested these personnel changes as discriminatory, but to no avail. Plaintiff was then assigned to foot patrol and given out-of-the-way assignments. Plaintiff also was given poor evaluations, was shunned by unidentified persons and was subjected to excessive scrutiny for the purpose of making his employment record suffer. In September 1997, an unidentified sergeant in the 14th District berated plaintiff for his allegedly "insufficient activity."

In late September and early October 1997, plaintiff filed complaints of discrimination, harassment, retaliation and other illegal actions against the 14th District administration, including defendants Nestel and LaCon, with Internal Affairs, the Department's internal equal employment opportunity office and "other outside agencies." In October and November 1997, plaintiff gave interviews to Internal Affairs and the EEOC regarding this allegedly discriminatory, retaliatory and illegal conduct.

Plaintiff was subsequently served with a notice of

discipline charging him with insubordination in connection with the incident of September 1997, presumably the undescribed conduct for which he was "berated" by a sergeant for "insufficient activity." Inspector Frankie Heyward refused to approve the notice of discipline. Defendant Nestel nevertheless processed the disciplinary charge and required plaintiff to appear at a Police Board of Inquiry hearing. Plaintiff was detailed out of the 14th District and ultimately transferred to the 5th District. In July 1998, plaintiff was given a notice of suspension relating to the September 1997 incident in which a sergeant berated him for insufficient activity.

Defendants' actions have caused plaintiff "considerable distress" for which medical treatment has been required. Plaintiff's reputation and career have been adversely affected because his peers and supervisors view him as having had disciplinary problems and as having violated "the unstated 'code of silence' for the Police Department." The retaliatory actions taken against him have resulted in economic loss including lost wages, benefits "and other work related emoluments."

### IV. *Discussion*

*3 Defendants concede that the 1991 amendments to § 1981 expanded the Act's definition of making and enforcing contracts to encompass the "performance, modification and termination of contracts." *See* 42 U.S.C. § 1981(b); *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 300, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994); *Spriggs v. Diamond Auto Glass,* 165 F.3d 1015, 1017-18 (4th Cir.1999). They argue that plaintiff's § 1981 claim nevertheless fails because he had no individual employment contract with the City and lacks standing to assert his rights under the collective-bargaining agreement because only the authorized collective-bargaining representative may assert a union member's rights under the agreement.

If defendants are correct, no employee who is a member of a union may assert a claim in court under § 1981 for post-hiring discrimination by his employer, at least before exhausting all grievance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 274979 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

and arbitration procedures provided in the collective bargaining agreement. Defendants cite no authority for this proposition. Defendants merely argue that plaintiff had no "contract" with the City other than the collective bargaining agreement since he had no written individual employment contract and because public contracts must be in writing to be enforceable under Pennsylvania law. The single case to which defendants cite is *Malone v. City of Philadelphia,* 147 Pa. 416, 23 A. 628 (Pa.1892). That case, however, dealt with municipal liability under public construction contracts. There is no reported decision applying the statute addressed in *Malone* or its modern-day successor, 53 P.S. § 12671, in any context other than public works projects by outside contractors.

Moreover, defendants' argument presumes that plaintiff is seeking a contractual recovery from the City. He is not. *See,* e.g., *McAlester v. United Airlines,* 851 F.2d 1249, 1255 (10th Cir.1988) (§ 1981 claims sound in tort rather than contract); *McElveen v. CSX Transportation, Inc.,* 1996 WL 481105, *4 (D.S.C. Aug.21, 1996) (purpose of § 1981 is not to enforce contractual obligations but was to create independent actionable right of equal opportunity); *Randolph v. Cooper Industries,* 879 F.Supp. 518, 522 & n. 4 (W.D.Pa.1994) (§ 1981 claim alleges violations of federal antidiscrimination statute and not breach of collective bargaining agreement); *Partin v. St. Johnsbury Co., Inc.,* 447 F.Supp. 1297, 1300 (D.R.I.1978) (§ 1981 guarantees rights derived from the Thirteenth Amendment and not from implied or express provisions in a private agreement between two parties). The fact that plaintiff is covered by a collective bargaining agreement does not mean that only his collective bargaining representative may advance his § 1981 claim. Plaintiff is not alleging that defendants committed an unfair labor practice or violated his rights under the collective bargaining agreement. Plaintiff alleges that defendants violated his individual rights under federal antidiscrimination statutes.

