# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| JOSEPH N. GIELATA,<br><br>                    *Plaintiff*,<br><br>         v.<br><br>ANDREA L. ROCANELLI, individually and in her official capacity as Chief Counsel of the Office of Disciplinary Counsel for the Supreme Court of Delaware, and THE OFFICE OF DISCIPLINARY COUNSEL FOR THE SUPREME COURT OF DELAWARE,<br><br>                    *Defendants*. | Civil Action No. 05-567 GMS |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Dated: April 3, 2006

Joseph N. Gielata (# 4338)
501 Silverside Road, No. 90
Wilmington, Delaware 19809
(302) 798-1096

*Pro Se*

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

COUNTERSTATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       Background of the Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

       The PayPal Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       Rocanelli Forces Plaintiff to Abort the Objection Campaign. . . . . . . . . . . . . . . 4

       Rocanelli's Vendetta Escalates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      THE STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.     THERE IS NO BASIS FOR CREATING ABSOLUTE
       IMMUNITY FOR ROCANELLI AND THE ODC. . . . . . . . . . . . . . . . . . . . . . . . 7

       A.     The Defendants Do Not Decide Cases, and They Are
              Not Entitled To Absolute Judicial Immunity. . . . . . . . . . . . . . . . . . . . . .10

            1.     Only public officials who decide cases are
                  entitled to absolute judicial immunity. . . . . . . . . . . . . . . . . . . . . . 10

            2.     Rocanelli and the ODC do not decide cases. . . . . . . . . . . . . . . . . 12

       B.     The Defendants May Not Claim Absolute Immunity
              Under Any Other Common Law Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . .14

       C.     The Policies Underlying Common Law Absolute Immunities
              Do Not Support Such Immunity for the ODC and its Head. . . . . . . . . . . 16

            1.     Holding Rocanelli and the ODC liable will
                  not cause a flood of vexatious litigation. . . . . . . . . . . . . . . . . . . . 17

            2.     Liability for Rocanelli and the ODC
                  serves important public purposes. . . . . . . . . . . . . . . . . . . . . . . . . .18

III.    THE ODC IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY
       BECAUSE ANY RECOVERY AGAINST IT
       WILL NOT COME FROM THE STATE TREASURY. . . . . . . . . . . . . . . . . . . 19

IV.    THIS COURT'S JURISDICTION OVER CLAIMS AGAINST
       ROCANELLI AND THE ODC IS SETTLED LAW OF THE CASE. . . . . . . . 21

       A.    This Court's Exercise of Jurisdiction is Law of the Case. . . . . . . . . . . . 22

       B.    The *Rooker-Feldman* Doctrine is Inapplicable. . . . . . . . . . . . . . . . . . . . 24

V.     THE COMPLAINT STATES VIABLE § 1983 CLAIMS. . . . . . . . . . . . . . . . . 25

       A.    *Noerr-Pennington* Does Not Bar Plaintiff's Claims. . . . . . . . . . . . . . . . 25

       B.    Counts 1 Through 10 All State Viable § 1983 Claims. . . . . . . . . . . . . . 26

VI.    THE COMPLAINT STATES VIABLE COMMON LAW CLAIMS. . . . . . . . . 33

       A.    Intentional Infliction of Emotional Distress. . . . . . . . . . . . . . . . . . . . . . . 33

       B.    Tortious Interference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       C.    Malicious Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       D.    Rule 10 is Inapplicable and Void. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

VII.   THE COMPLAINT STATES A JUSTICIABLE
       CLAIM FOR DECLARATORY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page**

*Addiction Specialists, Inc. v. Twp. of Hampton,*
    411 F.3d 399 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Albright v. Oliver,*
    510 U.S. 266 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Alston v. Parker,*
    363 F.3d 229 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Amy v. The Supervisors,*
    11 Wall. 136 (1870) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Anderson v. Creighton,*
    483 U.S. 635 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Antoine v. Byers & Anderson, Inc.,*
    508 U.S. 429 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Berger v. Cuyahoga County Bar Ass'n,*
    983 F.2d 718 (6th Cir 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bishop v. State Bar of Texas,*
    736 F.2d 292 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.11

*Blessing v. Freestone,*
    520 U.S. 329 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Briscoe v. LaHue,*
    460 U.S. 325 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Brooks v. New Hampshire Supreme Court,*
    80 F.3d 633 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . n.13

*Buckley v. Fitzsimmons,*
    509 U.S. 259 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Burns v. Reed,*
    500 U.S. 478 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,11,15

*Butz v. Economou,*
    438 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.5

*Calkins v. Summer*,
    13 Wis. 193 (1860) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Callahan v. City of Philadelphia*,
    207 F.3d 668 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Carroll v. Gross*,
    984 F.2d 392 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Carter v. City of Philadelphia*,
    181 F.3d 339 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20,21

*In re Cavanaugh*,
    306 F.3d 726 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.19

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.19

*In re Cendant Corp. Sec. Litig.*,
    404 F.3d 173 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Chiropractic Alliance of New Jersey v. Parisi*,
    854 F. Supp. 299 (D.N.J. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.11

*Chisholm v. Georgia*,
    2 U.S. 419 (1793) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Christy v. Pennsylvania Turnpike Commission*,
    54 F.3d 1140 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cleavinger v. Saxner*,
    474 U.S. 193 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.5

*Clinton v. Jones*,
    520 U.S. 681 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6 & n.7

*Cyprus v. Diskin*,
    936 F. Supp. 259 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Ernst v. Child & Youth Services*,
    108 F.3d 486 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.7

*Ex parte Virginia*,
    100 U.S. 339 (1879). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*,
    544 U.S. 280, 125 S. Ct. 1517 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . .24,25

*Fagan v. City of Vineland*,
 22 F.3d 1283 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Farber v. City of Paterson*,
 440 F.3d 131 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ferri v. Ackerman*,
 444 U.S. 193 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.21

*Forrester v. White*,
 484 U.S. 219 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*Gallo v. City of Philadelphia*,
 161 F.3d 217 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.15

*Golden State Transit Corp. v. Los Angeles*,
 493 U.S. 103 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

*Green v. Wilmington Sav. Fund Soc.*,
 310 A.2d 638 (Del. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Griffin v. Breckenridge*,
 403 U.S. 88 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gwynedd Properties, Inc. v. Lower Gwynedd Township*,
 970 F.2d 1195 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hampton v. Chicago*,
 484 F.2d 602 (7th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.20

*Harlow v. Fitzgerald*,
 457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,18

*Hawaii v. Standard Oil Co. of Cal.*,
 405 U.S. 251 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Heck v. Humphrey*,
 512 U.S. 477 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

*Heritage Farms, Inc. v. Solebury Township*,
 671 F.2d 743 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hess v. Port Authority Trans-Hudson Corp.*,
 513 U.S. 30 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hoffman v. Harris*,
 114 S. Ct. 1631 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Horizon/CMS Healthcare Corp. Sec. Litig.*,
　　3 F. Supp. 2d 1208 (D.N.M. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . n.19

*Hospital Council of Western Pennsylvania v. City of Pittsburgh*,
　　949 F.2d 83 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Howlett v. Rose*,
　　496 U.S. 356 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.20

*Imbler v. Pachtman*,
　　424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*,
　　532 A.2d 983 (Del. Ch. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

*Jett v. Dallas Independent School District*,
　　491 U.S. 701 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Kalina v. Fletcher*,
　　522 U.S. 118 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.7

*Livadas v. Bradshaw*,
　　512 U.S. 107 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

*Lloyd v. Jefferson*,
　　53 F. Supp. 2d 643 (D. Del. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*Lockridge v. Board of Trustees of University of Arkansas*,
　　315 F.3d 1005 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Marchese v. Umstead*,
　　110 F. Supp. 2d 361 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Marran v. Marran*,
　　376 F.3d 143 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Martinez v. California*,
　　444 U.S. 277 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.20

*McClendon v. Coverdale*,
　　203 A.2d 815 (Del. Super. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*McCray v. Maryland*,
　　456 F.2d 1 (4th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*In re Member of Bar*,
　　257 A.2d 382 (Del. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Middlesex County Ethics Committee v. Garden State Bar Association,*
    457 U.S. 423 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,*
    453 U.S. 1 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Miller v. City of Philadelphia,*
    174 F.3d 368 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.7

*Mitchell v. Forsyth,*
    472 U.S. 511 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*Novotny v. Great Am. Fed. Sav. & Loan Ass'n,*
    584 F.2d 1235 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.18

*Oyler v. Boles,*
    368 U.S. 448 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Partin v. Arkansas State Board of Law Examiners,*
    863 F. Supp. 924 (E.D. Ark. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Pawlak v. Nix,*
    1996 WL 560360 (E.D. Pa. Sept. 30, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Phelps v. Hamilton,*
    59 F.3d 1058 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.11

*Pierson v. Ray,*
    386 U.S. 547 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Prevost v. Twp. of Hazlet,*
    159 Fed. Appx. 396 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Public Citizen Health Research Group v. National Inst. Of Health,*
    209 F. Supp. 2d 37 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.7

*Pulliam v. Allen,*
    466 U.S. 522 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ravens v. Iftikar,*
    174 F.R.D. 651 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.19

*Roadcloud v. Pa. Bd. of Probation & Parole,*
    No. 05-3787, 2006 WL 83453 (E.D. Pa. Jan. 6, 2006) . . . . . . . . . . . . . . . . . . . .30

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Senior Unsecured Creditors' Comm. of First Republic Bank Corp. v. FDIC,*
    749 F. Supp. 758 (N.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.7

*Slavin v. Curry,*
    574 F.2d 1256 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Smith v. Robinson,*
    468 U.S. 992 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Smith v. Wade,*
    461 U.S. 30 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Solomon,*
    886 A.2d 1266 (Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Stump v. Sparkman,*
    435 U.S. 349 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8,10

*Tackett v. State Farm Fire and Casualty Ins. Co.,*
    653 A.2d. 254 (Del. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Taylor v. Kentucky State Bar Association,*
    424 F.2d 478 (6th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tenney v. Brandhove,*
    341 U.S. 367 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*The Doyle,*
    105 F.2d 113 (3d Cir. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.10

*Torres v. McLaughlin,*
    163 F.3d 169 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.15

*Tower v. Glover,*
    467 U.S. 914 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14,17

*Tracinda Corp. v. DaimlerChrysler AG,*
    197 F. Supp. 2d 42 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Tse v. Ventana Medical Systems, Inc.,*
    123 F. Supp. 2d 213 (D. Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United Brotherhood of Carpenters & Joiners v. Scott,*
    463 U.S. 825 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Village of Willowbrook v. Olech,*
    528 U.S. 1073 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Watkins v. Pa. Bd. of Prob. and Parole*,
    No. 02-2881, 2002 WL 32182088 (E.D. Pa. Nov. 25, 2002) . . . . . . . . . . . . . . .29

*We, Inc. v. City of Philadelphia Dept. of Licenses and Inspections*,
    983 F. Supp. 637 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . n.12

