# Exhibit A

(Slip Opinion)          OCTOBER TERM, 2005          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HUDSON *v.* MICHIGAN

### CERTIORARI TO THE COURT OF APPEALS OF MICHIGAN

No. 04–1360.   Argued January 9, 2006—Reargued May 18, 2006—
Decided June 15, 2006

Detroit police executing a search warrant for narcotics and weapons entered petitioner Hudson's home in violation of the Fourth Amendment's "knock-and-announce" rule. The trial court granted Hudson's motion to suppress the evidence seized, but the Michigan Court of Appeals reversed on interlocutory appeal. Hudson was convicted of drug possession. Affirming, the State Court of Appeals rejected Hudson's renewed Fourth Amendment claim.

*Held:* The judgment is affirmed.

Affirmed.

JUSTICE SCALIA delivered the opinion of the Court with respect to Parts I, II, and III, concluding that violation of the "knock-and-announce" rule does not require suppression of evidence found in a search. Pp. 2–13.

(a) Because Michigan has conceded that the entry here was a knock-and-announce violation, the only issue is whether the exclusionary rule is appropriate for such a violation. Pp. 2–3.

(b) This Court has rejected "[i]ndiscriminate application" of the exclusionary rule, *United States* v. *Leon,* 468 U. S. 897, 908, holding it applicable only "where its deterrence benefits outweigh its 'substantial social costs,'" *Pennsylvania Bd. of Probation and Parole* v. *Scott,* 524 U. S. 357, 363. Exclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining the evidence. The illegal entry here was not the but-for cause, but even if it were, but-for causation can be too attenuated to justify exclusion. Attenuation can occur not only when the causal connection is remote, but also when suppression would not serve the interest protected by the constitutional guarantee violated. The interests protected by the knock-and-announce rule include human life and limb (because an

2                     HUDSON *v.* MICHIGAN

Syllabus

unannounced entry may provoke violence from a surprised resident),
property (because citizens presumably would open the door upon an
announcement, whereas a forcible entry may destroy it), and privacy
and dignity of the sort that can be offended by a sudden entrance.
But the rule has never protected one's interest in preventing the gov-
ernment from seeing or taking evidence described in a warrant.
Since the interests violated here have nothing to do with the seizure
of the evidence, the exclusionary rule is inapplicable. Pp. 3–7.

(c) The social costs to be weighed against deterrence are consider-
able here. In addition to the grave adverse consequence that exclud-
ing relevant incriminating evidence always entails—the risk of re-
leasing dangerous criminals—imposing such a massive remedy would
generate a constant flood of alleged failures to observe the rule, and
claims that any asserted justification for a no-knock entry had inade-
quate support. Another consequence would be police officers' refrain-
ing from timely entry after knocking and announcing, producing pre-
ventable violence against the officers in some cases, and the
destruction of evidence in others. Next to these social costs are the
deterrence benefits. The value of deterrence depends on the strength
of the incentive to commit the forbidden act. That incentive is mini-
mal here, where ignoring knock-and-announce can realistically be
expected to achieve nothing but the prevention of evidence destruc-
tion and avoidance of life-threatening resistance, dangers which sus-
pend the requirement when there is "reasonable suspicion" that they
exist, *Richards* v. *Wisconsin,* 520 U. S. 385, 394. Massive deterrence
is hardly necessary. Contrary to Hudson's argument that without
suppression there will be no deterrence, many forms of police mis-
conduct are deterred by civil-rights suits, and by the consequences of
increasing professionalism of police forces, including a new emphasis
on internal police discipline. Pp. 8–13.

JUSTICE SCALIA, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and
JUSTICE ALITO, concluded in Part IV that *Segura* v. *United States,* 468
U. S. 796, *New York* v. *Harris,* 495 U. S. 14, and *United States* v.
*Ramirez,* 523 U. S. 65, confirm the conclusion that suppression is
unwarranted in this case. Pp. 13–16.

SCALIA, J., delivered the opinion of the Court with respect to Parts I,
II, and III, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO,
JJ., joined, and an opinion with respect to Part IV, in which ROBERTS,
C. J., and THOMAS and ALITO, JJ., joined. KENNEDY, J., filed an opinion
concurring in part and concurring in the judgment. BREYER, J., filed a
dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ.,
joined.

Cite as: 547 U. S. ____ (2006)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–1360

BOOKER T. HUDSON, JR., PETITIONER *v.* MICHIGAN

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MICHIGAN

[June 15, 2006]

JUSTICE SCALIA delivered the opinion of the Court, except as to Part IV.

We decide whether violation of the "knock-and-announce" rule requires the suppression of all evidence found in the search.

## I

Police obtained a warrant authorizing a search for drugs and firearms at the home of petitioner Booker Hudson. They discovered both. Large quantities of drugs were found, including cocaine rocks in Hudson's pocket. A loaded gun was lodged between the cushion and armrest of the chair in which he was sitting. Hudson was charged under Michigan law with unlawful drug and firearm possession.

This case is before us only because of the method of entry into the house. When the police arrived to execute the warrant, they announced their presence, but waited only a short time—perhaps "three to five seconds," App. 15—before turning the knob of the unlocked front door and entering Hudson's home. Hudson moved to suppress all the inculpatory evidence, arguing that the premature entry violated his Fourth Amendment rights.

   The Michigan trial court granted his motion.  On inter-
locutory review, the Michigan Court of Appeals reversed,
relying on Michigan Supreme Court cases holding that
suppression is inappropriate when entry is made pursuant
to warrant but without proper "'knock and announce.'"
App. to Pet. for Cert. 4 (citing *People* v. *Vasquez*, 461 Mich.
235, 602 N. W. 2d 376 (1999) *(per curiam); People* v. *Ste-
vens*, 460 Mich. 626, 597 N. W. 2d 53 (1999)).  The Michi-
gan Supreme Court denied leave to appeal.  465 Mich.
932, 639 N. E. 2d 255 (2001).  Hudson was convicted of
drug possession.  He renewed his Fourth Amendment
claim on appeal, but the Court of Appeals rejected it and
affirmed the conviction.  App. to Pet. for Cert. 1–2.  The
Michigan Supreme Court again declined review.  472
Mich. 862, 692 N. W. 2d 385 (2005).  We granted certio-
rari. 545 U. S. ___ (2005).

                              II

   The common-law principle that law enforcement officers
must announce their presence and provide residents an
opportunity to open the door is an ancient one.  See *Wilson*
v. *Arkansas,* 514 U. S. 927, 931–932 (1995).  Since 1917,
when Congress passed the Espionage Act, this traditional
protection has been part of federal statutory law, see 40
Stat. 229, and is currently codified at 18 U. S. C. §3109.  We
applied that statute in *Miller* v. *United States,* 357 U. S. 301
(1958), and again in *Sabbath* v. *United States,* 391 U. S. 585
(1968).  Finally, in *Wilson*, we were asked whether the rule
was also a command of the Fourth Amendment.  Tracing its
origins in our English legal heritage, 514 U. S., at 931–936,
we concluded that it was.

   We recognized that the new constitutional rule we had
announced is not easily applied.  *Wilson* and cases follow-
ing it have noted the many situations in which it is not
necessary to knock and announce.  It is not necessary
when "circumstances presen[t] a threat of physical vio-

lence," or if there is "reason to believe that evidence would likely be destroyed if advance notice were given," *id.*, at 936, or if knocking and announcing would be "futile," *Richards* v. *Wisconsin,* 520 U. S. 385, 394 (1997). We require only that police "have a reasonable suspicion . . . under the particular circumstances" that one of these grounds for failing to knock and announce exists, and we have acknowledged that "[t]his showing is not high." *Ibid.*

When the knock-and-announce rule does apply, it is not easy to determine precisely what officers must do. How many seconds' wait are too few? Our "reasonable wait time" standard, see *United States* v. *Banks,* 540 U. S. 31, 41 (2003), is necessarily vague. *Banks* (a drug case, like this one) held that the proper measure was not how long it would take the resident to reach the door, but how long it would take to dispose of the suspected drugs—but that such a time (15 to 20 seconds in that case) would necessarily be extended when, for instance, the suspected contraband was not easily concealed. *Id.*, at 40–41. If our *ex post* evaluation is subject to such calculations, it is unsurprising that, *ex ante*, police officers about to encounter someone who may try to harm them will be uncertain how long to wait.

Happily, these issues do not confront us here. From the trial level onward, Michigan has conceded that the entry was a knock-and-announce violation. The issue here is remedy. *Wilson* specifically declined to decide whether the exclusionary rule is appropriate for violation of the knock-and-announce requirement. 514 U. S., at 937, n. 4. That question is squarely before us now.

### III

#### A

In *Weeks* v. *United States,* 232 U. S. 383 (1914), we adopted the federal exclusionary rule for evidence that was unlawfully seized from a home without a warrant in violation of the Fourth Amendment. We began applying the

Opinion of the Court

same rule to the States, through the Fourteenth Amendment, in *Mapp* v. *Ohio,* 367 U. S. 643 (1961).

Suppression of evidence, however, has always been our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," *United States* v. *Leon,* 468 U. S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large. We have therefore been "cautio[us] against expanding" it, *Colorado* v. *Connelly,* 479 U. S. 157, 166 (1986), and "have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application," *Pennsylvania Bd. of Probation and Parole* v. *Scott,* 524 U. S. 357, 364–365 (1998) (citation omitted). We have rejected "[i]ndiscriminate application" of the rule, *Leon, supra,* at 908, and have held it to be applicable only "where its remedial objectives are thought most efficaciously served," *United States* v. *Calandra,* 414 U. S. 338, 348 (1974)—that is, "where its deterrence benefits outweigh its 'substantial social costs,'" *Scott, supra,* at 363 (quoting *Leon, supra,* at 907).