*4 There is scant support for defendants' suggestion that plaintiff must pursue arbitration pursuant to the grievance procedure in the collective bargaining agreement to vindicate his § 1981 rights. A divided

panel of the Third Circuit has held that the provisions of a collective bargaining agreement may subject statutory employment claims under Title VII and § 1981 to mandatory arbitration. *See Martin v. Dana Corp.,* 114 F.3d 421, 1997 WL 313054 (3d Cir. June 12, 1997). The Third Circuit, however, vacated that opinion in favor of *en banc* rehearing, *see* 114 F.3d 428, 1997 WL 368629 (3d Cir. Jul.1, 1997), and then panel rehearing, *see* 124 F.3d 590 (3d Cir.1997), and ultimately held in an unpublished opinion that the arbitration provision in plaintiff's collective bargaining agreement did not bar his lawsuit. *See* 135 F.3d 765 (3d Cir.1997). Even the holding in the vacated *Martin* opinion was limited to collective bargaining agreements under which an employee can compel arbitration without union approval and which explicitly provide for arbitration of statutory discrimination claims.

The Sixth, Seventh, Eighth, Tenth and Eleventh Circuits have all held in post-1991 cases that a collective-bargaining agreement may not prospectively waive a union member's right to bring statutory discrimination claims in court. *See Penny v. United Parcel Serv.,* 128 F.3d 408, 414 (6th Cir.1997) (ADA claim); *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 363 (7th Cir.) (collective bargaining agreement does not consign enforcement of statutory rights under § 1981, Title VII or ADA to union-controlled grievance and arbitration machinery), *cert. denied,* 522 U.S. 912, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1213 (8th Cir.1996) (collective bargaining agreement may not impose requirement of arbitral exhaustion), *cert. denied,* 519 U.S. 1110 (1997); *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1453-54 (10th Cir.1997) (Title VII), *cert. granted and judgment vacated on other grounds,* 524 U.S. 947, 118 S.Ct. 2364, 141 L.Ed.2d 732 (1998); *Brisentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519, 526 (11th Cir.1997) (ADA). *See also Tran v. Tran,* 54 F.3d 115, 117 (2d Cir.1995) (no requirement of arbitral exhaustion for Fair Labor Standards Act claim), *cert. denied sub nom Dinh Tuong Tran v. Tho Dinh Tran,* 517 U.S. 1134, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). The Fourth Circuit is the only circuit which has reached a contrary result. *See Austin v. Owens-Brockway Glass Container, Inc.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4

Not Reported in F.Supp.2d, 1999 WL 274979 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

78 F.3d 875, 880-81 (4th Cir.), *cert. denied,* 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). *Cf. Penny,* 128 F.3d at 413 (noting that *"Austin* has not inspired many followers").

**\*5** Although not argued by defendants, plaintiff has clearly failed to state a cognizable § 1981 claim insofar as it is predicated on claims of harassment and retaliation for the exercise of his First Amendment rights. *See Ferrill v. The Parker Group, Inc.,* 168 F.3d 468, 473 (11th Cir.1999) ( " § 1981 proscribes discrimination solely on the basis of race"); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264 (9th Cir.1997); *Bisciglia v. Kenosha Unified Sch. Dist. No. 1,* 45 F.3d 223, 229 (7th Cir.1995) ("Section 1981 only provides relief for discrimination based on one's race"); *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1387 n. 7 (10th Cir.1991) ( § 1981 proscribes "only discrimination on the basis of race"); *Evans v. McKay,* 869 F.2d 1341, 1344 (9th Cir.1989) ( to sustain § 1981 claim plaintiff must "show intentional discrimination on account of race"); *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1412 n. 7 (D.C.Cir.1988) ( Section 1981 plaintiff must prove different treatment from similarly situated persons "because of his race"). Although the complaint is not a model of clarity or specificity, it appears that plaintiff may be alleging that defendants discriminated against him not only because of his protesting and whistleblowing, but also because of his race. In the absence of any contrary argument by defendants to which plaintiff then might be expected to respond, the court will not dismiss his § 1981 claim on that basis at this juncture.