*We, Inc. v. City of Philadelphia*,
    174 F.3d 322 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Wichert v. Walter*,
    606 F. Supp. 1516 (D.N.J. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.11

*Will v. Michigan Department of State Police*,
    491 U.S. 58 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wright v. United States*,
    139 F.3d 551 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n.7

**Statutes:**                                     **Page**

U.S. Constitution, First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

U.S. Constitution, Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S. Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S. Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

U.S. Constitution, Eleventh Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

15 U.S.C. § 78u-4(a)(3)(B)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

28 U.S.C. § 1404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

29 U.S.C. §§ 151–169 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29-30

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1985(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30-31

Delaware Constitution, Article I, § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Delaware Constitution, Article II, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

10 *Del. C.* § 161(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

10 *Del. C.* § 161(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

16 *Del. C.* § 6801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 *Del. C.* § 2409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

29 *Del. C.* § 9008A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Del. Supr. Ct. R. 64 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Del. Lawyers' R. Disciplinary P. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-37

**Other Authorities:**                                                      **Page**

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* 9 (1890) . . . . .11

J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L. J. 879 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Laura Oren, *Immunity and Accountability in Civil Rights Litigation: Who Should Pay?*, 50 U. PITT. L. REV. 935 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mary Miller Johnston, *Bar Discipline, in* DELAWARE SUPREME COURT: GOLDEN ANNIVERSARY 1951-2001 395 (Justice Randy J. Holland and Helen L. Winslow, Esq. eds., 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Ronald A. Cass, *Damage Suits Against Public Officers*, 129 U. PA. L. REV. 1110 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

This answering brief is respectfully submitted by Joseph N. Gielata ("Plaintiff"), a Delaware attorney, in opposition to the motion to dismiss and opening brief in support thereof ("Def. Br.") submitted by defendants Andrea L. Rocanelli ("Rocanelli") and the Office of Disciplinary Counsel (the "ODC").

## NATURE AND STAGE OF THE PROCEEDING

This case involves a public official who abused the influence of her office to benefit her family and friends. As head of the ODC, Rocanelli deliberately sought to destroy Plaintiff's liberty, livelihood and reputation, simply because he challenged the interests of those close to her. By initiating multiple bogus probes at the behest of former colleagues, and by instigating an absurd criminal proceeding at the behest of one of the world's largest corporations, the defendants have ridden roughshod over Plaintiff's rights, in the process violating this country's Constitution as well as federal and state laws.

This action was commenced on August 2, 2005, one week after criminal proceedings were instituted by the State of Delaware (the "State") against Plaintiff. On that date, Plaintiff moved to temporarily enjoin the criminal proceedings as well as a follow-on proceeding initiated by the ODC to suspend Plaintiff's law license on an interim basis. A hearing before the Honorable Norma L. Shapiro was held that afternoon, at which the ODC was represented by Patricia Bartley Schwartz, Esq. by phone. In a carefully written order, Judge Shapiro reasoned that sovereign immunity barred Plaintiff's claims against the State and prosecutorial immunity barred Plaintiff's claims against Deputy Attorney General Sean Lugg, ordering: "Defendants Sean Lugg and The State of Delaware are DISMISSED for lack of jurisdiction." (D.I. 5 #7.) In contrast to these immunity determinations, Judge Shapiro held that the Court has jurisdiction over the claims against Rocanelli and the ODC. Neither Rocanelli nor the ODC moved for

reconsideration of Judge Shapiro's order or filed a notice of appeal therefrom.[1]  Pursuant to 28 U.S.C. § 1404(a), Judge Shapiro transferred the suit to this District.

On August 9, 2005, a panel of the Supreme Court of Delaware determined to continue indefinitely the ODC's suspension petition and ordered Rocanelli's recusal from any further proceeding involving Plaintiff.  The Supreme Court panel permitted Plaintiff to continue practicing law subject to certain notification conditions.

On January 30, 2006, Plaintiff filed the instant Complaint, asserting claims for compensatory relief to be determined at trial and for injunctive and declaratory relief.

In the related criminal matter against Plaintiff, motions to dismiss for failure to state an offense and other dispositive motions have been filed.

## SUMMARY OF THE ARGUMENT

1.    The defendants are not entitled to absolute immunity.  Rocanelli is neither a judge nor a prosecutor.  Her misconduct took the form of frivolous and bad-faith inquisitions—not judicial or prosecutorial acts.  Neither the ODC nor any predecessor entity existed in the nineteenth century, and therefore the absolute immunity afforded to the class of persons protected by judicial immunity when the Civil Rights Act was enacted is not available to the ODC or Rocanelli.  Moreover, the ODC is privately funded and therefore is not entitled to the State's immunity from suit.

2.    This Court's jurisdiction over Rocanelli and the ODC is law of the case.

3.    The Complaint states viable Civil Rights Act claims for constitutional violations, interference with the right to make and enforce contracts, and impairment of a right conferred by federal statute.

4.    The Complaint states viable common law claims.

---

[1] This Court has since denied Plaintiff's motion for reconsideration of the dismissal of the State.  (D.I. 29.) Defendants contend that Plaintiff did not seek reconsideration of Judge Shapiro's *Younger* abstention holding, but this is plainly inaccurate, as the issue was expressly raised twice.  (D.I. 8 at 4; D.I. 11 at 3 n.4.)

- 2 -

5.     The Complaint states a justiciable declaratory judgment claim.

## COUNTERSTATEMENT OF FACTS

### Background of the Defendants

The ODC was created in 1984.  *See* Mary Miller Johnston, *Bar Discipline, in*
DELAWARE SUPREME COURT: GOLDEN ANNIVERSARY 1951-2001 395, 397 (Justice Randy
J. Holland and Helen L. Winslow, Esq. eds., 2001) (hereinafter, "*Bar Discipline*").[2]
Though charged with regulating Delaware attorneys, the ODC does *not* adjudicate
disciplinary proceedings, weigh evidence or decide disciplinary sanctions.  These
adjudicatory functions belong solely to the Preliminary Review Committee, the Board on
Professional Responsibility, and the Delaware Supreme Court.  *Ibid.*

At all times relevant to this action, Rocanelli was chief counsel of the ODC.  Prior
to her employment by the ODC, Rocanelli was employed by a prominent Delaware
corporate law firm (the "Delaware Firm").  ¶¶ 5, 64.[3]

### The PayPal Litigation

In 2004, Plaintiff was retained to file suit in Delaware against PayPal, Inc.
("PayPal") on behalf of an aggrieved PayPal user to enforce contractual rights.  ¶ 55.
PayPal retained the Delaware Firm.  ¶ 57.  The suit was voluntarily withdrawn, with the
right to re-file expressly reserved.  ¶ 58.  Soon thereafter, PayPal announced a proposed
settlement of a California class action which potentially would release claims asserted in
Plaintiff's Delaware suit.  ¶ 59.

As a class action practitioner, Plaintiff quickly spotted numerous flaws with the
proposed nationwide settlement.  ¶ 60.  Realizing that the flawed settlement would
benefit PayPal immensely while providing grossly inadequate consideration to aggrieved

---

[2] Its predecessor, the Censor Committee, was created in 1942.  *Id.* at 395.  Before the creation of the Censor
Committee, the Delaware Supreme Court alone regulated the practice of law within the State.  *Ibid.*
[3] References to "¶ _" are to paragraphs in the amended complaint (D.I. 25) (the "Complaint").

class members, Plaintiff began drafting an objection to the settlement and planning and preparing for an objection campaign to persuade the district court overseeing the class action to deny approval of the proposed settlement.  ¶¶ 60-62.

### Rocanelli Forces Plaintiff to Abort the Objection Campaign

The Delaware Firm decided to call in a favor from Rocanelli, its former employee.  ¶ 64.  Demonstrating her allegiance to the Delaware Firm, Rocanelli initiated a probe purportedly inquiring into Plaintiff's professional conduct.  *Ibid.*  This sham inquiry, lacking any legal or logical foundation, was designed to harass and intimidate Plaintiff.  ¶¶ 64-65.  Unaware of Rocanelli's connection to the Delaware Firm, Plaintiff met with Rocanelli on or about August 17, 2005 to fully explain the propriety of his conduct, but quickly discovered that Rocanelli's true aim had nothing to do with a good-faith investigation, and everything to do with protecting PayPal.  ¶ 65.

In particular, Plaintiff advised Rocanelli that he intended to campaign against PayPal's proposed class action settlement, even showing Rocanelli a draft of the objection that Plaintiff intended to circulate and file in federal court.  ¶ 66.  Rocanelli's hostility and animus was immediately obvious.  *Ibid.*  Indeed, her subsequent actions clearly demonstrated her illegitimate antagonism.  As the meeting concluded, Rocanelli advised Plaintiff to retain counsel and soon thereafter contacted the State's Attorney General office to instigate a criminal investigation.  ¶¶ 66-67.

As a result of Rocanelli's baseless inquiry, Plaintiff was placed on a leave of absence by his employer.  ¶ 67.  Plaintiff soon received veiled threats from lawyers involved in the PayPal class action to abandon the planned objection campaign.  ¶¶ 68-69.  Faced with such overwhelming retaliation, Plaintiff was forced to abort the objection campaign.  ¶ 70.  But his efforts to seek justice in other ways against PayPal's corrupt enterprise would not die so quickly.  ¶¶ 71-72.  Nor would Rocanelli's animus.

- 4 -

**Rocanelli's Vendetta Escalates**

On June 6, 2005, Plaintiff, as counsel, filed a derivative suit against officers of MBNA Corporation ("MBNA"), unaware that Rocanelli's husband is an MBNA executive. ¶¶ 83-85. This prompted Rocanelli to initiate a second sham inquiry, just two weeks after the filing of the MBNA suit. ¶ 86. Once again, Rocanelli's "investigation" lacked any legal or logical basis. ¶ 87. Again, the bogus probe was based on a protest lodged by an adversary of the Plaintiff and, as with the first inquiry, the adversary was yet another of Rocanelli's former colleagues at the Delaware Firm. ¶¶ 76-80, 88.

Plaintiff responded to the second bogus probe with a letter advising Rocanelli *inter alia* that he was involved in litigation against MBNA and that he would be leaving the country on July 25, 2005. ¶ 89. Rocanelli saw her opportunity to pounce.

On the very day that Plaintiff left the country, the State sought and obtained an indictment against Plaintiff. ¶¶ 91-93. Rocanelli immediately thereafter filed an ODC petition to suspend Plaintiff's license to practice law. ¶ 100. Upon discovering this shocking series of events, Plaintiff rushed back to the United States, only to be seized by government agents upon arrival due to a bad-faith arrest warrant. ¶¶ 12-13, 98-99. Within three days of Plaintiff's release, this suit was commenced.