We did not always speak so guardedly. Expansive dicta in *Mapp,* for example, suggested wide scope for the exclusionary rule. See, *e.g.,* 367 U. S., at 655 ("[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"). *Whiteley* v. *Warden, Wyo. State Penitentiary,* 401 U. S. 560, 568–569 (1971), was to the same effect. But we have long since rejected that approach. As explained in *Arizona* v. *Evans,* 514 U. S. 1, 13 (1995): "In *Whiteley,* the Court treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule to evidence secured incident to that violation. Subsequent case law has rejected this reflexive application of the exclusionary rule." (Citation omitted.) We had said as much in *Leon,* a decade earlier, when we explained that "[w]hether the exclusionary sanction is appropriately

Opinion of the Court

imposed in a particular case, . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" 468 U. S., at 906 (quoting *Illinois* v. *Gates*, 462 U. S. 213, 223 (1983)).

In other words, exclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression. In this case, of course, the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred *or not*, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house. But even if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.'" *Segura* v. *United States,* 468 U. S. 796, 815 (1984). See also *id.*, at 829 (STEVENS, J., dissenting) ("We have not . . . mechanically applied the [exclusionary] rule to every item of evidence that has a causal connection with police misconduct"). Rather, but-for cause, or "causation in the logical sense alone," *United States* v. *Ceccolini*, 435 U. S. 268, 274 (1978), can be too attenuated to justify exclusion, *id.*, at 274–275. Even in the early days of the exclusionary rule, we declined to

> "hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means suf-

Opinion of the Court

ficiently distinguishable to be purged of the primary taint.'" *Wong Sun* v. *United States,* 371 U. S. 471, 487– 488 (1963) (quoting J. Maguire, Evidence of Guilt 221 (1959) (emphasis added)).

Attenuation can occur, of course, when the causal connection is remote. See, *e.g., Nardone* v. *United States*, 308 U. S. 338, 341 (1939). Attenuation also occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained. "The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *Ceccolini*, *supra*, at 279. Thus, in *New York* v. *Harris,* 495 U. S. 14 (1990), where an illegal warrantless arrest was made in Harris' house, we held that

> "suppressing [Harris'] statement taken outside the house would not serve the purpose of the rule that made Harris' in-house arrest illegal. The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated." *Id.*, at 20.

For this reason, cases excluding the fruits of unlawful warrantless searches, see, *e.g., Boyd* v. *United States,* 116 U. S. 616 (1886); *Weeks*, 232 U. S. 383; *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920); *Mapp*, *supra*, say nothing about the appropriateness of exclusion to vindicate the interests protected by the knock-and-announce requirement. Until a valid warrant has issued, citizens are entitled to shield "their persons, houses, papers, and effects," U. S. Const., Amdt. 4, from the government's scrutiny. Exclusion of the evidence obtained by a war-

Opinion of the Court

rantless search vindicates that entitlement. The interests protected by the knock-and-announce requirement are quite different—and do not include the shielding of potential evidence from the government's eyes.

One of those interests is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident. See, *e.g., McDonald* v. *United States,* 335 U. S. 451, 460–461 (1948) (Jackson, J., concurring). See also *Sabbath*, 391 U. S., at 589; *Miller*, 357 U. S., at 313, n. 12. Another interest is the protection of property. Breaking a house (as the old cases typically put it) absent an announcement would penalize someone who "'did not know of the process, of which, if he had notice, it is to be presumed that he would obey it . . . .'" *Wilson*, 514 U. S., at 931–932 (quoting *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195–196 (K. B. 1603)). The knock-and-announce rule gives individuals "the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." *Richards*, 520 U. S., at 393, n. 5. See also *Banks,* 540 U. S., at 41. And thirdly, the knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the "opportunity to prepare themselves for" the entry of the police. *Richards*, 520 U. S., at 393, n. 5. "The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed." *Ibid.* In other words, it assures the opportunity to collect oneself before answering the door.

What the knock-and-announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant. Since the interests that *were* violated in this case have nothing to do with the seizure of the evidence, the exclusionary rule is inapplicable.

Opinion of the Court

### B

Quite apart from the requirement of unattenuated causation, the exclusionary rule has never been applied except "where its deterrence benefits outweigh its 'substantial social costs,'" *Scott,* 524 U. S., at 363 (quoting *Leon,* 468 U. S., at 907). The costs here are considerable. In addition to the grave adverse consequence that exclusion of relevant incriminating evidence always entails (viz., the risk of releasing dangerous criminals into society), imposing that massive remedy for a knock-and-announce violation would generate a constant flood of alleged failures to observe the rule, and claims that any asserted *Richards* justification for a no-knock entry, see 520 U. S., at 394, had inadequate support. Cf. *United States* v. *Singleton,* 441 F. 3d 290, 293–294 (CA4 2006). The cost of entering this lottery would be small, but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail-free card. Courts would experience as never before the reality that "[t]he exclusionary rule frequently requires extensive litigation to determine whether particular evidence must be excluded." *Scott, supra,* at 366. Unlike the warrant or *Miranda* requirements, compliance with which is readily determined (either there was or was not a warrant; either the *Miranda* warning was given, or it was not), what constituted a "reasonable wait time" in a particular case, *Banks, supra,* at 41 (or, for that matter, how many seconds the police in fact waited), or whether there was "reasonable suspicion" of the sort that would invoke the *Richards* exceptions, is difficult for the trial court to determine and even more difficult for an appellate court to review.

Another consequence of the incongruent remedy Hudson proposes would be police officers' refraining from timely entry after knocking and announcing. As we have observed, see *supra,* at 3, the amount of time they must wait is necessarily uncertain. If the consequences of running

Opinion of the Court

afoul of the rule were so massive, officers would be in-
clined to wait longer than the law requires—producing
preventable violence against officers in some cases, and
the destruction of evidence in many others. See *Gates*, 462
U. S., at 258. We deemed these consequences severe
enough to produce our unanimous agreement that a mere
"reasonable suspicion" that knocking and announcing
"under the particular circumstances, would be dangerous
or futile, or that it would inhibit the effective investigation
of the crime," will cause the requirement to yield. *Rich-
ards, supra,* at 394.

Next to these "substantial social costs" we must consider
the deterrence benefits, existence of which is a necessary
condition for exclusion. (It is not, of course, a sufficient
condition: "[I]t does not follow that the Fourth Amend-
ment requires adoption of every proposal that might deter
police misconduct." *Calandra*, 414 U. S., at 350; see also
*Leon, supra,* at 910.) To begin with, the value of deter-
rence depends upon the strength of the incentive to com-
mit the forbidden act. Viewed from this perspective,
deterrence of knock-and-announce violations is not worth
a lot. Violation of the warrant requirement sometimes
produces incriminating evidence that could not otherwise
be obtained. But ignoring knock-and-announce can realis-
tically be expected to achieve absolutely nothing except
the prevention of destruction of evidence and the avoid-
ance of life-threatening resistance by occupants of the
premises—dangers which, if there is even "reasonable
suspicion" of their existence, *suspend the knock-and-
announce requirement anyway.* Massive deterrence is
hardly required.

It seems to us not even true, as Hudson contends, that
without suppression there will be no deterrence of knock-
and-announce violations at all. Of course even if this
assertion were accurate, it would not necessarily justify
suppression. Assuming (as the assertion must) that civil

Opinion of the Court

suit is not an effective deterrent, one can think of many forms of police misconduct that are similarly "undeterred." When, for example, a confessed suspect in the killing of a police officer, arrested (along with incriminating evidence) in a lawful warranted search, is subjected to physical abuse at the station house, would it seriously be suggested that the evidence must be excluded, since that is the only "effective deterrent"?  And what, other than civil suit, is the "effective deterrent" of police violation of an already-confessed suspect's Sixth Amendment rights by denying him prompt access to counsel?  Many would regard these violated rights as more significant than the right not to be intruded upon in one's nightclothes—and yet nothing but "ineffective" civil suit is available as a deterrent.  And the police incentive for those violations is arguably greater than the incentive for disregarding the knock-and-announce rule.

  We cannot assume that exclusion in this context is necessary deterrence simply because we found that it was necessary deterrence in different contexts and long ago. That would be forcing the public today to pay for the sins and inadequacies of a legal regime that existed almost half a century ago.  Dollree Mapp could not turn to 42 U. S. C. §1983 for meaningful relief; *Monroe* v. *Pape,* 365 U. S. 167 (1961), which began the slow but steady expansion of that remedy, was decided the same Term as *Mapp.*  It would be another 17 years before the §1983 remedy was extended to reach the deep pocket of municipalities, *Monell* v. *New York City Dept. of Social Servs.,* 436 U. S. 658 (1978). Citizens whose Fourth Amendment rights were violated by federal officers could not bring suit until 10 years after *Mapp,* with this Court's decision in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971).

  Hudson complains that "it would be very hard to find a lawyer to take a case such as this," Tr. of Oral Arg. 7, but 42 U. S. C. §1988(b) answers this objection.  Since some

Opinion of the Court

civil-rights violations would yield damages too small to justify the expense of litigation, Congress has authorized attorney's fees for civil-rights plaintiffs. This remedy was unavailable in the heydays of our exclusionary-rule juris-prudence, because it is tied to the availability of a cause of action. For years after *Mapp*, "very few lawyers would even consider representation of persons who had civil rights claims against the police," but now "much has changed. Citizens and lawyers are much more willing to seek relief in the courts for police misconduct." M. Avery, D. Rudovsky, & K. Blum, Police Misconduct: Law and Litigation, p. v (3d ed. 2005); see generally N. Aron, Liberty and Justice for All: Public Interest Law in the 1980s and Beyond (1989) (describing the growth of public-interest law). The number of public-interest law firms and lawyers who specialize in civil-rights grievances has greatly expanded.