Defendants also have not argued that § 1981 is unavailable to redress employment discrimination by a state actor. Because this is a critical issue and solely a matter of law, and as plaintiff himself candidly acknowledged the question in his response to defendants' motion, the court will address it.

The court finds most persuasive the analysis and opinions of those courts which have held that the 1991 amendments do not abrogate the holding of the Supreme Court in *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 735-36, 109 S.Ct. 2702,

105 L.Ed.2d 598 (1989) that § 1983 provides the exclusive remedy for violations of § 1981 by state actors. The legislative history of the 1991 amendments shows that § 1981(c) was intended only to codify existing case law. There is no indication that Congress intended to nullify *Jett* and to create a new civil cause of action. *See Johnson v. City of Fort Lauderdale,* 903 F.Supp. 1520, 1522-23 (S.D.Fla.1995), *aff'd,* 148 F.3d 1228 (11th Cir.1998). *See also Dennis v. County of Fairfax,* 55 F.3d 151, 156 & n. 1 (4th Cir.1995) (§ 1983 is exclusive federal remedy for violation by state actor of rights guaranteed in § 1981); *Williams v. Little Rock Municipal Water Works,* 21 F.3d 218, 224 (8th Cir.1994) (same); *Villanueva v. City of Fort Pierce,* 24 F.Supp.2d 1364, 1368 & n. 8 (S.D.Fla.1998) (*Jett* requires merger of § 1981 claim asserted against municipality into plaintiff's § 1983 claim); *Tabor v. City of Chicago,* 10 F.Supp.2d 988, 991-92 (N.D.Ill.1998); *Stinson v. Pennsylvania State Police,* 1998 WL 964215, *3 n. 3 (E.D.Pa. Nov.2, 1998); *Poli v. SEPTA,* 1998 WL 405052, *12 (E.D.Pa. July 7, 1998). *Compare Federation of African American Contractors v. City of Oakland,* 96 F.3d 1204, 1214-15 (9th Cir.1996) (1991 Civil Rights Act abrogated holding in *Jett* regarding exclusivity of remedy while maintaining the "policy or custom" requirement). Plaintiff's § 1981 claim will be merged into his § 1983 claim.

**\*6 B.** *Section 1983 claims*

A plaintiff may recover damages under § 1983 for injuries caused by the deprivation of his constitutional rights by persons acting under color of state law. *See Farrar v. Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Squires v. Bonser,* 54 F.3d 168, 172 (3d Cir.1995). There is, however, no respondeat superior liability under § 1983. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1295 (3d Cir.1997).

A municipality is liable for a constitutional tort only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of. *Id.* (quoting *Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 1999 WL 274979 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

(1978)). "Policy" is made when a decisionmaker with final authority to establish municipal policy with respect to the action in question issues an official proclamation, policy or edict. A "custom" is a course of conduct which, although not formally authorized by state officials, reflects practices of state officials that are so permanent and well settled as to virtually constitute law. In either case, it is incumbent upon a plaintiff to show that a final policymaker is responsible for the policy or custom at issue. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481-82, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990). A municipal official is not a final policymaker if his decisions are subject to review and revision. *See Morro v. City of Birmingham,* 117 F.3d 508, 510 (11th Cir.1997), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1299, 140 L.Ed.2d 465 (1998). Liability under § 1983 may be predicated on a final policymaker's omissions if this inaction evinces "deliberate indifference" to the rights of those with whom an offending subordinate comes into contact. *See Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 25 (3d Cir.1997).