A panel of the Delaware Supreme Court held a pre-hearing conference concerning the ODC petition and resolved to continue indefinitely a hearing on the petition, thereby allowing Plaintiff to continue to practice law subject to agreed-upon notification conditions. ¶ 104. The Supreme Court panel also ordered Rocanelli's recusal. *Ibid.*

## ARGUMENT

This lawsuit raises the question of whether an attorney and an entity both entrusted with supervising Delaware lawyers can ever be held accountable for depriving litigants of their civil rights. Defendants seek to take refuge in absolute immunity.

However, defendants' invitation to radically expand the narrow class entitled to absolute immunity has no basis in precedent, history or policy.

Absolute immunity from civil liability is the exception from the rule. It is reserved for a very few officials who must have such protection to ensure that they will unabashedly discharge their official tasks. Moreover, public officials—including even the President of the United States—do not get such blanket protection from their titles (as judges or legislators, for example), but from an examination of the actual work that they do. *See, e.g., Clinton v. Jones*, 520 U.S. 681, 694 (1997) (denying President immunity from § 1983 action arising out of unofficial conduct and reaffirming "functional approach" to immunity analysis). Adjudicators, legislators, and prosecutors are immune only when they act as judges, or when they legislate or debate, or when they initiate or conduct prosecutions. Witnesses are absolutely immune when they testify. When these actors do administrative or investigative work, they lose their absolute immunity and, like other public officials, they have a qualified immunity from suit.

This qualified immunity from suit applies to the great majority of officials, from governors of states, senior aides to the President, prosecutors advising police officers, judges hiring court officers, and correctional officials, to agents of the federal government. If acting in good faith and not violating any clearly established legal rules, these officials are protected from suit. They are not so shielded, however, when they breach that faith and violate legal rights that are clearly established.

ODC counsel and the entity that employs them are like the majority of governmental officials. Their work is not within any of the narrow categories to which absolute immunity attaches. Their administrative and investigative tasks are cabined completely by rules. Their duties include investigating complaints, converting those investigations into disciplinary petitions if legitimate violations are stated, and then

presenting such petitions to the Preliminary Review Committee, the Board on Professional Responsibility, and/or the Delaware Supreme Court. While the ODC may be important to enforcing the standards of the Delaware bar, its work is not adjudicatory, presidential, legislative, prosecutorial or testimonial. No public purposes are furthered by completely insulating State-empowered ODC attorneys from liability for constitutional violations of litigants' civil rights.

Absent such absolute immunity, the Complaint is entirely viable.

## I.    THE STANDARD OF REVIEW

In *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002), this Court summarized the legal standards applicable to a motion to dismiss:

> The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. The Court is not required to accept legal conclusions either alleged or inferred from the pleaded facts. Dismissal is only appropriate when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. The burden of demonstrating that the plaintiff has failed to state a claim upon which relief may be granted rests on the movant.

197 F. Supp. 2d at 53 (internal citations and quotation marks omitted).

## II.    THERE IS NO BASIS FOR CREATING ABSOLUTE IMMUNITY FOR ROCANELLI AND THE ODC

The United States Supreme Court has emphasized that "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials

- 7 -

in the exercise of their duties" and, therefore, the Supreme Court has been "quite sparing" in its recognition of absolute immunity. *Id.* at 486-87.

Much of the litigation about immunities arises under 42 U.S.C. § 1983, the Civil Rights Act of 1871. Section 1983 provides that "every person" who, acting "under color" of state law, causes another citizen to be deprived of his or her constitutional rights "shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. While that statute is drafted in expansive language and "on its face admits of no immunities," *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976), the Supreme Court has concluded that, in enacting § 1983, Congress did not intend to "abolish wholesale all [then existing] common-law immunities." *Pierson v. Ray*, 386 U.S. 547, 554 (1966). Certain immunities were so "well grounded in history and reason" that Congress could not have meant to eliminate them "by covert inclusion in the general language" of the statute. *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). The Supreme Court has therefore read § 1983 "in harmony with the general [common-law] principles of tort immunities and defenses rather than in derogation of them." *Imbler*, 424 U.S. at 418.

Qualified immunity was a defense for government officials at common law and, thus, the United States Supreme Court has adopted qualified immunity as the presumptive standard for all government officials in civil rights actions. *See Scheuer v. Rhodes*, 416 U.S. 232, 239-42 (1974). Where, as here, an employee and her employer have claimed a right to absolute immunity, the Court must determine whether there is a legal source for this extraordinary protection. A few other governmental officials have been afforded absolute immunity under common law doctrines. These include judges acting in their judicial capacities (*see Stump v. Sparkman*, 435 U.S. 349 (1978)), witnesses testifying in court (*see Briscoe v. LaHue*, 460 U.S. 325 (1983)), and

prosecutors, while initiating a prosecution and presenting the government's case (*see Imbler v. Pachtman*, 424 U.S. 409 (1976)).

When a defendant claims that he or she is entitled to absolute common-law immunity, the Court must examine the nature of immunities afforded to such officials in the common law and then assess the vitality of those common-law principles against contemporary norms. *See Smith v. Wade*, 461 U.S. 30, 34 (1983). The Supreme Court has indicated many times that qualified immunity represents a difficult balance that it has struck across the board, and that the Court will not afford absolute immunity to an official "in the absence of the most convincing showing that [absolute] immunity is necessary." *Imbler*, 424 U.S. at 434 (White, J., concurring); *see also Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Therefore, the defendants bear a "heavy burden" in their attempt to rebut the presumption of qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 642 (1987).

The defendants in this case do not assert that they are entitled to absolute immunity under any constitutional provision. They claim, instead, absolute immunity under the common law. Their primary claim is that they are judicial actors and are therefore entitled to absolute judicial immunity. Hence, the Court must consider the nature of the work of the ODC and its attorneys and the extent to which that work fits within the doctrine of absolute judicial immunity. As explained in part A, below, ODC attorneys do not decide cases. They fill an investigative and ministerial role, and are therefore not entitled to absolute judicial immunity.

Next, as set forth in part B, below, there is no other common law source under which the ODC and its counsel can claim absolute immunity from suit. Neither the ODC nor any predecessor entity existed in the eighteenth and early nineteenth century; specialized disciplinary oversight over lawyers is a twentieth century phenomenon. In 1871, Delaware state courts did not have official disciplinary counsel. Because there was

no common-law tradition of official disciplinary proceedings, there was no common-law tradition of affording absolute immunity to disciplinary counsel.  Moreover, any attempt to equate disciplinary counsel to other court participants fails.

Finally, as explained in part C, below, none of the purposes that underlie the provision of absolute immunity are served by so insulating the ODC and its counsel. There is no public purpose in permitting ODC attorneys to stray from the narrow set of duties imposed upon them.  Unlike the judges whom we hope to protect from retaliation from unpopular judgments, the prosecutors who must choose who to prosecute and how, and the witnesses who need to speak without threat of any kind of lawsuit, the ODC merits no such shield.  Indeed, the ODC and its attorneys *should* be held accountable for complying with their obligations to provide independent and unbiased review of complaints against Delaware attorneys.

> **A.    The Defendants Do Not Decide Cases, and They Are
> Not Entitled To Absolute Judicial Immunity**

> **1.    Only public officials who decide cases are
> entitled to absolute judicial immunity**

The common law has long afforded judges absolute immunity for their judicial acts.  *See Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978); *see also* J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L. J. 879 (1980). An array of justifications support absolute immunity for those whose primary task is adjudication.  Judges are guaranteed to displease someone by almost every adjudication they undertake.[4]  Judges are insulated from liability because of the potential intimidation that large numbers of lawsuits can bring.  *See Forrester v. White*, 484 U.S. 219, 226-27

---

[4] "[T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have."  *Forrester v. White*, 484 U.S. 219, 226 (1988).

(1988); *see generally*, Ronald A. Cass, *Damage Suits Against Public Officers*, 129 U. PA. L. REV. 1110 (1981).

The "touchstone" of a judicial act is that it applies to the "performance of the function of resolving disputes between parties or of authoritatively adjudicating private rights." *Burns*, 500 U.S. at 500 (Scalia, J., concurring in part and dissenting in part). Hence, "[w]here an official is not called upon to exercise…judicial discretion, courts have properly refused to extend to him the protection of absolute judicial immunity, regardless of any apparent relationship of his role to the judicial system." *McCray v. Maryland*, 456 F.2d 1, 3 (4th Cir. 1972).

The Supreme Court has recognized the distinction between those acts that are "judicial" and those that are "administrative." Only the "judicial" acts are protected by absolute immunity. *See Forrester*, 484 U.S. at 227-29.[5] This distinction has always been in our law. Just like their modern-day counterparts, nineteenth-century judges performed both "judicial" and "ministerial" acts. Prior to 1871, the common law recognized absolute judicial immunity for judges acting in their judicial capacity. A functional approach determined which individuals qualified for such a broad protection. Judicial officers were "those whose duties are to decide controversies between individuals and accusations…against persons charged with a violation of the law." Floyd R. Mechem, *A*

---

[5] The doctrine of absolute immunity extends to only a small, clearly defined bundle of acts performed by the official, and not to the official *per se*. Thus, for example, while a judge is completely immunized when performing "the paradigmatic judicial acts involved in resolving disputes" (*Forrester*, 484 U.S. at 227), this protection does not include work done in his or her non-judicial duties. Judges have thus been held liable for their administrative acts such as employment decisions (*id.*), and the preparation of lists of available jurors. *See Ex parte Virginia*, 100 U.S. 339 (1879). Similarly, governors of states and correctional officials perform tasks central to our polity, but again do so without absolute immunity from suit. *Scheuer v. Rhodes*, 416 U.S. 232 (1974). That judicial immunity stems from the task, and not the person performing them, is also clear from other controlling cases. Judges outside of the courtroom, and judges in the executive branch, also have absolute judicial immunity for adjudicatory work. *See, e.g., Butz v. Economou*, 438 U.S. 478, 513 (1978). Further, not all those who do make quasi-judicial decisions have that full immunity. *See Cleavinger v. Saxner*, 474 U.S. 193, 203-06 (1985) (members of prison disciplinary committee are not entitled to absolute judicial immunity because they are not "neutral and detached" and because they do not fill a "classic" adjudicatory role).

*Treatise on the Law of Public Offices and Officers* 9 (1890) (citing BOUVIER'S LAW

DICTIONARY).  Whether a judge was entitled to judicial immunity turned upon "whether

the given act shall be considered as judicial or ministerial in its character."  *Id.* at 441; *see*

*also* Laura Oren, *Immunity and Accountability in Civil Rights Litigation: Who Should*

*Pay?*, 50 U. PITT. L. REV. 935, 945, 949 n.54 (1989).  As early as 1879, judges were held

liable for acts that were considered ministerial, rather than adjudicative.  *Ex parte*

*Virginia*, 100 U.S. 339 (1879).  Hence, the liability – rather than the immunity – of

ministerial officers was well established in the common law.  *See, e.g., Amy v. The*

*Supervisors*, 11 Wall. 136, 138 (1870) (noting an "unbroken current of authorities"

holding that a public officer may be liable for failure to perform a ministerial act).