Hudson points out that few published decisions to date announce huge awards for knock-and-announce violations. But this is an unhelpful statistic. Even if we thought that only large damages would deter police misconduct (and that police somehow are deterred by "damages" but indif-ferent to the prospect of large §1988 attorney's fees), we do not know how many claims have been settled, or indeed how many violations have occurred that produced any-thing more than nominal injury. It is clear, at least, that the lower courts are allowing colorable knock-and-announce suits to go forward, unimpeded by assertions of qualified immunity. See, *e.g.*, *Green* v. *Butler*, 420 F. 3d 689, 700–701 (CA7 2005) (denying qualified immunity in a knock-and-announce civil suit); *Holland ex rel. Overdorff* v. *Harrington*, 268 F. 3d 1179, 1193–1196 (CA10 2001) (same); *Mena* v. *Simi Valley*, 226 F. 3d 1031, 1041–1042 (CA9 2000) (same); *Gould* v. *Davis*, 165 F. 3d 265, 270–271 (CA4 1998) (same). As far as we know, civil liability is an effective deterrent here, as we have assumed it is in other

Opinion of the Court

contexts. See, *e.g.*, *Correctional Services Corp.* v. *Malesko,* 534 U. S. 61, 70 (2001) ("[T]he threat of litigation and liability will adequately deter federal officers for *Bivens* purposes no matter that they may enjoy qualified immunity" (as violators of knock-and-announce do not)); see also *Nix* v. *Williams,* 467 U. S. 431, 446 (1984).

Another development over the past half-century that deters civil-rights violations is the increasing professionalism of police forces, including a new emphasis on internal police discipline. Even as long ago as 1980 we felt it proper to "assume" that unlawful police behavior would "be dealt with appropriately" by the authorities, *United States* v. *Payner,* 447 U. S. 727, 733–734, n. 5 (1980), but we now have increasing evidence that police forces across the United States take the constitutional rights of citizens seriously. There have been "wide-ranging reforms in the education, training, and supervision of police officers." S. Walker, Taming the System: The Control of Discretion in Criminal Justice 1950–1990, p. 51 (1993). Numerous sources are now available to teach officers and their supervisors what is required of them under this Court's cases, how to respect constitutional guarantees in various situations, and how to craft an effective regime for internal discipline. See, *e.g.*, D. Waksman & D. Goodman, The Search and Seizure Handbook (2d ed. 2006); A. Stone & S. DeLuca, Police Administration: An Introduction (2d ed. 1994); E. Thibault, L. Lynch, & R. McBridge, Proactive Police Management (4th ed. 1998). Failure to teach and enforce constitutional requirements exposes municipalities to financial liability. See *Canton* v. *Harris,* 489 U. S. 378, 388 (1989). Moreover, modern police forces are staffed with professionals; it is not credible to assert that internal discipline, which can limit successful careers, will not have a deterrent effect. There is also evidence that the increasing use of various forms of citizen review can enhance police accountability.

In sum, the social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial—incomparably greater than the factors deterring warrantless entries when *Mapp* was decided. Resort to the massive remedy of suppressing evidence of guilt is unjustified.

## IV

A trio of cases—*Segura* v. *United States,* 468 U. S. 796 (1984); *New York* v. *Harris,* 495 U. S. 14 (1990); and *United States* v. *Ramirez,* 523 U. S. 65 (1998)—confirms our conclusion that suppression is unwarranted in this case.

Like today's case, *Segura* involved a concededly illegal entry. Police conducting a drug crime investigation waited for Segura outside an apartment building; when he arrived, he denied living there. The police arrested him and brought him to the apartment where they suspected illegal activity. An officer knocked. When someone inside opened the door, the police entered, taking Segura with them. They had neither a warrant nor consent to enter, and they did not announce themselves as police—an entry as illegal as can be. Officers then stayed in the apartment for *19 hours* awaiting a search warrant. 468 U. S., at 800–801; *id.,* at 818–819 (STEVENS, J., dissenting). Once alerted that the search warrant had been obtained, the police—still inside, having secured the premises so that no evidence could be removed—conducted a search. *Id.,* at 801. We refused to exclude the resulting evidence. We recognized that only the evidence gained from the particular violation could be excluded, see *id.,* at 799, 804–805, and therefore distinguished the effects of the illegal entry from the effects of the legal search: "None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners'

14          HUDSON *v.* MICHIGAN

Opinion of SCALIA, J.

apartment . . . ." *Id.*, at 814. It was therefore "beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged." *Ibid.*

If the search in *Segura* could be "wholly unrelated to the prior entry," *ibid.*, when the only entry was warrantless, it would be bizarre to treat more harshly the actions in this case, where the only entry was *with* a warrant. If the probable cause backing a warrant that was issued *later in time* could be an "independent source" for a search that proceeded after the officers illegally entered and waited, a search warrant obtained *before* going in must have at least this much effect.[1]

In the second case, *Harris*, the police violated the defendant's Fourth Amendment rights by arresting him at home without a warrant, contrary to *Payton* v. *New York,* 445 U. S. 573 (1980). Once taken to the station house, he gave an incriminating statement. See 495 U. S., at 15–16. We refused to exclude it. Like the illegal entry which led

---

[1] JUSTICE BREYER's insistence that the warrant in *Segura* was "obtained independently without use of any information found during the illegal entry," *post,* at 14 (dissenting opinion), entirely fails to distinguish it from the warrant in the present case. Similarly inapposite is his appeal to Justice Frankfurter's statement in *Wolf* v. *Colorado,* 338 U. S. 25, 28 (1949), that the "knock at the door, . . . as a prelude to a search, without authority of law . . . [is] inconsistent with the conception of human rights enshrined in [our] history," see *post,* at 17. "How much the more offensive," JUSTICE BREYER asserts, "when the search takes place without any knock at all," *ibid.* But a no-knock entry "without authority of law" (*i.e.*, without a search warrant) describes not this case, but *Segura*—where the evidence was admitted anyway.

JUSTICE BREYER's assertion that *Segura*, unlike our decision in the present case, had no effect on deterrence, see *post,* at 23, does not comport with the views of the *Segura* dissent. See, *e.g.*, 468 U. S., at 817 (STEVENS, J., dissenting) ("The Court's disposition, I fear, will provide government agents with an affirmative incentive to engage in unconstitutional violations of the privacy of the home").

Opinion of SCALIA, J.

to discovery of the evidence in today's case, the illegal arrest in *Harris* began a process that culminated in acquisition of the evidence sought to be excluded. While Harris's statement was "the product of an arrest and being in custody," it "was not the fruit of the fact that the arrest was made in the house rather than someplace else." *Id.*, at 20. Likewise here: While acquisition of the gun and drugs was the product of a search pursuant to warrant, it was not the fruit of the fact that the entry was not preceded by knock and announce.[2]

*United States* v. *Ramirez, supra,* involved a claim that police entry violated the Fourth Amendment because it was effected by breaking a window. We ultimately concluded that the property destruction was, under all the circumstances, reasonable, but in the course of our discussion we unanimously said the following: "[D]estruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *Id.,* at 71. Had the breaking of the window been unreasonable, the Court said, it would have been necessary to determine whether there had been a "sufficient causal relationship between the breaking of the window and the discovery of the guns to warrant suppression of the evidence." *Id.*, at 72, n. 3. What clearer expression could there be of the proposition that an

—————

[2]*Harris* undermines two key points of the dissent. First, the claim that "whether the interests underlying the knock-and-announce rule are implicated in any given case is, in a sense, beside the point," *post*, at 18. This is flatly refuted by *Harris*'s plain statement that the reason for a rule must govern the sanctions for the rule's violation. 495 U. S., at 17, 20; see also *supra*, at 6. Second, the dissent's attempt to turn *Harris* into a vindication of the sanctity of the home, see *post*, at 24. The whole point of the case was that a confession that police obtained by illegally removing a man from the sanctity of his home was admissible against him.

16                    HUDSON *v*. MICHIGAN

Opinion of SCALIA, J.

impermissible manner of entry does not necessarily trigger
the exclusionary rule?

\*          \*          \*

For the foregoing reasons we affirm the judgment of the
Michigan Court of Appeals.

*It is so ordered.*

Opinion of KENNEDY, J.

# SUPREME COURT OF THE UNITED STATES

————————

No. 04–1360

————————

## BOOKER T. HUDSON, JR., PETITIONER *v.* MICHIGAN

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
MICHIGAN

[June 15, 2006]

JUSTICE KENNEDY, concurring in part and concurring in
the judgment.

Two points should be underscored with respect to to-
day's decision.  First, the knock-and-announce require-
ment protects rights and expectations linked to ancient
principles in our constitutional order.  See *Wilson* v. *Ar-
kansas,* 514 U. S. 927, 934 (1995).  The Court's decision
should not be interpreted as suggesting that violations of
the requirement are trivial or beyond the law's concern.
Second, the continued operation of the exclusionary rule,
as settled and defined by our precedents, is not in doubt.
Today's decision determines only that in the specific con-
text of the knock-and-announce requirement, a violation is
not sufficiently related to the later discovery of evidence to
justify suppression.

As to the basic right in question, privacy and security in
the home are central to the Fourth Amendment's guaran-
tees as explained in our decisions and as understood since
the beginnings of the Republic.  This common understand-
ing ensures respect for the law and allegiance to our insti-
tutions, and it is an instrument for transmitting our Con-
stitution to later generations undiminished in meaning
and force.  It bears repeating that it is a serious matter if
law enforcement officers violate the sanctity of the home
by ignoring the requisites of lawful entry.  Security must
not be subject to erosion by indifference or contempt.

Opinion of KENNEDY, J.

Our system, as the Court explains, has developed proce-
dures for training police officers and imposing discipline
for failures to act competently and lawfully.  If those
measures prove ineffective, they can be fortified with more
detailed regulations or legislation.  Supplementing these
safeguards are civil remedies, such as those available
under 42 U. S. C. §1983, that provide restitution for dis-
crete harms.  These remedies apply to all violations, in-
cluding, of course, exceptional cases in which unan-
nounced entries cause severe fright and humiliation.