Defendants argue that plaintiff has not identified, and cannot identify, any official "policy" of retaliating against outspoken police officers or whistleblowers because the only "policies" of the Philadelphia Police Department are Directives promulgated by the Commissioner and there is no Directive requiring or authorizing retaliation against outspoken officers or whistleblowers. Defendants cite *Littlejohn v. City of Philadelphia,* 1993 WL 79600 (E.D.Pa. Mar.22, 1993) for the proposition that the Third Circuit has held that in the Philadelphia city government "only someone holding the rank of Commissioner may be considered the final decision-maker." *Littlejohn* was not in fact a decision of the Third Circuit. It was a district court opinion affirmed by an unpublished order of the Third Circuit. *See* 14 F.3d 48 (3d Cir.1993). Moreover, the word "Commissioner" appears nowhere in *Littlejohn.*

*7 Whether an official is a final policymaker in a particular area or on a particular issue depends upon the definition of his functions under pertinent state law. *See McMillian v. Monroe County,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Garrison v. Burke,* 165 F.3d 565, 572 (7th Cir.1999) ; *Myers v. County of Orange,* 157 F.3d 66, 76 (2d Cir.1998), *cert. denied,* 525 U.S. 1146, 119 S.Ct. 1042, 143 L.Ed.2d 49 (1999); *Garrett v. Kutztown Area School Dist.,* 1998 WL 513001, *4 (E.D.Pa. Aug.11, 1998). For many areas and issues, municipal department heads are in fact final policymakers. Defendants note that plaintiff in any event did not specifically allege the existence of an " official policy" promulgated by anyone who could be characterized as a "final decision-maker."

Insofar as plaintiff criticizes the requirement that only a high level decisionmaker may promulgate " official policy" binding upon the municipality as " rigid" and susceptible to an "ostrich-head in the sand defense," the short answer is that the requirement has been recognized and emphasized by the Supreme Court of the United States. Plaintiff's contention that "a panel of the Fifth Circuit rejected the high policy decision maker theory" is incorrect. Plaintiff points to *Sharp v. City of Houston,* 164 F.3d 923 (5th Cir.1999). In fact, the Court in *Sharp* found that a policy, custom or practice was established by evidence that plaintiff's " supervisors all the way up the chain of command, including Nuchia," knowingly acquiesced in acts of retaliation against plaintiff for reporting misconduct of other police officers to the Internal Affairs Division. *Id.* at 935. Mr. Nuchia was the Chief of Police, the highest ranking policymaker within the Department. *Id.* at 926.

A "policy," however, is not limited to an edict or directive. A single decision by an official with final discretionary decisionmaking authority over the subject matter can constitute a "policy." *See Pembauer,* 475 U.S. at 480; *Kennan v. City of Philadelphia,* 983 F.2d 459, 468 (3d Cir.1992); *Omnipoint Communications, Inc. v. Penn forest Twp.,* 1999 WL 181954, *10 n. 4 (M.D.Pa. Mar.31, 1999); *Callahan v. Lancaster-Lebanon Intermediate Unit 13,* 880 F.2d 319, 341 (E.D.Pa.1994). An official with final decisionmaking authority also may delegate his power to a subordinate whose decision, if unconstrained, could then constitute an "official policy." *See City of St. Louis v. Praprotnik,* 485

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 1999 WL 274979 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

U.S. 112, 126-27, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembauer,* 475 U.S. at 483 n. 12; *Ware v. Jackson County, Mo.,* 150 F.3d 873, 885-86 (8th Cir.1998); *Hyland v. Wonder,* 117 F.3d 405, 414 (9th Cir.), *amended on denial of rehearing,* 127 F.3d 1135 (9th Cir.1997), *cert. denied,* 522 U.S. 1148, 118 S.Ct. 1166, 140 L.Ed.2d 177 (1998); *Scala v. City of Winter Park,* 116 F.3d 1396, 1399-1400 (11th Cir.1997); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1481 (3d Cir.1990). It is not clear from the face of the complaint that plaintiff will be unable to show the Commissioner delegates to district supervisors the unfettered authority to make work assignments and to discipline officers.

**\*8** Defendants argue that plaintiff has also failed to assert the existence of a "custom" because he has not alleged the existence of any documents acknowledging the "unstated code of silence" and has not identified specific witnesses who would testify to the existence of the code. A plaintiff need not produce evidence or identify witnesses to survive a motion to dismiss for failure to state a claim. *See,* e.g., *Hakimoglu v. Trump Taj Mahal Assocs.,* 876 F.Supp. 625, 628-29 (D.N.J.1994), *aff'd,* 70 F.3d 291 (3d Cir.1995). Even at a trial, a plaintiff obviously need not produce documentary evidence of a code which allegedly is "unstated."