## 2.    Rocanelli and the ODC do not decide cases

The ODC screens complaints, gathers evidence, translates viable complaints into

petitions for sanctions, and presents such petitions to decision-making bodies.  The

Preliminary Review Committee, not the ODC, decides whether a complaint merits

presentment to the Board on Professional Responsibility.  The Board, not the ODC, then

decides whether the evidence proves a violation under the appropriate standard, and that

decision is subject to review by the Delaware Supreme Court, not the ODC.

Lacking any precedent directly on point, defendants rely upon a line of

nonbinding cases involving *adjudicatory* bodies comparable, at most, to the Preliminary

Review Committee or the Board on Professional Responsibility.  (Def. Br. at 7, 12-13.)

All these cases are therefore inapposite, since the ODC does not adjudicate.  For instance,

*Berger v. Cuyahoga County Bar Ass'n* is not comparable or persuasive because there, the

Court observed that, like the Preliminary Review Committee in Delaware, the "Grievance

Committee reviews an initial complaint and investigates to decide if a prima facie case of

improper conduct exists; if so, a formal hearing is held."  983 F.2d 718, 723 (6th Cir

1993).  As with the Delaware Supreme Court, "[t]he supreme court ultimately decides what discipline should be given."  *Ibid.  See In re Solomon*, 886 A.2d 1266, 1269 (Del. 2005) ("[T]his Court has the exclusive authority to discipline members of the Delaware Bar.").  Likewise, in *Pawlak v. Nix*, an unreported decision, the defendants included members of the Board of Law Examiners—which appears to be a decision-making body. 1996 WL 560360, at *8 (E.D. Pa. Sept. 30, 1996).  In *Carroll v. Gross*, although it is not clear, the defendants appear to have been members of a grievance committee—again, a decision-making body.  984 F.2d 392, 393 (11th Cir. 1993) (citing *Slavin v. Curry*, 574 F.2d 1256 (5th Cir. 1978)).  The summary affirmance of dismissal in *Carroll* offers no persuasive grounds to create absolute immunity for the ODC or its attorneys.

The ODC provides an important service to the Delaware legal system[6]  Delaware attorneys are officers of the judiciary and their supervision instills public confidence.  But that does not transform the functions of the ODC and its attorneys into judicial acts.

Judicial immunity does not come from working in a court.  It does not come from being part of the legal system  It comes from ***judging***.  ODC attorneys do not decide cases.  The ODC is not empowered to weigh evidence or decide whether sanctions might be appropriate.  ODC attorneys are not even permitted to choose which complaints to investigate, nor are they authorized to impose any sanctions.[7]  Because the ODC and its attorneys do not decide cases, they are not entitled to absolute judicial immunity.

---

[6] It should be noted that Rocanelli represents the ODC, not the State.  Indeed, the State does not even pay Rocanelli's salary or the expenses of the ODC.  *See* Del. Supr. Ct. R. 64(f)&(g), discussed *infra*.

[7] Except for one passing reference (Def. Br. at 35), offered without support, the defendants do not suggest or contend that they are entitled to prosecutorial immunity.  If defendants raise a prosecutorial immunity argument in their reply brief, it should not be considered.  *See Public Citizen Health Research Group v. National Inst. Of Health*, 209 F. Supp. 2d 37, 43-44 (D.D.C. 2002) ("The Court highly disfavors parties creating new arguments at the reply stage that were not fully briefed during the litigation." (citing *Senior Unsecured Creditors' Comm. of First Republic Bank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (noting that defendant "raised its third argument for the first time in its reply brief and the court will not consider it in deciding the motion to dismiss.")); *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998) ("The reason for this rule of waiver is that a reply brief containing new theories deprives the respondent of an opportunity to brief those new issues.").  In any case, the gravamen of the Complaint is

**B.      The Defendants May Not Claim Absolute Immunity
         Under Any Other Common Law Doctrine**

Defendants do not point to any historical or common-law basis for absolute immunity. In 1871, Delaware courts did not appoint any official(s) to perform a function that mirrors the modern-day functions of the ODC. *Bar Discipline* at 395. Not until the twentieth century was an office created to receive and handle complaints against attorneys. *Ibid.* Ethics complaints by adversaries (rather than by clients), such as those at issue in the Complaint, did not even emerge until the 1970's. *Id.* at 397.

When, as here, an official seeking immunity performs a function that did not generally exist prior to 1871, this Court has sometimes examined whether common-law immunities were historically afforded to officials performing analogous duties. *See, e.g., Tower v. Glover*, 467 U.S. 914, 921 (1984) (examining the common-law tort liability of English Barristers to determine whether modern-day public defenders should be accorded immunity); *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993) (denying court reporter absolute immunity in large part because official court reporters did not begin appearing in state courts until the late 19th century). *Cf. Pulliam v. Allen*, 466 U.S. 522, 529-36 (1984) (examining the King's prerogative writs to determine whether federal injunctive relief may be awarded against a state judge); *Hoffman v. Harris*, 114 S. Ct. 1631, 1632 (1994) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari)

---

directed to conduct that was not prosecutorial in nature. *Cf. Imbler*, *supra*, 424 U.S. at 430 (absolute prosecutorial immunity extends to those functions "intimately associated with the judicial phase of the *criminal process*") (emphasis added). It is well-established that "absolute immunity does not extend to investigative or administrative acts." *Miller v. City of Philadelphia*, 174 F.3d 368, 376 n.6 (3d Cir. 1999) (citing *Ernst v. Child & Youth Services*, 108 F.3d 486, 494 (3d Cir. 1997)). The Complaint alleges that the defendants performed investigative or administrative acts to deprive Plaintiff of his rights. Even if the defendants could claim that they performed prosecutorial acts—which they do not—such a claim would only shelter their conduct with absolute immunity insofar as they served a prosecutorial function. "This point is perhaps best illustrated by the determination that the senior law enforcement official in the Nation—the Attorney General of the United States—is protected only by qualified, rather than absolute, immunity when engaged in the performance of national defense functions rather than prosecutorial functions." *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).

(if "social workers [did not] enjoy[] absolute immunity for their official duties in 1871 [then] absolute immunity is unavailable to [them] under § 1983").

As already discussed, ODC attorneys are not like judges. Thus, they are not entitled to absolute judicial immunity. Two other sets of actors, prosecutors and witnesses, appear in court and have been accorded absolute immunity from suit. The protections afforded to both of them do not justify a similar immunity for ODC attorneys. As the United States Supreme Court has noted,

> The judicial process is an arena of open conflict, and in virtually every case there is, if not always a winner, at least one loser. It is inevitable that many of those who lose will pin the blame on judges, prosecutors or witnesses and will bring suit against them in an effort to relitigate the underlying conflict.

*Mitchell v. Forsyth*, 472 U.S. 511, 521-22 (1984) (citation omitted). Harassing litigation could deflect the attention of officials from their public duties. *Imbler v. Pachtman*, 424 U.S. at 423. Indeed, "the mere threat of litigation may significantly affect the fearless and independent performance of duty by actors in the judicial process." *Mitchell*, 472 U.S. at 522. They will "shade" their decisions, rather than exercise the "independence of judgment required by [their] public trust." *Imbler*, 424 U.S. at 423. For these reasons, prosecutors enjoy absolute immunity "in initiating a prosecution and in presenting the State's case." *Id.* at 431. Nevertheless, prosecutors receive no similar protection when performing non-prosecutorial acts such as conducting an investigation, providing legal advice to the police (*Burns*, 500 U.S. at 494-95) or making statements at a press conference (*Buckley v. Fitzsimmons*, 509 U.S. 259, 277-78 (1993)).

Witnesses are also entitled to absolute immunity as a testimonial privilege. The common law provided such a safeguard because liability could create an unacceptable

roadblock on "the paths which lead to the ascertainment of truth." *Briscoe v. LaHue*, 460 U.S. at 332-33 (quoting *Calkins v. Summer*, 13 Wis. 193, 197 (1860)).

Similarly, the Supreme Court has acknowledged absolute immunity for juries who are required to evaluate the facts, and reach conclusions as to the ultimate disposition of a case. *Forrester*, 484 U.S. at 225-26. Comparing ODC attorneys' work to that of witnesses, prosecutors, and jurors makes plain that none of the rationales that support absolute immunity applies. ODC attorneys do not make judgment calls about which complaints to investigate (*Bar Discipline* at 399), whether the evidence is sufficient to prove a violation, or what, if any, disciplinary sanctions are appropriate.

In addition to the historical/functional comparison above, the specific kind of conduct at issue in the Complaint—*i.e.* questionable ODC inquiries triggered by tactical protests lodged by sophisticated adversaries, rather than complaints by clients or judicial referrals—did not even exist in Delaware prior to the 1970s. *See Bar Discipline* at 397. Accordingly, no immunity at common law could have existed in 1871 to shield such investigations from suit even when initiated or conducted in bad faith.

In short, ODC attorneys have no true predecessors in the courts of the nineteenth century. That the work of the ODC and its attorneys is in some way related to the judiciary does not, standing alone, provide a sufficient basis for absolute immunity. When the work of ODC attorneys today is compared with the tasks of judges, prosecutors, jurors or witnesses, the differences are so marked as to make plain that absolute immunity cannot cloak the ODC and its attorneys.

**C.     The Policies Underlying Common Law Absolute Immunities
        Do Not Support Such Immunity for the ODC and its Head**

A final step to analyzing a claim of absolute immunity under § 1983 actions is to look at the contemporary context. In cases filed under § 1983, this Court has not taken its

role to be one of "freez[ing] into permanent law whatever principles were current in 1871." *Smith v. Wade*, 461 U.S. at 34 n.2. Rather, the Court has reviewed justifications for immunity to assess their present-day validity in light of the purposes of civil rights litigation. *Id.*; *Imbler*, 424 U.S. at 424-29. *But see Tower v. Glover*, 467 U.S. at 922-23 ("We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy."). Indeed, the need to weigh the costs and benefits of the immunity doctrine are especially pressing when the common law offers less than definitive guidance. *Smith*, 461 U.S. at 93 (O'Connor, J., dissenting).

Here, the provision of absolute immunity to the ODC and its attorneys serves neither the interests of the administration of justice nor the rights of litigants. Moreover, qualified immunity will more than adequately protect any legitimate concerns.

### 1. Holding Rocanelli and the ODC liable will not cause a flood of vexatious litigation

Defendants do not advance any policy argument or contend that a failure to extend absolute immunity to them will cause a flood of vexatious litigation and thereby frustrate their functions. Defendants point to no evidence that ODC proceedings are typically acrimonious or frequently produce ancillary suits. Indeed, such proceedings often appear to be largely uncontested, with the respondent often stipulating to findings of fact and violations.[8] A review of state and federal jurisprudence in Delaware reveals no suits similar to the instant Complaint or comparable history of similar litigation.

Accordingly, there is no basis to suggest that public policy weighs in favor of extending absolute immunity to defendants.