Suppression is another matter.  Under our precedents
the causal link between a violation of the knock-and-
announce requirement and a later search is too attenuated
to allow suppression.  Cf. *United States* v. *Ramirez,* 523
U. S. 65, 72, n. 3 (1998) (application of the exclusionary
rule depends on the existence of a "sufficient causal rela-
tionship" between the unlawful conduct and the discovery
of evidence).  When, for example, a violation results from
want of a 20-second pause but an ensuing, lawful search
lasting five hours discloses evidence of criminality, the
failure to wait at the door cannot properly be described as
having caused the discovery of evidence.

Today's decision does not address any demonstrated
pattern of knock-and-announce violations.  If a widespread
pattern of violations were shown, and particularly if those
violations were committed against persons who lacked the
means or voice to mount an effective protest, there would
be reason for grave concern.  Even then, however, the
Court would have to acknowledge that extending the
remedy of exclusion to all the evidence seized following a
knock-and-announce violation would mean revising the
requirement of causation that limits our discretion in
applying the exclusionary rule.  That type of extension
also would have significant practical implications, adding
to the list of issues requiring resolution at the criminal
trial questions such as whether police officers entered a

Opinion of KENNEDY, J.

home after waiting 10 seconds or 20.

In this case the relevant evidence was discovered not because of a failure to knock-and-announce, but because of a subsequent search pursuant to a lawful warrant. The Court in my view is correct to hold that suppression was not required. While I am not convinced that *Segura* v. *United States,* 468 U. S. 796 (1984), and *New York* v. *Harris,* 495 U. S. 14 (1990), have as much relevance here as JUSTICE SCALIA appears to conclude, the Court's holding is fully supported by Parts I through III of its opinion. I accordingly join those Parts and concur in the judgment.

Cite as: 547 U. S. ____ (2006)          1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 04–1360

―――――――

## BOOKER T. HUDSON, JR., PETITIONER *v.* MICHIGAN

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
MICHIGAN

[June 15, 2006]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE
SOUTER, and JUSTICE GINSBURG join, dissenting.

In *Wilson* v. *Arkansas,* 514 U. S. 927 (1995), a unani-
mous Court held that the Fourth Amendment normally
requires law enforcement officers to knock and announce
their presence before entering a dwelling. Today's opinion
holds that evidence seized from a home following a viola-
tion of this requirement need not be suppressed

As a result, the Court destroys the strongest legal incen-
tive to comply with the Constitution's knock-and-announce
requirement. And the Court does so without significant
support in precedent. At least I can find no such support
in the many Fourth Amendment cases the Court has
decided in the near century since it first set forth the
exclusionary principle in *Weeks* v. *United States,* 232 U. S.
383 (1914). See Appendix, *infra.*

Today's opinion is thus doubly troubling. It represents a
significant departure from the Court's precedents. And it
weakens, perhaps destroys, much of the practical value of
the Constitution's knock-and-announce protection.

## I

This Court has set forth the legal principles that ought
to have determined the outcome of this case in two sets of
basic Fourth Amendment cases. I shall begin by describ-

ing that underlying case law.

### A

The first set of cases describes the constitutional knock-and-announce requirement, a requirement that this Court initially set forth only 11 years ago in *Wilson* v. *Arkansas*, *supra*. Cf. *Sabbath* v. *United States,* 391 U. S. 585 (1968) (suppressing evidence seized in violation of federal statutory knock-and-announce requirement); *Miller* v. *United States,* 357 U. S. 301 (1958) (same). In *Wilson*, tracing the lineage of the knock-and-announce rule back to the 13th century, 514 U. S., at 932, we wrote that

> "[a]n examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering." *Id*., at 931.

We noted that this "basic principle" was agreed upon by "[s]everal prominent founding-era commentators," *id.*, at 932, and "was woven quickly into the fabric of early American law" via state constitutions and statutes, *id*., at 933. We further concluded that there was

> "little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure." *Id*., at 934.

And we held that the "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." *Id*., at 929. Thus, "a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement." *Id.*, at 936; see *United States* v. *Banks*, 540 U. S. 31, 36 (2003); *United States* v. *Ramirez*, 523 U. S. 65, 70 (1998); *Richards* v. *Wisconsin*, 520 U. S. 385, 387 (1997).

BREYER, J., dissenting

## B

The second set of cases sets forth certain well-established principles that are relevant here.  They include:

*Boyd* v. *United States,* 116 U. S. 616 (1886).  In this seminal Fourth Amendment case, decided 120 years ago, the Court wrote, in frequently quoted language, that the Fourth Amendment's prohibitions apply

> "to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life.  It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property."  *Id.,* at 630.

*Weeks, supra.*  This case, decided 28 years after *Boyd,* originated the exclusionary rule.  The Court held that the Federal Government could not retain evidence seized unconstitutionally and use that evidence in a federal criminal trial.  The Court pointed out that "[i]f letters and private documents" could be unlawfully seized from a home "and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and . . . might as well be stricken from the Constitution."  232 U. S., at 393.

*Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920).  This case created an exception to (or a qualification of) *Weeks'* exclusionary rule.  The Court held that the Government could not use information obtained during an illegal search to subpoena documents that they illegally viewed during that search.  Writing for the Court, Justice Holmes noted that the exclusionary rule "does not mean that the facts [unlawfully] obtained become sacred and inaccessible.  If knowledge of them is gained from an

Breyer, J., dissenting

independent source they may be proved like any others . . . ." 251 U. S., at 392. *Silverthorne* thus stands for the proposition that the exclusionary rule does not apply if the evidence in question (or the "fruits" of that evidence) was obtained through a process unconnected with, and untainted by, the illegal search. Cf. *Nix* v. *Williams,* 467 U. S. 431, 444 (1984) (describing related "inevitable discovery" exception).

*Wolf* v. *Colorado,* 338 U. S. 25 (1949), and *Mapp* v. *Ohio,* 367 U. S. 643 (1961). Both of these cases considered whether *Weeks*' exclusionary rule applies to the States. In *Wolf*, the Court held that it did not. It said that "[t]he security of one's privacy against arbitrary intrusion by the police . . . is . . . implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." 338 U. S., at 27–28. But the Court held that the exclusionary rule is not enforceable against the States as "an essential ingredient of the right." *Id.*, at 29. In *Mapp*, the Court overruled *Wolf*. Experience, it said, showed that alternative methods of enforcing the Fourth Amendment's requirements had failed. See 367 U. S., at 651–653; see, *e.g.*, *People* v. *Cahan*, 44 Cal. 2d 434, 447, 282 P. 2d 905, 913 (1955) (Traynor, C. J.) ("Experience [in California] has demonstrated, however, that neither administrative, criminal nor civil remedies are effective in suppressing lawless searches and seizures"). The Court consequently held that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." *Mapp*, 367 U. S., at 655. "To hold otherwise," the Court added, would be "to grant the right but in reality to withhold its privilege and enjoyment." *Id.*, at 656.

## II

Reading our knock-and-announce cases, Part I–A, *supra*, in light of this foundational Fourth Amendment case

BREYER, J., dissenting

law, Part I–B, *supra*, it is clear that the exclusionary rule should apply. For one thing, elementary logic leads to that conclusion. We have held that a court must "conside[r]" whether officers complied with the knock-and-announce requirement "in assessing the reasonableness of a search or seizure." *Wilson*, 514 U. S., at 934 (emphasis added); see *Banks*, 540 U. S., at 36. The Fourth Amendment insists that an unreasonable search or seizure is, constitutionally speaking, an illegal search or seizure. And ever since *Weeks* (in respect to federal prosecutions) and *Mapp* (in respect to state prosecutions), "the use of evidence secured through an illegal search and seizure" is "barred" in criminal trials. *Wolf*, *supra*, at 28 (citing *Weeks*); see *Mapp*, *supra*, at 655.

For another thing, the driving legal purpose underlying the exclusionary rule, namely, the deterrence of unlawful government behavior, argues strongly for suppression. See *Elkins* v. *United States,* 364 U. S. 206, 217 (1960) (purpose of the exclusionary rule is "to deter—to compel respect for the constitutional guaranty . . . by removing the incentive to disregard it"). In *Weeks*, *Silverthorne*, and *Mapp*, the Court based its holdings requiring suppression of unlawfully obtained evidence upon the recognition that admission of that evidence would seriously undermine the Fourth Amendment's promise. All three cases recognized that failure to apply the exclusionary rule would make that promise a hollow one, see *Mapp*, *supra*, at 657, reducing it to "a form of words," *Silverthorne*, *supra,* at 392, "of no value" to those whom it seeks to protect, *Weeks*, *supra*, at 393. Indeed, this Court in *Mapp* held that the exclusionary rule applies to the States in large part due to its belief that alternative state mechanisms for enforcing the Fourth Amendment's guarantees had proved "worthless and futile." 367 U. S., at 652.

Why is application of the exclusionary rule any the less necessary here? Without such a rule, as in *Mapp*, police

BREYER, J., dissenting

know that they can ignore the Constitution's requirements without risking suppression of evidence discovered after an unreasonable entry. As in *Mapp*, some government officers will find it easier, or believe it less risky, to proceed with what they consider a necessary search immediately and without the requisite constitutional (say, warrant or knock-and-announce) compliance. Cf. Mericli, The Apprehension of Peril Exception to the Knock and Announce Rule—Part I, 16 Search and Seizure L. Rep. 129, 130 (1989) (hereinafter Mericli) (noting that some "[d]rug enforcement authorities believe that safety for the police lies in a swift, surprising entry with overwhelming force— not in announcing their official authority").