Plaintiff has alleged that a district supervisor apparently authorized to make work assignments and take disciplinary action used this authority illegally to harass and retaliate against him. He has alleged that he complained to the Internal Affairs Bureau, presumably the office designated by the Commissioner to deter such conduct and resolve such complaints, and was retaliated against for doing so.

It is not clear from the face of the complaint that plaintiff will be unable to show that authority to take the preventive and remedial action implicated was delegated to district leadership and Internal Affairs officials who then encouraged or acquiesced in a practice of illegal retaliation. Indeed, it is not beyond doubt from the face of the complaint that plaintiff will be unable to show relevant knowledge and deliberate inaction by others in the chain of command including the Commissioner. *See Carter v. City of Philadelphia,* 181F.3d 339, 1999 WL 250771, *13 (3d Cir. Apr.28, 1999) ("insistence that [plaintiff] must identify a particular policy and attribute it to a policymaker at the pleading stage, without benefit of discovery, is unduly harsh").

Defendants Nestel and LaCon have also moved to dismiss plaintiff's § 1983 claims as to them on the ground of qualified immunity. Individual government officials engaged in discretionary functions enjoy qualified immunity from suits under § 1983 when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sherwood v. Mulvihill,* 113 F.3d 396, 398-99 (3d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The question is whether a reasonable officer in defendant's position could have believed his conduct was lawful in view of clearly established law and the information he possessed. *See Parkhurst v. Trapp,* 77 F.3d 707, 712 (3d Cir.1996).

Defendants Nestel and LaCon argue that they are entitled to qualified immunity because "[t]here is nothing which would indicate to [them] that in performing their normal duties, which include the occasional initiation of disciplinary procedures, they might be violating plaintiff's constitutional rights." At this juncture, the court must assume to be true all of plaintiff's factual allegations. A police supervisor who takes disciplinary or retaliatory action against a subordinate for speaking out against police misconduct or racial discrimination would be violating a clearly established right of which a reasonable police supervisor would be aware. *See, e.g., Watters v. City of Philadelphia,* 55 F.3d 886, 892-93 (3d Cir.1995); *Bennis v. Gable,* 823 F.2d 723, 731 (3d Cir.1987) (right not to be subjected to adverse employment action in retaliation for engaging in protected First Amendment activity clearly established since 1982); *McDonald v. City of Freeport, Tex.,* 834 F.Supp. 921, 930-32 (S.D.Tex.1993) (police officers who retaliate against subordinates for reporting police misconduct not entitled to qualified immunity from § 1983 suit).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 7

Not Reported in F.Supp.2d, 1999 WL 274979 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

### V. *Conclusion*

**\*9** Consistent with the foregoing, plaintiff's § 1981
claim will be treated as merged into his § 1983
claim and defendants' motion to dismiss will be
denied. An appropriate order will be entered.

### *ORDER*

AND NOW, this day of May, 1999, upon
consideration of defendants' Motion to Dismiss
(Doc. # 3) and plaintiff's response thereto,
consistent with the accompanying memorandum, IT
IS HEREBY ORDERED that said Motion is
DENIED.

E.D.Pa.,1999.
Miles v. City of Philadelphia
Not Reported in F.Supp.2d, 1999 WL 274979
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:98cv05837 (Docket) (Nov. 04, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB Q

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 241507 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Derrick U. JACOBS
v.
CITY OF PHILADELPHIA and Captain Joseph
O'Donnell
**No. Civ.A. 03-CV-950.**

Jan. 29, 2004.

Sharon Gilbert Timm, Law Offices of Sharon
Gilbert Timm, Doylestown, PA, for Plaintiff.
Gerald E. Wallerstein, City of Phila Law Dept.
Labor & Employment Unit, Gregory J. Vrato, City
of Philadelphia Law Department Deputy City
Solicitor, Philadelphia, PA, for Defendant.