---

[8] While the confidentiality of such proceedings necessarily limits this observation, it also weighs against any policy-based argument for absolute immunity. *Cf. Mitchell*, 472 U.S. at 522 ("National security tasks, by contrast [to litigation in open court], are carried out in secret; open conflict and overt winners and losers are rare. Under such circumstances, it is far more likely that actual abuses will go uncovered than that fancied abuses will give rise to unfounded and burdensome litigation.").

### 2.    Liability for Rocanelli and the ODC serves important public purposes

Civil rights actions represent a unique means of safeguarding those values we regard as most fundamental.  In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.  It is this recognition that has required the denial of absolute immunity to most public officers. *Harlow v. Fitzgerald*, 457 U.S. at 814.  This is especially true in the case of the ODC and its counsel.  ODC attorneys who, like Rocanelli, wrongfully exploit their office to benefit personal interests imperil public confidence in the Delaware legal system as well as cherished constitutional freedoms (*e.g.*, the rights to choose counsel and to adequate representation), and civil rights actions are an important mechanism by which violations of this kind can be remedied.  *See Forrester*, 484 U.S. at 223 ("[G]overnment officials are expected to make decisions…that above all are informed by considerations *other than the personal interests of the decisionmaker*." (emphasis added)).  Liability here will have a "salutary effect" (*id.*), because it will give the ODC and its attorneys a strong incentive to fulfill their duties without conflicts of interest or animus and without violating the Constitution and federal laws.  *Cf. Mitchell*, 472 U.S. at 524 ("We do not believe that the security of the Republic will be threatened if its Attorney General is given incentives to abide by clearly established law.").  That liability benefits not only the parties to disciplinary proceedings but the courts and the public as well.

### III.    THE ODC IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY BECAUSE ANY RECOVERY AGAINST IT WILL NOT COME FROM THE STATE TREASURY

The ODC contends that it is immune from suit under the Eleventh Amendment.[9]

(Def. Br. at 13.)  The Eleventh Amendment, adopted in response to *Chisholm v. Georgia*,

2 U.S. 419 (1793), has been construed to preclude suits against any of the United States.

However, the Complaint alleges at ¶ 23 that the ODC is an entity *privately funded* by

assessments paid by lawyers.  Delaware Supreme Court Rule 64(g) states this clearly:

> Funding. – The annual expenses of the [ODC] shall be paid out of assessments made annually against the active members of the Bar of this Court, and from other such sources as are determined by the Court.

*See also* Del. Supr. Ct. R. 64(f) ("The expenses of [ODC] counsel and staff,

administrative costs, and all other expenses relating to disciplinary matters shall be paid

in accordance with subsection (g) of this rule.").  Thus, the ODC cannot reasonably assert

an Eleventh Amendment defense.[10]

Eleventh Amendment immunity is an affirmative defense and the burden is thus

on the ODC to establish its immunity from suit.  *See Christy v. Pennsylvania Turnpike*

*Commission*, 54 F.3d 1140, 1144 (3d Cir. 1995) ("[T]he party asserting Eleventh

Amendment immunity (and standing to benefit from its acceptance) bears the burden of

proving its applicability.").  The Third Circuit "determine[s] Eleventh Amendment

---

[9] The Complaint's claims for compensatory relief are brought against Rocanelli in solely her personal capacity.  ¶ 21.  Thus, Rocanelli cannot claim Eleventh Amendment immunity.  *See Lloyd v. Jefferson*, 53 F. Supp. 2d 643, 681 (D. Del. 1999) ("plaintiff points out that she has brought these claims against the defendants in their individual capacities, and, thus, sovereign immunity is not applicable as a defense").

[10] Defendants contend that the *initial* complaint's single description of the ODC as an arm of the Delaware Supreme Court constitutes a judicial admission that the ODC is an arm of the State for Eleventh Amendment purposes.  (Def. Br. at 16.)  As set forth herein, the description was modified in the Complaint to reflect subsequent investigation and the Delaware Supreme Court's own rules.  Judicial admissions are limited to *facts* admitted unequivocally, but whether the ODC is an arm of the state is a question of law.  Accordingly, this single inaccurate phrase, concerning a conclusion of law, in a pleading superseded by the Complaint, should be disregarded because it does not explicitly refer to the Eleventh Amendment and thus admits of more than one meaning.  *See The Doyle*, 105 F.2d 113, 117 (3d Cir. 1939) ("[judicial] admissions to be binding must be unequivocal, …and anyway they may be disregarded in the interests of justice").

immunity by examining the evidence on three factors: (1) the source of funding—*i.e.*, whether payment of any judgment would come from the state's treasury, (2) the status of the agency/individual under state law, and (3) the degree of autonomy from state regulation." *Carter v. City of Philadelphia*, 181 F.3d 339, 347 (3d Cir. 1999).

In *Hess v. Port Authority Trans-Hudson Corp.*, the United States Supreme Court took note of "the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury." 513 U.S. 30, 48 (1994) (citation omitted). "Accordingly, Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations." *Ibid.* (citing cases). *See also Carter*, 181 F.3d at 347 ("[T]he most important question in determining Eleventh Amendment immunity is whether any judgment would be paid from the state treasury." (citations and internal quotes omitted)).

The ODC, unlike the State, is not funded by taxes. *See In re Member of Bar*, 257 A.2d 382, 385 (Del. 1969) (lawyer assessments are not taxes). The Complaint alleges (¶ 23), and it cannot reasonably be disputed (*see* Del. Supr. Ct. R. 64(f) & (g)), that the ODC is privately funded and "self-sustaining." *Hess*, 513 U.S. at 50. Accordingly, the ODC's financial independence from the State compels the conclusion that it is not an "arm of the State" for Eleventh Amendment purposes. *Id.* at 49 ("state treasury factor is the most important factor to be considered…and, in practice, [the vast majority of Circuits] have generally accorded this factor dispositive weight").

In *Callahan v. City of Philadelphia*, cited by defendants (Def. Br. at 14), the dismissal of claims against two Pennsylvania court divisions was affirmed by the Third Circuit only after it closely analyzed the funding sources of the court divisions. 207 F.3d 668, 670-72 (3d Cir. 2000). The funding factor was "of limited utility" in *Callahan* due

- 20 -

to the mixed sources of funding found there.  *Id.* at 672.  Thus, *Callahan* is inapposite because there is no question about the ODC's private source of funding in this case.

In addition to the "source of funding" factor, which alone should dispose of the Eleventh Amendment question, the autonomy of the ODC also weighs against immunity from suit.  Delaware Supreme Court Rule 64(b) provides that the ODC's chief disciplinary counsel "shall be responsible for the management and administration of the Office…, [and] shall prepare budgets, reports, and other proposals as necessary or appropriate for the operation of the Office."  Thus, the ODC functions independently as it screens complaints and presents viable complaints to a decision-making body.

As the ODC is not an arm of the State for Eleventh Amendment purposes, defendants' reliance on *Will v. Michigan Department of State Police* (Def. Br. at 11, 13), holding that a State is not a "person" within the meaning of § 1983, is misplaced.  491 U.S. 58, 70 (1989) ("[O]ur holding here…applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes.").

In sum, claims against the ODC do not pose any potential liability to the State treasury.  Nor do they implicate the dignity of the State.  *Cf. Carter*, 181 F.3d at 355 n.53 ("A suit for damages against a district attorney's office does not implicate the dignity of the state.").  Accordingly, the ODC is not entitled to Eleventh Amendment immunity.

## IV.     THIS COURT'S JURISDICTION OVER CLAIMS AGAINST ROCANELLI AND THE ODC IS SETTLED LAW OF THE CASE

After a hearing last year in this case, a predecessor court held that this Court properly has jurisdiction over Rocanelli and the ODC.  (D.I. 5 #7 ¶ D.)  The defendants now challenge that ruling and raise a *Rooker-Feldman* jurisdictional objection.

A.    **This Court's Exercise of Jurisdiction is Law of the Case**

In *Tse v. Ventana Medical Systems, Inc.*, 123 F. Supp. 2d 213 (D. Del. 2000), this Court applied the law of the case doctrine to refrain from disturbing a decision by the judge to whom the case had been previously assigned.  "The law of the case doctrine limits the extent to which an issue previously decided by a court of coordinate jurisdiction will be reconsidered by a successor court."  *Id.* at 220 (citing *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994)).  "Principles of comity dictate that when a predecessor court of equivalent jurisdiction decides an issue, that decision should govern in subsequent stages of the same case."  *Ibid.* (citations omitted).

Defendants themselves twice state that Judge Shapiro's ruling is law of the case. (Def. Br. at 24 n.7, 31.)  Thus, it has already been decided that this Court properly has jurisdiction over Plaintiff's claims against the defendants.  In particular, Judge Shapiro held that *Taylor v. Kentucky State Bar Association*, 424 F.2d 478 (6th Cir. 1970) controls this case.  Defendants elected not to challenge that determination through a motion for reconsideration or by interlocutory appeal.  Yet defendants now attack Judge Shapiro's holding, over six months later, as "clearly erroneous" (Def. Br. at 1 n.1), asserting that *Taylor* was superceded by *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982).  However, this contention lacks merit because *Middlesex* only concerns the propriety of federal court abstention *in the absence of* "bad faith, harassment, or some other extraordinary circumstance."[11]  457 U.S. at 435.  Such

---

[11] *See also Bishop v. State Bar of Texas*, 736 F.2d 292, 295 (5th Cir. 1984) (reversing dismissal where plaintiff's allegation that disciplinary proceedings "had been taken 'in bad faith and for an improper motive'…stated a claim for injunctive relief" not subject to *Middlesex* abstention); *Chiropractic Alliance of New Jersey v. Parisi*, 854 F. Supp. 299 (D.N.J. 1994) (denying motion to dismiss and refusing to abstain on *Younger* grounds where "there is 'evidence that the charges against the plaintiff were instituted with 'no genuine expectation' of their eventual success, but only to discourage the exercise of the plaintiff's protected rights.'" (quoting *Wichert v. Walter*, 606 F. Supp. 1516, 1521 (D.N.J. 1985))); *Phelps v. Hamilton*, 59 F.3d 1058, 1063 (10th Cir. 1995) (remanding due to necessity of further factfinding to consider availability of bad-faith exception to *Younger* abstention doctrine).

allegations represent the **heart** of this Complaint.  Moreover, that *Taylor* retains its

vitality after *Middlesex* is confirmed by *Partin v. Arkansas State Board of Law*

*Examiners*, 863 F. Supp. 924 (E.D. Ark. 1994).  In *Partin*, although *Middlesex* was found

to control, it was not seen as superceding *Taylor*, which the court distinguished:

> The circumstances in *Taylor* and the issues were quite
> different from the case at bar.  Daniel T. Taylor, III was a
> lawyer who had pursued a career in the defense of
> unpopular causes and controversial clients, including civil
> liberties organizations, civil rights activists, the poor, and
> the disadvantaged.  *Taylor*, at 479.  The Kentucky Bar
> Association filed a charge against Taylor seeking to have
> him disbarred.  Taylor's complaint in federal district court
> involved several key issues that differed from Mr. Partin's:
> Taylor contended that the Bar Association's actions "were
> instituted in bad faith, with no real hope of ultimate
> success; that said proceedings are calculated to deter,
> intimidate, harass, and punish Taylor for his association
> with and representation of persons and organizations
> advocating controversial ideas, and to prevent Taylor and
> deter other Kentucky lawyers from representing, in futuro,
> controversial clients and from advocating their ideas." *Id.*
> In contrast, Mr. Partin has alleged no violation of First
> Amendment rights, and there is no issue of a possible
> "chilling effect" on First Amendment activities in this case.