Of course, the State or the Federal Government may provide alternative remedies for knock-and-announce violations. But that circumstance was true of *Mapp* as well. What reason is there to believe that those remedies (such as private damages actions under 42 U. S. C. §1983), which the Court found inadequate in *Mapp*, can adequately deter unconstitutional police behavior here? See Kamisar, In Defense of the Search and Seizure Exclusionary Rule, 26 Harv. J. L. & Pub. Pol'y 119, 126–129 (2003) (arguing that "five decades of post-*Weeks* 'freedom' from the inhibiting effect of the federal exclusionary rule failed to produce any meaningful alternative to the exclusionary rule in any jurisdiction" and that there is no evidence that "times have changed" post-*Mapp*).

The cases reporting knock-and-announce violations are legion. See, *e.g.*, 34 Geo. L. J. Ann. Rev. Crim. Proc. 31–35 (2005) (collecting court of appeals cases); Annot., 85 A. L. R. 5th 1 (2001) (collecting state-court cases); Brief for Petitioner 16–17 (collecting federal and state cases). Indeed, these cases of reported violations seem sufficiently frequent and serious as to indicate "a widespread pattern." *Ante*, at 2 (KENNEDY, J., concurring in part and concurring in judgment). Yet the majority, like Michigan and the

Breyer, J., dissenting

United States, has failed to cite a single reported case in which a plaintiff has collected more than nominal damages solely as a result of a knock-and-announce violation. Even Michigan concedes that, "in cases like the present one . . . , damages may be virtually non-existent." Brief for Respondent 35, n. 66; And Michigan's *amici* further concede that civil immunities prevent tort law from being an effective substitute for the exclusionary rule at this time. Brief for Criminal Justice Legal Foundation 10; see also *Hope* v. *Pelzer,* 536 U. S. 730, 739 (2002) (difficulties of overcoming qualified immunity defenses).

As Justice Stewart, the author of a number of significant Fourth Amendment opinions, explained, the deterrent effect of damage actions "can hardly be said to be great," as such actions are "expensive, time-consuming, not readily available, and rarely successful." Stewart, The Road to *Mapp v. Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1388 (1983). The upshot is that the need for deterrence—the critical factor driving this Court's Fourth Amendment cases for close to a century—argues with at least comparable strength for evidentiary exclusion here.

To argue, as the majority does, that new remedies, such as 42 U. S. C. §1983 actions or better trained police, make suppression unnecessary is to argue that *Wolf,* not *Mapp,* is now the law. (The Court recently rejected a similar argument in *Dickerson* v. *United States,* 530 U. S. 428, 441–442 (2000).) To argue that there may be few civil suits because violations may produce nothing "more than nominal injury" is to confirm, not to deny, the inability of civil suits to deter violations. See *ante,* at 11. And to argue without evidence (and despite myriad reported cases of violations, no reported case of civil damages, and Michigan's concession of their nonexistence) that civil suits may provide deterrence because claims *may* "have been settled"

Breyer, J., dissenting

is, perhaps, to search in desperation for an argument. See *ibid.* Rather, the majority, as it candidly admits, has simply "assumed" that, "[a]s far as [it] know[s], civil liability is an effective deterrent," *ibid.,* a support-free assumption that *Mapp* and subsequent cases make clear does not embody the Court's normal approach to difficult questions of Fourth Amendment law.

It is not surprising, then, that after looking at virtually every pertinent Supreme Court case decided since *Weeks*, I can find no precedent that might offer the majority support for its contrary conclusion. The Court has, of course, recognized that not every Fourth Amendment violation necessarily triggers the exclusionary rule. *Ante*, at 4–5; cf. *Illinois* v. *Gates*, 462 U. S. 213, 223 (1983) (application of the exclusionary rule is a separate question from whether the Fourth Amendment has been violated). But the class of Fourth Amendment violations that do not result in suppression of the evidence seized, however, is limited. The Court has declined to apply the exclusionary rule only:

   (1) where there is a specific reason to believe that application of the rule would "not result in appreciable deterrence," *United States* v. *Janis*, 428 U. S. 433, 454 (1976); see, *e.g., United States* v. *Leon*, 468 U. S. 897, 919–920 (1984) (exception where searching officer executes defective search warrant in "good faith"); *Arizona* v. *Evans*, 514 U. S. 1, 14 (1995) (exception for clerical errors by court employees); *Walder* v. *United States*, 347 U. S. 62 (1954) (exception for impeachment purposes), or
   (2) where admissibility in proceedings other than criminal trials was at issue, see, *e.g., Pennsylvania Bd. of Probation and Parole* v. *Scott*, 524 U. S. 357, 364 (1998) (exception for parole revocation proceedings); *INS* v. *Lopez-Mendoza*, 468 U. S. 1032, 1050

Breyer, J., dissenting

(1984) (plurality opinion) (exception for deportation proceedings); *Janis*, *supra*, at 458 (exception for civil tax proceedings); *United States* v. *Calandra*, 414 U. S. 338, 348–350 (1974) (exception for grand jury proceedings); *Stone* v. *Powell*, 428 U. S. 465, 493–494 (1976) (exception for federal habeas proceedings).

Neither of these two exceptions applies here. The second does not apply because this case is an ordinary criminal trial. The first does not apply because (1) officers who violate the rule are not acting "as a reasonable officer would and should act in similar circumstances," *Leon, supra,* at 920, (2) this case does not involve government employees other than police, *Evans*, *supra*, and (3), most importantly, the key rationale for any exception, "lack of deterrence," is missing, see *Pennsylvania Bd. of Probation, supra*, at 364 (noting that the rationale for not applying the rule in noncriminal cases has been that the deterrence achieved by having the rule apply in those contexts is "minimal" *because* "application of the rule in the criminal trial context already provides significant deterrence of unconstitutional searches"); *Michigan* v. *Tucker,* 417 U. S. 433, 447 (1974) (noting that deterrence rationale would not be served if rule applied to police officers acting in good faith, as the "deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct"). That critical latter rationale, which underlies *every* exception, does not apply here, as there is no reason to think that, in the case of knock-and-announce violations by the police, "the exclusion of evidence at trial would not sufficiently deter future errors," *Evans*, *supra*, at 14, or "'further the ends of the exclusionary rule in any appreciable way,'" *Leon*, *supra*, at 919–920.

I am aware of no other basis for an exception. The Court has decided more than 300 Fourth Amendment

cases since *Weeks.* The Court has found constitutional
violations in nearly a third of them. See W. Greenhalgh,
The Fourth Amendment Handbook: A Chronological Sur-
vey of Supreme Court Decisions 27–130 (2d ed. 2003)
(collecting and summarizing 332 post-*Weeks* cases decided
between 1914 and 2002). The nature of the constitutional
violation varies. In most instances officers lacked a war-
rant; in others, officers possessed a warrant based on false
affidavits; in still others, the officers executed the search
in an unconstitutional manner. But in every case involv-
ing evidence seized during an illegal search of a home
(federally since *Weeks,* nationally since *Mapp*), the Court,
with the exceptions mentioned, has either explicitly or
implicitly upheld (or required) the suppression of the
evidence at trial. See Appendix, *infra.* In not one of those
cases did the Court "questio[n], in the absence of a more
efficacious sanction, the continued application of the [ex-
clusionary] rule to suppress evidence from the State's
case" in a criminal trial. *Franks* v. *Delaware,* 438 U. S.
154, 171 (1978).

I can find nothing persuasive in the majority's opinion
that could justify its refusal to apply the rule. It certain-
ly is not a justification for an exception here (as the major-
ity finds) to find odd instances in *other* areas of law that
do not automatically demand suppression. *Ante,* at 10
(suspect confesses, police beat him up *afterwards;* sus-
pect confesses, *then* police apparently arrest him, take
him to station, and refuse to tell him of his right to coun-
sel). Nor can it justify an exception to say that *some*
police may knock at the door anyway (to avoid being
mistaken for a burglar), for other police (believing
quick entry is the most secure, effective entry) will not
voluntarily do so. Cf. Mericli 130 (describing Special
Weapons and Tactics (SWAT) team practices); R.
Balko, No SWAT (Apr. 6, 2006), available at
http://www.cato.org/pub_display.php?pub_id=6344 (all In-

Cite as: 547 U. S. ____ (2006)          11

BREYER, J., dissenting

ternet materials as visited June 7, 2006, and available in
Clerk of Court's case file).

Neither can the majority justify its failure to respect the
need for deterrence, as set forth consistently in the Court's
prior case law, through its claim of "substantial social
costs"—at least if it means that those "social costs" are
somehow special here.  The only costs it mentions are
those that typically accompany *any* use of the Fourth
Amendment's exclusionary principle: (1) that where the
constable blunders, a guilty defendant may be set free
(consider *Mapp* itself); (2) that defendants may assert
claims where Fourth Amendment rights are uncertain
(consider the Court's qualified immunity jurisprudence),
and (3) that sometimes it is difficult to decide the merits of
those uncertain claims.  See *ante*, at 8–9.  In fact, the "no-
knock" warrants that are provided by many States, by
diminishing uncertainty, may make application of the
knock-and-announce principle less "cost[ly]" on the whole
than application of comparable Fourth Amendment prin-
ciples, such as determining whether a particular war-
rantless search was justified by exigency.  The majority's
"substantial social costs" argument is an argument
against the Fourth Amendment's exclusionary principle
itself.  And it is an argument that this Court, until now,
has consistently rejected.

### III

The majority, Michigan, and the United States make
several additional arguments.  In my view, those argu-
ments rest upon misunderstandings of the principles
underlying this Court's precedents.

### A

The majority first argues that "the constitutional viola-
tion of an illegal *manner* of entry was *not* a but-for cause
of obtaining the evidence."  *Ante*, at 5.  But taking causa-

BREYER, J., dissenting

tion as it is commonly understood in the law, I do not see
how that can be so. See W. Keeton, D. Dobbs, R. Keeton,
& D. Owen, Prosser and Keeton on Law of Torts 266 (5th
ed. 1984). Although the police might have entered Hud-
son's home lawfully, they did not in fact do so. Their
unlawful behavior inseparably characterizes their actual
entry; that entry was a necessary condition of their pres-
ence in Hudson's home; and their presence in Hudson's
home was a necessary condition of their finding and seiz-
ing the evidence. At the same time, their discovery of
evidence in Hudson's home was a readily foreseeable
consequence of their entry and their unlawful presence
within the home. Cf. 2 Restatement (Second) of Torts
§435 (1963–1964).