*MEMORANDUM*

BAYLSON, J.
*1 Derrick Jacobs (herein "Plaintiff") filed a
complaint against the City of Philadelphia and
Captain Joseph O'Donnell ("Defendants") on
February 19, 2003 and an amended complaint on
June 5, 2003 alleging racial discrimination under 42
U.S.C. §§ 1981 and 1983, Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("
Title VII") and the Pennsylvania Human Relations
Act, 43 Pa. Stat. Ann.. § 951 *et seq.* ("PHRA") for
employment discrimination based on race and a
racially hostile work environment. Defendants
subsequently filed their Motion to Dismiss on
September 2, 2003 and Plaintiffs responded on
September 22, 2003.

I. Factual and Procedural Background

Plaintiff was hired by the City of Philadelphia as a
police officer in January 1996 and promoted to the
position of Detective in December 1998. Plaintiff

alleges that, beginning in January 2001, his
supervisors began harassing him and in February of
2001, an official memo written to Defendant
O'Donnell referred to Plaintiff as "Brother Jacobs."
Plaintiff alleges that he was denied overtime and
removed from assignments that earned overtime,
while officers with similar seniority remained in
such assignments, in several instances in February,
May, and June of 2001. On June 22, 2001, when
Plaintiff asked Defendant O'Donnell about his
removal from these assignments, he was told "I'm
going to run your black ass out of this division and
off the department."

Plaintiff also makes the following allegations:
1. Plaintiff had vacation time unduly removed in
June and July of 2001 and on July 20, 2001
Defendant O'Donnell wrote a memo incorrectly
stating that Plaintiff had used six undocumented
sick days that year. In July 2001, Plaintiff was
unduly suspended for 20 days without pay for
making false reports and not signing a police
document.
2. On August 23, 2001, Plaintiff injured his knee in
the course of employment and was treated by a
physician, who told him to stay off of his knee for
two weeks. That same week, Plaintiff had sick time
unduly taken from him and the next week Plaintiff
was put down for two hours absent without leave ("
AWOL"), even though he had been at work.
3. On September 10, 2001, Detective Sloan asked
Plaintiff and Detectives Hobbs and Anderson, "
What's going on at the division? Why is the Captain
messing with all the blacks?" On September 16,
2001 a fellow white officer, Detective O'Brien, did
not call or report for work, but instead of being
listed as AWOL, was marked as taking vacation
time. On September 17, 2001, O'Brien reported late
for work and was not marked as late.
4. On September 19, 2001, Plaintiff called in sick
due to an intestinal ailment, and was called at home
by Lieutenant Bachmayer, who told him he had
been "sick checked" (squad cars had been sent to
his home to determine if he was in fact there) and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2

Not Reported in F.Supp.2d, 2004 WL 241507 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

told Plaintiff "as far as we are concerned, you are not home." On September 21, 2001, an official memo from Defendant O'Donnell to the Police Finance division directed that Plaintiff's vacation on July 3, 2001 should be changed to AWOL and that " disciplinary action is forthcoming."

*2 5. On September 27, 2001, Plaintiff submitted a doctor's note and took a sick leave of absence because of Defendants' ongoing course of harassment, and was marked AWOL rather than on sick leave, even though he had sick leave available. Defendant O'Donnell advised Plaintiff that he would be placed on the sick "abuse" list.

6. On October 24, 2001, Detective Kensey [FN1] was on duty and transporting himself and his child home and was involved in a road rage incident. The next day, Sgt. Terry changed Kensey's time to make the incident "off duty" and paid Kensey three hours overtime.

> FN1. Plaintiff does not indicate the race of Detective Kensey.

7. On November 1, 2001, Plaintiff filed a Charge of Discrimination with the EEOC in Philadelphia.

8. On November 16, 2001, Plaintiff was given sick time without pay for his back to work physical. On November 16, 2001, Plaintiff called the Fraternal Order of Police regarding grievances he had filed. Ken Rocks stated to Plaintiff, "it's obvious Captain O'Donnell does not like black detectives."

9. On January 1, 2002, Plaintiff was charged for eight hours of sick time despite working the 8:00 A.M. to 4:00 P.M. shift. On January 7, 2002, Plaintiff was charged with eight hours of vacation time despite working the 4:00 P.M. to 12:00 A.M. shift. On or around May 9 and 10, 2002, Plaintiff was again denied payment of overtime.

After receiving a right to sue letter from the EEOC on November 20, 2002, Plaintiff filed a complaint in this Court on February 19, 2003 and an amended complaint on June 5, 2003.