863 F. Supp. at 929.

Unlike the case in *Middlesex*, the Complaint does not seek to enjoin a disciplinary

proceeding *brought in good faith*.  Moreover, as in *Taylor*, this case concerns the

abridgment of First Amendment activity (Count I) by an attorney who represents

relatively powerless individuals fighting politically and financially powerful corporations

in controversial litigation.  As Judge Shapiro correctly ruled, *Taylor* is directly on point.

Defendants' *Middlesex*/*Younger* arguments are also deficient because they do not

contend that the Complaint implicates important state interests.  *Younger* abstention is

inappropriate here because "claims relating to… alleged discriminatory and

unconstitutional actions do not implicate important state interests under [*Gwynedd*

*Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195 (3d Cir. 1992)] and

[*Heritage Farms, Inc. v. Solebury Township*, 671 F.2d 743 (3d Cir. 1982)]." *Addiction*

*Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 410 (3d Cir. 2005) (holding that

district court abused its discretion in applying *Younger* abstention to certain claims).

Abstention is also inappropriate because Plaintiff's constitutional claims cannot be fully

entertained in either the criminal matter or a disciplinary proceeding. *See Prevost v. Twp.*

*of Hazlet*, 159 Fed. Appx. 396, 398 (3d Cir. 2005) (citing *Hospital Council of Western*

*Pennsylvania v. City of Pittsburgh*, 949 F.2d 83, 90 (3d Cir. 1991)).

    In any event, defendants wholly fail to explain or support their contention, buried

in a footnote, that Judge Shapiro's ruling was "clearly erroneous." As *Partin* makes

clear, Judge Shapiro did not err at all, let alone err "clearly." Accordingly, the law of the

case doctrine bars reconsideration of the issue of jurisdiction.

## B.    The *Rooker-Feldman* Doctrine is Inapplicable

    Defendants' *Rooker-Feldman* challenge to this Court's jurisdiction is simply

frivolous. (Def. Br. at 7, 16-21.) *First*, as stated above, this Court's jurisdiction is law of

the case. *Second*, as set forth below, the *Rooker-Feldman* doctrine is inapplicable

because there has been no state court *judgment* antedating the commencement of this

action—and defendants point to none—which could preclude this Court's jurisdiction.

*Third*, as the United States Supreme Court recently emphasized, the *Rooker-Feldman*

doctrine is extremely narrow in scope. *See Exxon Mobil Corp. v. Saudi Basic Industries*

*Corp.*, 544 U.S. 280, 125 S. Ct. 1517 (2005). As in *Exxon Mobil*, the circumstances at

bar fall well outside that limited scope.

    The *Rooker-Feldman* doctrine creates a narrow and limited exception to the

congressionally mandated structure of dual federal and state jurisdiction, and its sole role

is to prohibit federal district courts from conducting de facto appellate review of state-

court decisions.  According to the United States Supreme Court, the doctrine:

> is confined to cases of the kind from which the doctrine
> acquired its name: cases brought by state-court losers
> complaining of injuries caused by state-court judgments
> rendered before the district court proceedings commenced
> and inviting district court review and rejection of those
> judgments.  *Rooker-Feldman* does not otherwise override
> or supplant preclusion doctrine or augment the
> circumscribed doctrines that allow federal courts to stay or
> dismiss proceedings in deference to state-court actions.

*Exxon Mobil*, 125 S. Ct. at 1521-22.

In this case, no "state-court *judgments* rendered *before the district court*

*proceedings commenced*" are at issue.  Thus, defendants cannot colorably accuse Plaintiff

of "inviting district court review and rejection of [any state-court] judgments."  Indeed,

this action was commenced just days after the indictment was returned and *before* the

Delaware Supreme Court continued indefinitely (and thus did not rule upon) the ODC's

petition for interim suspension.  In sum, as in *Exxon Mobil*, "[t]his case surely is not the

paradigm situation in which *Rooker-Feldman* precludes a federal district court from

proceeding."  *Id.* at 1527 (citations and internal quotation marks omitted).

Accordingly, this Court's jurisdiction is law of the case and defendants' frivolous

*Rooker-Feldman* challenge should be denied.

## V.     THE COMPLAINT STATES VIABLE § 1983 CLAIMS

### A.     *Noerr-Pennington* Does Not Bar Plaintiff's Claims

Rocanelli contends that Counts 1 through 4 are barred by the *Noerr-Pennington*

doctrine, derived from the antitrust field, holding that an individual cannot be held liable

for exercising his or her First Amendment right to petition the government.  (Def. Br. at

31.)  However, the doctrine, even if applicable here (which it is not), provides at most a

defense against liability, not immunity from suit.  *See We, Inc. v. City of Philadelphia*,

- 25 -

174 F.3d 322, 326 (3d Cir. 1999).[12]  Accordingly, *Noerr-Pennington* cannot bar

Plaintiff's claims at this early juncture.

**B.    Counts 1 Through 10 All State Viable § 1983 Claims**

**Count 1:** Defendants contend that Count 1, for violation of the First Amendment,

fails because a single sentence fragment, ripped out of its context, may support their

version of events.  (Def. Br. at 31.)  Pointing to the first half of a sentence in the

Complaint, defendants then misleadingly omit the remainder of that sentence: Rocanelli's

"opposition to [challenging PayPal's class action settlement] was made clear to Plaintiff."

¶ 66.  Defendants also ignore the following critical sentence: "Indeed, her actions would

speak louder than words."  *Ibid.*  The Complaint thus adequately alleges that defendants,

under color of State authority, violated Plaintiff's "First Amendment rights to object to

the proposed settlement, to gather other objectors, and to petition the federal court

overseeing the class action not to approve the settlement as proposed."  ¶ 107.

Rocanelli also contends that Count 1 is contradicted by her view that the ODC did

not by itself obtain the indictment against Plaintiff.  There is no *Noerr-Pennington* issue,

*see* Part A *supra*, because Rocanelli's role, as alleged in the Complaint, had nothing to do

with merely petitioning for State action.  The Complaint alleges that "Rocanelli also

retaliated against Plaintiff for his expressed desire to exercise his First Amendment

rights…by causing Plaintiff to be subjected to the Prosecution."  ¶ 108.  Thus, Rocanelli

is alleged to be the proximate cause of the wrongful criminal prosecution.  In sum, her

---

[12] Defendants' reliance on *Noerr-Pennington* is also misplaced because the Complaint does not allege that Rocanelli petitioned the State—rather, under color of State authority, she exploited her official influence to instigate the prosecution of Plaintiff and actively furthered such prosecution by stealthily gathering evidence for the criminal investigation, initiating multiple bogus probes, and piling on after the indictment was obtained with her own official demand for interim suspension.  "There is no petitioning element to this activity."  *We, Inc. v. City of Philadelphia Dept. of Licenses and Inspections*, 983 F. Supp. 637, 640 (E.D. Pa. 1997) (denying *Noerr-Pennington* defense).  As in *We*, "the crux of plaintiff['s] complaint is that the [defendant] went beyond merely complaining or petitioning the government: [Plaintiff] claim[s] that defendants were integrally involved in not only initiating…a complaint, but in, among other things, carrying out" official activity.  *Id.* at 639.

alleged misconduct, taken under color of state law, deprived Plaintiff of his rights.

Nothing more is required to state a § 1983 claim. *See Alston v. Parker*, 363 F.3d 229,

233 (3d Cir. 2004) (vacating dismissal of complaint because civil rights claims need only

satisfy liberal standards of notice pleading, not heightened pleading standard).[13]

**Counts 2 through 4:** Defendants contend that Counts 2 through 4, seeking relief

under § 1983 for violations of the Fourth, Fifth and Sixth Amendments, respectively, are

barred by *Noerr-Pennington*, *Younger* abstention and *Heck v. Humphrey*, 512 U.S. 477

(1994). (Def. Br. at 31-32.) *First*, as argued above, *Noerr-Pennington* is inapposite and

prematurely raised, *see* Part A *supra*. *Second*, although Judge Shapiro ruled that *Younger*

abstention bars the Court from *enjoining* the criminal prosecution, *Younger* is of little

relevance to claims for *compensatory* relief, which would not interfere with any ongoing

state proceeding. *See Marran v. Marran*, 376 F.3d 143, 155 (3d Cir. 2004) ("abstention

under *Younger* principles is not proper when damages are sought"). *Third*, *Heck* is

inapposite because, there, Heck had been convicted, his conviction was upheld, two

federal habeas petitions were denied, the second denial of habeas relief was affirmed by

the Seventh Circuit, and Heck was serving out his sentence. *Heck* only precludes

"§ 1983 damage claims that…call into question the lawfulness of conviction or

confinement…." 512 U.S. at 483. There is no conviction or sentence at issue in this

case. Even if a person is convicted or confined, *Heck* still permits § 1983 claims to

proceed so long as the complaint does not amount to a collateral attack on the validity of

the judgment or sentence. 512 U.S. at 487 ("if the district court determines that the

---

[13] Defendants contend that the Complaint lacks sufficient particularity with respect to bad faith or harassment. (Def. Br. at 22-24.) This contention ignores the detailed allegations concerning Rocanelli's specific conflicts of interest. ¶¶ 64, 77, 84-88, 101. In *Brooks v. New Hampshire Supreme Court*, a non-binding opinion upon which the defendants rely heavily, the court observed that "[t]o implicate due process, claims of general institutional bias must be harnessed to a further showing, such as a potential conflict of interest, or a pecuniary stake in the outcome of the litigation." 80 F.3d 633, 640 (1st Cir. 1996) (emphasis added). The Complaint, which nowhere claims "general institutional bias," amply satisfies such a requirement of specificity, even if applied despite the lenient notice pleading standard in federal courts.

plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed" (emphasis in original)). In this case, there is no outstanding criminal judgment to invalidate. Indeed, a motion to dismiss the indictment for failure to state an offense and other dispositive motions remain pending in the Superior Court.[14]

Accordingly, defendants' motion to dismiss should be denied at this juncture.[15]

**Count 5:** Defendants' challenges to Count 5 appear to be directed largely to the original complaint, not the amended complaint. (Def. Br. at 32.) Thus, most of defendants' contentions, especially those concerning Rule 16 of the Delaware Lawyers' Rules of Disciplinary Procedure, are irrelevant.[16] Thus, defendants' contention that Count 5's equal protection claim satisfies a rational basis test is based on a misreading of the Complaint. The claim does not challenge Rule 16, which is scarcely referenced in the Complaint, but rather seeks relief in connection with the selective, unjustifiable and bad-faith prosecution of Plaintiff for conduct that has never before given rise to criminal charges or attorney discipline in Delaware (or anywhere else, apparently). ¶¶ 94, 97-99.