Moreover, separating the "manner of entry" from the
related search slices the violation too finely. As noted,
Part I–A, *supra,* we have described a failure to comply
with the knock-and-announce rule, not as an independ-
ently unlawful event, but as a factor that renders the
*search* "constitutionally defective." *Wilson,* 514 U. S., at
936; see also *id.,* at 934 (compliance with the knock-and-
announce requirement is one of the "factors to be consid-
ered in assessing the *reasonableness of a search or seizure*"
(emphasis added)); *Ker* v. *California,* 374 U. S. 23, 53 (1963)
(opinion of Brennan, J.) ("[A] lawful entry is the indispensa-
ble predicate of a reasonable search").

The Court nonetheless accepts Michigan's argument
that the requisite but-for-causation is not satisfied in this
case because, whether or not the constitutional violation
occurred (what the Court refers to as a "preliminary mis-
step"), "the police would have executed the warrant they
had obtained, and would have discovered the gun and
drugs inside the house." *Ante,* at 5. As support for this
proposition, Michigan rests on this Court's inevitable
discovery cases.

This claim, however, misunderstands the inevitable

discovery doctrine. Justice Holmes in *Silverthorne*, in discussing an "independent source" exception, set forth the principles underlying the inevitable discovery rule. See *supra*, at 4. That rule does not refer to discovery that would have taken place if the police behavior in question had (contrary to fact) been lawful. The doctrine does not treat as critical what *hypothetically could* have happened had the police acted lawfully in the first place. Rather, "independent" or "inevitable" discovery refers to discovery that did occur or that would have occurred (1) *despite* (not simply *in the absence of*) the unlawful behavior and (2) *independently* of that unlawful behavior. The government cannot, for example, avoid suppression of evidence seized without a warrant (or pursuant to a defective warrant) simply by showing that it could have obtained a valid warrant had it sought one. See, *e.g.*, *Coolidge* v. *New Hampshire*, 403 U. S. 443, 450–451 (1971). Instead, it must show that the same evidence "inevitably *would* have been discovered *by lawful means*." *Nix* v. *Williams*, 467 U. S., at 444 (emphasis added). "What a man *could* do is not at all the same as what he *would* do." Austin, Ifs And Cans, 42 Proceedings of the British Academy 109, 111–112 (1956).

The inevitable discovery exception rests upon the principle that the remedial purposes of the exclusionary rule are not served by suppressing evidence discovered through a "later, *lawful* seizure" that is "*genuinely independent* of an earlier, tainted one." *Murray* v. *United States,* 487 U. S. 533, 542 (1988) (emphasis added); see also *id.*, at 545 (Marshall, J., joined by STEVENS and O'Connor, JJ., dissenting) ("When the seizure of the evidence at issue is 'wholly independent of' the constitutional violation, then exclusion arguably will have no effect on a law enforcement officer's incentive to commit an unlawful search").

Case law well illustrates the meaning of this principle. In *Nix*, *supra*, police officers violated a defendant's Sixth

Amendment right by eliciting incriminating statements from him after he invoked his right to counsel. Those statements led to the discovery of the victim's body. The Court concluded that evidence obtained from the victim's body was admissible because it would ultimately or inevitably have been discovered by a volunteer search party effort that was ongoing—whether or not the Sixth Amendment violation had taken place. *Id.*, at 449. In other words, the evidence would have been found *despite*, and *independent of*, the Sixth Amendment violation.

In *Segura* v. *United States*, 468 U. S. 796 (1984), one of the "trio of cases" JUSTICE SCALIA says "confirms [the Court's] conclusion," *ante*, at 13, the Court held that an earlier illegal entry into an apartment did not require suppression of evidence that police later seized when executing a search warrant obtained on the basis of information unconnected to the initial entry. The Court reasoned that the "evidence was discovered the day following the entry, *during the search conducted under a valid warrant*"—*i.e.*, a warrant obtained independently without use of any information found during the illegal entry—and that "it was the product of *that* search, wholly unrelated to the prior [unlawful] entry." *Segura*, *supra*, at 814 (emphasis added).

In *Murray*, *supra*, the Court upheld the admissibility of seized evidence where agents entered a warehouse without a warrant, and then later returned with a valid warrant that was not obtained on the basis of evidence observed during the first (illegal) entry. The Court reasoned that while the agents' "[k]nowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry . . . it was *also* acquired at the time of entry pursuant to the warrant, and *if that later acquisition was not the result of the earlier entry* there is no reason why the independent source doctrine should not apply." *Id.*, at 541 (emphasis added).

Breyer, J., dissenting

Thus, the Court's opinion reflects a misunderstanding of what "inevitable discovery" means when it says, "[i]n this case, of course, the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence." *Ante*, at 5. The majority rests this conclusion on its next statement: "Whether that preliminary misstep has occurred *or not*, the police . . . would have discovered the gun and the drugs inside the house." *Ibid*. Despite the phrase "of course," neither of these statements is correct. It is not true that, had the illegal entry not occurred, "police would have discovered the guns and drugs inside the house." Without that unlawful entry they would not have been inside the house; so there would have been no discovery. See *supra*, at 12.

Of course, had the police entered the house lawfully, they would have found the gun and drugs. But that fact is beside the point. The question is not what police might have done had they not behaved unlawfully. The question is what they did do. Was there set in motion an independent chain of events that would have inevitably led to the discovery and seizure of the evidence despite, and independent of, that behavior? The answer here is "no."

B

The majority, Michigan, and the United States point out that the officers here possessed a warrant authorizing a search. *Ante*, at 5. That fact, they argue, means that the evidence would have been discovered independently or somehow diminishes the need to suppress the evidence. But I do not see why that is so. The warrant in question was not a "no-knock" warrant, which many States (but not Michigan) issue to assure police that a prior knock is not necessary. *Richards*, 520 U. S., at 396, n. 7 (collecting state statutes). It did not authorize a search that fails to comply with knock-and-announce requirements. Rather, it was an ordinary search warrant. It authorized a search

Breyer, J., dissenting

that *complied with*, not a search that *disregarded*, the Constitution's knock-and-announce rule.

Would a warrant that authorizes entry into a home on Tuesday permit the police to enter on Monday? Would a warrant that authorizes entry during the day authorize the police to enter during the middle of the night? It is difficult for me to see how the presence of a warrant that does not authorize the entry in question has anything to do with the "inevitable discovery" exception or otherwise diminishes the need to enforce the knock-and-announce requirement through suppression.

### C

The majority and the United States set forth a policy-related variant of the causal connection theme: The United States argues that the law should suppress evidence only insofar as a Fourth Amendment violation causes the kind of harm that the particular Fourth Amendment rule seeks to protect against. It adds that the constitutional purpose of the knock-and-announce rule is to prevent needless destruction of property (such as breaking down a door) and to avoid unpleasant surprise. And it concludes that the exclusionary rule should suppress evidence of, say, damage to property, the discovery of a defendant in an "intimate or compromising moment," or an excited utterance from the occupant caught by surprise, but nothing more. Brief for United States as *Amicus Curiae* 12, 28.

The majority makes a similar argument. It says that evidence should not be suppressed once the causal connection between unlawful behavior and discovery of the evidence becomes too "attenuated." *Ante,* at 5. But the majority then makes clear that it is not using the word "attenuated" to mean what this Court's precedents have typically used that word to mean, namely, that the discovery of the evidence has come about long after the unlawful

Breyer, J., dissenting

behavior took place or in an independent way, *i.e.*, through "'means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun* v. *United States,* 371 U. S. 471, 487–488 (1963); see *Brown* v. *Illinois,* 422 U. S. 590, 603–604 (1975).

Rather, the majority gives the word "attenuation" a new meaning (thereby, in effect, making the same argument as the United States).  "Attenuation," it says, "also occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Ante*, at 6.  The interests the knock-and-announce rule seeks to protect,  the Court adds, are "human life" (at stake when a householder is "surprised"), "property" (such as the front door), and "those elements of privacy and dignity that can be destroyed by a sudden entrance," namely, "the opportunity to collect oneself before answering the door."  *Ante*, at 7.  Since none of those interests led to the discovery of the evidence seized here, there is no reason to suppress it.

There are three serious problems with this argument.  First, it does not fully describe the constitutional values, purposes, and objectives underlying the knock-and-announce requirement.  That rule does help to protect homeowners from damaged doors; it does help to protect occupants from surprise.  But it does more than that.  It protects the occupants' privacy by assuring them that government agents will not enter their home without complying with those requirements (among others) that diminish the offensive nature of any such intrusion.  Many years ago, Justice Frankfurter wrote for the Court that the "knock at the door, . . . as a prelude to a search, without authority of law . . . [is] inconsistent with the conception of human rights enshrined in [our] history" and Constitution.  *Wolf*, 338 U. S., at 28.  How much the more offensive when the search takes place without any knock

at all. Cf. *Wilson*, 514 U. S., at 931 (knock-and-announce rule recognizes that "the common law generally protected a man's house as 'his castle of defence and asylum' " (quoting 3 W. Blackstone, Commentaries *288)); *Miller*, 357 U. S., at 313 (federal knock-and-announce statute "codif[ied] a tradition embedded in Anglo-American law" that reflected "the reverence of the law for the individual's right of privacy in his house").