II. Legal Standard

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1251, 1261 (3d Cir.1994). The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

III. Discussion

In their Motion to Dismiss, Defendants argue that Plaintiff's complaint should be dismissed because he has not exhausted his administrative remedies, because he has not provided a copy of the EEOC right to sue letter, because he incorrectly pleads a claim under § 1981, because punitive damages are inappropriate and because the pendent state claims are incorrectly in federal court if the federal claims are not valid. Each of these arguments will be addressed below. As a preliminary matter, Plaintiff has withdrawn his claim for punitive damages against Defendant City of Philadelphia (Plaintiff's Memorandum of Law Opposing Defendant's Motion to Dismiss at 7, n. 2), so Defendants' argument on that count need not be addressed here.

1. Right to Sue Letter

*3 Defendants first argue that they were not served with a copy of Plaintiff's right to sue letter from the EEOC. Defendants argue that, since they did not have a copy of this letter, it must be assumed that the date Plaintiff claims the EEOC letter was sent is incorrect and that Plaintiff has not properly sued within the 180-day time limit. Plaintiff responds that the right to sue letter lists Defendants as having received a copy and, in any event, Plaintiff is not required to attach the right to sue letter to his complaint. Plaintiff also attaches a copy of the letter, dated November 20, 2002 that shows a copy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 241507 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

to Defendants, to his response.

Regardless of whether Defendants actually received a copy of the right to sue letter from the EEOC, they now currently have a copy of the letter and the November 20, 2002 date on the letter shows that Plaintiff filed his February 19, 2003 original complaint well within the 180-day time limit. Therefore, Defendants' arguments on this issue are without merit.

### 2. Exhaustion

Defendants further argue that Plaintiff raises facts and a retaliation claim in his Complaint that were not included in the EEOC charge. Plaintiff argues that the allegation in the EEOC charge put the Defendants on notice of the charges against them, namely ongoing racial harassment beginning in January of 2001.

The "parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission." *Anjelino v. New York Times Co.,* 200 F.3d 73, 94 (3d Cir.1999) citing *Oubichon v. North Am. Rockwell Corp.,* 482 F.2d 569 (9th Cir.1973). As Plaintiff's EEOC charge alleges racial harassment by the Defendants, naming O'Donnell specifically, and makes the allegations within the same time frame as the Complaint filed in this Court, Defendants' argument that Plaintiff did not raise the facts before this Court in his EEOC charge is without merit.

Although the Third Circuit has not ruled directly on the issue, other judges in this district have found that courts can look at the substance of the allegations rather than the specific language of the charge to determine whether a theory was raised. *Phillips v. Heydt,* 197 F.Supp.2d 207, 217-8 (E.D.Pa.2002), *Williams v. Home Depot,* 1999 U.S. Dist. LEXIS 15250, at *16-17 (E.D.Pa.1999) (both looking at the facts alleged rather than language used to determine whether a continuing violation theory was raised in the EEOC charge). In this case,

Plaintiff states in his EEOC Charge that he was subject to unwarranted disciplinary action after complaining about his reassignment and was marked AWOL despite taking a medical absence. In addition, Plaintiff's complaint alleges similar harassment and unwarranted disciplinary action after the filing of his EEOC charge, facts that could not have been alleged in his EEOC charge but can reasonably be expected to grow out of it. These facts are sufficient to put Defendants on notice of a claim of retaliation before this Court. Accordingly, the allegations in Plaintiff's EEOC Charge are sufficient to properly raise the facts and claims in the Complaint before this Court.

### 3. § 1981 Claim

*4 Defendants argue that Plaintiff's claim under 42 U.S.C. § 1981 should be dismissed because 42 U.S.C. § 1983 is the exclusive remedy in this circumstance. Plaintiff argues that the appropriate action is to merge the § 1981 claim into the § 1983 claim. In support of dismissal of Plaintiff's § 1981 claim, Defendants cite *Miles v. City of Philadelphia,* 1999 WL 274979 (E.D.Pa. May 5, 1999) and note that the Third Circuit Court of Appeals has yet to address this issue, about which there is a circuit split.