"The essence of the Equal Protection Clause is that, absent a rational basis for doing otherwise, the state must treat similarly situated persons alike." *Marchese v. Umstead*, 110 F. Supp. 2d 361, 370 (E.D. Pa. 2000) (citing *Village of Willowbrook v. Olech*, 528 U.S. 1073 (2000)). The Complaint alleges at ¶ 130 that "Plaintiff, similarly situated to other PayPal users, has been intentionally singled out by the defendants for

---

[14] Among these motions is a challenge to the grand jury array, which very likely included grand jurors with financial or other material ties to PayPal, the purported corporate victim. Accordingly, despite defendants' contention to the contrary (Def. Br. at 21, 24), the claimed independence of the grand jury is not a compelling basis for presuming that the indictment was legitimately obtained in this case.

[15] *Gallo v. City of Philadelphia*, 161 F.3d 217 (3d Cir. 1998) confirms the viability of Count 2 in particular. *See also Torres v. McLaughlin*, 163 F.3d 169, 172 (3d Cir. 1998) (holding that *Albright v. Oliver*, 510 U.S. 266 (1994) "stands for the broader proposition that a section 1983 claim [for malicious prosecution] may [also] be based on a constitutional provision other than the Fourth Amendment.").

[16] The Delaware Supreme Court indefinitely continued a hearing on the ODC's Rule 16 petition against Plaintiff, thereby deflecting, for the time being at least, the challenge to Rule 16 in the original complaint.

disparate, unlawful and malicious treatment." In view of the wholly unprecedented nature of the criminal prosecution and follow-on disciplinary proceeding, this allegation suffices to state an equal protection claim. *See id.* at 371 ("The plaintiff's allegations that 'others' were allowed to sell cars on their property without paving or submitting land development plans, that others were permitted to have flashing light signs and that the previous owner of the property was permitted to park vehicles on the alleged sidewalk area for over 40 years is sufficient to withstand a motion to dismiss."). *See also Cyprus v. Diskin*, 936 F. Supp. 259, 263 (E.D. Pa. 1996) ("The Court has long acknowledged that the equal protection clause is available to redress such evils as selective enforcement." (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962))).

Defendants proffer no legitimate reason for the selective prosecution alleged in the Complaint to have been caused by them and which was motivated by animus and bad faith due to specific conflicts of interest. Accordingly, Count 5 should not be dismissed.

**Count 6:** Defendants contend that Count 6 is barred by *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989) despite congressional amendment of § 1981 in *Jett*'s wake.[17] They note a circuit split on *Jett*'s vitality and concede that the Third Circuit has not addressed this question. However, this debate is irrelevant to the instant suit. "[T]he *Jett* Court concluded that *where a claim is brought against a municipality*, 42 U.S.C. § 1983 provides the exclusive remedy for the violation of rights guaranteed by 42 U.S.C. § 1981." *Watkins v. Pa. Bd. of Prob. and Parole*, No. 02-2881, 2002 WL 32182088, at *4 (E.D. Pa. Nov. 25, 2002) (emphasis in original) (following Ninth Circuit in holding that post-*Jett* congressional amendment to § 1981 created an implied direct cause of action against state actors). *See also Jett*, 491 U.S. at 705 (resolving "whether 42 U.S.C.

---

[17] Following *Jett*, Congress amended § 1981 by adding subsection (c), which states: "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

- 29 -

§ 1981 provides an independent federal cause of action for damages against *local governmental entities*") (emphasis added). Thus, *Jett* is wholly inapposite because the Complaint is not brought against a municipality or a municipal officer.

Moreover, defendants' contention misconstrues Count 6. Although Count 6 is premised on a *violation* of § 1981, the Court may infer that, like Counts 1 through 5, the *remedy* for the violation is sought pursuant to § 1983. *See Roadcloud v. Pa. Bd. of Probation & Parole*, No. 05-3787, 2006 WL 83453, at *3 (E.D. Pa. Jan. 6, 2006) ("Plaintiffs' § 1981 claims will be merged with their § 1983 claims."). In *Lockridge v. Board of Trustees of University of Arkansas*, the Eighth Circuit liberally construed the plaintiff's complaint "as including claims for violations of… § 1981 brought under § 1983" because the complaint alleged §§ 1981 and 1983 violations. 315 F.3d 1005, 1007 (8th Cir. 2003). Likewise, at this juncture, the Court should liberally construe the Complaint as alleging violations of § 1981 for which relief may be sought independently or under § 1983. Alternatively, as in *Roadcloud*, Count 6 should be "merged" with the Complaint's various § 1983 claims.

Accordingly, as Count 6 alleges *prima facie* violations of § 1981, for which relief under § 1983 may be sought, defendants' motion to dismiss Count 6 should be denied.

**Counts 7 through 9:** Counts 7 through 9 allege, respectively, a conspiracy to interfere with civil rights, negligent failure to prevent such conspiracy and an entitlement to an award of costs. Count 7 and 9 are cognizable if Count 10 or any of Counts 1 through 6 is viable. Count 8 is cognizable if Count 7 is viable.

Defendants contend that Count 7 is barred by *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825 (1983). (Def. Br. at 35.) "[T]he Supreme Court has made clear: the victim of a conspiracy motivated by race discrimination may bring a § 1985(3) claim, [*Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)], while the victim of

- 30 -

mere commercial or economic animus may not. [*United Brotherhood*, 463 U.S. at 838]."
*Farber v. City of Paterson*, 440 F.3d 131, 138 (3d Cir. 2006). Defendants ignore the
Complaint's allegations of racial animus, which plainly satisfy § 1985(3). ¶¶ 134-36.[18]
These allegations do not point to "mere commercial or economic animus." Thus, *United
Brotherhood* is inapposite. Accordingly, Counts 7 through 9 state viable claims.

    **Count 10:** Pursuant to the express procedures and provisions of the Private
Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiff was appointed lead
counsel in a securities class action, a powerful and potentially valuable role. ¶¶ 82, 151.
The Complaint alleges that the defendants used bogus probes and the instigation of a
futile criminal prosecution to interfere with Plaintiff's PSLRA-mandated appointment.
The PSLRA vests authority in the lead plaintiff(s) to select and retain counsel to represent
the class, subject to the Court's approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). *See also In
re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 186 (3d Cir. 2005) ("The PSLRA is explicit
that the power to select counsel resides in the lead plaintiff"). Thus, a court cannot
disturb the lead plaintiffs' choice of counsel unless necessary to "protect the interests of
the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). *Cf. Cendant*, 404 F.3d at 192 ("The
power to select counsel lets clients choose lawyers with whom they are comfortable and
in whose ability and integrity they have confidence." (citation omitted)). Wrongful
impairment or deprivation of this specific entitlement merits relief under § 1983.

---

[18] The Court should infer from these allegations that Plaintiff is of the Hispanic race. *See also* ¶ 90.
Moreover, the Complaint alleges that, acting on behalf of a client of the Asian race, Plaintiff was prevented
from advancing the client's right to equal protection of the laws, which is also a sufficient basis for a
§ 1985(3) claim. *See Farber*, 440 F.3d at 141 (§ 1985(3) "provides a cause of action in any instance where
'in furtherance of the object of' a proscribed conspiracy an act is done 'whereby another is injured in his
person or property.' By its terms, the statute gives no hint of any requirement that the 'other' must have
any relationship to the 'person or class of persons' which the conspiracy seeks to deprive of equal
protection, privileges or immunities." (quoting *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d
1235, 1244 (3d Cir. 1978), *vacated on other grounds*, 442 U.S. 366 (1979))).

In several decisions, the Supreme Court has found that federal statutes created rights enforceable under § 1983.  For example, in *Golden State Transit Corp. v. Los Angeles*, the Court held that Golden State could sue for damages under § 1983 to remedy the violation of its right under the National Labor Relations Act (29 U.S.C. §§ 151–169) ("NLRA") not to have the renewal of its taxi license conditioned on the settlement of a pending labor dispute.  493 U.S. 103, 112-13 (1989).  Subsequently, in *Livadas v. Bradshaw*, the Supreme Court held that the plaintiff had an enforceable right under the NLRA "to complete the collective bargaining process and agree to an arbitration clause." 512 U.S. 107, 134 (1994).  The Court observed that "apart from…exceptional cases, § 1983 remains a generally and presumptively available remedy for claimed violations of federal law."  *Id.* at 133.

Unless the federal statute under consideration "expressly curtails § 1983 actions," officials trying to establish Congress's intent to foreclose must "make the difficult showing that allowing § 1983 actions to go forward in these circumstances 'would be inconsistent with Congress's carefully tailored scheme.'"  *Blessing v. Freestone*, 520 U.S. 329, 346 (1997) (quoting *Golden State*, 493 U.S. at 107).[19]  In apparently only two cases—*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981) and *Smith v. Robinson*, 468 U.S. 992 (1984)—has the Court determined that comprehensive schemes within a statute foreclosed the § 1983 lawsuit.  Defendants do

---

[19] *Blessing* directs courts to concentrate on Congress' intent to create rights in statutes enforceable through § 1983.  520 U.S. at 340.  The PSLRA was intended to encourage significant shareholders, and the lawyer(s) they select, to assume the leadership of securities class actions.  *See In re Horizon/CMS Healthcare Corp. Sec. Litig.*, 3 F. Supp. 2d 1208, 1212 (D.N.M. 1998) (The PSLRA "appears to reflect a congressional intent to transfer power from counsel who win the race to the courthouse to those shareholders who possess a sufficient financial interest in the outcome to maintain some supervisory responsibility over both the litigation and their counsel." (citation omitted)); *Ravens v. Iftikar*, 174 F.R.D. 651, 661 (N.D. Cal. 1997) ("Congress [through the PSLRA] sought to eliminate figurehead plaintiffs who exercise no meaningful supervision of litigation"); *In re Cavanaugh*, 306 F.3d 726, 739 (9th Cir. 2002) (granting petition for writ of mandamus where district court did not follow PSLRA's lead plaintiff provisions and presume that plaintiff with largest financial interest was most adequate plaintiff); *In re Cendant Corp. Litig.*, 264 F.3d 201, 254-86 (3d Cir. 2001) (discussing counsel selection under PSLRA).

not contend that the PSLRA expressly forecloses § 1983 claims. Nor do they contend that the PSLRA impliedly forecloses § 1983 claims through a comprehensive scheme. Accordingly, the federal rights created by the PSLRA are enforceable by § 1983.