Over a century ago this Court wrote that "it is not the breaking of his doors" that is the "essence of the offence," but the "invasions on the part of the government . . . of the sanctity of a man's home and the privacies of life." *Boyd*, 116 U. S., at 630. And just this Term we have reiterated that "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Georgia* v. *Randolph*, 547 U. S. ___, ___ (2006) (slip op., at 10) (quoting *Minnesota* v. *Carter*, 525 U. S. 83, 99 (1998) (KENNEDY, J., concurring)). The knock-and-announce requirement is no less a part of the "centuries-old principle" of special protection for the privacy of the home than the warrant requirement. See 547 U. S., at ___ (slip op., at 10) (citing *Miller*, *supra,* at 307). The Court is therefore wrong to reduce the essence of its protection to "the right not to be intruded upon in one's nightclothes." *Ante*, at 10; see *Richards*, 520 U. S., at 393, n. 5 ("[I]ndividual privacy interest[s]" protected by the rule are "not inconsequential" and "should not be unduly minimized").

Second, whether the interests underlying the knock-and-announce rule are implicated in any given case is, in a sense, beside the point. As we have explained, failure to comply with the knock-and-announce rule renders the related search unlawful. *Wilson*, *supra,* at 936. And where a search is unlawful, the law insists upon suppression of the evidence consequently discovered, even if that evidence or its possession has little or nothing to do with

BREYER, J., dissenting

the reasons underlying the unconstitutionality of a search. The Fourth Amendment does not seek to protect contraband, yet we have required suppression of contraband seized in an unlawful search. See, *e.g.*, *Kyllo* v. *United States*, 533 U. S. 27, 40 (2001); *Coolidge*, 403 U. S., at 473. That is because the exclusionary rule protects more general "privacy values through deterrence of future police misconduct." *James* v. *Illinois*, 493 U. S. 307, 319 (1990). The same is true here.

Third, the majority's interest-based approach departs from prior law. Ordinarily a court will simply look to see if the unconstitutional search produced the evidence. The majority does not refer to any relevant case in which, beyond that, suppression turned on the far more detailed relation between, say, (1) a particular materially false statement made to the magistrate who issued a (consequently) invalid warrant and (2) evidence found after a search with that warrant. But cf. *ante,* at 15, n. 2 (plurality opinion) (citing *New York* v. *Harris,* 495 U. S. 14 (1990), as such a case in section of opinion that JUSTICE KENNEDY does not join). And the majority's failure does not surprise me, for such efforts to trace causal connections at retail could well complicate Fourth Amendment suppression law, threatening its workability.

### D

The United States, in its brief and at oral argument, has argued that suppression is "an especially harsh remedy given the nature of the violation in this case." Brief for United States as *Amicus Curiae* 28; see also *id.*, at 24. This argument focuses upon the fact that entering a house after knocking and announcing can, in some cases, prove dangerous to a police officer. Perhaps someone inside has a gun, as turned out to be the case here. The majority adds that police officers about to encounter someone who may try to harm them will be "uncertain" as to how long to

BREYER, J., dissenting

wait. *Ante,* at 9. It says that, "[i]f the consequences of running afoul" of the knock-and-announce "rule were so massive," *i.e.,* would lead to the exclusion of evidence, then "officers would be inclined to wait longer than the law requires—producing preventable violence against officers in some cases." *Ante,* at 8–9.

To argue that police efforts to assure compliance with the rule may prove dangerous, however, is not to argue against evidence suppression. It is to argue against the validity of the rule itself. Similarly, to argue that enforcement means uncertainty, which in turn means the potential for dangerous and longer-than-necessary delay, is (if true) to argue against meaningful compliance with the rule.

The answer to the first argument is that the rule itself does not require police to knock or to announce their presence where police have a "reasonable suspicion" that doing so "would be dangerous or futile" or "would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards, supra,* at 394; see *Banks,* 540 U. S., at 36–37; *Wilson, supra,* at 935–936.

The answer to the second argument is that States can, and many do, reduce police uncertainty while assuring a neutral evaluation of concerns about risks to officers or the destruction of evidence by permitting police to obtain a "no-knock" search warrant from a magistrate judge, thereby assuring police that a prior announcement is not necessary. *Richards,* 520 U. S., at 396, n. 7 (collecting state statutes). While such a procedure cannot remove all uncertainty, it does provide an easy way for officers to comply with the knock-and-announce rule.

Of course, even without such a warrant, police maintain the backup "authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed." *Ibid.* "[I]f circumstances support a reasonable suspicion of exigency when the offi-

Breyer, J., dissenting

cers arrive at the door, they may go straight in." *Banks*, *supra*, at 37. And "[r]easonable suspicion is a less demanding standard than probable cause . . . ." *Alabama* v. *White*, 496 U. S. 325, 330 (1990); see *Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968) (no Fourth Amendment violation under the reasonable suspicion standard if "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate").

Consider this very case. The police obtained a search warrant that authorized a search, not only for drugs, but also for *guns*. App. 5. If probable cause justified a search for guns, why would it not also have justified a no-knock warrant, thereby diminishing any danger to the officers? Why (in a State such as Michigan that lacks no-knock warrants) would it not have justified the very no-knock entry at issue here? Indeed, why did the prosecutor not argue in this very case that, given the likelihood of guns, the no-knock entry was lawful? From what I have seen in the record, he would have won. And had he won, there would have been no suppression here.

That is the right way to win. The very process of arguing the merits of the violation would help to clarify the contours of the knock-and-announce rule, contours that the majority believes are too fuzzy. That procedural fact, along with no-knock warrants, back up authority to enter without knocking regardless, and use of the "reasonable suspicion" standard for doing so should resolve the government's problems with the knock-and-announce rule while reducing the "uncertain[ty]" that the majority discusses to levels beneath that found elsewhere in Fourth Amendment law (*e.g.*, exigent circumstances). *Ante*, at 8. Regardless, if the Court fears that effective enforcement of a constitutional requirement will have harmful consequences, it should face those fears directly by addressing the requirement itself. It should not argue, "the require-

BREYER, J., dissenting

ment is fine, indeed, a serious matter, just don't enforce
it."

### E

It should be apparent by now that the three cases upon
which JUSTICE SCALIA relies—*Segura* v. *United States,*
468 U. S. 796; *New York* v. *Harris,* 495 U. S. 14; and *Ra-
mirez,* 523 U. S. 65—do not support his conclusion. See
*ante,* at 13–15. Indeed, JUSTICE KENNEDY declines to join
this section of the lead opinion because he fails to see the
relevance of *Segura* and *Harris,* though he does rely on
*Ramirez. Ante,* at 3 (opinion concurring in part and con-
curring in judgment).

JUSTICE SCALIA first argues that, if the "search in
*Segura* could be 'wholly unrelated to the prior entry, . . .
when the only entry was warrantless, it would be bizarre
to treat more harshly the actions in this case, where the
only entry was *with* a warrant." *Ante,* at 14. Then it says
that, "[i]f the probable cause backing a warrant that was
issued *later in time* could be an 'independent source' for a
search that proceeded after the officers illegally entered
and waited, a search warrant obtained *before* going in
must have at least this much effect." *Ibid.* I do not under-
stand these arguments. As I have explained, the presence
of a warrant that did not authorize a search that fails to
comply with knock-and-announce requirements is beside
the point. See Part III–B, *supra.* And the timing of the
warrant in *Segura* made no difference to the case. The
relevant fact about the warrant there was that it was
lawfully obtained and arguably set off an independent
chain of events that led the police to seize the evidence.
468 U. S., at 814; see also *id.,* at 814–815 ("The valid
warrant search was a 'means sufficiently distinguishable'
to purge the evidence of any 'taint' arising from the entry"
(citations omitted)). As noted, there is no such independ-
ent event, or intervening chain of events that would purge

Cite as: 547 U. S. ____ (2006)          23

BREYER, J., dissenting

the taint of the illegal entry, present here.  See *supra*, at 15.  The search that produced the relevant evidence here is the very search that the knock-and-announce violation rendered unlawful.  There simply is no "independent source."

As importantly, the Court in *Segura* said nothing to suggest it intended to create a major exclusionary rule exception, notwithstanding the impact of such an exception on deterrence.  Indeed, such an exception would be inconsistent with a critical rationale underlying the independent source and inevitable discovery rules, which was arguably available in *Segura*, and which is clearly absent here.  That rationale concerns deterrence.  The threat of inadmissibility deters unlawful police behavior; and the existence of an exception applicable where evidence is found through an untainted independent route will rarely undercut that deterrence.  That is because the police can rarely rely upon such an exception—at least not often enough to change the deterrence calculus.  See *Murray*, 487 U. S., at 540 ("We see the incentives differently.  An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises in an unlawful manner.  By doing so, he would risk suppression of all evidence on the premises . . ."); *Nix*, 467 U. S., at 445 ("A police officer who is faced with the opportunity to obtain evidence illegally will rarely, if ever, be in a position to calculate whether the evidence sought would inevitably be discovered"); *id.*, at 444 ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received").

*Segura*'s police officers would have been foolish to have entered the apartment unlawfully with the *ex ante* hope that an independent causal chain of events would later

occur and render admissible the evidence they found.  By way of contrast, today's holding will seriously undermine deterrence in knock-and-announce cases.  Officers will almost always know *ex ante* that they can ignore the knock-and-announce requirement without risking the suppression of evidence discovered after their unlawful entry.  That fact is obvious, and this Court has never before today—not in *Segura* or any other post-*Weeks* (or post-*Mapp*) case—refused to apply the exclusionary rule where its absence would so clearly and so significantly impair government officials' incentive to comply with comparable Fourth Amendment requirements.