Defendants are correct that there is disagreement among other circuits, as well as within the Eastern District of Pennsylvania, over whether § 1983 is the exclusive remedy for § 1981 violations, despite the 1991 amendments to § 1981. However, Defendants misconstrue the position taken in *Miles.* In *Miles,* Judge Waldman found that the Supreme Court's holding in *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) that " § 1983 provides the exclusive remedy for violations of § 1981 by state actors" to still be effective despite the 1991 amendments to § 1981. Accordingly Judge Waldman treated the § 1981 claim as merged into the § 1983 claim. Other cases in this district have addressed the issue, as well. *See Poli v. SEPTA,* 1998 U.S. Dist. LEXIS 9935 (E.D.Pa. July 7, 1998) (following the holding in *Jett* that § 1983 is the exclusive remedy for § 1981); *Watkins v. Penn. Bd. of Probation and Parole, et*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 241507 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*al.,* 2002 U.S. Dist. LEXIS 23504 (E.D.Pa. November 25, 2002) (following the 9th Circuit view that there is an individual cause of action under § 1981).

Although Defendants are correct in asserting that the Third Circuit has not explicitly addressed this issue, in a recent case the Third Circuit stated:
The Court has ruled "that the express action at law provided by § 1983 ... provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor ... Thus, to prevail in his claim for damages [against a state actor], [a claimant] must show that the violation of his right to make contracts protected by § 1981 was caused by a custom or policy within the meaning of Monell and subsequent cases."

*Oaks v. City of Philadelphia,* 59 Fed. Appx. 502, 503 (2003) (citing *Jett,* 491 U.S. at 735-6). Although the opinion in Oaks does not directly address the effect of the 1991 amendments to § 1981 , it does apply the view that § 1983 is still the remedy for § 1981 claims against state actors in the case before it. This Court will follow the approach taken by the Third Circuit in *Oaks* and Judge Waldman in *Miles.* Accordingly, Plaintiff's § 1981 will not be dismissed, but will be treated as merged into his § 1983 claim.

### 4. Adequacy of Pleadings

Defendants further argue that Plaintiff has not pled sufficient facts to withstand a Motion to Dismiss, specifically arguing that Plaintiff has not presented any facts showing racial animus. As the present motion is a motion to dismiss, Plaintiff must only have fulfilled the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Plaintiff has alleged that he experienced lost vacation time, unwarranted discipline, and harassment from his superiors, because of his race. Plaintiff has also presented facts alleging that his superiors made racially disparaging statements. Finally, Plaintiff has presented facts alleging that similarly situated white officers were not subject to this treatment. Plaintiff has pled sufficient facts to

withstand Defendants' Motion to Dismiss.

### 5. Pendent claim

**\*5** As the federal claims remain, Defendants' argument that the pendent state claims should be dismissed from this Court fails.

### IV. Conclusion

For the reasons set forth above, the Court will deny Defendants' Motion to Dismiss the Amended Complaint.

An appropriate order follows.

### *ORDER*

AND NOW, this day of , 2003, upon consideration of Defendants' Motion to Dismiss it is hereby ORDERED that Defendants' Motion to Dismiss the Amended Complaint (Doc. No. 10) is DENIED.

E.D.Pa.,2004.
Jacobs v. City of Philadelphia
Not Reported in F.Supp.2d, 2004 WL 241507 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 1495899 (Trial Motion, Memorandum and Affidavit) Memorandum (Jan. 29, 2004)
• 2:03cv00950 (Docket) (Feb. 19, 2003)
• 2003 WL 23637982 (Trial Pleading) Plaintiff's Answer Opposing Defendants' Motion to Dismiss (2003)
• 2003 WL 23637984 (Trial Pleading) Plaintiff's Memorandum of Law Opposing Defendant's Motion to Dismiss (2003)
• 2003 WL 23639800 (Trial Pleading) Plaintiff's Answer Opposing Defendants' Motion for Relief from Entry of Judgment%n1%n (2003)
• 2003 WL 23639807 (Trial Pleading) Plaintiff's Memorandum of Law Opposing Defendants' Motion for Relief from Entry of Judgment (2003)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 5

Not Reported in F.Supp.2d, 2004 WL 241507 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.