Defendants attack Count 10 with a red herring: "If this logic were correct, then Delaware's theft statute must also be preempted--plaintiff's going to jail based on a theft conviction would also 'interfere' with his being lead counsel in the securities action." (Def. Br. at 37.) However, Count 10 is not a collateral attack on Delaware's theft statute. Rather, it challenges Rocanelli's abuse of the influence and investigative function of her office, under color of state law, to impede the right of an attorney to act as the chosen and duly-appointed lead counsel pursuant to the PSLRA. Relief from wrongful deprivation of this individual entitlement may be sought under § 1983.

## VI.    THE COMPLAINT STATES VIABLE COMMON LAW CLAIMS

The Complaint states viable claims for intentional infliction of emotional distress, tortious interference, and malicious prosecution.

### A.    Intentional Infliction of Emotional Distress

Defendants contend that Count 12 should be dismissed because "a plaintiff must allege either physical injury or a special relationship of trust owed to the plaintiff, such as the attorney-client relationship." (Def. Br. at 37 (citing *Tackett v. State Farm Fire and Casualty Ins. Co.*, 653 A.2d. 254, 265 (Del. 1995)). This contention is meritless because defendants misstate the law. *First*, nowhere does *Tackett* (or any other controlling precedent) suggest that a "special relationship of trust" is a necessary element of the tort. *Second*, "[a] line of cases in Delaware has established the rule that the intentional infliction of emotional distress is an independent tort action which does not require an underlying impact or physical injury." *Lloyd v. Jefferson*, 53 F. Supp. 2d 643, 673 (D.

Del. 1999) (citation omitted).  Defendants apparently conflate the intentional tort with its close cousin, negligent infliction of emotional distress, which is not at issue here.

The Complaint alleges that the defendants sought to have Plaintiff imprisoned and "eliminated" professionally without any legal or logical basis.  They have done so by misusing official authority to benefit family and friends.  This retaliatory scheme culminated in Rocanelli pouncing when she knew that the unsuspecting Plaintiff, traveling out of the country, was helpless to fight back.  Plaintiff has been viciously attacked and deeply humiliated.  His professional career may have been ended, as a practical matter, or at least severely harmed.  The jury could reasonably find that such conduct is outrageous enough to merit compensatory relief.

### B.    Tortious Interference

Defendants contend that Count 13 of the Complaint fails to allege a breach or that defendants acted without justification.  (Def. Br. at 38.)  In reality, the Complaint *does* allege breaches.  ¶ 171.  Although said breaches need not be alleged with particularity, the Complaint does put the defendants on notice of at least one specific instance of prospective economic advantage interfered with.  ¶ 75.  The Complaint also alleges that defendants acted for improper reasons and thus without justification.  ¶¶ 168-69.  "The term 'improper'…has essentially the same meaning as 'without justification' or 'without privilege.'"  *Lloyd*, 53 F. Supp. 2d at 676.  At trial, or at least after the completion of discovery, the factfinder can assess the following factors to determine whether the interference was improper or not: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the

- 34 -

parties." *Id.* at 677 (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 993 (Del. Ch. 1987)). As no discovery has been propounded or produced, this proceeding is not yet ripe for such fact-intensive analysis. *Cf. id.* at 678 (denying defendants' motion for summary judgment on claim of tortious interference). As all elements of tortious interference are alleged, nothing more is required to state a claim.

Accordingly, as Count 13 of the Complaint meets or exceeds the notice pleading standard under Fed. R. Civ. P. 8, defendants' motion should be denied.

### C.   Malicious Prosecution

Defendants contend that Count 11 fails to state a claim because the criminal matter and the disciplinary proceedings have not been terminated in Plaintiff's favor. As this contention is raised prematurely, Plaintiff respectfully submits that it be deferred until the dismissal of the related matters. Accordingly, once the criminal matter is formally terminated in Plaintiff's favor, this contention will be moot as to the claim for malicious prosecution with respect to the criminal matter. Plaintiff is amenable to a narrowly-delimited stay of this claim pending termination of related proceedings.

### D.   Rule 10 is Inapplicable and Void

Rocanelli contends that all claims against her are barred by Rule 10 of the Delaware Lawyers' Rules of Disciplinary Procedure, which states, in relevant part, that "members of the ODC…shall be immune from civil suit for any conduct in the discharge of their official duties." *First*, making all inferences in Plaintiff's favor at this juncture, Rule 10 is inapplicable because defendant Rocanelli's blatant and repeated abuse of her official authority does not constitute "conduct in the discharge of [her] official duties." *Second*, Rule 10 is plainly void as pre-empted insofar as it conflicts with the Supremacy

- 35 -

Clause.[20]  *Third*, Rule 10 is void because it violates Article I, § 9 of the Delaware

Constitution, which provides that "every person for an injury done him or her in his or

her reputation, person, movable or immovable possessions, shall have remedy by the due

course of law."  *Fourth*, as set forth below, Rule 10 is void as *ultra vires*.

The Delaware Supreme Court cannot confer immunity from suit by judicial fiat.

*Cf. McClendon v. Coverdale*, 203 A.2d 815, 817 (Del. Super. 1964) (absolute immunity

for certain statements to suit for slander may be created by legislature but not by

judiciary).  Article II, § 1 of the Delaware Constitution vests legislative authority solely

in the State's General Assembly.  Such authority includes granting immunity from suit.

*See, e.g.,* 29 *Del. C.* § 9008A (immunity for Office of Child Advocate personnel); 18 *Del.

C.* § 2409 (immunity in connection with reporting insurance fraud); 16 *Del. C.* § 6801

(immunity for rendering emergency care).[21]  Rocanelli does not cite any delegation of

this authority by the legislature to the Delaware judiciary.  *Cf. Green v. Wilmington Sav.

Fund Soc.*, 310 A.2d 638, 640 n.3 (Del. 1973) ("Indeed, the constitutionality of a

statutory assignment to the judiciary of such legislative function would be highly

questionable under the separation of powers doctrine." (citation omitted)).  Nor could

she.  Bestowing immunity from suit is not within the defined scope of judicial rule-

making authorized by 10 *Del. C.* § 161(a).  Moreover, Rule 10 violates 10 *Del. C.*

---

[20] Under the Supremacy Clause (U.S. Const. art VI, § 2), any state law which interferes with or is contrary to a federal law must yield to that federal law.  Thus, § 1983 certainly trumps Rule 10.  Further, the State may not expand any immunity available to a person or entity.  *See, e.g., Howlett v. Rose*, 496 U.S. 356, 375 (1990) ("If the [court below] meant to hold that governmental entities subject to 1983 liability enjoy an immunity over and above those already provided in 1983, that holding directly violates federal law."); *Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. 1983 or 1985(3) cannot be immunized by state law." (quoting *Hampton v. Chicago*, 484 F.2d 602, 607 (7th Cir. 1973))).

[21] *Cf. Ferri v. Ackerman*, 444 U.S. 193, 205 (1979) (denying absolute immunity to court-appointed defense counsel despite resultant disincentive to seek or accept such appointments, observing that "[w]hether a sufficient need can be demonstrated that would justify such a rule [of immunity], or whether such a problem might be better remedied by adjusting the level of compensation, are *questions that can most appropriately be answered by a legislative body* acting on the basis of empirical data." (emphasis added)); *Clinton v. Jones*, 520 U.S. 681, 683 (1997) ("If Congress deems it appropriate to afford the President stronger protection [from civil actions], it may respond with appropriate legislation.").

§ 161(c), which provides that "[t]he [Supreme Court] Rules *shall not abridge*, enlarge or modify *any substantive right of any party*." (Emphasis added.) Abolishing a party's right to sue undoubtedly "abridges" that party's substantive rights. Accordingly, Rule 10 is specifically barred by § 161(c) as well as *ultra vires* with respect to § 161(a).

Accordingly, Rule 10 is inapplicable as well as void as *ultra vires* and insofar as it violates the Supremacy Clause and the Delaware Constitution.

## VII.  THE COMPLAINT STATES A JUSTICIABLE CLAIM FOR DECLARATORY JUDGMENT

The Complaint alleges that, through the disciplinary and criminal proceedings against Plaintiff, the defendants and the State have stepped into PayPal's shoes to thwart Plaintiff's exercise of his First Amendment rights and to retaliate against Plaintiff for attempting to hold PayPal accountable in a court of law. As a critical aspect of the controversy between PayPal and Plaintiff arises from disputed provisions in PayPal's user agreement, declaratory judgment affirming the rights and obligations of Plaintiff and PayPal under the user agreement would expose the futility of the criminal prosecution.

Defendants contend that the Complaint's claim for declaratory judgment is not justiciable because *inter alia* "Plaintiff was not indicted for entering into a contract with PayPal." (Def. Br. at 28.) This contention flatly contradicts the Complaint's allegations, rather than taking them as true—as the defendants must on a Rule 12(b)(6) motion to dismiss. Viewed in the light most favorable to the Plaintiff, the criminal prosecution and disciplinary proceeding are, in effect, *parens patriae* suits which, by definition, involve the government as the real party in interest. *See* BLACK'S LAW DICTIONARY 1137 (7th ed. 1999) (*parens patriae* is "[a] doctrine by which a government has *standing* to prosecute a lawsuit on behalf of a citizen") (emphasis added); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258-59 (1972) (discussing "the right of a State to sue as *parens patriae*").

Alternatively, the Court may reasonably infer from the Complaint that the defendants and the State have stepped into PayPal's shoes without invoking the *parens patriae* doctrine. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982) ("[A] State may, for a variety of reasons, attempt to pursue the interests of a private party, and pursue those interests only for the sake of the real party in interest.").

However viewed, a "real and substantial controversy" exists between Plaintiff and the defendants (as well as the State). The facts set forth in the Complaint are not hypothetical— in the disciplinary and criminal proceedings, the defendants and the State have sued Plaintiff in connection with the PayPal user agreement. Plaintiff insists that the terms of the user agreement expose the fatal flaws and futility of all charges and accusations against him, while the defendants maintain that Plaintiff misused the user agreement. A declaration of Plaintiff's rights and obligations under the user agreement will resolve this controversy and bind the parties in pending matters.

Accordingly, defendants' motion to dismiss Count 14 should be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully submits that this Court should deny defendants' motion in its entirety. Leave to amend is respectfully requested if the Court determines that any claim is inadequately pleaded.

DATED:        April 3, 2006              Respectfully submitted,

/s/ *Joseph N. Gielata*
Joseph N. Gielata (#4338), *pro se*
501 Silverside Road, No. 90
Wilmington, Delaware 19809
(302) 798-1096

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on April 3, 2006, I electronically filed PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT with the Clerk of Court using CM/ECF which will send notification of such filing to:

Richard Hubbard, Esq.
Delaware Dept. of Justice
820 N. French St., 6th Floor
Carvel State Building
Wilmington, DE 19801

*Attorney for Defendants*

 /s/ *Joseph N. Gielata*
Joseph N. Gielata