Neither does *New York* v. *Harris*, *supra,* support the Court's result.  See *ante*, at 6, 14; but see *ante*, at 3 (opinion of KENNEDY, J.) (declining to join section relying on *Harris*).  In *Harris*, police officers arrested the defendant at his home without a warrant, in violation of *Payton* v. *New York*, 445 U. S. 573 (1980).  Harris made several incriminating statements: a confession in his home, a written inculpatory statement at the stationhouse, and a videotaped interview conducted by the district attorney at the stationhouse.  495 U. S., at 16.  The trial court suppressed the statements given by Harris in the house and on the videotape, and the State did not challenge either of those rulings.  *Ibid.*  The sole question in the case was whether the written statement given later at the stationhouse should also have been suppressed.  The Court held that this later, outside-the-home statement "was admissible because Harris was in legal custody . . . and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else."  *Id.*, at 20.  Immediately after the Court stated its holding, it explained:

"To put the matter another way, suppressing the

BREYER, J., dissenting

statement taken outside the house would not serve the purpose of the rule that made Harris' in-house arrest illegal. The warrant requirement for an arrest in the home *is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been;* the purpose of the rule has thereby been vindicated." *Ibid.* (emphasis added).

How can JUSTICE SCALIA maintain that the evidence here—a gun and drugs seized in the home—is "'not the fruit'" of the illegal entry? *Ante,* at 14. The officers' failure to knock and announce rendered the entire search unlawful, *Wilson,* 514 U. S., at 936, and that unlawful search led to the discovery of evidence in petitioner's home. Thus, *Harris* compels the opposite result than that reached by the Court today. Like the *Payton* rule at issue in *Harris,* the knock-and-announce rule reflects the "reverence of the law for the individual's right of privacy in his house." *Miller,* 357 U. S., at 313; cf. *Harris,* 495 U. S., at 17 ("*Payton* itself emphasized that our holding in that case stemmed from the 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic'"). Like the confession that was "excluded, as it should have been," in *Harris, id.,* at 20, the evidence in this case was seized in the home, immediately following the illegal entry. And like *Harris,* nothing in petitioner's argument would require the suppression of evidence obtained *outside* the home following a knock-and-announce violation should be suppressed, precisely because officers have a remaining incentive to follow the rule to avoid the suppression of any evidence obtained from the very place they are searching. Cf. *ibid.* ("Even though we decline to suppress statements made outside the home following a *Payton* violation, the principle incentive to obey *Payton* still obtains: the police know that a war-

Breyer, J., dissenting

rantless entry will lead to the suppression of any evidence found, or statements taken, inside the home").

I concede that *United States* v. *Ramirez*, 523 U. S. 65, offers the majority its last best hope. *Ante,* at 14–15. But not even that case can offer the majority significant support. The majority focuses on the Court's isolated statement that "destruction of property in the course of a search may violate the Fourth Amendment, *even though the entry itself is lawful and the fruits of the search are not subject to suppression." Ramirez, supra,* at 71 (emphasis added). But even if I accept this dictum, the entry here is unlawful, not lawful. *Wilson*, 514 U. S., at 931, 934. It is one thing to say (in an appropriate case) that destruction of property after proper entry has nothing to do with discovery of the evidence, and to refuse to suppress. It would be quite another thing to say that improper entry had nothing to do with discovery of the evidence in this case. Moreover, the deterrence analysis for the property destruction cases (where, by definition, there will almost always be quantifiable damages) might well differ.

IV

There is perhaps one additional argument implicit in the majority's approach. The majority says, for example, that the "cost" to a defendant of "entering this lottery," *i.e.,* of claiming a "knock-and-announce" violation, "would be small, but the jackpot enormous"—namely, a potential "get-out-of-jail-free card." *Ante*, at 8. It adds that the "social costs" of applying the exclusionary rule here are not worth the deterrence benefits. *Ante*, at 13. Leaving aside what I believe are invalid arguments based on precedent or the majority's own estimate that suppression is not necessary to deter constitutional violations, one is left with a simple unvarnished conclusion, namely, that in this kind of case, a knock-and-announce case, "[r]esort to the massive remedy of suppressing evidence of guilt is

BREYER, J., dissenting

unjustified." *Ibid.* Why is that judicial judgment, taken on its own, inappropriate? Could it not be argued that the knock-and-announce rule, a subsidiary Fourth Amendment rule, is simply not important enough to warrant a suppression remedy? Could the majority not simply claim that the suppression game is not worth the candle?

The answer, I believe, is "no." That "no" reflects history, a history that shows the knock-and-announce rule is important. See *Wilson, supra,* at 931–936. That "no" reflects precedent, precedent that shows there is no pre-existing legal category of exceptions to the exclusionary rule into which the knock-and-announce cases might fit. See *supra,* at 8–9. That "no" reflects empirical fact, experience that provides confirmation of what common sense suggests: without suppression there is little to deter knock-and-announce violations. See *supra,* at 6–7.

There may be instances in the law where text or history or tradition leaves room for a judicial decision that rests upon little more than an unvarnished judicial instinct. But this is not one of them. Rather, our Fourth Amendment traditions place high value upon protecting privacy in the home. They emphasize the need to assure that its constitutional protections are effective, lest the Amendment 'sound the word of promise to the ear but break it to the hope.' They include an exclusionary principle, which since *Weeks* has formed the centerpiece of the criminal law's effort to ensure the practical reality of those promises. That is why the Court should assure itself that any departure from that principle is firmly grounded in logic, in history, in precedent, and in empirical fact. It has not done so. That is why, with respect, I dissent.

## APPENDIX TO OPINION OF BREYER, J.

Fourth Amendment decisions from 1914 to present requiring suppression of evidence seized (or remanding for lower court to make suppression determination) in a private home following an illegal arrest or search:

1. *Weeks* v. *United States,* 232 U. S. 383 (1914) (warrantless search)
2. *Amos* v. *United States,* 255 U. S. 313 (1921) (warrantless arrest and search)
3. *Agnello* v. *United States,* 269 U. S. 20 (1925) (warrantless search)
4. *Byars* v. *United States,* 273 U. S. 28 (1927) (invalid warrant)
5. *United States* v. *Berkeness,* 275 U. S. 149 (1927) (invalid warrant; insufficient affidavit)
6. *Taylor* v. *United States,* 286 U. S. 1 (1932) (warrantless search)
7. *Grau* v. *United States,* 287 U. S. 124 (1932) (invalid warrant; insufficient affidavit)
8. *Nathanson* v. *United States,* 290 U. S. 41 (1933) (invalid warrant; insufficient affidavit)
9. *McDonald* v. *United States,* 335 U. S. 451 (1948) (warrantless arrest and search)
10. *Kremen* v. *United States,* 353 U. S. 346 (1957) *(per curiam)* (warrantless search)
11. *Elkins* v. *United States,* 364 U. S. 206 (1960) (search beyond scope of warrant)
12. *Silverman* v. *United States,* 365 U. S. 505 (1961) (warrantless use of electronic device)
13. *Chapman* v. *United States,* 365 U. S. 610 (1961) (warrantless search)
14. *Mapp* v. *Ohio,* 367 U. S. 643 (1961) (warrantless search)
15. *Wong Sun* v. *United States,* 371 U. S. 471 (1963) (warrantless search and arrest)

Appendix to opinion of BREYER, J.

16. *Fahy* v. *Connecticut,* 375 U. S. 85 (1963) (warrantless search)

17. *Aguilar* v. *Texas,* 378 U. S. 108 (1964) (invalid warrant; insufficient affidavit)

18. *Stanford* v. *Texas,* 379 U. S. 476 (1965) (invalid warrant; particularity defect)

19. *James* v. *Louisiana,* 382 U. S. 36 (1965) *(per curiam)* (warrantless search)

20. *Riggan* v. *Virginia,* 384 U. S. 152 (1966) *(per curiam)* (invalid warrant; insufficient affidavit)

21. *Bumper* v. *North Carolina,* 391 U. S. 543 (1968) (lack of valid consent to search)

22. *Recznik* v. *City of Lorain,* 393 U. S. 166 (1968) *(per curiam)* (warrantless search)

23. *Chimel* v. *California,* 395 U. S. 752 (1969) (invalid search incident to arrest)

24. *Von Cleef* v. *New Jersey,* 395 U. S. 814 (1969) *(per curiam)* (invalid search incident to arrest)

25. *Shipley* v. *California,* 395 U. S. 818 (1969) *(per curiam)* (invalid search incident to arrest)

26. *Vale* v. *Louisiana,* 399 U. S. 30 (1970) (invalid search incident to arrest)

27. *Connally* v. *Georgia,* 429 U. S. 245 (1977) *(per curiam)* (invalid warrant; magistrate judge not neutral)

28. *Michigan* v. *Tyler,* 436 U. S. 499 (1978) (warrantless search)

29. *Mincey* v. *Arizona,* 437 U. S. 385 (1978) (warrantless search)

30. *Franks* v. *Delaware,* 438 U. S. 154 (1978) (invalid warrant; obtained through perjury)

31. *Payton* v. *New York,* 445 U. S. 573 (1980) (warrantless arrest)

32. *Steagald* v. *United States,* 451 U. S. 204 (1981) (warrantless search)

33. *Michigan* v. *Clifford,* 464 U. S. 287 (1984) (war-

HUDSON *v.* MICHIGAN

Appendix to opinion of BREYER, J.

rantless search)

34. *Welsh* v. *Wisconsin,* 466 U. S. 740 (1984) (warrantless entry into home without exigent circumstances)

35. *Thompson* v. *Louisiana,* 469 U. S. 17 (1984) *(per curiam)* (warrantless search)

36. *Arizona* v. *Hicks,* 480 U. S. 321 (1987) (unreasonable search)

37. *Minnesota* v. *Olson,* 495 U. S. 91 (1990) (warrantless entry into home)

38. *Flippo* v. *West Virginia,* 528 U. S. 11 (1999) *(per curiam)* (warrantless search)

39. *Kyllo* v. *United States,* 533 U. S. 27 (2001) (warrantless use of heat-imaging technology)

40. *Kirk* v. *Louisiana,* 536 U. S. 635 (2002) *(per curiam)* (warrantless arrest and search)

41. *Kaupp* v. *Texas,* 538 U. S. 626 (2003) *(per curiam)* (warrantless search)